**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ESSAR STEEL ALGOMA INC.,

              Plaintiff,

        -against-

NEVADA HOLDINGS, INC., f/k/a
SOUTHERN COAL SALES CORPORATION,

            Defendant.

Case No. 1:17-mc-00360-AT

---

# PLAINTIFF ESSAR STEEL ALGOMA INC.'S
## SECOND AMENDED COMPLAINT FOR BREACH OF CONTRACT

Plaintiff Essar Steel Algoma Inc. ("**Algoma Canada**"), an applicant in a foreign proceeding (the "**CCAA Proceeding**") under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") pending before the Ontario Superior Court of Justice, Commercial List (the "**Canadian Court**"), hereby files this Second Amended Complaint for Breach of Contract (the "**Second Amended Complaint**") against Defendant Nevada Holdings, Inc., f/k/a Southern Coal Sales Corporation ("**Southern Coal**"). Algoma Canada further files this Second Amended Complaint for Breach of Contract against Defendants James C. Justice, II ("**Jim Justice**"); James C. Justice, III ("**Jay Justice**"); James C. Justice Companies, Inc.; James C. Justice Companies, LLC; Bluestone Industries, Inc.; Bluestone Coal Corporation; Mechel Bluestone; Bluestone Energy Sales Corporation; A&G Coal Corporation; Tams Management Inc.; Coal Mountain Mining Company, Limited Partnership, LLP; Bluestone Resources Inc.; Justice Family Farms, LLC, and Southern Coal Corporation (collectively, the "**Justice Parties**").

1

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). Algoma Canada is organized and exists under the laws of Ontario, Canada, and its principal place of business is in Ontario, Canada.  Southern Coal is a Delaware corporation, and its principal place of business is in Virginia.  Jim Justice and Jay Justice reside in West Virginia. Justice Party corporations are Delaware, Virginia, or West Virginia corporations with their principal place of businesses in Virginia or West Virginia.  Further, the matter in controversy exceeds $75,000.

2.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b).

3.      Southern Coal is subject to the personal jurisdiction of this Court and has waived any objection to personal jurisdiction or venue.  The Justice Parties are subject to the personal jurisdiction of this Court as alter egos of Southern Coal.

## NATURE OF THE CLAIM

4.      This Second Amended Complaint arises from the Coal Supply Agreement dated November 1, 2015 (the "**Original Agreement**"), the Amending Agreement to Coal Supply Agreement dated April 25, 2016 (the "**Amending Agreement**"), and the Term Sheet dated September 22, 2016 (the "**Term Sheet**," and, collectively with the Original Agreement and the Amending Agreement, the "**Agreements**") between Algoma Canada and Southern Coal.

5.      Southern Coal has repeatedly breached the Agreements by failing to deliver the quantity of coal to Algoma Canada as specified by the Agreements and by delivering coal that does not meet the quality specifications set forth in the Agreements.

6.     Pursuant to the Amending Agreement, between April 1, 2016 and March 31, 2017, Southern Coal was required to deliver to Algoma Canada a total of 780,000 tons of coal, which represents approximately 56% of Algoma Canada's annual coal requirements.

7.     Southern Coal delivered only 246,526 tons of coal to Algoma Canada during that period.

8.     Timely coal delivery is very important for Algoma Canada's production of coke and could cost Algoma hundreds of millions of dollars should coke production be forced to stop due to lack of sufficient, timely coal deliveries of the right quality.

9.     Additionally, Southern Coal delivered coal that was not sampled and analyzed as required by the Agreements and that did not meet the quality specifications set forth in the Agreements.  Yet, Southern Coal refused to pay Algoma Canada the penalties set forth in the Agreements for failure to conform to the quality specifications.

10.    Accordingly, Algoma Canada seeks an award of other damages, costs, and fees as set forth below.

## THE PARTIES

11.    Plaintiff Algoma Canada is organized and exists under the laws of Ontario, Canada with its principal place of business in Sault Ste. Marie, Ontario, Canada.

12.    Nevada Holdings, Inc., f/k/a Southern Coal Sales Corporation is a Delaware corporation with its principal place of business located at 302 S. Jefferson Street, Roanoke, Virginia 24011.  Southern Coal Sales Corporation changed its name to Nevada Holdings, Inc. effective January 17, 2017.

13.    Jim Justice is the Vice President and a director of James C. Justice Companies, Inc.  He resides in Lewisburg, West Virginia, and is the Governor of West Virginia.

14.     Jay Justice is the president and a director of Southern Coal, James C. Justice Companies, LLC, Bluestone Industries, Inc., Bluestone Coal Corporation, Mechel Bluestone, Bluestone Energy Sales Corporation, A&G Coal Corporation, Tams Management Inc., and Coal Mountain Mining Company, Limited Partnership, LLP.  He resides in Beckley, West Virginia.

15.     James C. Justice Companies, Inc. is a Delaware corporation with its principal place of business located at 302 S. Jefferson Street, Roanoke, Virginia 24011.

16.     James C. Justice Companies, LLC is a West Virginia corporation with its principal place of business located at 216 Lake Drive, Daniels, West Virginia  25832.

17.     Bluestone Industries, Inc. is a West Virginia corporation with its principal place of business located at 216 Lake Drive, Daniels, West Virginia  25832.

18.     Bluestone Coal Corporation is a West Virginia corporation with its principal place of business located at 216 Lake Drive, Daniels, West Virginia  25832.

19.     Upon information and belief, Mechel Bluestone is a Delaware corporation with its principal place of business located at 216 Lake Drive, Daniels, West Virginia  25832.

20.     Bluestone Energy Sales Corporation is a Virginia corporation with its principal place of business located at 302 S. Jefferson Street, Roanoke, Virginia 24011.

21.     A&G Coal Corporation is a Virginia corporation with its principal place of business located at 302 S. Jefferson Street, Roanoke, Virginia 24011.

22.     Tams Management Inc. is a West Virginia corporation with its principal place of business located at 216 Lake Drive, Daniels, West Virginia  25832.

23.     Coal Mountain Mining Company, Limited Partnership, LLP is a Virginia partnership with its principal place of business located at 314 W Main St., Tazewell, Virginia 24651.

24.     Bluestone Resources Inc. is a Delaware corporation with its principal place of business located at 216 Lake Drive, Daniels, West Virginia  25832.

25.     Justice Family Farms, LLC is a West Virginia corporation with its principal place of business located at 302 S. Jefferson Street, Roanoke, Virginia 24011.

26.     Southern Coal Corporation is a Delaware corporation with its principal place of business located at 302 S. Jefferson Street, Roanoke, Virginia 24011.

## FACTUAL BACKGROUND

27.     Algoma Canada is an integrated primary steel producer with its principal place of business in Sault Ste. Marie, Ontario, Canada.

28.     Southern Coal is in the business of producing, procuring, and selling coal.

29.     Algoma Canada usually buys coal via annual contracts which is delivered by vessel between April and December each year.  Southern Coal is one of the coal producers from whom Algoma Canada bought coal via an annual contract.

30.     Algoma Canada used the coal it purchased from Southern to make metallurgical coke.  The cokemaking process involves the carbonization of the coal to high temperatures in an oxygen deficient atmosphere in order to concentrate the carbon.

31.     Coke is produced in a coke battery, which is comprised of many coke ovens that are stacked into rows into which coal is loaded.

32.     Once the coke is produced, Algoma Canada feeds the coke into the blast furnace with iron ore and small quantities of fluxes (minerals, such as limestone, which are used to collect impurities). Then, air heated to over 2,000°F is blown into the blast furnace.

The air causes the coke to burn, producing carbon monoxide which reacts with the iron ore, as well as heat, to melt the iron.

33.     If the coke batteries were forced to stop production due to lack of coal, it would cost Algoma Canada hundreds of millions of dollars to repair and restart them.

## The Agreements

34.     On or about November 1, 2015, Algoma Canada and Southern Coal entered into the Original Agreement, by which Algoma Canada would buy coal from Southern on a consignment basis.  A copy of the Original Agreement is attached as Exhibit A.[1]

35.     The original term of said agreement was from November of 2015 – March 31, 2017, and it was divided into the First Contract Year (November 1, 2015 – March 31, 2016) and the Second Contract Year (April 1, 2016 – March 31, 2017).  Original Agreement, § 2.1.

36.     Algoma Canada and Southern Coal agreed that they would "cooperate in good faith to establish a rail and lake delivery schedule that shall reasonably accommodate the deliveries called for hereunder."  Original Agreement, § 4.1.  Southern Coal was responsible for rail transportation while Algoma Canada was responsible for vessel transportation.

37.     The parties agreed to design a delivery schedule by which Southern Coal would load the coal onto train cars at its mine, and the trains would take the coal to either Sandusky or Toledo, Ohio, where Southern Coal would load it onto vessels that Algoma Canada provided.  Thereafter, the vessels would travel from Ohio across the Great Lakes to the Port of Algoma Canada in Sault St. Marie, Ontario.  Original Agreement, § 4.1.

38.     Having consistent, predictable deliveries of coal is vital to Algoma Canada's business. Algoma Canada must build up a sufficient inventory of coal before the winter

---

[1] Algoma Canada has requested that redacted versions of each of the exhibits to the Second Amended Complaint be filed and the complete version of each exhibit be filed under seal because they contain confidential pricing and other commercial information.

months, when the Great Lakes freeze such that shipment by vessel is impossible, so that it can continue to make coke (and ultimately steel) throughout the winter.

39.     Additionally, if Algoma Canada does not receive sufficient, timely coal deliveries before the winter, its coke batteries will be stopped and it will require hundreds of millions of dollars to repair and restart them.

40.     On or about April 25, 2016, with full knowledge of the CCAA and chapter 15 bankruptcy proceedings, and in fact referencing such proceedings in the amendment, Southern Coal and Algoma Canada entered into the Amending Agreement, which modified certain provisions of the Original Agreement.  A copy of the Amending Agreement is attached as Exhibit B.

41.     Algoma Canada agreed to purchase both Type A High Vol Coal ("**HVA**") coal from Southern Coal's Coal Mountain mine and Type B High Vol Coal ("**HVB**") coal from Southern Coal's Paragon mine during the Second Contract Year at the pricing set forth in the Amending Agreement.  Amending Agreement, § C.

42.     Algoma Canada was required to pay Southern Coal "a deposit of 10% of the purchase price for each train of coal prior to loading by [Southern Coal]" (hereinafter, the "**Deposit**"). The Deposit was to "remain with [Southern Coal] during the period of [Algoma Canada]'s performance" under the Agreements, and was to be adjusted against remaining inventory when the contract terminated.  Original Agreement, § 6.2(a).

43.     During the time the Agreements were in effect, the amount of Algoma Canada's Deposit grew to approximately $6,100,000.00, and Southern Coal is still currently in possession of the Deposit.

44.     Algoma Canada made payments to Southern for each of the shipments of coal that Southern actually delivered to Algoma Canada and that Algoma Canada actually consumed as required during the Second Contract Year period.

45.     On or about October 4, 2016, again, with full knowledge of the CCAA and the chapter 15 bankruptcy proceedings and referencing such proceedings in the Term Sheet, Southern Coal and Algoma Canada executed the Term Sheet, which was effective as of September 22, 2016.  The Term Sheet modified certain provisions of the Original Agreement and Amending Agreement and left others intact.  It was meant to reflect "certain changes agreed by the Parties and where the Parties agreed to be bound until such time as a more formal Second Amendment can be agreed and formalized by the Parties." (Term Sheet, Recitals).  A copy of the Term Sheet is attached as Exhibit C.

46.     No such Second Amendment was ever agreed upon or formalized.

### Quantity of Coal that Southern Coal Was Required to Deliver

47.     Pursuant to the Original Agreement, for the Second Contract Year, Algoma Canada was to purchase from Southern Coal "at least 65% of the coal budgeted to be consumed by [Algoma Canada] at the [Algoma] mill for the period April 1, 2016 – March 31, 2017 . . . based upon a forecast of 1.4mm tons of coal to be consumed by [Algoma Canada] during this period," which equaled 910,000 tons.  Original Agreement, § 3.3.

48.     Pursuant to the Amending Agreement, the Parties agreed to reduce the quantity of coal that Southern Coal would deliver during the Second Contract Year.  The Parties amended Section 3.3 of the Original Agreement to state that Southern Coal would deliver a minimum of 780,000 tons of coal (140,000 tons minimum of Coal Mountain HVA and 640,000 tons minimum of Paragon HVB).  The Parties also agreed that Southern Coal would deliver a minimum of 16,000 tons of coal per week.  Amending Agreement,  § A.

49.     Algoma Canada reduced the quantity of coal it would take from Southern Coal in the Second Contract Year in large part because Algoma Canada had serious concerns regarding the quality of coal it would receive from Southern Coal based upon the Southern Coal's deliveries during the First Contract Year.

50.     During the First Contract Year, 100% of the Low Volatile coal that Southern Coal delivered and 65% of the HVA and HVB coal that Southern delivered were within penalty range.

51.     Additionally, Southern Coal delivered coal from sources other than the two sources identified in the Original Agreement – the Coal Mountain and Paragon mines.

52.     After it was clear that Southern Coal had fallen significantly behind in deliveries, in September of 2016, the Parties agreed to the Term Sheet, in order to set a specific schedule by which Southern Coal would deliver 200,000 tons of the original 780,000 tons of coal between August 29, 2016 and December 24, 2016.  Term Sheet, § 1.  This was in response to Southern Coal's representation to Algoma Canada that it was unable to deliver more than 200,000 tons for the remainder of the year.

**Non-Term Sheet Shortfall**

53.     Pursuant to the Amending Agreement, Southern Coal was required to deliver a total of 780,000 tons during the Second Contract year, 200,000 tons of which would ultimately be delivered pursuant to the specific delivery schedule set forth in the Term Sheet (as set forth in detail below).

54.     Thus, there were 580,000 tons that Southern Coal was required to deliver during the Second Contract Year in addition to the 200,000 Term Sheet tons scheduled to be delivered between September 18, 2016 – December 24, 2016.

9

55.     Southern Coal delivered less than 220,000 of those 580,000 non-Term Sheet tons during the Second Contract Year.

56.     Algoma Canada repeatedly notified Southern Coal that it had failed to meet its delivery obligations pursuant to the Amending Agreement, and Algoma Canada reserved all of its rights thereunder.

57.     In order to build sufficient coal inventory before the Great Lakes froze and vessel shipments became impossible, Algoma Canada was forced to purchase along the way the majority of the remaining tons that Southern Coal was to deliver pursuant to the Amending Agreement from third parties.  This resulted in Algoma Canada paying higher prices per ton for the replacement coal at a total additional cost exceeding $4million.

58.     Additionally, Algoma Canada's procurement and logistics teams were forced to spend extraordinary amounts of time and effort to secure sufficient alternate suppliers that resulted in significant operational costs to Algoma Canada.

**Term Sheet Shortfall**

59.     The Term Sheet governed the delivery of 200,000 tons of coal (50,000 tons of HVA coal and 150,000 tons of HVB coal) in the fall of 2016.

60.     The Term Sheet laid out a specific delivery schedule by which Southern was to ship two trains per week between September 18, 2016 and October 22, 2016 and one train per week between October 23, 2016 and December 24, 2016.  Term Sheet, § 2.

61.     Each train could have carried between approximately 12,000 and 15,000 tons of coal.

62.     Southern Coal did not comply with the delivery schedule set forth in the Term Sheet.

63.     Southern Coal delivered less than 50,000 tons of coal between September of 2016 and December of 2016.

64.     Because Southern Coal's shipments had historically been so erratic and significantly behind schedule, Algoma Canada and Southern Coal expressly agreed in the Term Sheet that "[i]f there is any shortfall, Algoma Canada can purchase any shortfall tonnages from any other third party.  [Southern Coal] shall pay to [Algoma Canada] the cost for the alternate coal that [Algoma Canada] purchases from other source(s).  If a shipment is missed by [Southern Coal], then [Southern Coal] is in breach of the terms and in default." Term Sheet, § 2.

65.     Additionally, the Parties agreed that "effective 25 September 2016 if a shipment is missed by [Southern Coal], [Algoma Canada] has the option to cease payment, purchase the missed shipment volume from a third party and charge [Southern Coal] the costs, and/or terminate the Term Sheet and/or the Agreement.  For any third party coal purchased under this section and prior to any payment by [Southern Coal], [Algoma Canada] must provide [Southern Coal] with evidence of the cost of the replacement coal including that the coal purchased is like quality, the transportation cost paid, etc."  Term Sheet, § 2.

66.     Algoma Canada purchased replacement tonnage for the coal that Southern Coal was supposed to deliver pursuant to the Term Sheet from third parties at higher prices per ton and with significant transportation expenses, at a total additional cost exceeding $6.5 million.

67.     Algoma Canada was also forced to incur additional transportation and storage expenses as a result of Southern Coal's breach in an amount exceeding $1 million.

68.     Additionally, Algoma Canada's procurement and logistics teams were forced to spend extraordinary amounts of time and effort to secure sufficient alternate suppliers that resulted in significant operational costs to Algoma Canada.

69.     Algoma Canada repeatedly notified Southern Coal that it had failed to meet its delivery obligations pursuant to the Term Sheet, and Algoma Canada reserved all of its rights thereunder.

### Quality of Coal that Southern Coal Was Required to Deliver

70.     Southern Coal was required to provide Algoma Canada with coal that met the specifications set forth in Exhibit 2 to the Original Agreement.  Original Agreement, § 9.1, Ex. 2.

71.     If the coal did not conform to those specifications, and if the deviations were within the rejection limits (identified in Exhibit 2), then Southern Coal was required to "reduce the price of Coal based on the penalties as per Exhibit 2."  Original Agreement, § 9.1.

72.     If the coal varied from the specifications beyond the rejection limits, Algoma Canada could choose to reject the coal.  Original Agreement, § 9.2.

73.     Pursuant to the Amending Agreement, a third party, Mineral Labs, was required to sample the coal Southern Coal was shipping to Algoma Canada "at origin," meaning the coal was sampled at Southern Coal's mine while the train cars were loaded with coal.  Amending Agreement, § E.

74.     On September 22, 2016, the Term Sheet modified the sampling and testing procedure set forth in the Amending Agreement.  Pursuant to the Term Sheet, "[c]oal will be sampled at mine-site during loading of the train . . . by Mineral Labs and Standard Lab.  Each lab shall keep a referee sample, which shall be sent to a referee lab (Intertek Lab).  In the case of any dispute related to quality analysis that the Parties are unable to resolve, the referee lab

shall test the samples and their analysis results shall be considered final for determining if the coal is to be accepted, rejected, or accepted with penalty." Term Sheet, § 3.

75.     All sampling and analysis was to be performed in accordance with ASTM standards. Amending Agreement, § E; Term Sheet, § 3.

76.     Southern Coal was required to provide to Algoma Canada "ten car sub-lot analyses for moisture, ash, sulfur and volatile matter" within 24 hours of completion of the loading of the train cars, while the coal was being shipped to the port to load onto the vessel. Original Agreement, § 8.1(b).

77.     Although the lab was supposed to perform sampling in addition to analysis, the quality analysis reports that Mineral Labs provided stated that coal was not sampled by the lab. Rather, the lab reports reflected that Southern Coal had provided Mineral Labs with the samples.

78.     Additionally, the sampling was not performed in accordance with ASTM standards.

79.     Algoma Canada's own laboratory and, in some cases, third-party laboratories, tested the ash, sulfur, and volatile matter levels of the coal that Southern provided, and found that those levels were often higher than Southern had reported to Algoma Canada.

80.     Based on the coal analysis that Algoma Canada conducted at its lab and the analyses performed by third-party labs, it became clear that the samples that Southern Coal provided to the lab for analysis were not representative samples from the actual coal that Southern Coal shipped to Algoma Canada and that the coal that Southern Coal delivered was actually subject to penalties and/or rejection pursuant to Exhibit 2 of the Original Agreement, though the reports Southern provided reflected that the coal conformed to the specifications.

81.     Algoma Canada notified Southern Coal of these quality issues for the Second Contract Year and reserved all of its rights pursuant to the Amending Agreement and the Term Sheet.

82.     There were 19 separate shipments between May of 2016 and October of 2016 that were subject to rejection and/or penalties pursuant to the Agreements due to ash, sulfur, and volatile matter that exceeded the upper limit or rejection limit.

83.     The total amount of penalties that Southern Coal owes to Algoma Canada for these 19 shipments exceeds $1,200,000.

**Alter Ego Allegations**

84.     Upon information and belief, Southern Coal is an undercapitalized sister entity to and/or a subsidiary of the Justice Parties, which exert complete dominion and control over and therefore operate over Southern Coal as its instrumentalities and alter egos.

85.     The Justice family owns many agricultural and mining companies which are referred to by Jay Justice collectively as the "family business" or simply "the Company."

86.     In 2015 and 2016, Southern Coal's President and CEO was Jay Justice.  Jim Justice was its Executive Vice President.  Its Treasurer was James T. Miller.  Its general counsel, Stephen W. Ball, is also its Secretary.

87.     In 2015 and 2016, Jim Justice and Jay Justice were Southern Coal's exclusive members.

88.     Southern Coal's agent in its relationship with Algoma Canada, Steve Sears, refers to Southern Coal simply as "Justice."  For example, he refers to who negotiated the Agreements on behalf of "Justice," Algoma sent their first check "to Justice," "Justice" had to pre-pay the railroad, communication "between Algoma and Justice," and "Justice not shipping what they were supposed to ship."  Mr. Sears admits to using "Justice and Southern [Coal]

14

interchangeably." Indeed, Sears's contract with Southern Coal was "to provide coal sales and marketing services for Southern Coal Sales Corporation including all subsidiaries and affiliated companies." The agreement was signed on behalf of "Southern Coal Sales Corporation including all subsidiaries and affiliated companies," by Tom Lusk, Chief Operating Officer of "Southern Coal Corporation."

89.     Southern Coal employees also view Southern Coal to be the same company as the Justice Parties. Southern Coal employees work for many of the Justice Parties simultaneously regardless of which entity's name is on a particular employment contract. Southern Coal employees are unclear of the entity for which they officially work. For example, Southern Coal employee Steve Sarver, when asked what company he works for, testified that he works for "all of the companies. So when you specify, you know, which company, you know, different ones are on the contracts, different companies names, so I can't remember which one that is." When he entered the coal business, he worked for the Justice family, generally. Southern Coal employees Summer Harrison and Steve Sarver also testified that Ms. Harrison was the Vice President of Treasury for all of the Justice coal-related companies.

90.     Southern Coal employee Steve Sarver testified that he sold coal under Southern Coal's name on behalf of and for the benefit of all of the companies owned by the Justice family.

91.     According to Jay Justice, the Southern Coal CEO, Southern Coal employees were paid in part by commission from their sales for the "total company," not just for Southern Coal but for "all the entities."

**A.     The Justice Parties' Undercapitialiation of Southern Coal and Control Over Southern Coal Were Unjust and Unfair to Algoma Canada.**

92.     In 2016, Algoma Canada paid Southern Coal over $54 million.  But Southern Coal reported zero revenue for the year on its consolidated tax return.  Presumably, therefore, an entity other than Southern Coal is reporting Algoma Canada's payments as revenue.

93.     The Justice Parties undercapitalized Southern Coal so that Southern Coal could not meet its obligations under the Agreements and be judgment-proof.  For example, Southern Coal repeatedly asserted that it could not pay for trains to ship coal to Algoma because it had not received payments from Algoma, but the Justice Parties selectively transferred money into Southern Coal's bank accounts from affiliated entities such as Justice Family Farms, LLC.  Also, money transferred into Southern Coal accounts by Algoma Canada was regularly transferred to accounts of other Justice Parties as soon as it was deposited.  Money received by Southern Coal was treated as money of the Justice Parties generally, and vice versa.

94.     Therefore, upon information and belief, as a proximate result of the Justice Parties' undercapitalization of Southern Coal, Southern Coal was emboldened to breach its Agreements with Algoma Canada.

95.     During the term of the Agreements, Algoma Canada paid Southern Coal millions of dollars.  Yet, Southern Coal consistently complained that it did not have sufficient cash flow to pay the railroad the advance payment it required to make shipments of coal to Algoma Canada.

96.     However, for each payment that Algoma Canada made pursuant to the Agreements, Southern Coal transferred almost the entire amount of the payment payment to third parties, including the Justice Parties, and other third parties, the identity of which are currently unknown by Algoma Canada.

97.     Likewise, in late August of 2016, at a face-to-face meeting between Algoma, Jim Justice and Jay Justice, Mr. Justice requested that Algoma make an immediate payment of approximately $2.3 million dollars to address Southern Coal's alleged liquidity and cash flow issues.  This payment was not due pursuant to the contract yet, but Algoma made the payment early in order to give Southern Coal suffient funds to pay the railroad so it could make weekly shipments of coal over the next few weeks per the parties' agreement.  Yet, Southern Coal failed to make shipments as required and did not use the $2.3 million dollars to pay the railroad as promised.

98.     This pattern of conduct was unfair to Algoma, because Southern Coal was using the funds it received from Algoma Canada for other purposes, and then claiming it had insufficient funds to pay the railroad for Algoma Canada's shipments.

### The Undercapitalization of Southern Coal

99.     On November 5, 2015, Algoma Canada paid Southern Coal $383,825. On November 6, Southern Coal transferred $383,825.44 to an account with an unidentified owner ending in 1166.

100.    On November 13, 2015, Algoma Canada paid Southern Coal $383,835.  The same day, Southern Coal transferred $183,000 to an account with an unidentified owner ending in 2315, $100,000 to an account with an unidentified owner ending in 7313, and $100,000 to an account with an unidentified owner ending in 6216.

101.    On November 20, 2015, Algoma Canada paid Southern Coal $742,745.  The same day, Southern Coal transferred $742,802 to an account with an unidentified owner ending in 1166.

102.    On November 25, 2015, Algoma Canada paid Southern Coal $822,505.  The same day,  Southern Coal, transferred a total of $822,505 to accounts with unidentified owners ending in 1166 and 2315.

103.    On December 3, 2015, Algoma Canada paid Southern Coal $1,171,455.  The same day, Southern Coal transferred $1,171,455.22 to an account with an unidentified owner ending in 2315.

104.    On December 4, 2015, Algoma Canada paid Southern Coal $962,085.  The same day, Southern Coal transferred a total of $962,000 to accounts with unidentified owners ending in numbers 7313 and 2315.

105.    On December 11, 2015, Algoma Canada paid Southern Coal $1,367,864.  The same day, Southern Coal transferred $1,367,864 to an account with an unidentified owner ending in 7313.

106.    On December 18, 2015, Algoma Canada paid Southern Coal $1,097,078.80 to Southern Coal.  Three days later, Southern Coal transferred $1,097,130 to an account with an unidentified owner ending in 1166.

107.    On December 23, 2015, Algoma Canada paid Southern Coal $821,906.60.  The same day, Southern Coal transferred $893,000 to an account with an unidentified owner ending in 5937.

108.    On December 31, 2015, Algoma Canada paid Southern Coal $795,187.20.  The same day, Southern Coal transferred $795,000 to an account with an unidentified owner ending in 7313.

109.     On January 8, 2016, Algoma Canada paid Southern Coal $779,833.40.  The same day, Southern Coal transferred $780,000 to an account with an unidentified owner ending in 7313.

110.     On January 15, 2016, Algoma Canada paid Southern Coal $826,293.60.  On January 22, Southern Coal transferred $873,500 to an account with an unidentified owner ending in 7313.

111.     On January 29, 2016, Algoma Canada paid Southern Coal $1,006,351.  The same day, Southern Coal transferred a total of $1,006,352 to accounts with an unidentified owners ending in 7313 and 2315.

112.     On February 5, 2016, Algoma Canada paid Southern Coal $978,136.70.  The same day, Southern Coal transferred $978,000 to an account with an unidentified owner ending in 7313.

113.     On February 19, 2016, Algoma Canada paid Southern Coal $1,741,739.  The same day, Southern Coal transferred $1,741,739 to an account with an unidentified owner ending in 7313.

114.     On February 26, 2016, Algoma Canada paid Southern Coal $1,219,909.  The same day, Southern Coal transferred $1,219,918 to an account with an unidentified owner ending in 7313.

115.     On March 4, 2016, Algoma Canada paid Southern Coal $1,797,172.  The same day, Southern Coal transferred a total of $1,797,170 to accounts with unidentified owners ending in 7313 and 1166.

116.    On March 11, 2016, Algoma Canada paid Southern Coal $1,603,156.  The same day, Southern Coal transferred a total of $1,603,000 to accounts with unidentified owners ending in 7313 and 3485.

117.    On March 18, 2016, Algoma Canada paid Southern Coal $1,649,815.60.  The same day, Southern Coal transferred $1,649,900 to an account with an unidentified owner ending in 7313.

118.    On March 24, Algoma Canada paid Southern Coal $1,785,208.20.  The same day, Southern Coal transferred $1,785,200 to an account with an unidentified owner ending in 3272

119.    On April 1, 2016, Algoma Canada paid Southern Coal $1,723,294.  The same day, Southern Coal transferred $1,723,200 to an account with an unidentified owner ending in 3272.

120.    On April 8, 2016, Algoma Canada paid Southern Coal $1,757,491.60.  The same day, Southern Coal transferred $1,757,000 to other Justice Parties: $475,000 to Southern Coal Corporation and $1,282,000 to Bluestone Resources.

121.    On April 15, 2016, Algoma Canada paid Southern Coal $1,790,392.60.  The same day, Southern Coal transferred $1,790,794.60 to an account with an unidentified owner ending in 3272.

122.    On April 22, 2016, Algoma Canada paid Southern Coal $1,794,580.  The same day, Southern Coal transferred a total of $1,794,000 to accounts with unidentified owners ending in 3272, 2315, and 3272.

123.    On April 29, 2016, Algoma Canada paid Southern Coal $1,938,674.57.   The same day, Southern Coal transferred $1,939,254 to an account with an unidentified owner ending in 3272.

124.    On May 3, 2016, Algoma Canada paid Southern Coal $114,230.   The next day, Southern Coal transferred $114,230 to an account with an unidentified owner ending in 2315.

125.    On May 6, Algoma Canada paid Southern Coal $2,021,840.   The same day, Southern Coal transferred $2,021,840 to an account with an unidentified owner ending in 3272.

126.    On May 12, 2016, Algoma Canada paid Southern Coal $1,794,580.  The same day, Southern Coal transferred $1,794,650 to an account with an unidentified owner ending in 7313.

127.    On June 10, 2016, Algoma Canada paid Southern Coal $1,104,855.62.   Three days later, Southern Coal transferred a total of $1,104,000 to accounts with unidentified owners ending in 3272 and 2315.

128.    On June 17, 2016, Algoma Canada paid Southern Coal $1,794,580.   The same day, Southern Coal transferred a total of $1,794,580 to accounts with unidentified owners ending in 7313 and 2315.

129.    On June 24, 2016, Algoma Canada paid Southern Coal $849,569,05.   Three days later, Southern Coal transferred $850,569.05 to an account with an unidentified owner ending in 7313.

130.    July 7, 2016, Algoma Canada paid Southern Coal $1,478,000.  The same day, Southern Coal wired Bluestone Energy Sales Corporation $1,478,000.

131.    On July 8, 2016, Algoma Canada paid Southern Coal $1,576,000.  Three days later, Southern Coal transferred $1,577,000 to an account with an unidentified owner ending in 5376.

132.    On July 12, 2016, Algoma Canada paid Southern Coal $31,190.64.  The same day, Southern Coal transferred $31,190.64 to an account with an unidentified owner ending in 8036.

133.    On July 14, Algoma Canada paid Southern Coal $292,460.  The same day, Southern Coal transferred $292,460 to an account with an unidentified number ending in 8596.

134.    On July 15, 2016, Algoma Canada paid Southern Coal $1,462,380.  The same day, Southern Coal transferred a total of $1,462,412 to accounts with unidentified owners ending in 8063 and 8596.

135.    On July 22, 2016, Algoma Canada paid Southern Coal $1,462,380.  The same day, Southern Coal transferred $1,462,000 to an account with an unidentified owner ending in 5376.

136.    On July 29, 2016, Algoma Canada paid Southern Coal $1,633,535.  The same day, Southern Coal transferred a total of $1,633,535 to accounts with unidentified owners ending in 5376 and 7659.

137.    On August 3, 2016, Algoma Canada paid Southern Coal $1,515,180.  The same day, Southern Coal transferred $1,515,180 to an account with an unidentified owner ending in 7659.

138.    On August 12, 2016, Algoma Canada paid Southern Coal $1,515,180.  The same day, Southern Coal transferred $1,515,000 to an account with an unidentified owner ending in 8596.

139.    On August 26, 2016, Algoma Canada paid Southern Coal $2,353,039.90.  The same day, Southern Coal transferred $2,353,039.90 to an account with an unidentified owner ending in 5376.

140.    On September 6, 2016, Algoma Canada paid Southern Coal $495,463.28.  The same day, Southern Coal transferred a total of $495,463.28 to accounts with unidentified owners ending in 7659 and 8596.

141.    On September 13, 2016, Algoma Canada paid Southern Coal $475,858.86.  The same day, Southern Coal transferred $475,856.86 to an account with an unidentified owner ending in 7659.

142.    On October 12, 2016, Algoma Canada paid Southern Coal $561,539.45.  The same day, Southern Coal transferred $561,539.45 to an account with an unidentified owner ending in 7659.

143.    On October 18, 2016, Algoma Canada paid Southern Coal $403,371.01.  The same day, Southern Coal transferred $403,371.01 to an account with an unidentified owner ending in 8596.

144.    On October 19, 2016, Algoma Canada paid Southern Coal $421,696.24.  The same day, Southern Coal transferred $421,696.24 to an account with an unidentified owner ending in 8596.

145.    On October 26, 2016, Algoma Canada paid Southern Coal $616,659.57.  The same day, Southern Coal transferred $616,659.57 to an account with an unidentified owner ending in 8596.

146.    On October 27, 2016, Algoma Canada paid Southern Coal $241,060.  The same day, Southern Coal transferred $241,080 to an account with an unidentified owner ending in 8596.

**B.    The Alter Ego Defendants**

**JIM JUSTICE**

147.    Algoma Canada realleges paragraphs 84–146 as if fully stated herein.

148.    In 2015 and 2016, Jim Justice was a member and Executive Vice President of Southern Coal.

149.    Jim Justice led Southern Coal's negotiation of the Agreements with Algoma Canada in his office, at his resort making decisions for the company on its largest contracts.

150.    Jim Justice also signed the Original Agreement with Algoma Canada on Southern Coal's behalf.

151.    According to Jay Justice, the Southern Coal's CEO, Jim Justice was also involved in the day-to-day operations of Southern Coal in 2015 and 2016.  For example, he made staffing decisions and marketed coal on behalf of Southern Coal.

152.    Further, according to Jay Justice, Jim Justice was "very involved" in all of Southern Coal's banking and lending.

153.    Southern Coal's agent in its relationship with Algoma Canada, Steve Sears, "had no involvement with what Justice did with the money once he got it" from Algoma Canada.

154.    Jay Justice also testified that Jim Justice "plowed in tons and tons of money" into Southern Coal to keep it running because it was losing "big, big, big money."

### JAY JUSTICE

155.    Algoma Canada realleges paragraphs 84–146 as if fully stated herein.

156.    Jay Justice has worked for "the family business" for a long time and in various capacities.

157.    According to Jay Justice, he is the President and the CEO of all but one of the Justice family agricultural and mining entities, including Southern Coal.

158.    Jay Justice oversees Southern Coal employee Summer Harrison, who is also the Vice President of Treasury for Bluestone Industries, Inc.

159.    Jay Justice directs Ms. Harrison how to handle the money for Southern Coal. Ms. Harrison cannot independently determine who Southern Coal needs to pay and how. Instead, she tells Jay Justice where Southern Coal is "cash wise," and Jay Justice tells her "do this, do that."  Based on Jay Justice's directions, Ms. Harrison tells everyone at Southern Coal "what they are supposed to do," and then she "just track[s] it."

### JAMES C. JUSTICE COMPANIES, INC.

160.    Algoma Canada realleges paragraphs 84–146 as if fully stated herein.

161.    Jim Justice is the President and Director of James C. Justice Companies, Inc. Jay Justice is the Vice President and Director.  Steve Ball, General Counsel for Southern Coal, and its Secretary, is also the Secretary of James C. Justice Companies, Inc.  James T. Miller, who is the Treasurer for Southern Coal, is also the Treasurer of James C. Justice Companies, Inc.

162.   The principal place of business of James C. Justice Companies, Inc. is the same address as Southern Coal's principal place of business: 302 S. Jefferson Street, Roanoke, Virginia  24011.

163.   Rodney Campbell of Mineral Labs, who Southern Coal used to sample the coal it sent to Algoma Canada, worked only with an entity of "Kentucky Fuel," which is a subsidiary of James C. Justice Companies, Inc.  Mr. Campbell had never heard of "Southern Coal" before his deposition.

164.   The email addresses of Southern Coal employees had domain names associated with James C. Justice Companies, Inc. (e.g., @justicecorporation.com).

165.   Southern Coal employees' email signature blocks reflect their connections to "James C. Justice Companies, Inc. and affiliates"

### JAMES C. JUSTICE COMPANIES, LLC

166.   Algoma Canada realleges paragraphs 84–146 as if fully stated herein.

167.   Jay Justice is a member of James C. Justice Companies, LLC.  Steve Ball, General Counsel for Southern Coal and its Secretary, is the Organizer of James C. Justice Companies, LLC.

168.   The email addresses of Southern Coal employees had domain names associated with James C. Justice Companies, LLC. (e.g., @justicecorporation.com).

### BLUESTONE ENTITIES

169.   Southern Coal employees refer generally to "Bluestone" without specifying any specific "Bluestone" entity.

170.    Foreman Tim Fugate "guessed" he was employed by "Southern Coal Justice Corporation or whatever."  But he received his paychecks from "Bluestone," which to him is the "same thing" as Southern Coal.

171.    While working for Southern Coal, CEO Jay Justice thinks he was "probably" paid by "Bluestone," but cannot state so with certainty.

Southern Coal employee Steve Sarver, who testified that he works "for all of the companies," received his paychecks from "Bluestone."  His paychecks never came from Southern Coal.

172.    "Bluestone" owned and operated Coal Mountain, a mine from which Southern Coal provided Algoma Canada with coal.

173.    The email addresses of Southern Coal employees had domain names associated with Bluestone Industries, Inc. (e.g., @bluestoneindustries.com).

174.    The email addresses of Southern Coal employees had domain names associated with "Bluestone Industries, Inc. and affiliates."

### Bluestone Resources, Inc.

175.    Algoma Canada realleges paragraphs 84–146 and 169–174 as if fully stated herein.

176.    Jay Justice is a director of Bluestone Resources, Inc.  James T. Miller, who is the Treasurer for Southern Coal, is also the Secretary and Treasurer of Bluestone Resources, Inc.

177.    On November 3, 2015, Bluestone Resources, Inc. deposited $75,000 into a Southern Coal bank account.  On November 17, 2015, it deposited $298,000.  And on December 23, 2015, deposited $71,100.

178.    On April 8, 2016, Algoma Canada paid Southern Coal $1,757,491.60.   The same day, a Southern Coal bank account wired Bluestone Resources, Inc. $1,282,000.

179.    Bluestone Resources, Inc. issued invoices to Algoma Canada in 2016 for coal delivered under Algoma Canada's agreements with Southern Coal.   For example, a January 11, 2016 invoice directed Algoma Canada to remit payment to a bank account in the name of "Bluestone Energy Sales Corporation."   The invoice lists a business address for "Bluestone Energy Sales Corporation" of 302 S. Jefferson Street, Roanoke, Virginia 24011, the same address as the principal place of business for Southern Coal.

### Bluestone Industries, Inc.

180.    Algoma Canada realleges paragraphs 84–146 and 169–174 as if fully stated herein.

181.    Jim Justice is the President and Director of Bluestone Industries, Inc.  James T. Miller, who is the Treasurer for Southern Coal, is also the Secretary and Treasurer of Bluestone Industries, Inc.

182.    Southern Coal employee Summer Harrison was also the Vice President of Treasury for "Bluestone, Industries, Inc." and for "all of the coal related companies" while she helped facilitate the shipment of coal from Southern Coal to Algoma Canada.

### Bluestone Industries Coal Corporation

183.    Algoma Canada realleges paragraphs 84–146 and 169–174 as if fully stated herein.

184.    Jay Justice is the President and Director of Bluestone Industries Coal Corporation.  James T. Miller, who is the Treasurer for Southern Coal, is also the Secretary and Treasurer of Bluestone Industries Coal Corporation.

**Mechel Bluestone**

185.    Algoma Canada realleges paragraphs 84–146 and 169–174 as if fully stated herein.

186.    Jim Justice is the President and Director of Mechel Bluestone.  James T. Miller, who is the Treasurer for Southern Coal, is also the Secretary and Treasurer of Mechel Bluestone.

**Bluestone Energy Sales Corporation**

187.    Algoma Canada realleges paragraphs 84–146 and 169–174 as if fully stated herein.

188.    On June 29, 2016, Bluestone Energy Sales Corporation transferred $200,000 to Southern Coal, and the next day Southern Coal wired $200,000 back to Bluestone Energy Sales Corporation.

189.    Also on June 30, 2016, Algoma Canada paid Southern Coal $383,250.  The same day, Southern Coal wired Bluestone Energy Sales Corporation $349,250.

190.    A week later, on July 7, 2016, Algoma Canada paid Southern Coal $1,478,000.  The same day, Southern Coal wired Bluestone Energy Sales Corporation $1,478,000.

191.    Bluestone Energy Sales Corporation issued invoices to Algoma Canada in 2016 for coal delivered under Algoma Canada's agreements with Southern Coal.  Some of those invoices, including ones dated July 12, 2016 and October 18, 2016, directed Algoma Canada to remit payment to a bank account in the name of "Southern Coal Sales Corp." Others, including one dated June 2, 2016, directed Algoma Canada to remit payment to a bank account in the name of "Bluestone Energy Sales Corporation."

192.    Jay Justice is the President and Director of Bluestone Energy Sales Corporation. Steve Ball, General Counsel for Southern Coal and its Secretary, is also the Vice President for Bluestone Energy Sales Corporation.  James T. Miller, who is the Treasurer for Southern Coal, is also the Secretary and Treasurer Bluestone Energy Sales Corporation.

193.    The principal place of business of Bluestone Energy Sales Corporation is the same address as Southern Coal's principal place of business: 302 S. Jefferson Street, Roanoke, Virginia  24011.  Invoices issued by Bluestone Energy Sales Corporation to Algoma Canada in 2016 list this address.

194.    On at least one occasion, Bluestone Energy Sales Corporation paid the railroad, Norfolk Southern, for the transportation of coal from Southern Coal to Algoma Canada.

## A&G COAL CORPORATION

195.    Algoma Canada realleges paragraphs 84–146 as if fully stated herein.

196.    Jay Justice is the President and Director of A&G Coal Corporation.  Steve Ball, General Counsel for Southern Coal and its Secretary, is also the Vice President for A&G Coal Corporation.  James T. Miller, who is the Treasurer for Southern Coal, is also the Secretary and Treasurer of A&G Coal Corporation.

197.    The principal place of business for A&G Coal is at the same address as Southern Coal's principal place of business: 302 S. Jefferson Street Roanoke, Virginia 24011.

198.    Southern Coal employee Summer Harrison thinks that she used to work for A&G Coal Corporation, but she is unsure because she "bounce[d] around" so much among the Justice Entities.

199.    A&G Coal Corporation is marketed under the "Southern Coal umbrella."

## TAMS MANAGEMENT INC.

200.    Algoma Canada realleges paragraphs 84–146 as if fully stated herein.

201.    Jay Justice is the President and Director of Tams Management Inc.  James T. Miller, who is the Treasurer for Southern Coal, is also the Secretary and Treasurer of A&G Coal Corporation.

202.    Tams Management Inc. is marketed under the "Southern Coal umbrella."

## COAL MOUNTAIN MINING COMPANY LIMITED PARTNERSHIP, LLP

203.    Algoma Canada realleges paragraphs 84–146 as if fully stated herein.

## JUSTICE FAMILY FARMS, LLC

204.    Algoma Canada realleges paragraphs 84–146 as if fully stated herein.

205.    James C. Justice Companies, Inc. is the sole member of Justice Family Farms, LLC. Jim Justice is the President and Director of James C. Justice Companies, Inc.  Jay Justice is the Vice President and Director of James C. Justice Companies, Inc.  Steve Ball, General Counsel for Southern Coal and its Secretary, is also the Secretary of James C. Justice Companies, Inc.  James T. Miller, who is the Treasurer for Southern Coal, is also the Treasurer of James C. Justice Companies, Inc.

206.    The principal place of business for Justice Family Farms, LLC is at the same address as Southern Coal: 302 S. Jefferson Street Roanoke, Virginia  24011.

207.    Funds of Justice Family Farms, LLC were commingled with funds of Southern Coal Sales Corporation and used to capitalize Southern Coal's operations.  In the first half of 2016, Justice Family Farms, LLC deposited about $7.9 million into a Southern Coal bank account, and those funds were used to fund Southern Coal's operations.

208.    On November 6, 2015, Justice Family Farms deposited $1 million into a Southern Coal bank account.

209.    On November 9, 2015, Justice Family Farms deposited $175,000 into a Southern Coal bank account.

210.    On December 7, 2015, Justice Family Farms deposited $352,000 into a Southern Coal bank account.

211.    On December 10, 2015, Justice Family Farms deposited $109,400 into a Southern Coal bank account.

212.    On December 14, 2015, Justice Family Farms deposited $65,100 into a Southern Coal bank account.

213.    On January 13, 2016, Justice Family Farms deposited $50,000 into a Southern Coal bank account.

214.    On January 25, 2016, Justice Family Farms deposited $100,000 into a Southern Coal bank account.

215.    On January 28, 2016, Justice Family Farms deposited $490,000 into a Southern Coal bank account.

216.    On February 2, 2016, Justice Family Farms deposited $496,000.

217.    On February 3, 2016, Justice Family Farms deposited $300,000 into a Southern Coal bank account.

218.    On February 5, 2016, Justice Family Farms deposited $542,000 into a Southern Coal bank account.

219.    On February 11, 2016, Justice Family Farms deposited $189,000 into a Southern Coal bank account.

220. On February 16, 2016, Justice Family Farms deposited $1,170,000 into a Southern Coal bank account.

221. On March 3, 2016, Justice Family Farms deposited $600,000 into a Southern Coal bank account.

222. On March 8, 2016, Justice Family Farms deposited $500,000 into a Southern Coal bank account.

223. On March 10, 2016, Justice Family Farms deposited $200,000 into a Southern Coal bank account.

224. On March 21, 2016, Justice Family Farms deposited $404,000 into a Southern Coal bank account.

225. On March 22, 2016, Justice Family Farms deposited $1,644,000 into a Southern Coal bank account.

226. On March 23, 2016, Justice Family Farms deposited $332,000 into a Southern Coal bank account.

227. On March 24, 2016, Justice Family Farms deposited $723,000 into a Southern Coal bank account.

228. On April 4, 2016, Justice Family Farms deposited $164,200 into a Southern Coal bank account.

## SOUTHERN COAL CORPORATION

229. Algoma Canada realleges paragraphs 84–146 as if fully stated herein.

230. Jay Justice is the President and Director of Southern Coal Corporation. James T. Miller, who is the Treasurer for Southern Coal, is also the Secretary and Treasurer for Southern Coal Corporation.

231.     On April 8, 2016, Algoma Canada paid Southern Coal $1,757,491.60.   The same day, Southern Coal wired $475,000 to Southern Coal Corporation.

232.     Tom Lusk, the Chief Operating Officer of Southern Coal Corporation, signed the contract with Southern Coal's agent Steve Sears on behalf of Southern Coal.

## FIRST CLAIM FOR RELIEF –BREACH OF CONTRACT
### (TERM SHEET SHORTFALL)

233.     Algoma Canada realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully stated herein.

234.     The Term Sheet, in combination with the Original and Amending Agreement, constitutes a contract between Southern Coal and Algoma Canada, entered into for valuable consideration, that is valid and enforceable.

235.     The Agreements are an installment contract for the sale of goods and are governed by New York's enactment of the Uniform Commercial Code, NY UCC § 1-101 *et seq.*

236.     Pursuant to the Term Sheet, Southern Coal was required to deliver to Algoma Canada 200,000 total tons of coal between August 29, 2016 and December 24, 2016.

237.     Specifically, pursuant to the Term Sheet, Southern Coal was required to deliver 50,000 tons of HVA coal and 150,000 tons of HVB coal.

238.     Southern Coal breached the Term Sheet when it only delivered a total of 45,363 tons of coal between August 29, 2016 and December 24, 2016 and, in so doing, substantially impaired the value of numerous installments and the parties' agreement as a whole.

239. Specifically, Southern Coal breached the Term Sheet and substantially impaired the value of the Agreements when it provided Algoma Canada with less than 18,434 tons of HVA coal and 26,929 tons of HVB coal between August 29, 2016 and December 24, 2016.

240. Algoma Canada has substantially performed the material terms of the Agreements.

241. Algoma Canada notified Southern Coal of Southern's breaches, and Algoma Canada reserved all of its rights pursuant to the Agreements.

242. Southern Coal's failure to timely deliver coal to Algoma Canada as required by the Term Sheet has presently, directly, and proximately caused damage to Algoma Canada in an amount exceeding $6.7 million, or such other amount to be proven at trial, plus interest.

243. Despite its obligation to deliver coal to Algoma Canada as provided by the Term Sheet, Southern Coal has failed to deliver the coal as required. Southern Coal's failure constitutes a breach of the Original Agreement, the Amending Agreement, and the Term Sheet, all of which violates the covenant of good faith and fair dealing.

244. Algoma Canada is entitled to recover from Southern Coal and the Justice Parties, jointly and severally, for this breach.

## SECOND CLAIM FOR RELIEF –BREACH OF CONTRACT
### (NON-TERM SHEET SHORTFALL)

245. Algoma Canada realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully stated herein.

246. The Amending Agreement, in combination with the Original Agreement, constitutes a contract between Southern Coal and Algoma Canada, entered into for valuable consideration, that is valid and enforceable.

247.    The Agreements are an installment contract for the sale of goods and are governed by New York's enactment of the Uniform Commercial Code, NY UCC § 1-101 et seq.

248.    Pursuant to the Amending Agreement, Southern Coal was required to deliver to Algoma Canada 780,000 total tons of coal between April 1, 2016 and March 31, 2017.

249.    Specifically, pursuant to the Amending Agreement, Southern Coal was required to deliver 140,000 tons of HVA coal and 640,000 tons of HVB coal.

250.    The Term Sheet delineated 200,000 of those tons of coal to be delivered between September and December of 2016, which is the subject of Count I above.

251.    Southern Coal breached the Amending Agreement when it delivered less than 220,000 tons (not including the less than 45,363 tons delivered as described in Count I above) of the remaining 580,000 tons of coal that the Amending Agreement required between April 1, 2016 and March 31, 2017, and in so doing, substantially impaired the value of numerous installments and the parties' agreement as a whole.

252.    The less than 220,000 tons described in Paragraph 251 consisted of both HVA coal and HVB coal delivered between April 1, 2016 and March 31, 2017 (again, not including the those tons of HVA coal and HVB coal delivered as described in Count I above).

253.    Algoma Canada has substantially performed the material terms of the Agreements.

254.    Algoma Canada notified Southern Coal of Southern Coal's breaches, and Algoma Canada reserved all of its rights pursuant to the Agreements.

255.    Southern Coal's failure to timely deliver coal to Algoma Canada as required by the Amending Agreement has presently, directly, and proximately caused damage to Algoma

Canada in an amount exceeding $4.0 million, or such other amount to be proven at trial, plus interest.

256.    Despite its obligation to deliver coal to Algoma Canada as provided by the Amending Agreement, Southern Coal has failed to deliver the coal as required.  Southern Coal's failure constitutes a breach of the Original Agreement and the Amending Agreement, all of which violates the covenant of good faith and fair dealing.

257.    Algoma Canada is entitled to recover from Southern Coal and the Justice Parties, jointly and severally, for this breach.

### THIRD CLAIM FOR RELIEF –BREACH OF CONTRACT
### (FAILURE TO PROVIDE COAL THAT CONFORMED TO THE CONTRACTUAL QUALITY STANDARDS)

258.    Algoma Canada realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully stated herein.

259.    The Amending Agreement, in combination with the Original Agreement and Term Sheet, constitutes a contract between Southern Coal and Algoma Canada, entered into for valuable consideration, that is valid and enforceable.

260.    The Agreements are an installment contract for the sale of goods and are governed by New York's enactment of the Uniform Commercial Code, NY UCC § 1-101 et seq.

261.    Pursuant to the Original Agreement, Southern Coal was required to deliver to Algoma Canada coal that conformed to the specifications set forth in Exhibit 2 to the Original Agreement.

262.    If Southern Coal failed to provide coal that conformed to the specifications but the deviations were within the rejection limits, Southern Coal was required to reduce the price of the Coal based on the penalties set forth in Exhibit 2 to the Original Agreement.

263.    Southern Coal breached the Agreements when it delivered 19 shipments between May of 2016 and October of 2016 that did not conform to the specifications and thereafter refused to reduce the price of coal accordingly, and, in so doing, substantially impaired the value of numerous installments.

264.    Southern Coal further breached the Agreements when it provided inaccurate analyses to Algoma Canada.

265.    Southern Coal also breached the Agreements when it provided samples to the lab for analysis, instead of allowing the lab to sample the coal, and did not follow ASTM standards in sampling the coal.

266.    Algoma Canada has substantially performed the material terms of the Agreements.

267.    Algoma Canada notified Southern Coal of Southern Coal's breaches, and Algoma Canada reserved all of its rights pursuant to the Agreements.

268.    Southern Coal's failure to deliver coal to Algoma Canada that conformed to the contractual specifications and failure to reduce the price of the coal accordingly has presently, directly, and proximately caused damage to Algoma Canada in excess of $1.2 million, or such other amount to be proven at trial, plus interest.

269.    Despite its obligation to deliver coal to Algoma Canada that meets the specifications provided by the Agreements or reduce the price of the coal if it does not meet the specifications, Southern Coal has failed to deliver the coal as required.  Southern Coal's failure constitutes a breach of the Agreements, all of which violate the covenant of good faith and fair dealing.

270.    Algoma Canada is entitled to recover from Southern Coal and the Justice Parties, jointly and severally, for this breach.

## PRAYER FOR RELIEF

**WHEREFORE**, Algoma Canada prays for this Court to:

A.    Enter judgment in favor of Algoma Canada and against Southern Coal on Counts I, II, and III and order Southern Coal and/or the Justice Parties to pay damages to Algoma Canada, including pre- and post-judgment interest, for Southern Coal's breach of the Agreements; and

B.    Award Algoma Canada such other and further relief as the Court finds just and proper.

Respectfully submitted,

**THOMPSON HINE LLP**

Dated: October ___, 2018                    By:_____
    Kip T. Bollin (*admitted pro hac vice*)
    Laura L. Watson (*admitted pro hac vice*)
    Mark R. Butscha, Jr.
    3900 Key Center, 127 Public Square
    Cleveland, OH 44114
    Tel: (216) 566-5500
    Fax: (216) 566-5800
    Email: kip.bollin@thompsonhine.com
    Email: laura.watson@thompsonhine.com
    Email: mark.butscha@thompsonhine.com

    -and-

    Rebecca A. Brazzano
    335 Madison Ave., 12th Floor
    New York, NY 10017-4611
    Tel:  (212) 344-5680
    Fax:  (212) 344-6101
    Email: rebecca.brazzano@thompsonhine.com

*Attorneys for Plaintiff Essar Steel Algoma Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this _____ day of October, 2018, a copy of the foregoing was served via the Court's ECF system to all counsel of record.

_____
One of the Attorneys for
Plaintiff Essar Steel Algoma, Inc.