CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
2

3

          _____
4                                    :
ESSAR STEEL ALGOMA, INC.,  :
5                                    :
          Plaintiff,                 :
6                                    : Case No.
vs.                        :   1:17-mc-00360-AT
7                                    :
SOUTHERN COAL SALES        :
8  CORPORATION,                      :
                                     :
9          Defendant.                :
          _____:
10

11

12          CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14               Tuesday, October 30, 2018

15

              Oral Deposition of STEPHEN WAYNE BALL,
16

taken at the Law Offices Kelley Drye & Warren
17

LLP, Washington Harbour, Suite 400, 3050 K
18

Street NW, Washington, D.C., beginning at
19

9:05 a.m., before Ryan K. Black, a Registered
20

Professional Reporter, Certified Livenote
21

Reporter and Notary Public in and for the
22

District of Columbia.
23

24

25

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

```
 1        A P P E A R A N C E S:

 2

 3        THOMPSON HINE LLP

 4        BY:  KIP T. BOLLIN, ESQUIRE

 5             LAURA WATSON SCHULTZ, ESQUIRE

 6        3900 Key Center

 7        127 Public Square

 8        Cleveland, Ohio  4411420006

 9        216.566.5500

10        kip.bollin@thompsonhine.com

11        laura.schultz@thompsonhine.com

12        Representing - The Plaintiffs

13

14        KELLEY DRYE & WARREN LLP

15        BY:  MARK R. ROBECK, ESQUIRE

16             MELISSA E. BYORADE, ESQUIRE

17        Washington Harbour

18        Suite 400

19        3050 K Street, NW

20        Washington, DC  20007

21        202.342.8400

22        mrobeck@kelleydrye.com

23        mbyroade@kelleydrye.com

24        Representing - Defendants

25
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 3

1                    I N D E X

2    TESTIMONY OF:  STEPHEN WAYNE BALL          PAGE

3    By Mr. Bollin............................6, 235

4    By Ms. Schultz..............................208

5                    E X H I B I T S

6    EXHIBIT           DESCRIPTION              PAGE

7    Exhibit 501 a document titled Second Amended

8                Notice of Rule 30(b) Deposition of

9                Defendant..........................7

10   Exhibit 502 an organizational chart for Southern

11               Coal Corporation..................12

12   Exhibit 503 an Agreement in lieu of Annual

13               Meeting of Sole Shareholder of

14               Southern Coal Sales Corporation

15               for Years 2013 through 2018.......23

16   Exhibit 504 a document titled Agreement in

17               Lieu of Annual Meeting of Board of

18               Directors of Southern Coal Sales

19               Corporation from 2013 through

20               2018..............................29

21   Exhibit 505 the balance sheet and income

22               statement for Nevada Holdings,

23               Inc., for the year-end 2015.......66

24

25

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 4

1                    I N D E X (Cont'd)

2        EXHIBIT           DESCRIPTION                PAGE

3        Exhibit 506 the balance sheet and income

4                    statement for Nevada Holdings,

5                    Inc..............................74

6        Exhibit 507 the balance sheet and income

7                    statement for Nevada Holdings, Inc.,

8                    for the year ended 12/31/2017.....81

9        Exhibit 508 the balance sheet and income

10                   statement for June 30th, 2018,

11                   for Nevada Holdings, Inc..........84

12       Exhibit 509 a summary of all of Southern Coal

13                   Sales Corporation's shipments for

14                   the Years 2015, '16 and '17.......95

15       Exhibit 510 a supplemental spreadsheet to

16                   Exhibit 509.......................95

17       Exhibit 511 a spreadsheet created by

18                   Mr. Bollin.......................108

19       Exhibit 512 Bank statements from January

20                   2015 through July of 2016.......121

21       Exhibit 513 the monthly bank statements for

22                   Southern Coal Sales Corporation from

23                   Chase, dated June of 2016 through

24                   April 2017......................133

25

CONFIDENTIAL - ATTORNEYS EYES ONLY

1                    I N D E X (Cont'd)

2        EXHIBIT            DESCRIPTION              PAGE

3        Exhibit 514 the tax return for Southern Coal

4                    Corporation for 2013............139

5        Exhibit 515 the 2014 income tax return for

6                    Southern Coal Corporation and

7                    subsidiaries....................144

8        Exhibit 516 the federal tax return for Southern

9                    Coal Corporation and its subsidiaries

10                   from 2015.......................146

11       Exhibit 517 the 2016 Southern Coal Corporation

12                   Subsidiary's tax return.........158

13       Exhibit 518 a document Bates Numbered

14                   SE-ESAL-7308 through 7360........167

15       Exhibit 519 the 2017 return for Southern Coal

16                   Corporation.....................171

17       Exhibit 519A the 2017 return for Southern Coal

18                   Corporation printed in portrait

19                   format..........................201

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 6

1      Whereupon --

2                         STEPHEN WAYNE BALL,

3      called to testify, having been first duly sworn

4      or affirmed, was examined and testified as

5      follows:

6                         EXAMINATION

7      BY MR. BOLLIN:

8          Q.   Good morning, Mr. Ball.  We just met a

9      minute ago, but, again, for the record my name

10     is Kip Bollin.  I'm counsel for Essar Steel

11     Algoma, the plaintiff in this lawsuit.

12               Could you please state your name for

13     the record?

14         A.   Stephen Wayne Ball.

15         Q.   And you are -- what's your

16     relationship with Southern Coal Sales

17     Corporation?

18         A.   I'm vice president and general

19     counsel.

20         Q.   So you're a lawyer, correct?

21         A.   Yes.

22         Q.   Have you been deposed before?

23         A.   I have, yes.

24         Q.   And you've taken depositions before?

25         A.   Not in a civil litigation setting.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 7

1          I've done it in administrative proceedings.

2               Q.    Okay.

3               A.    I, typically, try my best not to

4          litigate, --

5               Q.    God bless you.

6               A.    -- but I have done it before, yes.

7               Q.    Okay.  So I'm going to dispense with

8          going through how this works, because you're as

9          well versed as me.  Fair enough?

10              A.    That's fair enough.

11              Q.    When did you pass the Bar?

12              A.    2001.

13              Q.    And where from?

14              A.    West Virginia.

15                    (Ball Exhibit No. 501, a document

16         titled Second Amended Notice of Rule 30(b)

17         Deposition of Defendant, was marked.)

18         BY MR. BOLLIN:

19              Q.    I'm going to hand to you what's been

20         marked as Exhibit 501, which is titled Second

21         Amended Notice of Rule 30(b) Deposition of

22         Defendant.

23                    Have you seen this document before?

24              A.    I have.

25              Q.    And this is the notice of the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 8

1        deposition pursuant to which you've appeared

2        today?

3               A.    Correct.

4               Q.    And have you prepared yourself to

5        testify on these topics set forth in the notice?

6               A.    Yes.

7               Q.    How did you do so?

8               A.    I met with our counsel, read

9        deposition transcripts.  I reviewed documents

10       that have been provided as part of discovery,

11       and had a few conversations with individuals at

12       Southern Coal.

13              Q.    And when you say you met with counsel,

14       you're talking about the folks at Kelley Drye?

15              A.    Yes, sir.

16              Q.    How many times did you meet with them?

17              A.    I met in person with them yesterday,

18       have had numerous phone conversations with them,

19       probably four or five phone conversations.

20              Q.    In preparation for this deposition?

21              A.    Yes.

22              Q.    And how long did you meet yesterday?

23              A.    About six-and-a-half hours, and then

24       met for, approximately, an hour this morning.

25              Q.    What deposition transcripts did you

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 9

1    review?

2         A.   I read portions of Kenny Lambert, Jr.,

3    he goes by Tiger; Tim Fugit [phonetic]; Steve

4    Sarver; Jay Justice.

5         Q.   Did you review Summer Harrison's?

6         A.   And some excerpts from Summer

7    Harrison's, yes, sir.

8         Q.   Did you pick the excerpts or did

9    somebody else?

10        A.   A little bit of both.  I mean,

11   there were certainly some excerpts that were

12   intentionally shown to me, but then there were

13   other parts that I chose what I read in the

14   transcript.

15        Q.   Okay.  And what documents did you

16   review?

17        A.   I read a summary of the coal supply

18   agreements, or who coal shipments had been made

19   to.  I reviewed a summary of bank account

20   transactions, a few bank statements, the coal

21   supply agreement, the first amendment to the

22   coal supply agreement, the term sheet, the draft

23   second amendment to the coal supply agreement,

24   some of the third-party coal contracts that had

25   been disclosed, I think ██████ ███████ and ████████

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 10

1          Q.    Anything else?

2          A.    If anything else comes to mind, I'll

3     tell you.  I've -- there were a lot of documents

4     I reviewed.  That's -- just going through it in

5     my head, that's what comes to mind first.

6          Q.    Okay.  You said you also had

7     conversations with individuals in preparation

8     for your deposition?

9          A.    Yes.

10         Q.    Who were they?

11         A.    I spoke to Summer Harrison, Steve

12    Sarver and Jay Justice.

13         Q.    What did you speak with Summer

14    Harrison about?

15         A.    I just had a few questions about

16    trying to ascertain bank accounts, who was

17    the holder of the bank account.  Frankly, that

18    related to your all's amended complaint.  There

19    were some account numbers that were referenced

20    in there, so trying to figure out who those

21    were.

22              I spoke to Steve Sarver just

23    to understand a few things he said in his

24    deposition relating to sampling, and Jay Justice

25    and I discussed production and anticipated

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 11

1        production from 2015 through 2017.

2               Q.    Okay.  Did you discuss anything else

3        with Jay Justice?

4               A.    No.

5               Q.    Did you say for 2015 or 2016?

6               A.    '15, '16 and '17.

7               Q.    Okay.  Thank you.

8                     Going through the documents in

9        this case, I became aware that you also hold

10       positions with other Justice-related entities,

11       is that fair?

12              A.    That's fair.  Yes, sir.

13              Q.    Okay.  I'd like to know what those

14       positions are.

15              A.    Okay.

16              Q.    Do you happen to know them all off the

17       top of your head?

18              A.    Sure.

19              Q.    We'll give you a try.  Okay.

20              A.    So for Southern Coal Corporation

21       and all of its affiliates, which would include

22       Southern Coal Sales Corporation, today I'm vice

23       president and general counsel.

24              Q.    You said today.

25              A.    Yeah.  And, historically, I've also

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 12

1       served as vice president of operations.

2              Q.   What were your positions with those

3       companies in 2016?

4              A.   In 2016, I would have been secretary

5       and general counsel.

6              Q.   Were you VP of Ops in 2016, as well?

7              A.   Not in 2016.

8              Q.   So secretary and general counsel?

9              A.   Yes.

10             MR. BOLLIN:  And just so we're clear

11      which companies we're talking about, I'm going

12      to go ahead and hand you an exhibit.

13             (Ball Exhibit No. 502, an

14      organizational chart for Southern Coal

15      Corporation, was marked.)

16      BY MR. BOLLIN:

17             Q.   This is being marked as Exhibit 502.

18                  First of all, do you recognize Exhibit

19      502?

20             A.   Yes.

21             Q.   What is it?

22             A.   It's an organizational chart for

23      Southern Coal Corporation.

24             Q.   Okay.  That's the first page.  What's

25      the second page?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 13

1          A.   The second page is an organizational

2     chart for Bluestone Resources, Inc.

3          Q.   A moment ago you testified that in

4     2016 you were secretary and general counsel for

5     Southern Coal Corporation and all of its

6     affiliates; is that right?

7          A.   Correct.

8          Q.   Is the first page in Exhibit 502 a

9     full and complete list of the affiliates that

10     you were secretary and general counsel for in

11     2016?

12          MR. ROBECK:  Well, I'm going to

13     object, Kip, just to the question.  But -- I

14     don't think you intend this, but you've also

15     got Bluestone to go for.  And you've limited

16     your question to just Southern Coal Corporation,

17     so we don't know if he had the same position at

18     Bluestone.

19          MR. BOLLIN:  Right.  No, I was just

20     doing the first page first.

21          MR. ROBECK:  Okay.  That's what I

22     figured, but the question --

23          THE WITNESS:  I believe so, yes.

24     BY MR. BOLLIN:

25          Q.   Turning to the second page of Exhibit

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 14

1      502, the Bluestone Resources, Inc., org chart,

2      were you secretary and general counsel for all

3      of these entities on the second page of Exhibit

4      502, as well, in 2016?

5           A.   Yes.

6           Q.   Did you hold any other positions, in

7      addition to secretary and general counsel, for

8      any of these entities in Exhibit 502 in 2016?

9           A.   No.

10           Q.   Were you also -- did you also hold

11      officer positions for any other Justice-related

12      entities in 2016?

13           A.   Yes.

14           Q.   What were those?

15           A.   James C. Justice Companies, Inc.

16           Q.   What were your positions for James C.

17      Justice Companies, Inc.?

18           A.   Secretary and general counsel.

19                Kentucky Fuel Corporation.

20           Q.   And your role there?

21           A.   Secretary and general counsel.

22                MR. ROBECK:  And we're talking 2016

23      again, right?

24                MR. BOLLIN:  Correct.

25                THE WITNESS:  A&G Coal Corporation,

Page 15

1    secretary and general counsel; Tams Management,

2    Inc., secretary and general counsel; Greenbrier

3    Hotel Corporation, secretary and general

4    counsel.

5    BY MR. BOLLIN:

6        Q.   Did you have a role with Coal Mountain

7    Mining Company Limited Partnership LLP?

8        A.   No.  That entity is not owned by the

9    Justice Family.

10       Q.   Do you know who owns it?

11       A.   I do not.

12       Q.   Did you have a role with Justice

13   Family Farms LLC in 2016?

14       A.   I would have served as general

15   counsel.  Justice Family Farms does not have

16   officers, although, typically, our LLCs allow

17   for officers in their operating agreements,

18   Justice Family Farms has managers which are

19   James C. Justice, III, and his sister Jillian

20   Justice.

21       Q.   And your role was as general counsel

22   to Justice Family Farms LLC?

23       A.   I would serve as their general

24   counsel.  It's an inactive entity, but if

25   something were to come up with Justice Family

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 16

1      Farms, I would definitely serve as their general

2      counsel.

3          Q.   It's inactive now, or it was inactive

4      in 2016?

5          A.   Both.

6          Q.   Was it inactive in 2015?

7          A.   I believe so.

8          Q.   In 2016 did you have a role with

9      Bluestone Energy Sales Corporation?

10         A.   I would have been secretary and

11     general -- well, I would have been general

12     counsel for Bluestone Energy Sales.

13         Q.   Do you know who the officers and

14     directors of Bluestone Energy Sales Corporation

15     were?

16         A.   In 2016?

17         Q.   Yes.

18         A.   President would have been James C.

19     Justice, II.  Vice president would have been

20     James C. Justice, III.  Treasurer would

21     definitely be James T. Miller.  I could check

22     this for you, either myself or James T. Miller

23     would be the secretary.  I can't recall at this

24     moment, though.

25         Q.   Did you have a role with Mechel

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 17

1      Bluestone in 2016?

2           A.    We changed the name of that to

3      Bluestone Mineral.

4           Q.    And when did you do that?

5           A.    Shortly after we reacquired Bluestone

6      in February of 2015.  I can't recall the -- I

7      can't recall the specific date, but it would

8      have been in the first half of 2015.

9           Q.    So Mechel Bluestone and Bluestone

10     Mineral, Inc., are the same entity?

11          A.    Correct.

12          Q.    Okay.  Did you have a role with that

13     company?

14          A.    The same as all Bluestone subsidiaries

15     and affiliates, general counsel and secretary.

16          Q.    We've gone through all your roles in

17     2016.  Did you have the same roles with the same

18     companies in 2015?

19          A.    Yes.

20          Q.    And did you have the same roles with

21     the same companies in 2016 -- I'm sorry, 2017?

22          A.    No.  My title changed in January of

23     2017.

24          Q.    What did your title become in January

25     of 2017?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 18

1          A.   Vice president and general counsel,

2     and he goes by Terry, but James, Terry Miller,

3     replaced me as secretary.  So he's now secretary

4     and treasurer.

5          Q.   Of all of the entities set forth in

6     Exhibit 502?

7          A.   Yes.

8          Q.   Did you become vice president general

9     counsel of all of the entities set forth in

10    Exhibit 502 on the same date in 2017?

11         A.   Approximately.  There was a shift due

12    to James C. Justice, II, becoming Governor of

13    West Virginia, and so he had to step down as a

14    day-to-day officer of the entities.  And when

15    he did that, we had a change.  James C. Justice,

16    III, became president since James C. Justice,

17    II, was no longer president.  I became vice

18    president, and Terry Miller became secretary and

19    treasurer.  The reason I can't say for sure that

20    that all happened on the exact same day is, it

21    took a few days to get that papered, --

22         Q.   Okay.  It --

23         A.   -- but all around the approximate same

24    time.

25         Q.   Okay.  Thank you.  I appreciate that.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 19

1              For all of the entities identified in

2        Exhibit 502, did they share the same officers

3        and directors in 2016?

4              A.    I think it's fair to say all of the

5        corporations did.   I think some of the LLCs,

6        just the nomenclature would have had a manager

7        or a member versus directors and officers.

8              Q.    Were the managers and directors of the

9        LLCs the same individuals who were officers and

10       directors of the corporations in Exhibit 502?

11             A.    The managers would be the same as the

12       directors.

13             Q.    Who were the managers of James

14       C. -- I'm sorry, Justice Family Farms, LLC?

15             A.    In what year?

16             Q.    2016.

17             A.    James C. Justice, II, and James C.

18       Justice, III.

19             Q.    And who were the directors of the

20       corporation set forth in Exhibit 502 in 2016?

21             A.    James C. Justice, II, and James C.

22       Justice, III.

23             Q.    And who were the managers of the LLC

24       set forth in Exhibit 502 in 2016?

25             A.    I just want to make sure, what was

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 20

1      your last question?

2                  MR. BOLLIN:  Could you read it?

3                  THE REPORTER:  Two questions ago?

4                  THE WITNESS:  Yeah.  I feel like --

5      did he ask about 2016 twice?

6      BY MR. BOLLIN:

7          Q.   I did, but the first one was for the

8      corporations and the second one was for the

9      LLCs.

10         A.   Okay.  I thought the managers had been

11     asked twice.

12         Q.   It may have.  I apologize.

13         A.   Okay.  It's James C. Justice, II, and

14     James C. Justice, III.

15         Q.   So James C. Justice, II, and James

16     C. Justice, III, are the directors of all the

17     corporations set forth in Exhibit 502 and the

18     managers of all the LLCs set forth in Exhibit

19     502.

20                 MS. BYROADE:  Objection to the extent

21     you're asking about the current -- your

22     question's about the present.

23     BY MR. BOLLIN:

24         Q.   In 2016.

25         A.   But with one caveat, like, JCJ Coal

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 21

1          Group, for example, is member managed instead

2          of manager managed, so Bluestone Mineral, as its

3          sole member, would manage it.  And same thing

4          with James C. Justice Companies LLC, it's

5          member-managed, and so it would be controlled by

6          JCJ Coal Group.

7                  Q.   On the first page?

8                  A.   Yeah.  I think on the first page all

9          those LLCs are manager managed.

10                 Q.   And then on the second page, the LLCs

11         are managed by the corporation that owns the

12         LLC?

13                 A.   Correct.  As its sole member.

14                 Q.   And so, for example, James C. Justice

15         Companies LLC is managed by JCJ Coal Group LLC?

16                 A.   Correct.

17                 Q.   Who is JCJ Coal Group LLC managed by?

18                 A.   Bluestone Mineral, Inc.

19                 Q.   And who is Bluestone Mineral, Inc.,

20         managed by?

21                 A.   As a corporation, its directors and

22         officers.

23                 Q.   Okay.  Who are its directors and

24         officers?

25                 A.   James C. Justice, II, and James C.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 22

1       Justice, III, are the directors in 2016.  And

2       the officers were James C. Justice, II, was

3       president.  James C. Justice, III, was executive

4       vice president.  I was secretary.  James T.

5       Miller was treasurer.

6           Q.   And the officers you just identified,

7       are those the same officers for all of the

8       corporations identified in Exhibit 502, both

9       first and second page --

10              MR. ROBECK:  Objection.  Asked and

11      answered.

12      BY MR. BOLLIN:

13          Q.   -- in 2016?

14          A.   Yes.

15          Q.   For Southern Coal Sales Corporation,

16      you were a secretary in 2016; is that right?

17          A.   Correct.

18          Q.   Were there stock certificates issued

19      by Southern Coal Sales Corporation to its owner?

20          A.   Typically, we do issue stock

21      certificates.  There would be a single

22      certificate issued to Southern Coal Corporation.

23          Q.   Do you know if that happened?

24          A.   I don't know right off the top of my

25      head if that happened, but I'm just saying, as

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 23

1       a matter of course, we typically do issue

2       certificates.

3                   (Ball Exhibit No. 503, an Agreement in

4       Lieu of Annual Meeting of Sole Shareholder of

5       Southern Coal Sales Corporation for years

6       2013 through 2018, was marked.)

7       BY MR. BOLLIN:

8            Q.   I'm handing you what's been marked as

9       Exhibit Number 503.  Do you recognize the

10      exhibit?

11           A.   Yes.

12           Q.   What is it?

13           A.   It's an Agreement in Lieu of Annual

14      Meeting of Sole Shareholder of Southern Coal

15      Sales Corporation.  The first page is for 2013,

16      and the second page is the same document for

17      2014.  Third page, same document for 2015.

18      Fourth page, same document for 2016.  Fifth page

19      same document for 2017.  And the last page is

20      same document for 2018.

21           Q.   Didn't Southern Coal Sales Corporation

22      change its name?

23           A.   It did.

24           Q.   And what's its current name?

25           A.   Nevada Holdings.

Page 24

1          Q.   When did that happen?

2          A.   I think it was in January of 2017.

3          Q.   Okay.  I see here January 17, 2017,

4     does that sound about right?

5          A.   That sounds about right, yes.

6          Q.   Okay.  So why does the last page of

7     Exhibit 503 state that it's the Agreement in

8     Lieu of Annual Meeting of Sole Shareholder of

9     Southern Coal Sales Corporation?

10         A.   That's a mistake.

11         Q.   Did you create the documents set forth

12    in Exhibit 503?

13         A.   I would have created the earlier

14    years.  In the latter years, probably someone

15    else would have done that.

16         Q.   And how can we tell the difference?

17         A.   I just know because I know the ones

18    that I did.  And in 2013, '14 and '15 I would

19    have been the only person doing that.

20         Q.   Okay.

21         A.   In recent years, I've had some help.

22    There's a gentleman by the name of Charlie

23    Hinthorne that works in our finance department,

24    but he helps me from time to time with

25    administrative matters.  And when we do

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 25

1      the annual minutes, he helps me prepare them

2      sometimes.

3           Q.   Okay.  So you prepared 2013, '14 and

4      '15?

5           A.   Yeah.  I'm comfortable saying I would

6      have definitely prepared those years.

7           Q.   Now, each one of those has an

8      electronic signature, right?

9           A.   That's definitely my signature.

10     It could be electronic.  I may have used

11     electronic.

12          Q.   I mean, it's identical from year to

13     year, correct?

14          A.   It appears to be, yeah.

15          Q.   So first of all, why did you have an

16     agreement in lieu of an annual meeting?

17          A.   Since I've been around the companies,

18     that's just how it's always been done with it

19     being a privately held business, the sole

20     shareholders being either directly or indirectly

21     the Justice family, that's just

22     the way we choose to do it.

23          Q.   Do you kind -- do you discuss -- well,

24     first of all, the sole shareholder was Southern

25     Coal Sales Corporation, right?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 26

```
 1            A.    Southern Coal Corporation.
 2            Q.    Oh, I'm sorry.  You're right.
 3    The sole shareholder of Southern Coal Sales
 4    Corporation was Southern Coal Corporation;
 5    is that right?
 6            A.    Correct.  That's right.  Yes.
 7            Q.    And who directed you to create this
 8    Agreement in Lieu of Annual Meeting?
 9            A.    Typically, I would ask either Jay
10    Justice or Jim Justice -- I would tell them
11    that it was time to do the annual minutes, and
12    I would ask them if there were any changes to
13    officers or directors.  And, typically, the
14    answer was, no, it's the same as what we had
15    last year, and then I would take care of it
16    from there.
17            Q.    Did you prepare Agreements in Lieu of
18    Annual Meetings for all of the Justice entities
19    for which you served as secretary at the same
20    time every year?
21            A.    Generally speaking, yes.
22            Q.    Each of these first three years, in
23    Exhibit 503, 2013, 2014 and 2015, each were
24    dated the 1st of May; --
25            A.    Yeah.
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

1         Q.   -- is that right?

2         A.   Correct.

3         Q.   Were these documents actually created

4    on the 1st of May?

5         A.   Somewhere thereabouts.

6         Q.   There was a form, you used the same

7    form and changed the date every year?

8         A.   Yes.

9         Q.   And then in 2016, you had some help

10   from Charlie Hinthorne?

11        A.   It's possible.

12        Q.   Okay.

13        A.   I just know that in '16 Charlie

14   started helping me with minute books and keeping

15   up minutes and things of that nature.

16        Q.   And so you don't know exactly who or

17   when Exhibit 503 -- strike that.  It's poorly

18   phrased.

19             Do you know exactly who prepared or

20   when the May 1st, 2016, Agreement in Lieu of

21   Annual Meeting document was created?

22        A.   No.

23        Q.   I notice in 2017 we've shifted, and

24   instead of it being May of the year we've now

25   got January 15th of 2017?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 28

1        A.    Correct.

2        Q.    Okay.  And why the change?

3        A.    That was precipitated by Mr. Justice

4    being sworn in as Governor.  James C. Justice,

5    II, becoming Governor of West Virginia.

6        Q.    And who are the new directors in 2017?

7        A.    James C. Justice, III, and Jillian

8    Justice.

9        Q.    And James C. Justice, III, goes by

10   Jay, right?

11       A.    Correct.

12       Q.    Okay.  And did this correspond with

13   the change in ownership of the Southern Coal

14   Corporation?

15       A.    Ownership did not change.

16       Q.    Okay.  Who was the owner of Southern

17   Coal Corporation?

18       A.    James C. Justice, II, James C. Justice,

19   III, and Jillian Justice.

20       Q.    Okay.  Did the officers and directors

21   of -- well, I think we've already established

22   that.  Strike that.

23            For the 2017 and 2018 Agreements in

24   Lieu of Annual Meeting that are set forth in

25   Exhibit 503, is it fair to say that you don't

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 29

1      know who prepared those?

2           A.   I think I did the one in 2017, because

3      I was definitely involved with getting all of

4      this documented when Mr. Justice took office

5      as Governor.  And I don't recall in 2018.

6           Q.   The 1st of January 2018 was a holiday,

7      right?

8           A.   Yes.

9           Q.   Do you believe that the Agreement in

10     Lieu was created on the 1st of January 2018?

11          A.   I don't know.

12               (Ball Exhibit No. 504, a document

13     titled Agreement in Lieu of Annual Meeting of

14     Board of Directors of Southern Coal Sales

15     Corporation from 2013 through 2018, was marked.)

16     BY MR. BOLLIN:

17          Q.   I'm handing you what's been marked as

18     Exhibit 504.

19               Do you recognize this document?

20          A.   I do, yes.

21          Q.   And what is it?

22          A.   It's the Agreement in Lieu of Annual

23     Meeting of Board of Directors of Southern Coal

24     Sales Corporation.  The first page is for 2013,

25     and it continues on for each year through 2018

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 30

1      being the last page.

2           Q.   And were these Agreements in Lieu

3      created by you or at your direction?

4           A.   Yes.

5           Q.   And are you able to identify which of

6      these documents you created?

7           A.   Not specifically, but it would be

8      consistent with the answers I just gave, which

9      I'm fairly confident in saying '13, '14 and '15

10     would have definitely been me.  I think '17

11     also would have been me, given the special

12     circumstances.  I can't say for sure on '16 or

13     '18.

14          Q.   Were these Agreements in Lieu created

15     on or about the date set forth, or were they

16     created after the fact?

17          A.   Typically, they would be on or about

18     the date set forth.

19          Q.   Okay.  Were any of these created much

20     past the date set forth on the document?

21          A.   Not that I'm aware of.

22          Q.   Okay.  Do you know whether any of the

23     Agreements in Lieu in Exhibit 503 were created

24     on dates much after the date set forth on each

25     agreement in lieu?

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          A.    Not that I'm aware of.

2          Q.    After Mr. Hinthorne creates an

3    Agreement in Lieu of Annual meeting, does he

4    show it to you, or does he just put it in the

5    file?  What's he do?

6          A.    It could be both.  Sometimes he'll

7    ask me to look it over, and there have been

8    instances where he also just files it.  He and

9    I will have a conversation before we start

10   updating the minutes for the year, and if he has

11   any questions about whether there have been any

12   changes or anything like that, we go through

13   those.  And then, you know, he prepares them.

14   It's happened both ways.  There's been times

15   where I don't see them again, and then there's

16   certainly been times where he's asked me to

17   double-check them.

18         Q.    Going back to Exhibit 503, the 2016

19   agreement, do you know when this agreement was

20   created?

21         A.    The 2016 one?

22         Q.    Yes.

23         A.    Not specifically, no.  Typically, they

24   would be on or about the date in the agreement,

25   though.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 32

1           Q.   Right.

2           A.   If it wasn't exactly May 1st, it would

3      be close to it.

4           Q.   So you're confident that it wasn't

5      created months after May 1st, 2016?

6           A.   Yes.

7           Q.   And how do you know that?

8           A.   Just by experience.  I mean,

9      typically, we do these at the same time each

10     year, and I would expect -- I don't remember any

11     extraordinary circumstances that year, so I

12     would expect it to be around that date.

13          Q.   And you create all the Agreements in

14     Lieu for all of the corporations at the same

15     time?

16          A.   Yes.

17               MR. BOLLIN:  I'm sorry to do this, but

18     can we take a short break?

19               THE WITNESS:  Sure.

20               (Recess taken.)

21     BY MR. BOLLIN:

22          Q.   Turning back to Exhibit 502, the org

23     chart, --

24          A.   Okay.

25          Q.   -- does this org chart reflect the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 33

1        organization of Southern Coal Corporation now or

2        in 2016?

3              A.    I'm not aware of any changes for

4        Southern Coal Corporation between 2016 and 2017,

5        so I think it would be yes to both years.

6              Q.    Okay.   How about the second page, is

7        this reflective of the organization of Bluestone

8        Resources, Inc., now or in the past?

9              A.    Both.

10             Q.    Okay.   So it's consistent?   It hasn't

11       changed?

12             A.    Correct.

13             Q.    Bluestone Resources, Inc., who are the

14       owners?

15             A.    James C. Justice, II, and James C.

16       Justice, III.

17             Q.    Who are the officers?

18             A.    What timeframe?

19             Q.    2016.   Thank you.

20             A.    James C. Justice, II, was president.

21       James C. Justice, III, was executive vice

22       president.   I was secretary, and Terry Miller

23       was treasurer.

24             Q.    Who were the directors?

25             A.    James C. Justice, II, and James C.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 34

1        Justice, III,

2               Q.    And then that all changed in January

3        of 2017?

4               A.    Correct.

5               Q.    And how did it change?

6               A.    The ownership stayed the same, but the

7        directors changed to James C. Justice, II, and

8        Jillian Justice.  President changed to James C.

9        Justice, III.  Vice president changed to myself.

10       And James T. Miller became secretary and

11       treasurer.

12              Q.    Do all of the Southern Coal

13       Corporation affiliates identified on Page 1

14       of Exhibit 502 have the same employees?

15              A.    I don't understand.  You mean --

16              Q.    Do they share the same employees?

17              A.    Well, today all of these companies are

18       idled when they were operating; for example,

19       Four Star Resources was a surface mine, it,

20       certainly, would have different employees than

21       Infinity Energy, Inc., would have, which is a

22       separate surface mine.

23              Q.    Okay.  So at the mines themselves, the

24       employees were different?

25              A.    Correct.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 35

```
 1          Q.   Okay.  What about the main office,
 2     were the employees the same?
 3          A.   It would depend.  Sometimes, like, an
 4     accountant would be on Infiniti Energy, Inc.'s,
 5     payroll.  There are other times that certain
 6     overhead services such as accounting, legal,
 7     engineering, those employees would be on the
 8     parent company and then they would be shared
 9     with the subsidiaries.
10          Q.   How do you decide when to share
11     employees between the parent company, Southern
12     Coal Corporation, and the subsidiaries?
13          A.   I think it varies from time to time,
14     but, typically, it depends on whether the
15     subsidiary would be large enough to justify
16     having a single accountant or a single engineer
17     solely dedicate  to that entity.  If, for
18     example, it wasn't large enough or didn't have
19     enough production to justify having its own
20     engineering staff, then, in that instance, that
21     would be shared from the corporate or parent
22     company level.
23          Q.   Okay.  And the parent or corp -- well,
24     who is the parent or corporate level entity that
25     shares their employees with the subsidiaries?
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 36

```
 1          A.   For this group, it would be Southern
 2     Coal Corporation.
 3          Q.   So Southern Coal Corporation would
 4     share its employees with its subsidiaries so
 5     that they could do whatever work they needed to
 6     get done?
 7          A.   Yes.
 8          Q.   Okay.  Was Southern Coal Corporation
 9     compensated for that?
10          A.   I don't know if I understand the
11     question.
12          Q.   Well, was there an agreement?  Was
13     there an employee-sharing agreement between
14     Southern Coal Corporation and its subsidiaries?
15          A.   Nothing formalized, no.
16          Q.   Okay.  Rather, whenever one of the
17     summer -- when -- strike that.
18               When one of the subsidiaries required
19     services, it could turn to Southern Coal
20     Corporation, who would provide them to the
21     subsidiary free of charge, correct?
22          A.   Yes.  And, like I said, this,
23     typically, related to what I would call either
24     kind of professional or administrative-type
25     services.  At the mine site, they definitely
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 37

```
 1          would have been employed by the operating

 2          company.  This was -- the main three functions

 3          would be accounting, legal and engineering.

 4               Q.   Were there individuals that were

 5          employees of all of these entities?

 6               A.   Not that I'm aware of.

 7               Q.   Okay.  What about Summer Harrison, who

 8          did she work for?

 9               A.   It changes from time to time.

10               Q.   Okay.  In 2016, do you know who she

11          worked for?

12               A.   Not specifically.

13               Q.   I asked Summer and she didn't know

14          either.

15               A.   That makes me feel a little better.

16               Q.   Turning to the second page in

17          Exhibit 502, those entities and subsidiaries of

18          Bluestone Resources, Inc., did you follow the

19          same basic pattern for Bluestone Resources,

20          Inc.'s, subsidiaries?  Did they use the services

21          and borrow employees from Bluestone Resources,

22          Inc., as needed?

23               A.   The concept was similar.  The employer

24          was Bluestone Industries, Inc., for this group.

25               Q.   Okay.  So Bluestone Industries, Inc.,
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 38

1        is a subsidiary of Bluestone Mineral, Inc.,

2        right?

3                A.   Correct.

4                Q.   Okay.  And Bluestone Mineral, Inc.,

5        is the only subsidiary of Bluestone Resources,

6        Inc.?

7                A.   Correct.

8                Q.   Okay.  And Bluestone Industries,

9        Inc., employed all of the employees who

10       performed services for the entities identified

11       on Page 2 of Exhibit 502?

12               MR. ROBECK:  Objection; form.

13               THE WITNESS:  It would be similar

14       to what we discussed with Southern Coal, the

15       services that relate to corporate office-type

16       functions, accounting, engineering, legal.  I

17       include payroll with accounting.  But mine site

18       employees would be employed by the particular

19       operating entity.

20       BY MR. BOLLIN:

21               Q.   Okay.  Did Bluestone Resources, Inc.,

22       have any of its own employees?

23               A.   No.

24               Q.   Did Bluestone Mineral, Inc., have any

25       of its own employees?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 39

1          A.    No.

2          Q.    Who did the work of those entities?

3          A.    The -- the Blue -- the people employed

4     by Bluestone Industries, Inc.

5          Q.    Okay.

6          A.    Bluestone Mineral is just a holding

7     company, so there would be nothing to do, other

8     than the things we've talked about, annual

9     filings with the Secretary of State's Office,

10    things of that nature.  But there wouldn't be

11    any operational activity within Bluestone

12    mineral.

13         Q.    All the entities identified in

14    Exhibit 502, did they operate out of -- are they

15    headquartered out of the same office?

16         A.    Yes.

17         Q.    And what is that office?

18         A.    302 South Jefferson Street, Roanoke,

19    Virginia.

20         Q.    Now, we've talked about some other

21    entities that are not on this organizational

22    chart, and I'm going to try to do this

23    efficiently and painlessly, but we'll see

24    how it goes.

25         A.    Okay.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 40

1          Q.   First of all, do these other

2    entities, James C. Justice Companies, Inc.,

3    Tams Management, Inc., Bluestone Energy Sales

4    Corporation, A&G Coal Corporation and Justice

5    Family Farms LLC, are they also headquartered in

6    the same place?

7          A.   Yes.

8          Q.   Do those entities I just identified

9    share the same professional staff as the

10   entities set forth on Exhibit 502?

11              MR. ROBECK:  Can you read that list

12   again, I'm sorry, for me?

13              MR. BOLLIN:  Sure.

14              James C. Justice Companies, Inc.,

15   Tams Management, Inc., Bluestone Energy Sales

16   Corporation, A&G -- that's A ampersand G -- Coal

17   Corporation and Justice Family Farms LLC.

18   BY MR. BOLLIN:

19         Q.   Do they --

20         A.   I'm sorry, I was going to say, can you

21   remind me of the question?  Sorry.

22         Q.   Do they share a headquarters with the

23   entities identified in Exhibit 502?

24              MS. BYROADE:  On the second page of

25   that exhibit or --

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 41

1          MR. BOLLIN:  Both.

2          THE WITNESS:  Yes.

3     BY MR. BOLLIN:

4          Q.   Let me ask you a quick question about

5     Coal Mountain Mining Company Limited Partnership

6     LLP.  You said that the Justice entities do not

7     own that company, right?

8          A.   Correct.

9          Q.   And you don't know who does?

10          A.   Not aware of it.

11          Q.   Was there a time when one of the

12     Justice entities did own Coal Mountain?

13          A.   Not that entity.

14          Q.   Okay.  What did they --

15          A.   I mean, Coal Mountain, as it's

16     generally known as an operation, the Justice

17     entities owned Coal Mountain Surface Mine

18     operation through the entity Dynamic Energy,

19     Inc., which is on the second page of Exhibit

20     502, but that entity I have no familiarity with.

21          Q.   Okay.  So Dynamic Energy, Inc., on the

22     second page of Exhibit 502, is a subsidiary of

23     Bluestone Mineral, Inc., right?

24          A.   Correct.

25          Q.   Okay.  And that was the entity that

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42

1    owned Coal Mountain Mine?

2         A.   The Coal Mountain Number 1 Surface

3    Mine.

4         Q.   Okay.  The Dynamic Energy, Inc.,

5    entity still exists today but is inactive?

6         A.   Correct.

7         Q.   When did it become inactive?

8         A.   January of 2017.

9         Q.   And is that when you sold Coal

10   Mountain Mine?

11        A.   Correct.  I believe the date was

12   January 27th.

13        Q.   To whom did Dynamic Energy Inc., sell

14   Coal Mountain?

15        A.   It was a group called ███████████

16   ████████.

17        Q.   Is that a Justice-related entity?

18        A.   No.  ████████████████████ formed

19   some special-purpose entities for the purpose of

20   the acquisition.  I believe their name was ███

21   ███████ I'm assuming for Coal Mountain, but I

22   can't recall their entity's names specifically.

23   I know the parent group was called ████████

24   ████████████.

25        Q.   Do you recall the sale price?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 43

1        A.   There were a couple different

2    components to the sale price.  There was a

3    preparation plant that was not owned by Dynamic

4    Energy.  It was owned by National Resources.

5    Its component of the sales price was ███████

6    ███████

7        Q.   Is that a Justice-related entity?

8        A.   It's on Page 2 of Exhibit 502.

9             MR. ROBECK:  So, Steve, is the

10   amount confidential, or is the sales price

11   confidential?

12            MR. BOLLIN:  We can mark it attorneys'

13   eyes only.

14            THE WITNESS:  I mean, the agreement

15   definitely has a confidentiality provision, if

16   we can do that.  That's a fair point.

17   BY MR. BOLLIN:

18       Q.   Okay.  So I'm sorry, the prep plant

19   was an asset of National Resources, Inc.?

20       A.   Correct.

21       Q.   And that sold for ███████████?

22       A.   Correct.

23       Q.   Okay.

24       A.   The surface mine permits and leases,

25   and there was some owned property, as well, it

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 44

```
 1        was owned by Dynamic Energy, the purchase price

 2        -- I could be off slightly on this, but it was

 3        in the neighborhood of ███████████.

 4             Q.   And then how did you wind up the

 5        Dynamic Energy, Inc., entity?

 6             A.   It really doesn't have any -- it has

 7        a couple leases left in its name for coal seams

 8        that weren't acquired by ██████████████████

 9        █████████ but -- it's still out there because

10        it's a lessee, but it has no operational

11        activity.

12             Q.   Where did the proceeds of the sale go?

13             A.   Most of it went to Carter Bank &

14        Trust, who has a loan facility with Bluestone

15        Resources.  And then as part of our 2015

16        transaction with ██████████ we owe █████ percent

17        of the purchase price to them, so they received

18        ███████ percent of the proceeds.

19             Q.   I'm sorry.  Who's the them?

20             A.   ██████████████

21             Q.   Who owed ███████████ money?

22             A.   Bluestone Resources.

23                  Their agreement has a provision that,

24        if you sell one of the assets or companies that

25        you acquired from that -- that we acquired from
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 45

1      them in 2015, if that sale occurs in the first

2      five years, you owe them ███ percent of the

3      sale price.

4            It goes down between years 5

5      and 10.  I don't remember what it drops to.

6      But, obviously, this was within the first five

7      years so the ███ percent applied.

8            Q.   Okay.  You said that Bluestone

9      Resources had a credit facility with Carter

10     Bank?

11           A.   Correct.

12           Q.   Okay.  And the sale of Dynamic Energy,

13     Inc.'s, Bluestone -- I'm sorry.  And the sale

14     of Dynamic Energy, Inc.'s, Coal Mountain Mine

15     resulted in proceeds that went to Bluestone

16     Resources, Inc.?

17           A.   To get the blanket lien released that

18     Carter Bank had filed, to get a partial release

19     of that, obviously, some proceeds had to go to

20     them.  The facility was larger than the amount

21     that went to them, so it was a partial release.

22           There were some other things.  When

23     we reacquired Bluestone in 2015, ████ had

24     incurred close to $██████ of tax liabilities

25     with the State of West Virginia, and to transfer

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

1    clean title ███████████████████, there

2    were about $███████ in taxes that had to be

3    paid.  The other 11 did not relate,

4    specifically, to dynamic.

5           Q.   All right.  I'm going to back up just

6    a second, and I'll probably ask a couple

7    questions I asked previously, because I've

8    forgotten the answers, so I apologize, --

9           A.   Okay.

10          Q.   -- but most of them will be new.

11          A.   Okay.

12          Q.   So the owner of James C. Justice

13   Companies, Inc., is James C. Justice, II, and

14   James C. Justice, III?

15          A.   And Jillian Justice, for James C.

16   Justice Companies, Inc.

17          Q.   Okay.  Do they have any subsidiaries?

18          A.   Yes.

19          Q.   What are those subsidiaries?

20          A.   Justice Family Farms LLC, that you

21   asked before about earlier; Southeast Cotton,

22   Inc.; Wilcox Industries, Inc.  I feel like I'm

23   missing one.  I'm happy to supplement this

24   answer when I can look, but I think that's --

25          Q.   If you think of one later, let me

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 47

1      know.

2              A.   Yeah.  I think that's it, but maybe a

3      plus one.

4              Q.   Who are the directors of Southeast

5      Cotton, Inc., and Wilcox Industries, Inc.?

6              A.   What timeframe?

7              Q.   2016.

8              A.   James C. Justice, II, and James C.

9      Justice, III.

10             Q.   And then that changed in 2017?

11             A.   Correct.

12             Q.   And who became the officers -- I'm

13     sorry, the directors in 2017?

14             A.   James C. Justice, III, and Jillian

15     Justice.

16             Q.   And who were the officers of SE

17     Cotton, Inc., and Wilcox Industries, Inc., in

18     2016?

19             A.   James C. Justice, II, was president.

20     James C. Justice, III, was vice president.  I

21     was secretary.  James T. Miller treasurer.

22             Q.   And that was for both entities?

23             A.   Correct.

24             Q.   Were those entities also headquartered

25     at the same address in Virginia as all the other

Page 48

1         entities we've discussed here today?

2              A.   Yes.

3              Q.   I think earlier you already indicated

4         that the members of the Justice Family Farms LLC

5         were Jay and Jillian Justice; is that right?

6              A.   If I said that I misspoke.

7              Q.   I may have misinterpreted.

8              A.   Because it's a wholly owned subsidiary

9         of James C. Justice Companies.

10                  If I said that, --

11             Q.   You may not have.

12             A.   -- let's clear it up.

13                  They are the managers of Justice

14        Family Farms.

15             Q.   Okay.  Thank you.

16                  And the member is James C. Justice

17        Companies, Inc.?

18             A.   Correct.

19             Q.   And that's also headquartered in the

20        same location as all the other entities we've

21        discussed today?

22             A.   Yes.

23             Q.   And it has the same employees?

24             A.   It has no --

25             Q.   The same --

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 49

1          A.   It has no employees, technically, --

2          Q.   Okay.

3          A.   -- but to the extent it has an annual

4     filing or something like that that needs done,

5     it would be done by the -- what we've been -- or

6     what I've been referring to as professional and

7     administrative staff of Bluestone Industries.

8          Q.   Up until January of 2017, who were the

9     directors of Tams Management, Inc.?

10         A.   James C. Justice, II, and James C.

11    Justice, III.

12         Q.   Who were the officers?

13         A.   James C. Justice, II, was president.

14    James C. Justice, III, executive vice president.

15    I was secretary.  James T. Miller treasurer.

16         Q.   Up until January of 2017 -- well,

17    strike that.

18              After January of 2017, were -- I was

19    going to try to name it for you, but I'm just

20    going to let you do it.  Strike that.

21              After January 2017, who were the

22    directors and officers of Tams Management, Inc.?

23         A.   Directors were James C. Justice, III,

24    and Jillian Justice.  The officers were James

25    C. Justice, III, president; myself as vice

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

1    president., James T. Miller as secretary and

2    treasurer.

3         Q.   Bluestone Energy Sales Corporation,

4    who were the directors up 'til January 2017?

5         A.   James C. Justice, II, and James C.

6    Justice, III.

7         Q.   And during the same time period, who

8    were the officers?

9         A.   James C. Justice, II, president; James

10   C. Justice, III, executive vice president.  I

11   was secretary.  James T. Miller as treasurer.

12        Q.   And who were the directors and

13   officers of Bluestone Energy Sales Corporation

14   after January of 2017?

15        A.   The directors are James C. Justice,

16   III, and Jillian Justice.  The officers are

17   James C. Justice, III, as president.  I'm the

18   vice president, and James T. Miller is secretary

19   and treasurer.

20        Q.   For A&G Coal Corporation, who

21   were the directors prior to January of 2017?

22        A.   James C. Justice, II, and James C.

23   Justice, III.

24        Q.   And who are the officers?

25        A.   James C. Justice, II, is -- or was

CONFIDENTIAL - ATTORNEYS EYES ONLY

1     president, James C. Justice, III,  executive

2     vice president.  I was secretary and Terry -- or

3     James T. Miller was treasurer.

4          Q.   And who were the directors and

5     officers of the A&G Coal Corporation after

6     January of 2017?

7          A.   The directors are James C. Justice,

8     III, and Jillian Justice.  The officers are

9     James C. Justice, III, president.  I'm the vice

10    president.  James T. Miller is secretary and

11    treasurer.

12         Q.   Who were the managers of Justice

13    Family Farms LLC prior to January of 2017?

14         A.   James C. Justice, II, and James C.

15    Justice, III.

16         Q.   In 2016, what was the business of

17    Southern Coal Sales Corporation?

18         A.   In 2016, Southern Coal Sales

19    Corporation had, basically, been wound down.

20    It was the primary sales company for Southern

21    Coal Corporation in 2015, and some other Justice

22    entities in 2015.  In 2016, Bluestone Energy

23    Sales Corporation had become the primary

24    sales company, and so other than some existing

25    relationships, one being Algoma Southern Coal

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 52

1       Sales Corporation, it was winding down.

2              Q.    What do you mean by winding down?

3              A.    Any new relationships were going

4       through Bluestone Energy Sales Corporation.

5       So other than maintaining and administering

6       existing and ongoing relationships that Southern

7       Coal Sales had, it was not taking on any new

8       business.

9              Q.    Why?

10             A.    It was predominantly finance-driven.

11      Carter Bank & Trust was the primary lender for

12      all Justice organizations.  To take on the

13      Algoma contract with the coal being sold on

14      consignment, that was a heavy liquidity drain

15      on the Southern Coal Sales and Southern Coal

16      entities.  And so we approached Carter Bank for

17      a credit facility.  Southern Coal Corporation

18      had already either reached or exceeded its

19      lending limitation at the bank.  That was a

20      bank requirement, not ours.  Whatever their FDIC

21      lending limits were, Southern Coal Corporation

22      had basically been tapped out.  So they advised

23      us they were willing to do a credit facility for

24      coal receivables, but it would have to be a new

25      entity and it would have to be a standalone

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 53

1    entity.  And that's when we formed Bluestone

2    Energy Sales in November of 2015 for that

3    purpose.

4        Q.   So that's when the original agreement

5    was signed with Essar Algoma, correct, November

6    of '15?

7        A.   Yes.

8        Q.   Okay.  So the Bluestone Energy Sales

9    entity was created, specifically, so that one

10   of the Justice entities could get the credit

11   required to go through with the Algoma deal?

12       A.   That was the primary driver, and then

13   it, obviously, financed all receivables -- coal

14   sales receivables, in general.  But that was the

15   driver, was to create liquidity to be able to do

16   the Algoma contract.

17       Q.   All right.  Does -- Bluestone Energy

18   Sales Corporation, who owns it?

19       A.   James C. Justice, II.

20       Q.   Is Bluestone Energy Sales Corporation

21   existing today?

22       A.   It's not operational today.  I do

23   believe the entity still exists.

24       Q.   When did it become non-operational?

25       A.   I believe it -- I believe in 20 -- it

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 54

1   may have been 2018.  Late 2017, early 2018,

2   we closed out the facility with Carter Bank &

3   Trust, and once that facility was closed we

4   no longer used it.

5          Q.   So tell me, why did Southern Coal

6   Sales Corporation enter into the agreement

7   with Algoma rather than Bluestone Energy Sales

8   Corporation?

9          A.   Southern Coal Sales Corporation had

10  an existing relationship with Algoma.  And the

11  Carter Bank & Trust issue was not anticipated.

12  We didn't realize that that was the only way

13  they could loan us money.  And so, at the time,

14  Southern Coal Sales Corporation was the primary

15  and only sales company being utilized by the

16  Justice organization for coal sales.

17         Q.   Okay.  And I'm trying to understand

18  something you referred to, the Justice

19  organization and the only way Carter Bank

20  could loan us money, --

21         A.   Okay.

22         Q.   -- I'm trying to figure out who the

23  us is and who the Justice organization is.

24         A.   Okay.  So the -- I'm, probably,

25  just painting with too broad of a brush, but the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 55

1       Justice organization, generally, would be the
2       coal companies that we've been discussing today,
3       that those were the companies that had coal
4       sales either through Southern Coal Corporation
5       or the Bluestone Resources entities.  You also
6       had Tams Management, Inc.  You also had A&G Coal
7       Corporation, Kentucky Fuel Corporation.  Any of
8       those coal companies that are owned by the
9       Justice Family, their coal would have been
10      marketed through Southern Coal Sales
11      Corporation.
12           Q.   Okay.
13           A.   So that's who I was referring to when
14      I said that.
15           Q.   Okay.
16           A.    In the other context of your question,
17      the us in that question would be Southern Coal
18      Corporation.  Southern Coal -- in -- Southern
19      Coal Corporation approached Carter Bank for the
20      additional credit on coal sales receivables,
21      and Carter Bank said they would be happy to do
22      a credit line, but they could not do it with
23      Southern Coal Corporation, or any of its
24      subsidiaries, due to their lending limits.
25           Q.   Okay.  And so you created the new

Page 56

1      entity, Bluestone Energy Sales Corporation, so

2      that it could take out the credit from Carter

3      Bank and move forward with the Algoma

4      transaction?

5            A.   Correct.

6            Q.   What assets -- well, no, that's not a

7      good -- strike that.

8                 What was Southern Coal Sales

9      Corporation bringing to the table in the Algoma

10     agreement?

11                MS. BYROADE:  Objection to form.

12     BY MR. BOLLIN:

13           Q.   Okay.  I'll ask that a little more

14     formally.

15           A.   Okay.

16           Q.   What is it that Southern Coal Sales

17     Corporation had or did in relation to the Algoma

18     agreement?

19           A.   They supplied the coal that Algoma

20     purchased under the contract.

21           Q.   How did they supply it?

22           A.   By working with the various

23     operations, A&G Coal Corporation being one,

24     Dynamic Energy Surface Mine being one, Tams

25     Surface Mine being the third, they acquired coal

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 57

1          from those operations and, in turn, supplied it

2          to Algoma.  And in 2015, during the month of

3          December -- November and December, they also

4          acquired some third-party coal from third-party

5          producers and supplied it to Algoma.

6               Q.   Okay.  So Southern Coal Sales

7          Corporation didn't own any coal, right?

8               A.   It doesn't own coal reserves, and it

9          does not operate coal mines.

10               Q.   Okay.  It doesn't produce coal?

11               A.   No.

12               Q.   It acquires and transfers coal?

13               A.   Acquires and resells.

14               Q.   Okay.  Were there agreements between

15          Southern Coal Sales Corporation and these three

16          entities, A&G, Dynamic, Tams?

17               A.   No.

18               Q.   So --

19               A.   No written agreements.

20               Q.   Okay.  Were there even unwritten

21          agreements?

22               A.   Well, given the last hour, --

23               Q.   Yeah.

24               A.   -- you know, I mean, you have common

25          people on each side of that transaction.  So,

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 58

1    obviously, there was an understanding that when

2    a certain amount and quality of coal was agreed

3    upon to be delivered to Algoma, those same

4    people had an understanding on whether or not

5    these three operations could produce that coal.

6         Q.   Okay.  So rather than an agreement,

7    there was an understanding among the Justice

8    Coal Companies that they would supply enough

9    coal of the right quality to Algoma to satisfy

10   the obligations under the agreement between SCSC

11   and Algoma?

12        A.   Yes.

13        Q.   And that explicitly did include

14   Bluestone -- let me say the name again -- that

15   understanding did include Bluestone Energy Sales

16   Corporation, right?

17        A.   I don't understand the question.

18        Q.   Sure.

19             I mean, Southern Coal Sales

20   Corporation was getting its coal from the three

21   Justice coal companies, right?

22        A.   Three Justice family-owned, either

23   directly or indirectly, operations.

24        Q.   Okay.  And it was getting the

25   financing to go through with the deal with

CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Algoma from Bluestone Energy Sales Corporation?

2           A.   Yeah.   Some of the money would have

3      been used, ideally, to pay for trains, I know

4      that's been an issue here, and to produce coal

5      that was later sold to Algoma.

6                That was somewhat complicated by the

7      fact that the Algoma contract was never formally

8      transferred to Bluestone Energy Sales, because

9      it created an issue where Carter Bank couldn't,

10     in turn, get a lien on the Algoma receivable,

11     so it was somewhat complicated.  We attempted

12     to have the contract assigned, but what was

13     conveyed to me by Steve Sears is, due to the

14     bankruptcy complication with Algoma, there could

15     be problems getting an assignment ratified in

16     the bankruptcy proceeding, and so the contract

17     stayed in Southern Coal Sales' name.

18          Q.   So perhaps you can explain to

19     me how it works, or how it worked in 2016.

20     There's an agreement between Southern Coal Sales

21     Corporation and Algoma, signed in April of 2016,

22     an amending agreement.  You're familiar with

23     that?

24          A.   Yes.

25          Q.   Okay.   There's a request for a

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 60

1      shipment of coal.  How would Southern Coal Sales

2      Corporation fund, for example, the acquisition

3      of trains to provide service to provide the

4      delivery of coal to the port?

5            A.   So going back to the beginning, --

6            Q.   Yeah.

7            A.   -- in a perfect world, we would have

8      been able to have gotten that money from Carter

9      Bank, but because the Algoma contract was never

10     assigned and Carter Bank did not have a lien on

11     Algoma receivables back to Southern Coal Sales,

12     that didn't quite work out like we had

13     originally anticipated.  So those trains would

14     be funded either through money from Southern

15     Coal Corporation or, possibly, another

16     Justice-owned entity through a loan.

17            There had been instances over the

18     years where we have, basically, had brokers

19     factor a coal shipment for us, where they'll

20     prepay the transportation -- I don't remember

21     that happening on Algoma, but a broker, for

22     example, will prepay your transportation costs,

23     and then they get a certain percent of the sales

24     price in return for doing that.

25            So there's different ways of doing

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 61

1      that, but, I think, typically, with Algoma we

2      were funding it within either Southern Coal

3      Corporation or a loan from another Justice-owned

4      entity.

5             Q.   Okay.  I mean, Southern Coal Sales

6      Corporation didn't really have its own money,

7      right?

8                  MR. ROBECK:   Objection; form.

9                  THE WITNESS:   It had receivables that

10     were paid to it, --

11     BY MR. BOLLIN:

12            Q.   Okay.

13            A.   -- but sometimes the timing of

14     receivables coming in and trains being scheduled

15     would not match up exactly.  So if you needed

16     to schedule a train but you hadn't received a

17     receivable recently, there would be a cash need.

18            Q.   Okay.  And when there was a cash need,

19     that was funded by Southern Coal Corporation or

20     Bluestone Energy Sales Corporation?

21            A.   Or it's possible even a separate

22     Justice-owned entity.  It's not uncommon for

23     us to do intercompany loans when there's a cash

24     need like that.

25            Q.   Okay.  Are those formal loans?  Are

Page 62

1    those documented?

2         A.   They're documented in our accounting

3    records.  Each company records a receivable to

4    -- or a payable to and a receivable from, and

5    then those are reconciled throughout the year.

6         Q.   Okay.  So there's no other formal loan

7    documents?

8         A.   Not in a traditional sense, like a

9    promissory note or anything like that.  Nothing

10   like that.

11            MR. BOLLIN:  Can we take a

12   three-minute break?

13            MS. BYROADE:  Yeah.

14            MR. ROBECK:  Sure.

15            (Recess taken.)

16   BY MR. BOLLIN:

17        Q.   So just before the break you had

18   testified that you have accounting records that

19   show transfer of money of loans among Justice

20   entities; is that right?

21        A.   Yes.

22        Q.   Okay.  What are those records?

23        A.   So it would be journal entries that

24   relate to the balance sheet for each specific

25   entity.  If it's within a parent subsidiary

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 63

1        context, it would be referred to as an

2        intercompany payable or intercompany receivable.

3        If it's a Justice-owned entity but it's outside

4        of the parent subsidiary context, it would be

5        referred to as a related party payable or a

6        related party receivable.  And then there's a

7        third separate one for shareholder loans.

8             Q.   Who keeps those records?

9             A.   It has varied over time, but whoever

10       the accountant is for each particular entity.

11            Q.   Okay.  Is there a master ledger where

12       all of this is kept?

13            A.   It would be on each party's books.

14       So it would be on the general ledger of each

15       party's books, which all of our accounting is

16       run through an accounting software called MAS,

17       M-A-S, MAS 200.  It's a Sage product.  So it

18       would all be included within that company's

19       books on that accounting system.

20            Q.   Okay.  And these accounts are all

21       maintained at the headquarters -- the common

22       headquarters?

23            A.   All accounting is at the headquarters,

24       yes.

25            Q.   And it's all the same shared personnel

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 64

1      who are doing the accounting for all the various

2      Justice entities?

3              A.    Typically.

4              Q.    Okay.

5              A.    I mean, there have been instances over

6      the years -- well, I think during this timeframe

7      that would be.

8              Q.    And who runs that part of the

9      business?

10             A.    The accounting department, it has

11     -- we refer to each one of our accountants

12     that is responsible for a particular group of

13     companies as a senior controller.  Like, today

14     the senior controller for the Bluestone Group of

15     companies is Amanda Boggs.  She's a CPA.

16     She has 30 years' experience.  During this

17     timeframe, she was doing Southern Coal

18     Corporation.  She was the senior controller

19     for Southern Coal.  And during '15, '16 and

20     '17, the senior controller for Bluestone was a

21     gentleman by the name of Aaron Smith.  He no

22     longer works for the company.

23             Q.    And who did they report to?

24             A.    They reported to Summer Harrison,

25     typically.  They also will sometimes report

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 65

1      directly to me, although, organizationally

2      speaking, they typically directly report to

3      Summer.

4           Q.   Do you know if these records that

5      you've been speaking of have been produced in

6      this litigation?

7           A.   As it relates to Southern Coal Sales

8      Corporation, it shows up as a line item on their

9      balance sheet.  It would also show up as a line

10     item on the balance sheet of Southern Coal

11     Corporation.  To my knowledge, none of the

12     books for other Justice-owned entities have been

13     disclosed.

14          Q.   Have the books related to transfers

15     and loans from other Justice entities to

16     Southern Coal Sales Corporation been produced?

17          A.   It's included on the balance sheet of

18     Southern Coal Corporation.  The actual entries

19     themselves, I don't think that the -- I think

20     that would be part of the general ledger, and,

21     to my knowledge, the general ledger has not been

22     disclosed.  It was just the balance sheet and

23     the income statement.

24          Q.   Is there any way --

25               MR. ROBECK:  Nor do I think it was

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

1    requested.

2              MR. BOLLIN:  Well, we can disagree

3    about that.

4    BY MR. BOLLIN:

5         Q.   Is there any way to determine what

6    specific loans were made to or from Southern

7    Coal Corporation from other Justice entities,

8    other than looking at the general ledger?

9         A.   No.  That's where you would go to

10   determine that.

11             (Ball Exhibit No. 505, the balance

12   sheet and income statement for Nevada Holdings,

13   Inc., for the year-end 2015, was marked.)

14   BY MR. BOLLIN:

15        Q.   I'm handing to you what's been marked

16   as Exhibit 505.  Do you recognize it?

17        A.   Yes.  It's the balance sheet and

18   income statement for Nevada Holdings, Inc., for

19   the year-end 2015.

20        Q.   Okay.  A moment ago we were talking

21   about moneys received by Southern Coal Sales

22   Corporation -- well, first, Nevada Holdings,

23   Inc., that's the same thing as Southern Coal

24   Sales Corporation?

25        A.   Correct.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 67

1    Q.   In December of 2015, it was not yet

2    known as Nevada Holdings, Inc., correct?

3    A.   That's correct.

4    Q.   Do you know when this consolidated

5    balance sheet was created?

6    A.   I don't.

7    Q.   Fair to say that it was created after

8    2015?

9    A.   The printout.  I mean, the accounting

10   system, once a period has been closed, that

11   period should not change.  But all of this is

12   kept electronically now, so it's not like these

13   are kept in the ordinary course in a paper copy.

14        So when they would go to generate

15   this, I'm assuming for this request, the system

16   would recognize whatever entity name had been

17   assigned to it at the time the report was

18   generated.  But the numbers would not have

19   changed since whenever these books were closed

20   out, usually, you know, within 120 days of

21   year-end.

22   Q.   All right.  So let's look at the

23   sheet.  This is -- so when this says Nevada

24   Holdings, Inc., consolidated balance statement,

25   it is -- we're talking about Southern Coal Sales

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 68

1        corporation, right?

2                A.   Correct.

3                     MR. ROBECK:   Asked and answered.

4        BY MR. BOLLIN:

5                Q.   Where in Exhibit 505 are the loans

6        that you were referenced from other Justice coal

7        entities or Justice entities?

8                A.   So it's in two spots.  On the

9        first page, under other assets, you see I/C

10       receivables.  That stands for intercompany

11       receivable.  Here it's a negative, so

12       technically it's a payable.

13               Q.   So that's money owned by SCSC?

14               A.   Correct.

15               Q.   Who is it owed to?

16               A.   I can't tell from the face of this.

17                    And then on the second page,

18       under long-term liabilities, you have loan to

19       shareholders, and then you have I/C payables,

20       which stands for intercompany payables.

21               Q.   What is the loan to shareholders?

22               A.   That would be money that has been

23       loaned to the entity.  In this instance, it

24       would come from Southern Coal Corporation.

25       It could come from the Justice family through

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 69

1     Southern Coal Corporation, but it's to indicate

2     that it came from the shareholder instead of a

3     subsidiary or a related party.

4         Q.   So the ███████████ of long-term

5     liability on Page 2 of Exhibit 505 is a loan

6     from Southern Coal Corporation?

7              MR. ROBECK:  Say that one more time.

8              MR. BOLLIN:  Can you read it back?

9              (Referred-to testimony read back.)

10             THE WITNESS:  I would anticipate that

11    that is money that has been loaned to Southern

12    Coal Corporation by the Justice family, and

13    then, in turn, from Southern Coal to Southern

14    Coal Sales.  It is possible that the Justice

15    family would loan it directly to Southern Coal

16    Sales Corporation.  That has happened before.

17    But, typically speaking, when money is loaned to

18    a subsidiary, we want that to flow through the

19    parent company, not directly from the indirect

20    shareholders, which would be the Justice family.

21    BY MR. BOLLIN:

22        Q.   Okay.  Why is that?

23        A.   It's just cleaner accounting-wise,

24    from what I'm told, I'm not an accountant, but

25    it's cleaner to keep the shareholder loans

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 70

1    with the direct shareholder, not the indirect

2    shareholders.  So it's for an efficiency purpose

3    from an accounting standpoint.

4         Q.   Okay.  So whether it's pass-through

5    or directly, the ███████████ set forth on Page 2

6    of Exhibit 505 comes from the Justice family?

7              MR. ROBECK:  Objection.

8    Mischaracterizes what he testified to.

9              THE WITNESS:  If it comes from

10   Southern Coal Corporation, it would not

11   necessarily have to come from the Justice

12   family.  It more than likely would.  But if

13   Southern Coal Corporation otherwise had cash

14   available and Southern Coal Sales Corporation

15   needed it, it could loan its own cash.

16   BY MR. BOLLIN:

17        Q.   Okay.  So if it came -- if the $███

18   ████████ loan set forth on Page 2 of Exhibit 505

19   came from Southern Coal Corporation, it could be

20   Justice family money, or it could come from

21   Southern Coal's own coffers or it could come

22   from some third party?

23        A.   Through -- yeah.  The -- yes.  But it

24   would come through southern coal.

25        Q.   Okay.  And how could we find out the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 71

1    answer to that question?  Who was funding the █████

2    ████████?

3           A.    There would be detail.  Similar

4    to what we described on these intercompany

5    transactions, the loan to shareholder would have

6    a similar entry.  So when Southern Coal Sales

7    received that money, there would be an entry

8    describing whether it came directly from

9    Southern Coal Corporation or from the Justice

10   family shareholders.

11          If it came from Southern Coal

12   Corporation, if you wanted to then determine

13   whether they had received that money from some

14   other entity, then you would look at their books

15   for a corresponding entry to see if they had

16   received a similar amount on that same day.

17          Q.    So that would be in the Southern Coal

18   Corporation ledger?

19          A.    Yes.

20          Q.    Did you review that ledger in

21   preparation for your deposition today?

22          A.    No.

23          Q.    Is that something you have access to?

24          A.    I could see it.  I don't have -- I

25   don't have unfettered access to it, but if I

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 72

1     asked to see it, I could see it.

2         Q.   Earlier you were talking about the

3     -- that the money for the loan, the ██████████,

4     could come from the Justice family, right?

5         A.   Correct.

6         Q.   Who do you mean?

7         A.   Either --

8         Q.   Who's the Justice family?

9         A.   The shareholders of Southern Coal

10    Corporation are James C. Justice, II,  James C.

11    Justice, III, and Jillian Justice, and over time

12    all three of them have loaned money to Southern

13    Coal Corporation.

14        Q.   Going back to the first page of

15    Exhibit 505, what were Southern Coal Sales

16    Corporation's fixed assets at the time this

17    document was created in 2015?

18        A.   There are █████.

19        Q.   How could we determine to whom the

20    intercompany receivable of ██████ -- strike

21    that.

22             Is that $██████?

23        A.   Yes.

24        Q.   Okay.  How could we determine who that

25    was owed to?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 73

1          A.   Again, on the accounting records
2     that underpin this report, there would be
3     entries that record that, and that's how it,
4     ultimately, shows up on the balance sheet.
5          Q.   Okay.  Do you have access to those?
6          A.   I mean, they're part of the accounting
7     system.
8          Q.   So you do?
9          A.   Yeah.  I mean, it's the same as --
10         Q.   Okay.
11         A.   This is just a report that the
12    accounting system is designed to generate, but
13    all of the information that underpins this
14    report is in that system.
15         Q.   Okay.  Did you review the information
16    in that system in preparation for your
17    deposition here today?
18         A.   No.
19         Q.   Why not?
20         A.   I don't have access to the accounting
21    system directly.
22         Q.   So you have to ask for it?
23         A.   Yeah.
24         Q.   And if you asked for it, you'd be
25    given it?

1    A.   Yeah.  If I asked for a specific

2    report, they would generate it for me.

3    Q.   And beyond that, if you wanted to

4    see who was making loans -- intercompany loans

5    to Southern Coal Sales Corporation, you could

6    find out, right?

7    A.   I could see who the loans had been

8    made to or from, yes.

9    Q.   You were characterizing them as loans.

10   Do you know if they were paid back?

11   A.   Typically, they are.

12   Q.   We would have to look at a particular

13   loan in order to determine whether it was paid

14   back?

15   A.   Yeah, I mean, you would look at the

16   same account over -- at different time periods

17   to see what the activity was, but, typically, we

18   do expect for those to be paid back.

19         (Ball Exhibit No. 506, the balance

20   sheet and income statement for Nevada Holdings,

21   Inc., for 2016, was marked.)

22   BY MR. BOLLIN:

23   Q.   You've been handed Exhibit 506.  Do

24   you recognize the exhibit?

25   A.   It's the balance sheet and income

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 75

1    statement for Nevada Holdings, Inc., for 2016.

2         Q.   And, again, this is the same entity as

3    Southern Coal Sales Corporation?

4         A.   Correct.

5         Q.   And this is the year-end statement,

6    correct?

7         A.   It is.  Correct.

8         Q.   What are the intercompany receivables

9    as of that date, December 31st, 2016?

10        A.   ████.

11        Q.   What are the prepaid expenses?

12        A.   ████████.

13        Q.   And what are those prepaid expenses?

14        A.   I believe those relate to a throughput

15   and transloading agreement that Southern Coal

16   Sales had with ███████████ for port

17   space in Newport News.  It had -- that agreement

18   required for a monthly minimum payment of ██

19   ██████ dollars.

20        Q.   And Southern Coal Sales Corporation

21   had prepaid 11 months?

22        A.   Yes.

23        Q.   Did Southern Coal Sales Corporation

24   have an agreement with ██████████

25        A.   There is an agreement with ████████.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 76

1     I can't recall off the top of my head if it's

2     Southern Coal Corporation or if it's Southern

3     Coal Sales Corporation.

4          Q.   Well, you told me that Southern Coal

5     Sales Corporation was winding down in 2016 and

6     that all new business went to other entities and

7     not to Southern Coal Sales Corporation, right?

8          A.   Yeah.  And I believe this is just a

9     carryover from the prior year.  I don't think

10    the port space had been used, and I think in the

11    prior year there was also a prepaid expense of a

12    similar amount, and so I think this is just a

13    carryover.

14         Q.   Okay.  Looking at Exhibit --

15              MR. ROBECK:  They're not selling coal

16    either.  This is not a sale of coal.

17              MR. BOLLIN:  Right.

18              MR. ROBECK:  Okay.

19    BY MR. BOLLIN:

20         Q.   -- Exhibit 505, it has prepaid

21    expenses in 2015 of $██████████; is that right?

22         A.   Correct.

23         Q.   So sometime prior to the end of 2015

24    Southern Coal Sales Corporation had prepaid

25    expenses of $███████ to ████████?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 77

1          A.    Correct.

2          Q.    And by the end of 2016 it was down to

3    ████████████████ ?

4          A.    Yes.

5          Q.    Do you know if payments were made to

6    ██████████ during 2016?

7          A.    I don't recall when that agreement

8    ended.

9          Q.    Do you recall whether the agreement

10   with ██████████ was a Southern Coal Sales

11   Corporation agreement?

12         A.    I don't.  Like I said, I believe it

13   was either Southern Coal Corporation or Southern

14   Coal Sales.  I believe it started in 2013.

15         Q.    Okay.

16         A.    And I don't recall when it ended, off

17   the top of my head.

18         Q.    Looking at the second page of the

19   Exhibit 506, what were the long-term liabilities

20   as of that date?

21         A.    ████████████████████████

22         Q.    And how much of that was loans from

23   shareholders?

24         A.    ████████████████████████

25         Q.    If I'm not mistaken, I think you just

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 78

1     gave me the number for the intercompany

2     payables, didn't you?

3          A.   I'm sorry.  What was your question?

4     I may have read the wrong number.

5          Q.   No.  That's fine.  That's why I'm

6     asking.

7          A.   Yeah.  No.

8          Q.   What were the loans to shareholders?

9          A.   I'm sorry.  I read the wrong number.

10         Q.   Yeah.

11         A.   It's $██████ -- $███████ in the

12    negative.

13         Q.   What does that mean?

14         A.   That would appear -- a negative on

15    this side would indicate a receivable.  We've

16    never paid back loans to shareholders, so I

17    think this has to be when something was booked

18    in the form of a shareholder loan, or what have

19    you, there had to be a typo from a numbers

20    standpoint.  Because we wouldn't have a

21    receivable on this side.  I mean, there wouldn't

22    be a dividend.  We wouldn't pay a div -- that,

23    technically, would indicate there's a dividend

24    owed, --

25         Q.   Mm-hmm.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 79

1          A.    -- and we wouldn't have that.

2          Q.    Okay.  So --

3          A.    And I misspoke.  Can I clarify

4     something?

5          Q.    Sure.

6          A.    We do repay shareholder loans.

7          Q.    Okay.

8          A.    We do not make dividends.  And this

9     negative number here would indicate that it

10    would be a dividend upcoming.  You haven't made

11    it yet, but it's recorded, so that tells me

12    that's a mistake.

13         Q.    Okay.  And in any case, the $█

14    █████████ loan to Southern Coal Sales Corporation

15    in 2015 has been paid back by the end of 2016?

16         A.    Yes.

17         Q.    If we wanted to find out what the

18    balance was there -- you're saying it's not

19    negative ██████.  If we're trying to figure out

20    what the real balance is, where would we look?

21         A.    You would look at the ledger recording

22    all of the shareholder loans and all of the

23    shareholder repayments.  There is a chance, and

24    I don't know that this happened, sometimes with

25    subsidiaries -- excuse me.  Yeah, it didn't

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 80

1      happen here.  Sometimes shareholder loans can be

2      capitalized and converted to equity, and so you

3      could have a loan go away from that standpoint,

4      but you would see the increase in equity, and I

5      don't think that happened here.

6              So you would go to the general ledger

7      to look at the recording of the shareholder

8      loans.

9          Q.   What were the intercompany payables at

10     the end of 2016?

11         A.   ███████████████

12         Q.   And to whom did Southern Coal Sales

13     Corporation owe ████████████

14         A.   I can't tell from the face of this.

15         Q.   Again, to find out, you'd have to look

16     at Southern Coal Sales Corporation's ledger?

17         A.   Yes.  A summary of their intercompany

18     transactions, which would be generated from the

19     general ledger.

20         Q.   It also listed a note payable?

21         A.   Yes.

22         Q.   What was that?

23         A.   I can't tell from the face of this.

24         Q.   Where would we have to look to figure

25     that out?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 81

1          A.    The general ledger.

2                (Ball Exhibit No. 507, the balance

3    sheet and income statement for Nevada Holdings,

4    Inc., for the year ended 12/31/2017, was

5    marked.)

6    BY MR. BOLLIN:

7          Q.    I've handed you what's been marked as

8    Exhibit 507.  Can you identify the document?

9          A.    This is the balance sheet and income

10   statement for Nevada Holdings, Inc., for the

11   year ended 12/31/2017.

12         Q.    Turning to the second page, first of

13   all, the accounts payable has changed from 2016.

14   In 2016 it was ██████████████ and now it's

15   ████████; is that right?

16         A.    That's correct, yes.

17         Q.    Was Southern Coal Sales Corporation

18   doing business in 2017?

19         A.    No.

20         Q.    Do you know where the $████████ was

21   paid out to?

22         A.    Are you asking me who paid the

23   accounts payable?

24         Q.    No.

25         A.    Just so I understand the question.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

1      Sorry.
2           Q.   I'm wondering who was paid with the
3      $███████ difference between 2016 and 2017?
4           A.   It would be various vendors, I'm sure.
5           Q.   Do you know what for?
6           A.   Not specifically, no.
7                MR. ROBECK:  Maybe legal services by
8      that point.
9      BY MR. BOLLIN:
10          Q.   Could any of the vendors be other
11     Southern Coal -- I'm sorry, other Justice
12     entities?
13          A.   No.
14          Q.   And how do you know that?
15          A.   I can't think of any instance where
16     we bill one of our own entities as an account
17     payable.
18          Q.   Okay.  The loan to shareholders is
19     still negative, right?
20          A.   Correct.
21          Q.   And you think that's a mistake?
22          A.   I do.  I mean, it's nominal, but I do.
23          Q.   The amount owed to intercompany loans
24     has increased from 2016 by almost $███████; is
25     that right?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 83

1          A.   Yes.

2          Q.   Again, Nevada Holdings, Inc., wasn't

3   doing business in 2017, was it?

4          A.   It was not doing any active coal

5   sales, no.

6          Q.   How did it incur ████████ more in

7   intercompany loans in 2017?

8          A.   I think it's logical to think that █

9   ████████████ of that went to pay bills that

10  are no longer on the balance sheet.  The other

11  ████████, I can't tell just by looking at the

12  balance sheet what it would have been used for.

13          There's a -- you know, there's

14  a $██████ general expense on the income

15  statement.  I can't tell what that is from

16  the face of the document.

17          Q.   If you wanted to determine what that

18  $████████ expense was, where would we look?

19          A.   It's ████████ --

20          Q.   I'm sorry.

21          A.   -- but we would look at the detail in

22  the general ledger.

23          Q.   And, again, you didn't review the

24  general ledger prior to your deposition today?

25          A.   No.

Veritext Legal Solutions

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 84

1              (Ball Exhibit No. 508, the balance

2       sheet and income statement for June 30th, 2018,

3       for Nevada Holdings, Inc., was marked.)

4       BY MR. BOLLIN:

5              Q.    Could you identify Exhibit 508 for the

6       record, please?

7              A.    It is the balance sheet and income

8       statement for June 30th, 2018, for Nevada

9       Holdings, Inc.

10             Q.    All right.  Change of topic real

11      quick.  I have a follow-up question.

12                   From Exhibit 502, --

13             A.    Yes.

14             Q.    -- the entities listed on the first

15      page, Southern Coal Corporation entities, are

16      any of those still active?

17             A.    None of these companies have active

18      operations.

19             Q.    And that includes Southern Coal

20      Corporation?

21             A.    Southern Coal Corporation never

22      operated.  It only had operations through its

23      subsidiaries, but it was never an operating

24      company itself.

25             Q.    Who employed the employees who worked

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 85

1        for Southern Coal Corporation?  Where did they
2        get their paychecks?
3            A.    During what time period?
4            Q.    2016.
5            A.    During 2016, none of these companies
6        would have been operating, and so the corporate
7        overhead -- I mean, the answer to your question
8        is, I don't know, specifically.  But it would
9        have been Blue -- either Bluestone Industries,
10       who was operating, or it's possible A&G Coal,
11       who was operating during that time period, they
12       could have been employed by them.
13           Q.    Okay.
14           A.    But it would not have been by any of
15       these entities.
16           Q.    Okay.  So folks who are doing work for
17       Southern Coal Sales Corporation in 2016, do we
18       know who paid them?
19           A.    There really would only be -- you have
20       a salesperson, Steve Sarver, and then whatever
21       legal accounting support they needed.  And I
22       don't know.  Because I had -- you would have
23       Summer Harrison, who would have handled the
24       cash.  There really would only be, like, three
25       or four people --

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 86

1          Q.    Okay.

2          A.    -- for Southern Coal Sales

3     Corporation.

4          Q.    So in 2016, the Algoma agreement,

5     that was the biggest deal within the Justice

6     Coal Companies, right?

7          A.    I can't say one way or the other.

8     I don't know.

9          Q.    All right.  I'm just trying to figure

10    out, you've got an agreement signed by Southern

11    Coal Sales Corporation with Algoma, right?

12         A.    Correct.

13         Q.    And it's being performed by employees

14    of Southern Coal Corporation?

15         A.    Well, it's being performed by Southern

16    Coal Sales Corporation.

17         Q.    Okay.

18         A.    Southern Coal Sales Corporation is the

19    entity delivering the coal to Algoma.

20         Q.    Okay.  And they're getting their coal

21    from other Justice entities and -- for the 2016

22    agreement, right?

23         A.    For 2016, they were receiving it from

24    Dynamic Energy and A&G Coal Corporation.

25         Q.    Okay.  And when they were interacting

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 87

```
 1        with the railroad and interacting with Algoma,
 2        were they acting as Southern Coal Corporation
 3        employees?  Whose employees were they?
 4             A.   Well, they were never -- I mean, you
 5        can only be an employee -- not trying to give a
 6        legal answer, but I think you can only be an
 7        employee of whoever pays you.  I mean, I think
 8        you can represent other people.
 9             Q.   That's all I'm trying to figure out.
10             A.   Southern Coal Sales Corporation has
11        never had employees, --
12             Q.   Okay.
13             A.   -- so they were never an employee of
14        Southern Coal Sales Corporation.
15             Q.   Okay.
16             A.   So they would have been representing
17        Southern Coal Sales Corporation.  Who they were
18        actually receiving their paycheck from, --
19             Q.   You just don't know.
20             A.   -- I don't know.
21             Q.   In 2016, Jim Justice and Jay Justice
22        and you and Mr. Miller were officers and
23        directors of Southern Coal Sales Corporation,
24        right?
25             A.   Yes.
```

Page 88

1              MR. ROBECK:   Objection; form.

2              Do you mean all of them were both

3        officers and directors?

4        BY MR. BOLLIN:

5              Q.   Okay.   So the directors were the

6        Justices, right, Jim and Jay?

7              A.   Correct.

8              Q.   And the officers were, Jim Justice,

9        Jay Justice, you and Mr. Miller?

10             A.   Yes.

11             Q.   Were you compensated for those

12        services?

13             A.   Not from Southern Coal Sales

14        Corporation.

15             Q.   Do you know who you were compensated

16        by?

17             A.   Yes.

18             Q.   Who were you compensated by?

19             A.   Greenbrier Hotel Corporation.

20             Q.   So if you're an employee of Greenbrier

21        Hotel Corporation, why are you doing services

22        for Southern Coal Sales Corporation?

23             A.   Because I'm a corporate officer.

24             Q.   Of Southern Coal Sales Corporation?

25             A.   Yes.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 89

1          Q.   I'm sorry.  You said Greenbrier Hotel

2    Corporation?

3          A.   Yes.

4          Q.   Who owns Greenbrier Hotel Corporation?

5          A.   Greenbrier Resort and Club Management

6    Company.

7          Q.   Resort and Club Management Company?

8          A.   Yes.

9          Q.   Who owns resort -- Greenbrier Resort

10   and Club Management Company?

11         A.   C&O Traveler, Inc.

12         Q.   Who owns C&O Traveler, Inc.?

13         A.   Justice Family Group, LLC.

14         Q.   Who are the members of Justice Family

15   Group, LLC?

16         A.   James C. Justice, II, James C.

17   Justice, III, and Jillian Justice.

18         Q.   Were they also the managers of the

19   Justice -- I'm sorry.  Strike that.

20              Did C&O Traveler, Inc., Resort and

21   Club Management Company -- or is it corporation?

22         A.   Which one?  I think you combined two.

23         Q.   Yeah.  Resort and Club Management --

24         A.   Greenbrier Resort and Club Management

25   Company, Inc.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 90

```
 1          Q.    Okay.

 2                Did Greenbrier Hotel Corporation,

 3    Greenbrier Resort and Club Management Company,

 4    Inc., C&O Traveler, Inc., all share the same

 5    directors?

 6          A.    No.

 7          Q.    Just taking a shot.

 8          A.    Yeah.

 9          Q.    Who are the directors of C&O Traveler,

10    Inc.?

11          A.    I should have asked this.  What time

12    frame?

13          Q.    2016.

14          A.    James C. Justice, II, and James C.

15    Justice, III.

16          Q.    Who are the officers?

17          A.    I'd like the chance to clean this up

18    later, if I need to.  I'll do the best I can.

19          Q.    Tell me what you know.

20          A.    I didn't plan on these.

21                MR. ROBECK:  No, because it is outside

22    the scope.

23                MR. BOLLIN:  I'm just going where he

24    took me.

25                MR. ROBECK:  You're now outside the
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 91

1      scope of the deposition.  I'm going where he
2      took me does not expand the deposition.
3                  MR. BOLLIN:  He's an employee and
4      officer --
5                  MR. ROBECK:  I understand that.
6                  MR. BOLLIN:  -- of Southern Coal Sales
7      Corporation, who's paid by Greenbrier Hotel
8      Corporation, and you think that's beyond the
9      scope of the deposition, to find out who's
10     paying him?
11                 MS. BYROADE:  You're well beyond who's
12     paying him.
13                 MR. ROBECK:  First off, I haven't
14     instructed him not to answer.  But it is beyond
15     the scope of the deposition, and he may not know
16     the answer because he didn't prepare for it.
17                 MR. BOLLIN:  Okay.  That's a different
18     issue, and I understand that.  Thank you.
19                 THE WITNESS:  I think the directors
20     were James -- are James C. Justice, II, and
21     James C. Justice, III.  The president in 2016
22     was James C. Justice, II.  Jay Justice,
23     typically, is not an officer of the Greenbrier
24     entities, so I'm not sure if there is a vice
25     president.  And I believe Terry Miller is the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 92

1    secretary and treasurer.

2    BY MR. BOLLIN:

3        Q.   Were you an officer of C&O Traveler

4    Inc.?

5        A.   I have been before.  I've been

6    secretary.

7        Q.   You just don't know about the timing?

8        A.   Yeah.  Off the top of my head, I can't

9    remember what year I stopped doing that.

10       Q.   Okay.  You're not the secretary now?

11       A.   No.

12       Q.   Do you have a role with Greenbrier

13   Resort and Club Management Company, Inc.?

14       A.   These companies are just holding

15   companies, just so you know, but, no.

16       Q.   Okay.  And when you say these

17   companies, which ones are you referring to?

18       A.   C&O Traveler -- well, Justice Family

19   Group, C&O Traveler, Inc., and Greenbrier Resort

20   and Club Management Company.

21       Q.   Who are the directors of Greenbrier

22   Hotel Corp?

23       A.   What time period?

24       Q.   2016.

25       A.   James C. Justice, II, Jeff Kemeic, I

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 93

1      think he spells that K-e-m-e-i-c, and James C.

2      Justice, III.

3             Q.   Who are the officers?

4             A.   In 2016, James C. Justice, II, was

5      still president and CEO, Elmer Coppoolse was the

6      chief operating officer, Elaine Butler was the

7      treasurer, and I was the secretary.

8             Q.   Why was Greenbrier Hotel Corporation

9      paying your salary?

10            A.   In 2015, the prior COO of the

11     Greenbrier passed away.  He was a really good

12     friend of Mr. Justice's, and it was a sudden

13     death.  And after his death Mr. Justice asked me

14     to move to the Greenbrier to help fill in some

15     gaps.

16            Q.   So while you're receiving your

17     paycheck from Greenbrier Hotel Corporation you

18     continued your role working for all of the other

19     Justice entities that we've described here

20     today?

21            A.   Yes.

22            Q.   And was your compensation from the

23     Greenbrier Hotel Corporation intended to

24     compensate you for the work you were performing

25     for those other entities?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

1          A.   My compensation didn't change, so it

2     was intended to compensate me for the tasks I

3     was asked to do.

4          Q.   For all of the companies?

5          A.   For all of the companies for which I

6     represented in whatever capacity, whether it was

7     as general counsel, as secretary, whatever that

8     capacity was.

9          Q.   In 2016, Jim Justice was the president

10    of Southern Coal Sales Corporation, right?

11         A.   Yes.

12         Q.   How was he compensated?

13         A.   I, honestly, don't know Mr. Justice's

14    compensation structure.

15         Q.   Do you know Jay Justice's

16    compensation?

17         A.   Not specifically, no.

18         Q.   If we wanted to find that out, where

19    would you look?

20         A.   Payroll records.  I mean, I guess you

21    could ask him for his personal tax return, which

22    would reflect his W2s.  I mean, I don't know,

23    but I'm just thinking if I wanted to find

24    someone's compensation, that's where I would

25    look.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 95

1           Q.    Okay.

2           A.    But I don't know what his compensation

3      structure is.

4           Q.    What about Mr. Miller?  Do you know

5      how he was compensated in 2016?

6           A.    I believe he was compensated by the

7      Greenbrier similar to what I was.  He has served

8      -- he physically works out of the Greenbrier,

9      and he doesn't have any true day-to-day role

10     with the coal companies.  He does still serve

11     as treasurer and has some -- obviously, some

12     oversight in that role, but doesn't do anything

13     day to day with the coal companies.

14                (Ball Exhibit No. 509, a summary of

15     all of Southern Coal Sales Corporation's

16     shipments for the years 2015, '16 and '17, was

17     marked.)

18                (Ball Exhibit No. 510, a supplemental

19     spreadsheet to Exhibit 509, was marked.)

20     BY MR. BOLLIN:

21          Q.    I'm going to ask you to first look at

22     Exhibit 509.  Have you seen this document

23     before?

24          A.    Yes.

25          Q.    Do you know what this is?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 96

1          A.   I believe it's a summary of all of

2    Southern Coal Sales Corporation's shipments for

3    the years 2015, '16 and '17.

4          Q.   And these are to all customers, not

5    just to Algoma?

6          A.   It includes other customers, yes.

7          Q.   Okay.  And who compiled this document?

8          A.   I think that Janet Ransom, who

9    works in the Roanoke office and assists Summer

10   Harrison with billing and invoicing, prepared

11   this for Summer.

12         Q.   Do you know why she prepared it for

13   Summer?

14         A.   I think it was for this litigation.

15         Q.   And this was compiled from information

16   that was kept on Southern Coal Corporation's

17   financial records?

18         A.   I don't think this information would

19   be in the accounting system that we were talking

20   about earlier.  I think this is more just

21   maintained on a spreadsheet.

22         Q.   And this is the total sales of

23   Southern Coal Corporation from November of

24   2015 through December of 2017?

25              MR. ROBECK:  Which exhibit are you

Page 97

1        asking about?

2                    MR. BOLLIN:  It's 509.

3                    MR. ROBECK:  509 or 510?

4                    MR. BOLLIN:  It's been 509 this whole

5        time.

6                    MS. BYROADE:  Well, he's got both in

7        front of him.

8                    MR. BOLLIN:  And if you look back at

9        the transcript you'll see that I said let's just

10       look at 509 first.

11                   MS. BYROADE:  Well, for the record,

12       510 is the supplemental spreadsheet that

13       contains more than what's on 509.

14                   MR. ROBECK:  And when he answered the

15       question earlier, he said it included everything

16       for the years '15, '16 and '17.  So I think

17       maybe --

18                   MR. BOLLIN:  Okay.  So when I asked

19       the question the answer wasn't correct?

20                   MR. ROBECK:  Well --

21                   MS. BYROADE:  You've got two

22       spreadsheets in front of the witness, so why

23       don't you just --

24                   MR. BOLLIN:  He's only been looking at

25       one the whole time.  Okay.  We'll straighten it

Page 98

1    out.  I'm not trying to fool anybody.  I'm just

2    trying to work off the spreadsheet.  I think the

3    confusion is all over here.

4              MS. BYROADE:  Our attention was on

5    510.

6              MR. ROBECK:  Well, the confusion's on

7    the record.

8              MS. BYROADE:  510 contains more than

9    what's on 509 and 510 is the sales spreadsheet,

10   so ...

11             THE WITNESS:  Okay.  I mean, I don't

12   think that I said 509 included everything.  I

13   said it includes customers other than Algoma.

14   BY MR. BOLLIN:

15        Q.   Okay.

16        A.   And so -- because I know what 510 is,

17   that we're going to get to in a second, --

18        Q.   Right.

19        A.   -- and just to clarify everything,

20   I mean, 509 is just from November of '15 through

21   the end of '17.  And I -- as I understood your

22   last question, you said November.

23        Q.   I did.  Yeah.

24        A.   Okay.

25        Q.   Okay.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 99

1         A.   So I think this would reflect Southern

2    Coal Sales' sales from November of 2015 through

3    the end of 2017.

4         Q.   Okay.  And then what is Exhibit 510?

5         A.   Exhibit 510 is an updated version of

6    509, to include the months -- to include -- in

7    addition to what's already on 509, to also

8    include the months of January through October

9    of 2015.

10        Q.   And why was Exhibit 510 created?

11        A.   When I was going through Exhibit 509

12   with counsel, I realized that it started in

13   November of 2015, and I don't know that anyone

14   realized that before.  And the topic for this

15   deposition was for the entire year of 2015, so

16   we requested that it be updated.

17        Q.   At the end of Exhibit 510 there's four

18   entries entitled Algoma with invoice numbers

19   beginning with 15.  Do you see those?

20        A.   Yes.

21        Q.   Okay.  Now, 15 means 2015, right?

22        A.   I mean, that would be a typical

23   invoicing mechanism, yes.

24        Q.   And same thing with the ██████████

25   entry just before that, ██████████, and then

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 100

1        the Invoice Numbers 15DE006, do you see that?

2             A.    Yes.

3             Q.    Okay.  Now, that would mean to you

4        that these are 2015 invoices, right?

5             A.    They're adjustments to 2015 invoices.

6             Q.    Okay.  And those were not included in

7        the prior version, 509, but they are included in

8        510.  Do you know why?

9             A.    I'm trying to find all those invoices.

10       My expectation is it's because they all relate

11       to invoices that were generated pre-November

12       2015.

13            Q.    Okay.

14            A.    And so when those invoices were added,

15       the adjustments to those invoices were also

16       picked up.

17            Q.    Okay.  It's just curious to me

18       that then they're all at the tail end of the

19       spreadsheet.  It looks like they were manually

20       cut and pasted in there, as opposed to being

21       imported is from someplace.

22            A.    I don't read it that way, but I think

23       it's because they relate to invoices that were,

24       most likely, and like I said, I haven't been

25       able to find them as we've been looking here.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 101

1        Q.    Mm-hmm.

2        A.    I would expect that those would

3   be related to invoices that occurred between

4   January 1st, 2015, and the end of October 2015,

5   and that's why they're on here.  I can't answer

6   why they're on the end.

7        Q.    Okay.  Now, Exhibit 509 in the lower

8   left-hand corner of the table, which is on the

9   last page of the exhibit says it's the total

10  sales 11/2015 to 12/2017 under SCC PO.  Do you

11  see that?

12       A.    Yes.

13       Q.    Okay.

14            MR. ROBECK:  Sorry.  Where are you?

15  I'm sorry.

16            MR. BOLLIN:  Yeah, Exhibit 509, last

17  page, lower left-hand corner of the table.

18            MR. ROBECK:  Okay.

19  BY MR. BOLLIN:

20       Q.    SCC is Southern Coal Corporation,

21  right?

22       A.    I can't tell what it means on

23  this, I mean, but, I mean, typically, within

24  our organization, SCC means Southern Coal

25  Corporation.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 102

1          Q.    Okay.  And then if you look at Exhibit

2     510 in the same spot, last page, lower left-hand

3     corner it says, total sales 1/2015 to 12/2017

4     under SCC/SCSC PO, do you see that?

5          A.    Yes.

6          Q.    What does that mean to you?

7          A.    I don't know for sure, but I

8     would assume that's indicating Southern

9     Coal Corporation and/or Southern Coal Sales

10    Corporation.

11         Q.    Okay.  Do you know how these records

12    are kept internally?  Are they kept under

13    Southern Coal Corporation's ledger or are they

14    kept under Southern Coal Sales Corporation's

15    ledger?

16              I'm sorry.  I'm using the word ledger

17    improperly, and it's confusing you, right?

18         A.    Yeah.

19         Q.    So what would you call these

20    documents, summaries of sales?

21         A.    Of invoices or receivable summaries.

22         Q.    Yeah.

23              And so --

24         A.    They have a couple different names.

25    Sorry to interrupt, but they have a couple of

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 103

1      different names.

2            Q.   Well, how would you refer to them?

3            A.   It could be -- it really depends

4      on who's asking, shipping summary, accounts

5      receivable summary, invoicing summary.  I mean,

6      I've heard all of those things.

7            Q.   Okay.

8            A.   They all mean the same to me.

9            Q.   So 509 and 510 are invoicing

10     summaries.  Fair enough?

11           A.   Yeah.

12           Q.   Okay.  Are invoicing summaries kept

13     for each separate entity?

14           A.   Yeah.

15           Q.   Okay.

16           A.   I don't really under -- I mean,

17     obviously, anytime someone sells a ton of coal,

18     they keep track of selling it.  So I'm afraid

19     I'm not understanding your question.

20           Q.   Well, I'm just trying to figure this

21     out.  So the first one, 509, says it's a summary

22     for Southern Coal Corporation, SCC.  The second

23     one, which incorporates most of the first one --

24           A.   Right.

25           Q.   -- so 510, says it's for SCC/SCSC.

Page 104

1        So I'm just trying to figure out, in your

2        records, whose sales these are identified as.

3            A.   I believe it's Southern Coal Sales

4        Corporation.  I don't know why that distinction

5        is on that sheet.  I'm happy to ask the person

6        that prepared it.  But I don't know why they

7        changed that.

8            Q.   Okay.  So they don't keep invoice

9        summaries for Southern Coal Corporation entities

10       all under one invoice summary?

11               MR. ROBECK:  Objection to form.

12               THE WITNESS:  Well, like, in 2015,

13       for example, all of the sales would have been

14       through Southern Coal Sales Corporation.

15       BY MR. BOLLIN:

16           Q.   Okay.

17           A.   So there shouldn't be one independent

18       from Southern Coal Sales Corporation.

19           Q.   Okay.  The sales of Southern Coal

20       Sales Corporation were the same as the Southern

21       Coal Corporation?

22               MR. ROBECK:  Objection; form.

23               THE WITNESS:  Southern Coal Sales

24       Corporation should be all the sales.

25       BY MR. BOLLIN:

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 105

1      Q.   Okay.  And then that changed in 2016?

2      A.   Late 2015 and 2016 is when Bluestone

3  Energy Sales Corporation started selling all of

4  the coal, except for Algoma.

5      Q.   Are any Bluestone Energy Sales

6  Corporation sales reflected on Exhibit 509 or

7  510?

8      A.   Yes.

9      Q.   What are those?

10     A.   So with ████ and ████ and ████ the

11  original contracts were in the name of Southern

12  Coal Sales Corporation.  But after November of

13  2015, we asked them to start making payments to

14  Bluestone Energy Sales Corporation, and they

15  agreed to do that.  They did not formally assign

16  the contracts, but they started making Bluestone

17  Energy Sales Corporation.  And we, internally,

18  assigned the contracts to Bluestone Energy Sales

19  Corporation, and we were administering those as

20  Bluestone Energy Sales Contracts.

21     Q.   Why did they appear on Exhibit 509 and

22  510?

23     A.   It's my understanding because the

24  original contracts were in the name of Southern

25  Coal Sales Corporation, they were included.

Veritext Legal Solutions

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 106

1          Q.   Let's just work off of one for a

2     minute so we don't get confused.

3          A.   Okay.

4          Q.   Let's go with 510.

5          A.   Okay.

6          Q.   There are many entries here where the

7     purchaser is identified as Algoma?

8          A.   Correct.

9          Q.   And that would be Essar Steel Algoma,

10    Inc., who is the plaintiff in this lawsuit,

11    right?

12         A.   Correct.

13         Q.   Okay.  Now, am I mistaken that -- I'll

14    ask this in a positive so we don't get confused

15    in the answer.

16              Algoma didn't have an agreement with

17    any Justice entity prior to November of 2015,

18    did it?

19         A.   So Southern Coal Sales or Justice

20    entities were shipping coal to Algoma through,

21    and I always for -- I always mess the name up,

22    Virginia Mining something.

23         Q.   Through another third party?

24         A.   Yes.

25         Q.   Okay.  A broker?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 107

1          A.   I don't know if they were a broker,

2     per se.  I know they guaranteed the performance

3     of Algoma as it related to payments, and so

4     without having that agreement in front of me I'm

5     hesitant to say there was no agreement between

6     any Justice entity and Algoma, because I know

7     we were shipping, we being one of the Justice

8     entities, was shipping coal to Algoma.  And it

9     resulted in a, roughly, $6 million liability

10    that is caught up in the bankruptcy.

11         Q.   Are you aware of any contracts between

12    any Justice entity and Algoma in 2015 prior to

13    November?

14         A.   I'm not aware of any written

15    contracts.

16         Q.   Are you aware of any other kind of

17    contract?

18         A.   Well, I mean, there was, clearly,

19    an agreement by Algoma to buy coal, and by the

20    Justice organization, whichever entity that is,

21    to ship coal to them.

22         Q.   Do you think the two spoke?

23         A.   I don't know how those conversations

24    went.

25         Q.   Or if they occurred?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 108

1          A.    I don't know that.

2               MR. BOLLIN:  Take a break?

3               MR. ROBECK:  Sure.

4               (Lunch recess taken.)

5               (Ball Exhibit No. 511, a spreadsheet

6       created by Mr. Bollin, was marked.)

7       BY MR. BOLLIN:

8          Q.    You've been handed what's been marked

9       Exhibit 511.  This is just my handiwork starting

10      with Exhibit 509, not Exhibit 510, but 509.

11         A.    Okay.

12         Q.    I took that and we took the purchasers

13      listed on the far left and created another line

14      for each of them -- another column for each of

15      them over on the right.  Do you see that?  That

16      way I could just keep track of what purchaser

17      was buying what.

18         A.    Okay.

19         Q.    Or, I'm sorry, I guess the best way

20      to say that would be which purchaser was paying

21      what.  Okay?

22               MR. ROBECK:  I'm sorry.  This is 509?

23               MR. BOLLIN:  The new one is 511, but

24      it's based on 509.  Yes.  Yes.  Not 510.  I

25      didn't have 510.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 109

 1              MR. ROBECK:  It's just sorted entries?

 2              MR. BOLLIN:  That's what I did.  I

 3     left the original entries on left and added five

 4     new columns on the right.  And take a moment to

 5     satisfy yourself that it looks generally

 6     correct, and I don't expect you to --

 7              MR. ROBECK:  Well, there's no way

 8     we're going to figure that out, but we'll go

 9     with your representation, subject to check.

10     BY MR. BOLLIN:

11          Q.   Yeah.  But, I mean, you can spot check

12     a couple anyway, just to satisfy yourself as to

13     how it works.  So, for example, the first line,

14     the purchaser says ███████ sales amount is

15     ███████████, and the invoiced amount is

16     ███████████.  So what I've done in the right, if

17     you go over and you see ██████ and first number

18     underneath there is the invoiced amount, right,

19     ███████████, right?

20          A.   Yes.

21          Q.   So I just wanted you to understand how

22     I set it up.

23          A.   Okay.  Yeah.  I think I follow you.

24          Q.   And I don't have a whole lot to do

25     here with this, except I wanted to -- part of my

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 110

1     purpose here was to figure out how much people

2     were paying between November of 2015 and

3     December of 2017 under, at the time, for Exhibit

4     509 for, SCC PO.  That's what Exhibit 509 says,

5     right?

6          A.   I think that's right.

7               Yes.  That's correct.

8          Q.   Okay.  And we can all check my math

9     later to see if the spreadsheet did it right,

10    but I came up with sales -- I'm sorry, what

11    would you call this?  You would call this

12    invoiced amounts, right?  That's what you're

13    recording here?

14         A.   Yeah.  I mean, I think this would be

15    a summary of accounts receivable or invoiced

16    amounts.  I think they're the same thing.

17         Q.   Okay.

18         A.   Like I said, some people refer to

19    these things differently, but I think this is

20    a summary of invoices and it also reflects what

21    your accounts receivable summary over the course

22    of the year was.

23         Q.   Okay.  And Southern Coal Corporation

24    and Southern Coal Sales Corporation use an

25    accrual method of accounting, correct?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 111

1          A.   Yes.

2          Q.   Okay.  So if there's a sale booked at

3     a particular time, that's when you count it for

4     your accounting purposes, right?

5          A.   Correct.

6          Q.   Okay.  You don't wait for the

7     collections to book it?

8          A.   No.

9          Q.   Okay.  So for 2015, you booked sales

10    of $39,223,474.20 from Algoma; is that right?

11         A.   I'm sorry.  I don't see that number.

12         Q.   Did I say 2014 or 2015?

13         A.   I see it now.  I didn't see this

14    separate by year down here.

15         Q.   Yeah.  The total's at the bottom.  I'm

16    sorry.

17         A.   Yeah.  No, I gotcha.

18         Q.   Okay.

19         A.   Yeah.  Again, taking your caveat

20    earlier, assuming your math is right, that's

21    what this reflects, yes.

22         Q.   Okay.  And a little over 24 million in

23    sales to Algoma in 2016, correct?

24         A.   Yes.

25         Q.   Okay.  And the total of sales to

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 112

1    Algoma in 2015, 2016 and 2017 is, approximately,

2    63 million?

3         A.   That's what this says, yes.

4         Q.   Okay.  And that dwarfs any of your

5    other customers, correct?

6         A.   ███████████████████  ████████

     ███████████████████

8         Q.   Are there any significant coal

9    customers that were missing off of this

10   spreadsheet?

11        MR. ROBECK:  Well, objection just to

12   significant, whatever you mean by that.

13        THE WITNESS:  During this time period

14   for Southern Coal Sales, just the other ones

15   that are reflected on what has been marked

16   as 510, although they're, typically, a spot

17   purchaser, ████████████████ has bought a

18   significant amount of coal from Southern Coal

19   Sales.

20   BY MR. BOLLIN:

21        Q.   And were those sales to ████████ did

22   they postdate November 1, 2015?

23        A.   No, they predate November 1.

24             Anything after November 1 with

25   ████████ would be through Bluestone Energy

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 113

1    Sales.

2        Q.   Okay.  So Bluestone Energy Sales was

3    also making coal sales at this time, late 2015

4    and through 2016?

5        A.   After November.  I forget the exact

6    date.  It was formed, like, the first half of

7    November, and so after that point it would have

8    also been making sales.

9        Q.   And were those sales from the same

10   mines, A&G and Coal Mountain?

11       A.   They could be, yes.

12       Q.   Were there any other significant

13   customers of Bluestone during that time period,

14   November 1, 2015, through the end of 2016?

15       A.   Again, on 510 I see that we sold

16   what appears to be a vessel a Panamax vessel to

17   ████████.  You know, that's, roughly, ██████ tons,

18   so that's pretty significant.

19         I think most of the other orders

20   would have been spot-type orders, so nothing

21   approaching the 63 million to Algoma.

22       Q.   And the ██████ sales, you're talking

23   about, those also predate November 1, 2015?

24       A.   Yes.

25       Q.   Did Bluestone sell to ██████ in 2016?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 114

1          A.   Not that I'm aware of.  That's not a

2     real longstanding relationship, and I think that

3     was just, basically, a vessel, plus a couple of

4     additional trains, and so it was -- all in it

5     was less than a ███████████ tons, and I

6     don't think that that continued.

7          Q.   Did Bluestone sell met coal?

8          A.   Bluestone Energy Sales, or Bluestone

9     Resources as it's on the org chart?  I need to

10    clarify.

11         Q.   Okay.  Yeah.  That's fair.  Bluestone

12    Energy Sales Corporation, did they sell met

13    coal?

14         A.   They sold met coal and steam coal.

15         Q.   To whom?

16         A.   ███████ would be one of their

17    purchasers.  Time frames run together, but

18    Bluestone also sells to ████.  You know,

19    Bluestone Energy Sales has sold to a lot of

20    the domestic steel mills, ████████, ████████,

21    ████████, ████  And, you know, those sales

22    today are through Bluestone Coal Sales, but over

23    the years those are typically the buyers for the

24    Bluestone Resources, met coal, which, you know,

25    for a period of time would have been marketed

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 115

1          by Bluestone Energy Sales.

2                  Q.   You'll have to excuse me, I get

3          lost with all the Bluestone entity names.

4          Bluestone -- you just identified Bluestone Sales

5          Corporation and then you said the one that's

6          operating now is Bluestone ...

7                  A.   Coal Sales --

8                  Q.   -- Coal Sales --

9                  A.   -- Corporation.

10                 Q.   Wait.  That is operating now?

11                 A.   Yes.

12                 Q.   Oh, okay.

13                      And it's Bluestone Coal Sales

14         Corporation?

15                 A.   Correct.

16                 Q.   That's what's operating now?

17                 A.   Yes.

18                 Q.   Okay.  Which one is not -- which

19         one has stopped operating?  Isn't there one that

20         has stopped operating?

21                 A.   Bluestone Energy Sales Corporation.

22                 Q.   Okay.  How do you keep them straight?

23                      And that was the standalone company

24         under -- that was owned -- wholly owned by Jay

25         Justice?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 116

1          A.    Jim Justice.

2          Q.    By Jim Justice?

3          A.    But, yes, that's a standalone entity.

4          Q.    And that's the entity that took out

5    the loan that funded the contract with Algoma?

6          A.    It was intended to fund Algoma, and,

7    like I said, that didn't quite work out like we

8    had hoped because those receivables never were

9    assigned to Bluestone Energy Sales.  So it did

10   end up, ultimately, financing a lot of other

11   coal sales that Bluestone Energy Sales was

12   representing from Justice Family-owned mines, --

13         Q.    Okay.

14         A.    -- which are the mines we've discussed

15   here today, but, yes, it's -- it's that entity

16   that had Carter Bank facility.

17         Q.    Did it also -- in addition to funding

18   other -- other efforts through other coal

19   companies, did it also end up funding the

20   Southern Coal Sales Corporation's contract

21   with Algoma?

22         A.    I think that Bluestone Energy Sales

23   did advance Southern Coal Sales some money.

24         Q.    Okay.

25         A.    It loaned some money to Southern Coal

Page 117

1      Sales.

2            Q.   Which, in turn, loaned it to Southern

3      Coal Sales Corporation?

4            A.   That's -- that's who I meant.

5            Q.   Okay.  That's what I'm asking.

6            A.   Yeah.

7            Q.   I'm trying to be straight.

8            A.   Yeah.  I just didn't say corporation.

9            Q.   Okay.  So it would have been a direct

10     -- direct loan from Bluestone Energy to Southern

11     Coal Sales Corporation?

12           A.   Again, like we discussed earlier,

13     without having it in front of me, it could have

14     flowed through Southern Coal Corporation to

15     Southern Coal Sales.

16           Q.   Okay.

17           A.   Or the money could have gone directly

18     to Southern Coal Sales Corporation.  I do

19     believe, though, even if the money had flowed

20     directly, the accounting entry would have flown

21     through Southern Coal Corporation and then down

22     to Southern Coal Sales Corporation.

23           Q.   Okay.  And in order to follow that

24     path, we'd have to look at the ledger?

25           A.   Yes.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 118

1        Q.   Now, Bluestone Coal Sales

2   Corporation --

3        A.   I'm sorry.

4        Q.   I'm sorry.

5        A.   Or I mean the cash -- the bank

6   statements would show that, as well.

7        Q.   Okay.

8        A.   You don't necessarily need the ledger.

9        Q.   If you have all the bank statements?

10       A.   Well, yeah.  I mean, the bank -- the

11  Southern Coal Sales bank statement, you would

12  be able to tell where the money came from.

13       Q.   Well, if it comes from Southern Coal

14  Corporation, you don't know where Southern Coal

15  Corporation got the money, right?

16       A.   Yes.  But you would know that Southern

17  Coal Sales Corporation received it from Southern

18  Coal Corporation.

19       Q.   Right.  Okay.  But you won't be able

20  to tell that it came from somebody who gave it

21  to Southern Coal Corporation?

22       A.   If they did.  Like we said earlier,

23  there could be instances where they did not.

24       Q.   Right.  We just don't know.

25            Bluestone Coal Sales Corporation

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 119

1      continues to exist and operate today?

2              A.   Yes.

3              Q.   And what is it selling?

4              A.   Today it sells the metallurgical coal

5      of that Bluestone Group that you're looking at

6      on Exhibit --

7              Q.   502?

8              A.   -- 502, second page.

9              Q.   Do you know what mines are involved?

10             A.   Today the mines running at the

11     Bluestone Group of Companies are Red Fox Surface

12     Mine, which is Justice Energy Company.

13             Q.   What does that mean, which is Justice

14     Energy Company?

15             A.   That's the name of the operator.

16             Q.   Oh, I see.

17             A.   It should be right there near your

18     pen.

19             Q.   Oh, yeah.  Okay.  So Justice Energy

20     Company, Inc., owns, what was it?

21             A.   It owns and operates the Red Fox

22     Surface Mine.

23             Q.   Okay.

24             A.   Pay Car Mining operates what's known

25     as the 58 Underground Mine.  Frontier Coal

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 120

1      Company operates what is known as the 57

2      Underground Mine.  And National Resources,

3      Inc., operates the 39A Surface Mine.

4           Q.   And Bluestone Energy is in the

5      business of selling National Resources, Inc.,

6      coal?

7           A.   No.

8           Q.   Okay.

9           A.   Bluestone Coal Sales is, --

10          Q.   That's right.

11          A.   -- not -- not Bluestone Energy.

12          Q.   Okay.  Bluestone Coal Sales

13     Corporation sells coal from National Resources

14     Mine 39A surface mine?

15          A.   Yes.

16          Q.   Now, I understand that in 2015

17     and 2016 Southern Coal Sales Corporation had a

18     single bank account that changed in 2016.  They

19     went from one bank account at one bank to a new

20     bank account at a second bank in 2016, is that

21     fair?

22          A.   Yes.

23          Q.   Okay.  And the first bank account was

24     with Wells Fargo?

25          A.   Yes.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 121

1              (Ball Exhibit No. 512, Bank statements

2       from January 2015 through July of 2016, was

3       marked.)

4    BY MR. BOLLIN:

5          Q.   I'm handing you what's been marked

6       as Exhibit 512, which are the bank account

7       statements produced to us in litigation Bates

8       labeled SC --

9              MS. SCHULTZ:  They're not sequential.

10      Sorry.

11             MR. BOLLIN:  Oh, okay.  Nevermind.

12      They were not produced to us in a sequential

13      manner, they have now been put into a

14      chronological order, and they compromise [sic]

15      the bank statements from January 2015 through

16      July of 2016.

17             MS. SCHULTZ:  And what we have of

18      them, there are some months that are missing,

19      so ...

20             MS. BYROADE:  So are these produced

21      pursuant to the subpoena?

22             MS. SCHULTZ:  No.  So everyone that

23      you produced, we used your number.  If there are

24      ones that you didn't produce but Wells Fargo

25      did, we used the Wells Fargo number.

Page 122

1           MR. BOLLIN:  Okay.  So they're mostly

2     your numbers.

3           MS. SCHULTZ:  They're mostly your

4     numbers.

5           They may, in fact, be all.  I can't

6     remember.

7           I said they may be all their numbers.

8     I know that we --

9     BY MR. BOLLIN:

10         Q.   First of all, do you recognize the

11    statements in the exhibit?

12         A.   Yeah.  Generally, I recognize these to

13    be monthly bank statements from Wells Fargo.

14         Q.   Okay.  I'm going to ask you to turn to

15    Page 22262, which is about 60 percent of the way

16    through the exhibit.

17         A.   Okay.

18           MS. BYROADE:  They're not sequential,

19    so how do we find it?

20           MS. SCHULTZ:  It may be easier to tell

21    him the month, because they are chronological.

22           MR. BOLLIN:  Yeah.  That was going to

23    be my next question.

24    BY MR. BOLLIN:

25         Q.   Is this the bank statement for

Page 123

1    November of 2015?

2         A.   Okay.

3         Q.   Is this the November 2015 bank

4    statement for Southern Coal Sales Corporation?

5         A.   Yes.

6         Q.   What was the beginning balance that

7    month?

8         A.   █████████

9         Q.   What was the ending balance?

10        A.   █████████

11        Q.   How was this account used by Southern

12   Coal Sales Corporation?

13        A.   To -- I mean, just like any other bank

14   account would be used, to receive -- receive

15   payments from coal buyers.  And then, you know,

16   from there the money was used as it was -- as

17   determined by management.

18        Q.   Management being Mr. Justice?

19        A.   Jay Justice.

20        Q.   Now, if you'll take a look at the

21   November 5th entry on the first page, this

22   appears to be the first payment from Algoma

23   under the original agreement with Southern Coal

24   Sales Corporation.  Do you see that payment?

25        A.   Yes.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 124

1      Q.   And what's the amount?

2      A.   ██████████

3      Q.   Okay.  If you turn the page to debits

4    on the next page, you see an entry on November

5    6th for ██████████.  Do you see that?

6      A.   I do, yes.

7      Q.   And it says it's an online transfer to

8    an Account Number ██████████.  Do you know who

9    the owner of that account is?

10      A.   Yes.  I need some assistance, though.

11      Q.   Sure.

12      A.   Southern Coal Corporation.

13      Q.   Do you know why that payment was made

14    to Southern Coal Corporation?

15      A.   I can't tell from the bank statement,

16    but consistent with our discussion earlier, it

17    would -- it would be as a repayment of money

18    that had been previously advanced to Southern

19    Coal Sales by Southern Coal Corporation.

20      Q.   So if we were to go back through the

21    prior deposits in 2015 we would be able to find

22    transfers from Southern Coal Corporation, which

23    would represent a loan to Southern Coal Sales

24    Corporation?

25      A.   Or it could be earlier.  It doesn't

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 125

1    have to be in 2015.  Southern Coal Sales

2    Corporation has been around since, I believe,

3    2010.  So, I mean, there's just no way to know

4    specifically without looking at it, but the loan

5    could be from 2011 or '12 that Southern Coal

6    Sales is just now paying back.

7         Q.   And there's no documentation of that

8    loan, other than what we can find in your bank

9    statements, right?

10        A.   Well, no.  That's the --

11             MS. BYROADE:  Asked and answered.

12             THE WITNESS:  That's the transactions

13   that are recorded on the books of each company.

14   BY MR. BOLLIN:

15        Q.   So that would be on the ledger?

16        A.   Yeah.

17        Q.   Is there a running tally someplace?

18        A.   It would be on that.

19             So if you ran a summary of the

20   intercompany accounts, it would show you what

21   the balance is.  And, again, that's the general

22   ledger.  That would just be a different report

23   that you'd ask the accounting system to

24   generate.

25        Q.   Okay.  Do you know how much Southern

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 126

1      Coal Corporation loaned to Southern Coal Sales

2      Corporation in 2015?

3            A.   Not the specific amount in 2015.

4            Q.   Do you know how much Southern Coal

5      Corporation loaned to Southern Coal Sales

6      Corporation in 2016?

7            A.   Not specifically, no.  I mean, I think

8      we can tell how much was sent to them by going

9      through these statements, but I don't know those

10     amounts off the top of my head.

11           Q.   Are any amounts received from Southern

12     Coal Corporation automatically loans?  Do they

13     have to be loans?

14           A.   Typically, anytime a parent or

15     shareholder loans money to a subsidiary, it's

16     initially treated as a loan.  There have been

17     times where those loans have been converted

18     to equity and capitalized, but the initial

19     treatment has always been a loan.

20           Q.   And where do we look to see if a

21     loan's been capitalized?

22           A.   You would see it -- you would see

23     it within the detail of the shareholder loan

24     account, general ledger, again.

25           Q.   Okay.  And, also, we can tie it back

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 127

1    to the statements, if you want, but really what

2    I really want to know is who owns the different

3    account numbers.  So why don't I go through

4    those.  If you can tell me who owns them, great.

5    If you can't, we'll go to the statements and

6    figure it out.

7                    ███████████████

8         A.    That's also Southern Coal Corporation.

9         Q.    Do you know the purpose in the

10   different accounts, or behind the different

11   accounts?

12        A.    Not right offhand, because, typically,

13   we only have separate accounts if -- and

14   we don't do this anymore, but historically

15   sometimes there would be a payroll account

16   that was separate from an operating account.

17   But Southern Coal Corporation does not have

18   employees, so I need to go back and double-check

19   that.

20        Q.    Okay.  Who owns account number

21   █████████████████████

22             MR. ROBECK:  What were the numbers,

23   just the last four?

24             MR. BOLLIN:  ████████

25             THE WITNESS:  Do you have a transfer

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 128

```
 1      on here because I don't have that in my notes?
 2      BY MR. BOLLIN:
 3           Q.   Sure.  Yeah.  The date I have on that
 4      is March 22, 2016.
 5                MR. ROBECK:  That's money coming in,
 6      right?
 7                MR. BOLLIN:  Yeah.  It's a deposit.
 8                THE WITNESS:  I can't tell from
 9      looking at this.
10      BY MR. BOLLIN:
11           Q.   Okay.  What about Account Number
12      ██████████████
13           A.   Bluestone Resources, Inc.
14                My notes only have the last four.
15      If you need to read the whole account for the
16      record, that's fine, but if --
17           Q.   ███████ is that what you're saying?
18           A.   Yeah.  I'd defer to you, though.
19           Q.   Okay.  All right.  Account number
20      ██████, is that what we just did?
21           A.   That's what we just discussed,
22      Bluestone Resources.
23           Q.   Okay.  ████████  That one only appears
24      once for ██████  Let's skip to the next one.
25           A.   Okay.
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 129

1        Q.    ██████?

2        A.    James C. Justice Companies, Inc.

3        Q.    ██████

4        A.    Encore Leasing, LLC.

5        Q.    Encore?

6        A.    Yes.  E-n-c-o-r-e.

7        Q.    Is that a Justice Company?

8        A.    It -- it is owned by the Justice

9   family.

10       Q.    Directly by the family?

11       A.    Yes.

12       Q.    What's the business of Encore Leasing?

13       A.    It owns aircraft.

14       Q.    So a payment to Encore Leasing

15   would typically be to pay for the lease of an

16   aircraft?

17       A.    That's what I would expect it to be,

18   yes.

19       Q.    Who owns Account ██████

20       A.    Southern Coal Corporation.

21       Q.    And who owns Account ██████

22       A.    I'm sorry.  Can you repeat?

23       Q.    Yes.  ██████.

24             MR. ROBECK:  Where's the entry on it?

25             MR. BOLLIN:  That one's a one-time

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 130

1    entry for $███   Let's skip it.

2    BY MR. BOLLIN:

3         Q.   Who owns account ███

4         MR. ROBECK:  Where's the entry on

5    that?  That's 1/11/2016.  It's very small.

6    1/13/2016.

7         THE WITNESS:  What was the last four

8    again?

9    BY MS. BOLLIN:

10        Q.   ███.

11        A.   I don't believe that's a Justice

12   account.  I don't see it anywhere.

13        Q.   Okay.  Who owns account ███

14        A.   Justice Family Farms, LLC.

15        Q.   Account Number ███, whose is that?

16        A.   James C. Justice Companies, Inc.

17        Q.   Sorry.  I've come across a couple that

18   you've identified already, so I'm skipping.

19        All right.  ███

20        MR. ROBECK:  Where is that one?

21        MR. BOLLIN:  December 8, 2015, debit.

22        THE WITNESS:  I don't know who that

23   is.

24   BY MR. BOLLIN:

25        Q.   Okay.  Next I've got a Chase E-Pay

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 131

1      statement on February 17 of 2016.

2                MS. BYROADE:  Is that a different

3      exhibit?

4      BY MR. BOLLIN:

5          Q.   It shouldn't be.  It says Chase,

6      though, doesn't it?

7                Well, I got it off of this debit

8      statement, so I think it was a payment to Chase,

9      a Chase account, that is, $█████ on February

10     17th, Page 22185.

11         A.   I -- I can't tell what that is.

12         Q.   Okay.  Next up I'd like to know to

13     whom a payment was made on March 7, 2016?

14               Yeah, March 7, 2016, it's got a

15     Pacific Coast Bank, First National Bank

16     transaction detail, █████.

17               MR. ROBECK:  You're talking about the

18     payment coming in?

19               MR. BOLLIN:  Is that a deposit?

20     No, it's a debit, on Page █████.

21               MS. BYROADE:  It says it's a credit.

22     You're talking about the one that says Pacific

23     Coast Bank, First National Bank?

24               MR. BOLLIN:  Yeah.  That one.

25               THE WITNESS:  I can't tell who that

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 132

1    is.

2    BY MR. BOLLIN:

3        Q.    Okay.  So sitting here today, is it

4    possible for you to tell us the reason behind

5    the transfers of money to these entities we just

6    identified in the Wells Fargo Bank statements?

7        A.    It would be repayment of loans that

8    had previously been made to Southern Coal Sales

9    Corporation, or, possibly, it could be to

10   Southern Coal Corporation, as well.  But

11   it would be for repayment of loans that had

12   previously been advanced.

13       Q.    Okay.  And do you know that or are you

14   assuming it?

15       A.    No, that's why Southern Coal Sales

16   would send the money to these entities.

17       Q.    Okay.  And, again, in order to find

18   out how much Southern Coal Sales Corporation

19   owed to each of these entities, we would need

20   to look at a summary of intercompany accounts?

21       A.    Specifically, by entity.  I mean, we

22   know the total amount from the balance sheet.

23   But if you want to know by entity, you would

24   have to look at the general ledger.

25       Q.    And that would tell us when the debt

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 133

```
 1        was incurred and when it was paid back, if it
 2        was paid back?
 3             A.   It would tell you the interaction.
 4                  Typically, these are multiple
 5        advances, not a single large advance, and the
 6        repayments don't always match up perfectly to
 7        the advance.  So you may have one -- you could
 8        have one advance and multiple repayments, or
 9        you could have multiple advances and one
10        large repayment.  They don't always match up
11        perfectly, but, yes, that detail would tell you
12        the history between those two entities.
13             Q.   This is Exhibit 512 we're looking at?
14             A.   Yes.
15             Q.   Okay.
16                  (Ball Exhibit No. 513, the monthly
17        bank statements for Southern Coal Sales
18        Corporation from Chase, dated June of 2016
19        through April 2017, was marked.)
20        BY MR. BOLLIN:
21             Q.   Here's Exhibit 513.  Do you know what
22        this exhibit is?
23             A.   These appear to be the monthly bank
24        statements for Southern Coal Sales Corporation
25        from Chase.
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 134

1      Q.   And they're dated June of 2016 through

2    April 2017?

3      A.   Yes.

4      Q.   I'm going to go through a similar

5    exercise here, --

6      A.   Okay.

7      Q.   -- but there aren't as many state

8    -- accounts that we need to identify, so it

9    should go a little faster.

10           Do you know who the owner of Account

11   Number ████ is?

12     A.   Bluestone Energy Sales Corporation.

13     Q.   Who owns Account ████?

14     A.   Can you tell me where that one is?

15     Q.   Sure.

16           Well, it's a one-time payment.

17   September 6th, 2016.

18     A.   What was the numbers again?

19     Q.   Sure.  It ends with ████.

20           MR. ROBECK:  I'm not finding it.

21           MR. BOLLIN:  Yeah.  I'm not either.

22   Let me look.

23   BY MR. BOLLIN:

24     Q.   Okay.  I've got the number written

25   down wrong, probably.  Let me see here.  It's

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 135

1    the ██████████ deposit on September 6th.  That's

2    what I'm asking about.

3         A.   I can't tell, other than it came from

4    Carter Bank & Trust.  I can -- I -- I don't know

5    if that's one of our accounts or not, but like

6    I said earlier, we, obviously, bank with -- we

7    borrow money.  We don't run bank accounts with

8    Carter Bank & Trust.

9         Q.   Mm-hmm.

10        A.   But I can't tell, specifically, what

11   that particular deposit is for.

12        Q.   Okay.  Or who's making the deposit,

13   right?

14        A.   Right.  I just can't tell, other than

15   it appears to have initiated from Carter Bank &

16   Trust.

17        Q.   Okay.  Who's the owner of Account

18   Number ████████

19        A.   Bluestone Energy Sales Corp.

20             MS. BYROADE:  That's asked and

21   answered.

22   BY MR. BOLLIN:

23        Q.   I said the wrong number.  I really

24   apologize.

25             It is ███████

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 136

1          A.    Southern Coal Corporation.

2          Q.    And hopefully we'll have a bunch of

3     repeats here and it will be easy.

4                Who owns Account █████

5          A.    Southern Coal Sales Corporation.

6          Q.    Southern Coal Sales Corporation?

7          A.    That's what my notes have.

8          Q.    As opposed to Southern Coal

9     Corporation?

10         A.    I'm happy to double-check it, but the

11    notes I'm referring to show that it's Southern

12    Coal Sales Corporation.

13         Q.    Okay.  Then, I mean, that would be a

14    third bank account that we didn't know about,

15    right?

16               MR. ROBECK:  What do you mean that we

17    didn't know about?

18               MR. BOLLIN:  Well, I mean, I asked

19    you at the beginning of this, you had two banks

20    account, right?  Yes, we had two bank accounts.

21               THE WITNESS:  Well, that's one of

22    the ones on this statement, now that I look at

23    it.  It's the savings --

24               MR. BOLLIN:  Okay.

25               THE WITNESS:  -- that's linked to the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 137

1    checking account.

2    BY MR. BOLLIN:

3        Q.   So they transferred to savings?

4            MS. BYROADE:  So you did know about

5    it?

6    BY MR. BOLLIN:

7        Q.   So it's a transfer to savings?

8        A.   Yeah.  These two accounts are linked

9    together.

10       Q.   Okay.  So if you look at that

11   statement from July of 2016, it shows that

12   transfer from the checking account to the

13   savings account ████████████  Do you see

14   that, or I guess it's a money market account,

15   right?

16       A.   Yes.

17       Q.   Okay.  And if you turn to the last

18   -- the next page, it's got the savings summary,

19   and it shows deposits of a little over ██████

20   and withdrawals of the same amount, right?

21       A.   Yes.

22       Q.   And those withdrawals are being

23   transferred to the Bluestone -- one of the

24   Bluestone accounts.  Which Bluestone entity

25   is that?  █████, that's Bluestone Energy Sales

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 138

1      Corporation?

2              A.   Correct.

3              Q.   Do you know why the money was

4      transferred to the savings account prior

5      to being transferred to Bluestone Energy?

6                   MR. ROBECK:  Objection; form.

7                   THE WITNESS:  Only for, you know,

8      typical why you would put money in a money

9      market account.  But it appears to be very

10     quick, so I'm not sure -- I'm not sure what that

11     would accomplish, and I don't recall us doing

12     that at the time, so I'm not sure why that

13     happened.

14     BY MR. BOLLIN:

15             Q.   Okay.  Do you know which entity owned

16     Account Number █████████

17             A.   That's Bluestone Resources, Inc.

18             Q.   If you turn to the statement for

19     January 4 of 2017, --

20             A.   Okay.

21             Q.   -- do you see it, first page is Bates

22     stamped 22009.

23             A.   Okay.  I'm there.

24             Q.   On the second page, 22010, it has

25     several -- references several checks cut, do

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 139

1       you see that, Checks 1002 through 1007?

2               A.   Yes.

3               Q.   The next -- two pages later it

4       actually has images of those checks?

5               A.   Yes.

6               Q.   And these are checks totaling

7       approximately $███████, and they're all made

8       out to Carter Bank & Trust.  Do you see that?

9               A.   I do, yes.

10              Q.   Why was Southern Coal Sales

11      Corporation cutting checks to Carter Bank &

12      Trust in December of 2016?

13              A.   I can't tell from the face of the

14      checks what these are specifically for, but,

15      based on the amounts, I believe those are loan

16      payments for loans from various Justice-owned

17      entities to Carter Bank & Trust.

18              Q.   Did Carter Bank & Trust make any loans

19      to Southern Coal Sales Corporation itself?

20              A.   No.

21                   (Ball Exhibit No. 514, the tax return

22      for Southern Coal Corporation for 2013, was

23      marked.)

24      BY MR. BOLLIN:

25              Q.   I'm handing to you Exhibit 514.  Let

Page 140

1      me know if you recognize the exhibit.

2           A.   This appears to be the tax return for

3      Southern Coal Corporation for 2013.

4           Q.   Now, it starts off with a document

5      called, Qualified Subchapter S Subsidiary

6      Election.  Do you see those forms?

7           A.   Yes.

8           Q.   What are these forms?

9           A.   When your parent company is a -- an

10     S Corporation, which, basically, allows it to

11     have pass-through status for tax purposes, you

12     file a similar form on behalf of each of the

13     subsidiaries to qualify them under the same

14     manner.  That way their income and loss is

15     passed through to the parent, and then the

16     parents', basically, passes through to the

17     shareholders.

18          Q.   Okay.  Now, unlike the other tax

19     returns that we're going to take a look at from

20     2014 onward, this one indicates that it's filed

21     on behalf of Southern Coal Corporation, and it

22     does not say that it's also being filed on

23     behalf of any subsidiaries.  Do you see that?

24          A.   Where are you?

25          Q.   I went to the first page of the tax

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 141

1       return itself, 22354.

2                   I'm sorry, that's Texas -- Kentucky.

3       I'm at the wrong page.

4                   22309.

5            A.   Okay.  Where are you?

6            Q.   At the top it says, name, Southern

7       Coal Corporation?

8            A.   Yes.  I see that.

9            Q.   Okay.  So unlike the other tax returns

10      we're going to look at, this one indicates it

11      was filed for Southern Coal Corporation.  It

12      doesn't identify any other entities that it

13      was filed on behalf of.  Do you know why?

14                  MR. ROBECK:  And let me just say for

15      the record that since we agreed that the time

16      period of the deposition would start in 2015, we

17      did not go back to 2013.

18                  MR. BOLLIN:  Okay.

19                  MR. ROBECK:  So he may or may not

20      know, but we certainly didn't prepare to -- have

21      the witness prepare to answer questions about

22      2013.

23                  THE WITNESS:  I think it's just

24      the way the preparer presented it, because the

25      tax return is Southern Coal Corporation's tax

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 142

1         return, but the subsidiaries are definitely

2         included within the return.

3         BY MR. BOLLIN:

4              Q.   Where it says, signature of officer,

5         it's got your name typed; is that right?

6              A.   Yes.

7              Q.   Okay.  Did you approve this tax

8         return?

9              A.   I would have definitely signed this

10        tax return, --

11             Q.   Okay.

12             A.   -- yeah.

13             Q.   It also says that it was prepared by a

14        non-paid preparer.  Do you know who prepared the

15        tax return?

16             A.   Brian Rice.

17             Q.   Who is that?

18             A.   Brian Rice, R-i-c-e.

19             Q.   Who's Brian?

20             A.   At the time he was a CPA that worked

21        for one of the Justice Companies.

22             Q.   Southern Coal Sales Corporation was a

23        subsidiary of Southern Coal Corporation in 2013,

24        right?

25             A.   Yes.

Page 143

1          Q.   Was this tax return meant to include

2     Southern Coal Sales Corporation, as well?

3          A.   It's my understanding that it should

4     have.  I need to find the subsidiary schedule.

5          Q.   I believe it's on Page 22334.

6          A.   Yeah.  I don't see it on there.  I

7     don't know why.

8               MR. ROBECK:  That's a schedule of

9     companies they own the stock in.

10              MS. BYROADE:  In other words, it's

11    a schedule for -- it's a statement for Schedule

12    B on Page 2 of the return that asks about

13    corporations in which Southern Coal Corporation

14    owns stock.

15    BY MR. BOLLIN:

16         Q.   Okay.  I don't think there is a

17    statement that lists -- unlike 2014, '15, '16,

18    '17, I don't see a statement that lists any

19    subsidiaries.  So I'm just trying to figure out

20    if this is Southern Coal Sales Corporation's

21    return or not.

22         A.   I'm not aware of Southern Coal Sales

23    Corporation ever filing a standalone tax return.

24         Q.   So this tax return exhibit -- that's

25    included in Exhibit 514 was intended to be the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 144

1       tax return filed on behalf of Southern Coal

2       Sales Corporation?

3                   MR. ROBECK:  Well, the witness didn't

4       prepare to answer questions about 2013 tax

5       returns, so, you know, I mean, that's five years

6       ago.

7                   If he knows, fine, but, you know, he

8       doesn't need to speculate either.

9                   MR. BOLLIN:   Okay.

10                  (Ball Exhibit No. 515, the 2014 income

11      tax return for Southern Coal Corporation and

12      subsidiaries, was marked.)

13      BY MR. BOLLIN:

14          Q.   We've just had marked Exhibit 515,

15      which I believe to be the 2014 income tax return

16      for Southern Coal Corporation and subsidiaries;

17      is that correct?

18          A.   Yes.

19          Q.   It indicates that it was to be signed

20      by the VP and COO.  Were you the VP and COO in

21      2014?

22          A.   I think they're combining two titles

23      there.  It was actually vice president of

24      operations, so I think -- I think that may

25      be -- I mean, probably the same practical

Page 145

1   effect, --

2          Q.   Okay.

3          A.   -- but my recollection is I signed

4   this one, as well.

5          Q.   All right.  The copy we have is,

6   apparently, a file copy or something?

7          A.   Yeah.

8          Q.   Okay.  But this is a true and

9   accurate copy of what was filed on Southern

10  Coal Corporation and its subsidiaries in 2014?

11         A.   I believe so, yes.

12         Q.   Okay.  Now, this tax return does

13  include schedules that reflect revenue,

14  expenses, assets and liabilities of

15  subsidiaries, and that includes --

16              MS. BYROADE:  Just for the record,

17  these are not the complete file, correct,

18  because these are the ones I printed today?

19              MS. SCHULTZ:  Sorry.  It's just

20  federal.  So this is the complete federal tax

21  return, --

22              MS. BYROADE:  Right.

23              MS. SCHULTZ:  -- but it does not

24  include the state.  It's not exactly as

25  produced.  But just for ease of saving the

Case 1:17-mc-00360-AT-RWL   Document 100   Filed 12/03/18   Page 145 of 245
CONFIDENTIAL - ATTORNEYS EYES ONLY

Veritext Legal Solutions
www.veritext.com                                      888-391-3376

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 146

1      earth, we included the federal portion only.

2              MS. BYROADE:  Yeah.  Great.

3      BY MR. BOLLIN:

4          Q.   Okay.  If you can go to the page

5      marked 22598 within Exhibit 515.

6          A.   Okay.

7          Q.   This reports the combined revenue and

8      expenses for 11 sub-entities for 2014, correct?

9      It goes on to the next page.

10         A.   Yes.

11         Q.   Okay.  What was the combined revenue

12     of all these sub-entities, upper left corner?

13         A.   █████████████

14         Q.   Okay.  And how much of that came from

15     Southern Coal Sales Corporation?

16         A.   ███████████

17              MR. ROBECK:  And just for the record,

18     we're, again, a year before the agreed-upon time

19     period for the deposition, right?

20              MR. BOLLIN:  Okay.  Yes.  Thank you.

21              (Ball Exhibit No. 516, the federal tax

22     return for Southern Coal Corporation and its

23     subsidiaries from 2015, was marked.)

24     BY MR. BOLLIN:

25         Q.   You've been handed Exhibit 516, which

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 147

1    is the federal tax return for Southern Coal

2    Corporation and its subsidiaries from 2015.

3              MS. SCHULTZ:  And, again, for the

4    record, this is just the federal portion that's

5    shortened from the complete version that was

6    produced to us.

7    BY MR. BOLLIN:

8         Q.   Do you recognize the document?

9         A.   It's the 2015 tax return for Southern

10   Coal Corporation and subsidiaries.

11        Q.   And, again, this looks like a file

12   copy.  Is this identical to the copy that you

13   signed and filed on behalf of Southern Coal

14   Corporation and its subsidiaries?

15        A.   I can't say for sure if I signed this

16   one.

17        Q.   Do you know who did?

18        A.   I don't know who did.

19        Q.   Do you know if this is a true and

20   accurate copy of Southern Coal Corporation

21   subsidiary's tax filing for 2015?

22        A.   I believe it to be so, yes.

23        Q.   If you turn to Page 22767, again,

24   we've got the combined and consolidated revenue

25   and expenses for subsidiaries.  Now we're down

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 148

1    to six entities, as opposed to 11 on the prior

2    year, right?

3         A.   Yes.  Six not counting Southern Coal

4    Corporation, right.

5         Q.   Right.  Six subsidiaries, right?

6         A.   Right.  Yeah.  You may have said that.

7    As I was counting it I just --

8         Q.   Okay.  And first of all, what happened

9    to the other five entities?

10        A.   They were Kentucky Fuel Corporation

11   and A&G coal Corporation, Justice Low Seam

12   Mining and Virginia Fuel Corporation were spun

13   off to be standalone entities.  That was

14   finance-driven.  Similar to the Bluestone Energy

15   Sales Conversation we had earlier, they had

16   the ability to obtain financing as standalone

17   entities, whereas, being part of the Southern

18   Coal Corporation structure made it more

19   difficult.

20             I haven't put them side by side.  I

21   think I named four.  I don't know what the fifth

22   one was.

23        Q.   Do those entities continue today?

24        A.   Yes.

25        Q.   Are they active?

Page 149

1      A.   No.

2      Q.   Were they associated with particular

3   mines?

4      A.   Yes.

5      Q.   And those mines aren't being mined

6   today?

7      A.   No.

8      Q.   The combined receipts and sales, the

9   combined revenue in 2015 from all these entities

10  was ██████████; is that right?

11     A.   Correct.

12     Q.   That's a lot less than the prior year,

13  where it was ██████████████, correct?

14     A.   Yes.

15     Q.   Do you know why?

16     A.   I know in 2015 it was a very bad year

17  for the coal market, in general, so I would -- I

18  would hazard a guess that that's the primary

19  reason.  And then I think also just not having

20  the other five entities in here would,

21  obviously, have an impact.  But the coal

22  market would be the main reason.

23     Q.   The largest contributor to the

24  gross receipts was sales from Southern Coal

25  Sales Corporation at ███████████, correct?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 150

1          A.   Yes.

2          Q.   And I think we've already determined

3     that a substantial portion of that came from

4     Algoma, is that fair to say?

5          A.   I think that's fair, yes.

6          Q.   Let's go back and take a look at

7     Exhibit 511.

8               The 2015 receipts from Algoma were

9     $39,223,474.20 between November of 2015 and

10    December of 2017 -- strike that.  I apologize.

11    I just screwed up the dates.

12              There were receipts of $39,223,474.20

13    from Algoma in November and December of 2015,

14    correct?

15         A.   Yes.

16         Q.   So that number's ███████ what

17    appears as gross receipts or sales from Southern

18    Coal Sales Corporation on the 2015 return and

19    schedule that's at Page 22767.

20         A.   Yeah.

21         Q.   Do you know why?

22         A.   I mean, this is not an accounting

23    record, per se.  This is --

24         Q.   Which is?

25         A.   511.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 151

1     Q.   Okay.

2     A.   Exhibit 511 is not an accounting

3  record, per se.  It's just a list of when

4  shipments were made and things like that.

5          There -- you could have some timing

6  differences on tax returns.  You know, I've seen

7  that before.  In the grand scheme of things, I

8  mean, ██████████ dollars is a lot of

9  money, but I would expect it to be in some type

10  of timing difference between when something was

11  booked and maybe it got reclassified, maybe

12  there was an adjustment, but I would assume it's

13  something along those lines.

14     Q.   Okay.  What could we look at to try to

15  determine the reason for the difference between

16  the receipts that SCSC received from Algoma in

17  2015 and the gross receipts or sales reported in

18  the 2015 return?

19          MR. ROBECK:  Let me just object for

20  a second, because I think you used the word

21  receipts intending to describe Exhibit 511,

22  and I'm not sure if that's been established,

23  that those were actual receipts, as opposed to

24  a list of transactions that were never booked.

25  I --

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 152

1              MR. BOLLIN:  I think they have, but

2       let me go through it, just to make sure.

3       BY MR. BOLLIN:

4              Q.   You account on an accrual basis.

5              Yes?

6              A.   Yes.

7              Q.   When you make a sale, whether or not

8       you've received the money, you report the money

9       that you billed -- you report the money that you

10      are owed?

11             A.   Yes.

12             Q.   Okay.  So you would expect, aside from

13      maybe some small timing issues, the amount of

14      money invoices and reflected on Exhibit 509 and

15      then again on Exhibit 511 to relate pretty

16      closely to the gross relates for sales on your

17      schedule in the 2015 return, right?

18             A.   Yes.  But you could have had

19      adjustments to these, as we saw earlier.  So

20      it could be that.  Like I said, it could be a

21      timing difference.  Maybe something on this --

22      because this is, basically, an Excel

23      spreadsheet, maybe something here wasn't

24      recording on here right timing-wise.  And so

25      when the accountants went back and looked at it

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 153

1          at year-end, maybe it to got adjusted for the

2          books and tax return but it wasn't adjusted on

3          the spreadsheet.  There's a lot of things like

4          that that could happen.

5                  Q.   And that's what I'm asking about.

6                  A.   Yeah.

7                  Q.   So you referred to timing and

8          adjustments.  Is that the same thing, or are you

9          talking --

10                 A.   No.

11                 Q.   Okay.  What adjustments are you

12         referring to?

13                 A.   So adjustments could be sometimes

14         weights are estimated, and you don't know the

15         weights immediately.  There could be a weight

16         adjustment.  Sometimes you have premiums or

17         penalties, so you could have a price adjustment

18         to the original invoice.  And those can happen

19         later in time, so maybe they were captured

20         before the end of the year, or maybe they

21         weren't, and then -- but the tax preparer

22         said, because that relates to a shipment that

23         occurred in that taxable year, we have to adjust

24         the price.  So you do see things like that

25         happen.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 154

1           Timing is sometimes people just purely

2     book something, say, on December 30th for the

3     purposes of the spreadsheet, and then it turns

4     out it didn't actually load until January 5th,

5     and so you have a timing adjustment, as well.

6     So it could be a couple of different things.

7           Q.   So my question from a few minutes ago

8     was, where would we look in order to determine

9     what those adjustments were, what the timing

10    issues may have been that would cause the

11    invoiced amounts in Exhibit 509 and 511 to

12    differ or exceed the gross receipts or sales

13    amount for Southern Coal Sales Corporation in

14    the year 2015?

15          A.   You would have to see what,

16    specifically, the tax preparer was relying on

17    when he generated this schedule, which I would

18    expect to be the balance sheet and financial

19    records of the company.

20          Q.   Okay.

21          A.   I mean, he wouldn't have any other

22    information to base that on.

23          Q.   So let's go back and look at the

24    financial -- I'm sorry, the balance sheet.

25    We had that before, right?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 155

1          A.   What year is this?

2          Q.   Yeah.  2015.

3          A.   2015.  Okay.

4          Q.   All right.  So Exhibit 505.

5          A.   Yeah.

6          Q.   Okay.  Now, this doesn't break things

7     down by entity, right?

8          A.   Well, this is just Southern Coal

9     Sales --

10          Q.   Oh, okay.

11          A.   -- Corporation.

12          Q.   Yeah.  You're right.  It's for

13     Southern Coal.

14          So here it's got receivables listed ██

██                  ████████  Did I read that right?  Over ██

██        █████████

17          A.   Oh, you're on the balance sheet?

18          Q.   Yeah.

19          A.   For that number, I would look at the

20     income statement.

21          Q.   Okay.  Let's look at the income

22     statement.

23          All right.  So there we've got coal

24     sales of ███████████████, right?

25          A.   Yep.  Yep.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 156

1        Q.   All right.  That's even more than what
2   was listed in the 2015 return, right?
3        A.   Well, but not if you add the ███████
4   amount to the Algoma amount.  Because this would
5   not be specific to Algoma.  This would be for
6   Southern Coal Sales as a whole.
7        Q.   Well, so is the 2015 tax return,
8   right?
9        A.   Yeah.  Yeah.
10             Which as you're going to see, though,
11   for general -- for revenue, you have adjustments
12   to the top-line revenue number.  There's a
13   negative adjustment here of $███████████.
14        Q.   Okay.  What's that adjustment for?
15        A.   Typically, that is, because it's not
16   premiums or penalties, that's going to be if you
17   have to take, like, a bad debt write-off on our
18   books, that shows up as general revenue.
19             On Southern Coal Sales, that's,
20   typically, what that would be, is it something
21   like a bad debt write-off.
22        Q.   And do you know whose bad debt that
23   was?
24        A.   I can't tell just by looking at that.
25        Q.   How could we tell?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 157

1           MR. ROBECK:  It's probably a payment

2      Algoma didn't make --

3           THE WITNESS:  I mean, it's very likely

4      it is something like that, but you would look at

5      the -- you'd have to look at the general ledger

6      again.

7      BY MR. BOLLIN:

8      Q.   Okay.  When the five entities that

9      used to be part of Southern Coal Corporation in

10     2013 were spun off, and 2014 were spun off to be

11     their own entities in 2015, did Southern Coal

12     Corporation receive some sort of compensation

13     for that?

14     A.   No.  No.  It was done under -- I may

15     get the code sections wrong here, but it was

16     done under Sections, I think, 351, 353 and 365

17     of the Internal Revenue Code.  And if you do --

18     on a closely held business, if you do a spinoff

19     and the identical percentage is of the existing

20     parent company, it's a tax-free transaction

21     without consideration.

22          And I think they were allowed to do

23     that because they had current status as an

24     S Corporation, and after the fact they had

25     identical ownership and they were still

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 158

1    pass-through entities.

2                (Ball Exhibit No. 517, the 2016

3        Southern Coal Corporation subsidiary's tax

4        return, was marked.)

5    BY MR. BOLLIN:

6        Q.   You've been handed Exhibit 517,

7        which is the 2016 Southern Coal Corporation

8        subsidiary's tax return.  Is this a true and

9        accurate copy of the tax return filed on

10       behalf of Southern Coal Corporation and its

11       subsidiaries?

12       A.   Yes, I believe so.

13                MR. ROBECK:  Sorry.  What number was

14       this?

15                MR. BOLLIN:  517.

16   BY MR. BOLLIN:

17       Q.   And do you know if you reviewed,

18       approved and signed this return?

19       A.   I don't recall signing this one.  I

20       don't think it was me.

21                MR. ROBECK:  And, again, this is just

22       the federal?

23                MR. BOLLIN:  Again, this is just

24       the federal.  These are all just the federal.

25                THE WITNESS:  And would it be okay if

Page 159

1      we took just a moment?

2                 MR. BOLLIN:  Oh, yeah.  Of course.

3      Yeah, whenever you want a break, just say so.

4                 THE WITNESS:  Okay.  I just need a

5      minute.

6                 MR. BOLLIN:  Okay.

7                 (Recess taken.)

8      BY MR. BOLLIN:

9           Q.   All right.  Do you have Exhibit 517 in

10     front of you?

11          A.   I do.

12          Q.   All right.  If you could turn to the

13     page marked 22995 within Exhibit 517.

14          A.   Okay.

15          Q.   Do you see it?  It's the combined

16     trader business income and deductions page.

17          A.   Yes.

18          Q.   And, again, this is the same form

19     we've been looking at for the other tax returns

20     listing the receipts, et cetera, of Southern

21     Coal Corporation and its subsidiaries, correct?

22          A.   Yes.

23          Q.   Okay.  Now we're down to four

24     subsidiaries whereas before we had five.  Who

25     did we lose?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 160

1          A.   Meg-Lynn Land Company and Black River

2     Coal.

3          Q.   Okay.

4          A.   And both -- what those two are,

5     Meg-Lynn Land is associated with the A&G Coal

6     Corporation operation.  It is a lessee.  And so

7     when A&G was spun off, Meg-Lynn should have gone

8     with it, and this is a correction of that.

9               And Black River Coal is the same type

10    setup with Justice Low Seam Mining.  So when

11    Justice Low Seam Mining was spun off, Black

12    River Coal should have gone off at the same

13    time.

14         Q.   Okay.  So by 2016 those two entities

15    had been spun off, as well?

16         A.   Correct.

17         Q.   Now, the gross receipts for Southern

18    Coal Corporation and its subsidiaries are listed

19    as ████████; is that right?

20         A.   Yes.

21         Q.   And how much of that was from Southern

22    Coal Corporation -- I'm sorry, was from Nevada

23    Holdings, Inc.?

24         A.   On the schedule, █████.

25         Q.   Okay.  Now, Nevada Holdings, Inc.,

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 161

1    is the same thing as Southern Coal Sales

2    Corporation, right?

3         A.   Yes.

4         Q.   Okay.  First of all, why did Southern

5    Coal Sales Corporation change its name?

6         A.   I wasn't involved with that directly,

7    but Southern Coal Sales Corporation was in a

8    dispute.  I think the name of the other company

9    was ███████████   And I think the name change was

10   a first step in the event that the entity would

11   ultimately file bankruptcy.

12        Q.   Which entity?

13        A.   Southern Coal Sales Corporation.

14             That, obviously, never happened, but I

15   think -- I think that was the first step in case

16   that -- that was a necessary move.

17        Q.   Okay.  Do you know why you'd want to

18   change the name before filing bankruptcy?

19        A.   I just -- I think because Southern

20   Coal Corporation was not going to be involved,

21   it was one where only the subsidiary was going

22   to file.  And to avoid any confusion with who

23   was actually in bankruptcy, it made sense to

24   change the name.  But, again that was something

25   that was proactive, but it never actually

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 162

1    culminated.

2         Q.    Now, we've already gone through

3    and established that Battle Holdings, Inc., or

4    Southern Coal Sales Corporation, made sales of

5    ██████████████████ to Algoma in 2016.  So how is

6    it that there were ████ gross receipts or sales

7    for Nevada Holdings, Inc., on the 2016 tax

8    return?

9         A.    In just referring back to Exhibit 506,

10   the income statement for that year has a large

11   negative general revenue adjustment, and I would

12   assume somehow those two tie together, as we've

13   discussed in 2015, but I can't say for sure.

14        Q.    What's a negative revenue adjustment?

15        A.    It's just some type of adjustment, and

16   it's just the way our income statement works,

17   but certain types of adjustments show up as

18   either a positive or a negative in general

19   revenue, if there's not, otherwise, a specific

20   line item for it.  Like, on these statements,

21   there's line items for coal sales revenue,

22   premiums and penalties, shipping royalty.  And,

23   basically, general revenue is just a catchall

24   for anything that doesn't fit into one of those

25   categories.  As I mentioned earlier, it could be

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 163

1      something like a bad debt expense or something

2      like that.

3          Q.   But as you sit here today, you don't

4      know what the general revenue adjustment was

5      that took you into negative territory?

6          A.   I can't tell by looking at that

7      exhibit.

8          Q.   And by that exhibit, you mean Exhibit

9      506?

10         A.   Correct.

11         Q.   Wouldn't the 2016 tax return combined

12     trader business income and deductions statement

13     include, under gross receipts or sales, all of

14     the sales made by an entity regardless of

15     whether there are any adjustments?  It's

16     gross receipts and sales, right?

17         A.   Yeah.  But as we saw on the 2015

18     return, the way this schedule presents the

19     income statement, it's the -- what's,

20     ultimately, the -- it's what's described as

21     total revenue on the income statement is what

22     corresponds to I think it's gross revenue, I

23     lost my spot here, but what corresponds to gross

24     revenue on the tax return.

25         Q.   So where it says gross receipts or

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 164

1      sales on the tax return, it doesn't really mean

2      all receipts and sales.  It means all receipts

3      and sales after adjusting for other things?

4          A.   Yes.  I mean, and when you compare --

5      like, 2015, for example, when you compare that

6      line item with the year-end income statement,

7      it's what shows up at total revenue on the

8      income statement.

9          Q.   And in order to understand how you did

10     the calculation of general revenue for 2016, we

11     would have to look at the general ledger?  What

12     would we have to look at?

13         A.   Yeah.  That's what would show you what

14     makes up that line item.

15         Q.   Did any other entity besides Nevada

16     Holdings, Inc., report the revenue generated

17     from the sale of coal to Algoma?

18         A.   I can't tell that from this document.

19         Q.   Do you know who reported the revenue

20     on sales to Algoma in 2016?

21         A.   If it's not on this tax return,

22     the only other place I think it could be is

23     Bluestone Energy Sales Corporation, but I don't

24     have that tax return in front of me, so I can't

25     say for sure.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 165

1      Q.    What could I do to try to figure out

2   the answer?  Where could I look?

3      A.    I think I would have to see what the

4   general revenue adjustment is at the year-end

5   for 2016 to make sure that's not otherwise

6   offsetting any coal revenue.  It doesn't appear

7   that it is, and then I think you would have to

8   look at, probably, the Bluestone Energy Sales

9   tax return to see if it's there.

10     Q.    ████████████ is a pretty big general

11  revenue negative adjustment in 2016, right?

12     A.    Yes.

13     Q.    Do you recall what that was for?

14     A.    Not specifically.

15     Q.    But, again, that would be of -- that

16  information would be available on the general

17  ledger?

18     A.    Yeah.  It would be in the records as

19  to what created that.

20     Q.    Okay.  Which records?

21     A.    The accounting records.

22     Q.    Okay.  Just because I need to be

23  a little more specific, do you know which

24  accounting records?

25     A.    I don't know exactly what it is.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 166

1    Like I said, general revenue is a catchall for

2    anything that does not fit into one of those

3    other categories.

4         Q.   And the other categories are set forth

5    below on this third page of Exhibit 506?

6         A.   Yes.  I think it was coal sales

7    revenue, premiums and penalties, farm revenue,

8    shipping royalty.  If it's not one of those, it

9    would, by default, fall into general revenue.

10        Q.   Okay.  If you could take a look at

11   Exhibit 506, the third page, this is the

12   consolidated income statement for 2016?

13        A.   Yes.

14        Q.   The third page has a bad debt expense

15   of ▆▆▆▆▆▆▆▆, do you see that?

16        A.   Yeah.

17        Q.   What was that?

18        A.   I can't tell from this what that is.

19        Q.   And you don't know otherwise?

20        A.   I mean, it would be a write-off of a

21   bad receivable, but I don't know who that would

22   be just by looking -- or how many different

23   receivables that is.

24        Q.   If you could go back to Exhibit 511,

25   please.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 167

1          A.   Okay.

2          Q.   Okay.  On the last page where we've

3     totaled up all the sales, for 2016 we came up

4     with a total of ██████████, correct?

5          A.   Yes.

6          Q.   Okay.  And when we were just looking

7     at Exhibit 506, third page, bad debt expense,

8     that's ███████████, right?

9          A.   Yes.

10         Q.   So according to Exhibit 506 Page 3,

11    you had $████████ worth of bad debt expense

12    on $██████████ worth of sales?

13         A.   That wouldn't have to be from the

14    same year.  I mean, you could be writing off

15    something from a prior year.

16         Q.   Okay.

17         A.   So you can't specifically say it only

18    relates to that.

19         Q.   So if we want to find out -- how do I

20    find out what that bad debt expense was for?

21         A.   It would be in the general ledger.

22              (Ball Exhibit No. 518, a document

23    Bates Numbered SE-ESAL-7308 through 7360, was

24    marked.)

25    BY MR. BOLLIN:

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 168

1          Q.   I've handed you Exhibit 518, which

2     encompasses documents SE-ESAL-7308 through 7360.

3     These are invoices received by Algoma from

4     Southern Coal Sales Corporation relating to

5     the coal purchased pursuant to the original

6     agreement, the amending agreement and term

7     sheet -- actually, not the term sheet, up

8     through the amending agreement.

9               First of all, do you recognize the

10    invoices?  Have you ever seen these before?

11         A.   I haven't gone through every single

12    one of them, but, yeah, I mean, they generally

13    appear to be our form of invoice that we use.

14         Q.   Okay.  And then if you'll go to

15    Page 7339 within this Exhibit 518, you'll see

16    that the invoices starting April 29 of 2016 are

17    from Bluestone Energy Sales Corporation.  Do you

18    see that?

19         A.   Yes.

20         Q.   Do you know why that change in form

21    was made?

22         A.   I think it ties to the Carter Bank

23    conversation we had earlier.  I think we were

24    trying to qualify these invoices and receivables

25    for financing purposes under the Carter Bank

CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Bluestone Energy Sales line of credit to, you

2      know, basically, create access to cash for

3      operations.

4           Q.   And that -- that didn't work out for

5      you?

6           A.   I mean, it just wasn't quite what we

7      had hoped.

8           Q.   The wire instructions actually sought

9      payment to a Bluestone energy account, correct?

10          A.   On some of them, and on some of the

11     Bluestone Energy Sales ones it's Southern Coal

12     Sales.

13          Q.   Okay.  In any case, the payments were

14     always made to a Southern Coal Sales Corporation

15     account number, right?

16          A.   Yes.

17          Q.   Did Bluestone Energy Sales Corporation

18     assume the contract within -- within the

19     company?  Did it take over the contract?

20          A.   That was our intention, but I don't

21     think that ever happened.

22               I think it was a little different than

23     the utility contracts where they were willing to

24     start paying into the Bluestone energy sales

25     bank account.  In this instance, Algoma only

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    paid the Southern Coal Sales bank account.  So

2    I don't think there was no -- I don't think we

3    ever completed an internal assignment of the

4    contract.

5        Q.   Okay.  But after the money would be

6    received from Algoma, it would, nonetheless, be

7    transferred out almost immediately to Bluestone

8    Energy Sales Corporation and other

9    Justice-related entities, correct?

10             MR. ROBECK:  Objection; form.

11             THE WITNESS:  Yeah.  As we

12   discussed earlier, to pay back loans that had

13   been previously made.

14   BY MR. BOLLIN:

15       Q.   And it was accomplished in such a way

16   as to leave the account balance at ███ or ████

17   ████████ every month?

18       A.   As the money came in, it -- it --

19   almost all it have always went back out.

20       Q.   Who prepared the invoices that were

21   sent to Algoma?

22       A.   Typically, either Summer Harrison or

23   Janet Ransom would do that.

24       Q.   Do you know whose decision it would

25   have been to change the invoices from Southern

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 171

1      Coal Corporation -- Sales Corporation to

2      Bluestone Energy Sales Corporation?

3           A.   I think Jay Justice would have

4      instructed Summer to have that done.

5                (Ball Exhibit No. 519, the 2017 return

6      for Southern Coal Corporation, was marked.)

7      BY MR. BOLLIN:

8           Q.   Is Exhibit 519 the 2017 return for

9      Southern Coal Corporation?

10          A.   Yes.

11          Q.   If you could turn to Page 22921, going

12     back to that consolidated report we've been

13     looking at for the other tax returns, --

14          A.   Okay.

15          Q.   -- this one's a little hard to read,

16     but is there any gross receipts reported for

17     Nevada Holdings, Inc.?

18          A.   No.

19          Q.   Because I can't read that page too

20     well, let me go back to the first page of the

21     actual return, which is Page 22904.

22          A.   Okay.

23          Q.   The combined revenue for Southern Coal

24     and its subsidiaries for 2017 was ██████; is

25     that right?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 172

1      A.   Yes.

2      Q.   Okay.  Is this during the time

3  period that Southern Coal Corporation and its

4  subsidiaries became inactive?

5      A.   Yeah.  None of these companies were

6  operating in 2017.

7      Q.   I'm going to jump around a little bit

8  between the tax returns for a minute here, if

9  you could put them in front of you.  I'm going

10  to start with 2014.

11       If you go to the -- it's Page 22560,

12  please, --

13      A.   Okay.

14      Q.   -- what was the rent expense for

15  Southern Coal Sales -- I'm sorry, Southern

16  Coal Corporation in 2016 -- I'm sorry, 2014?

17      A.   Can you point me to a line item on

18  that?  I'm not seeing it.

19      Q.   Sure.  I think it's 11.  I don't have

20  it in front of me.

21      A.   Zero.

22      MR. ROBECK:  This is for Southern Coal

23  Corporation, right?

24      MR. BOLLIN:  Yeah.  Southern Coal

25  Corporation.  The 2014 return for Southern Coal

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 173

```
 1      Corporation.
 2      BY MR. BOLLIN:
 3           Q.   And this includes all the subsidiaries
 4      including Southern Coal Sales Corporation,
 5      correct?
 6           A.   Yes.
 7           Q.   So neither Southern Coal Corporation
 8      or its subsidiaries paid any rent in 2014?
 9                MS. BYROADE:   Objection.
10                THE WITNESS:   Not -- I mean, not as
11      it's categorized on a tax return.
12      BY MR. BOLLIN:
13           Q.   Is there another kind of rent that
14      they paid?
15           A.   Yeah.   I mean, like, coal lease, rent
16      and/or royalties.   You know, when you're not
17      mining, you still have to pay a minimum lease
18      amount.   I mean, in coal leases, they don't
19      always call it rent.   I don't know where that
20      gets picked up on a tax return, but as it gets
21      characterized for a tax return, Line 11 has
22      zero.
23           Q.   Okay.   If you could go to Page 22598
24      of that same return, --
25           A.   Okay.
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 174

1          Q.    -- Line 11, that indicates that none
2     of the entities pays rent, right?
3          A.    Yeah.  As it's categorized on a tax
4     return, that line is ████.
5          Q.    Okay.  And Southern Coal Sales
6     Corporation doesn't own any property or any land
7     or buildings, right?
8          A.    No.
9          Q.    Okay.  Southern Coal wasn't paying for
10    office space or for any of its employees to use
11    office space, correct?
12         A.    I can't say that for sure.  I mean,
13    there is -- from time to time, there have been
14    intercompany charges.  In this specific time
15    period, I can't say whether or not, but
16    companies have made charges intercompany for
17    what some people refer to as management fees
18    and things like that.
19         Q.    How would we know about those
20    management fees that you're describing?
21         A.    It would show up as an intercompany
22    charge.
23         Q.    Where?
24         A.    Same place we've been talking
25    about all day.  It would be in the intercompany

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 175

1      payable or receivable on the balance sheet, and

2      then for the detail that you've been asking

3      about that would be shown on the intercompany

4      summary that would be generated from the general

5      ledger.

6          Q.   But in 2014, at least, you didn't

7      report any rents paid on behalf of any Southern

8      Coal Corporation entity, correct?

9          A.   I think, for the third time, Line 11

10     on the tax return says ███████

11         Q.   Okay.  Well, you were qualifying

12     it a second ago, so I just wanted to make sure.

13         A.   I have said, unequivocally, every

14     time, that Line 11 says █████ on the tax return.

15         Q.   You know of no rents, you think there

16     may have been some charges, you don't know,

17     those would be in the ledger?

18         A.   I don't know if there were any charges

19     or not.

20         Q.   Okay.  The 2015 to 2016 tax returns

21     also showed ██████ rent expense for Southern Coal

22     and its subs?

23         A.   I don't know.

24         Q.   We can go through it, if you'd like.

25         A.   Yeah.  What exhibits are those?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 176

1          Q.   I'm sorry?

2          A.   What exhibits are those?

3          Q.   Sure.  The 2015 tax return is --

4               MR. ROBECK:  516.

5     BY MR. BOLLIN:

6          Q.   -- 516.  Take a look at Line 11, if

7     you will.

8          A.   Yeah.  Line 11 says ██████

9          Q.   Okay.  The 2016 tax return is Exhibit

10    517.

11         A.   Line 11 says █████.

12         Q.   Okay.

13              So the Southern Coal Corporation and

14    its subs weren't paying for office space in 2014

15    through 2016, right?

16              MR. ROBECK:  Objection.

17              THE WITNESS:  Yeah.  Can you ask that

18    again?

19    BY MR. BOLLIN:

20         Q.   In 2014 through 2016, Southern Coal

21    Corporation and its subsidiaries were not

22    paying for rent for office space, correct?

23         A.   I mean, I think that's different than

24    what you asked earlier.  I can't tell from that

25    if Southern Coal Corporation was -- because

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 177

1        Southern Coal Corporation, I think, did have

2        some assets.  You've asked me about Southern

3        Coal Sales not having assets, which I do agree

4        with you would imply, if they had office space,

5        they would have to rent it.  But I can't say

6        from looking at the face of that if Southern

7        Coal -- because each mine has mine offices,

8        I mean, I just can't say by looking at that

9        document whether Southern Coal, or any of its

10       subsidiaries as you asked the question, doesn't

11       have any of its own offices.

12            Q.   Okay.  My question really was just

13       rents.  Did Southern Coal or any of its

14       subsidiaries pay rent for offices between

15       2014 and 2016?

16            A.   No.  And, like I said, I -- I think

17       it's possible, though, at some of the mine

18       operations you have mine offices.  And if

19       Southern Coal owned those, which is possible,

20       it wouldn't show up in rents.  That's the only

21       point I was trying to make.

22            Q.   Okay.  That's fine.

23                 And where would you look to find out

24       if Southern Coal Corporation owned offices at

25       mine operations?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 178

1          A.   It would show up as a fixed asset on

2     their balance sheet.

3          Q.   And the balance sheets that we've

4     seen for Southern Coal Sales Corporation don't

5     provide that level of detail.  Do the balance

6     sheets for Southern Coal Corporation show that

7     level of detail identifying what the fixed

8     assets are?

9          A.   I mean, it would show whether or not

10    they had fixed assets.

11         Q.   Okay.

12         A.   And if you wanted to see what those

13    fixed assets are, you would have to look at the

14    general ledger.

15         Q.   Can you look at the 2017 tax return,

16    which is Exhibit 519?  Now, on this one, it

17    shows Southern Coal Corporation and its

18    subsidiaries paid rents of $███████.

19    Did I get that right?

20         A.   Yes.

21         Q.   And do you know what that rent expense

22    is for?

23         A.   No.

24         Q.   If you look on the schedule on

25    Page 22921, all of that amount is allocated to

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 179

1      an entity identified as subsidiary Southern Coal

2      Corporation.

3                  MR. ROBECK:  22921?

4                  MR. BOLLIN:  Yeah.

5      BY MR. BOLLIN:

6           Q.   Do you think that means to allocate

7      the rent to Southern Coal Corporation?

8           A.   I don't know what that means.

9           Q.   All right.  No rent is allocated to

10     Nevada Holdings, Inc., right?

11          A.   Correct.

12          Q.   Did Southern Coal Corporation have any

13     revenue in 2017?

14          A.   I think you asked this earlier, but

15     ████.

16          Q.   Okay.  So the rent attributed to

17     Southern Coal Corporation in 2017 exceeded its

18     revenue?

19          A.   The rent that is claimed on

20     Line 11 exceeds its revenue by, I guess,

21     roughly, ████.  I don't agree with your

22     characterization of it, though.  Because I

23     think if it was attributed to Southern Coal

24     Corporation, it would have to show up on both

25     sides of the equation.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 180

1            Q.    What do you mean by that?

2            A.    Maybe I misunderstood what you're

3       saying, but I thought you said it was rent

4       attributed to Southern Coal Corporation.

5            Q.    It appears to be in that form we were

6       looking at on Page 22921.

7            A.    And you mean as an expense?

8            Q.    Yeah.

9            A.    Oh, okay.  I misunderstood what

10      you were saying.  I thought you said paid to

11      Southern Coal Corporation.

12           Q.    No, paid by.

13                 It does raise the question, though, of

14      who they paid it to.  Do you know who they paid

15      the rent to?

16           A.    No.  No.  I mean, I don't think it's

17      uncommon for -- if companies don't have revenue,

18      I think companies struggle to pay rent every

19      day.  I think it's where the saying comes from.

20           Q.    Well, this is the first year they

21      appear to have paid rent, and yet they didn't

22      have revenue.

23           A.    Correct.

24           Q.    Okay.  If you could take a look at the

25      2013 return, Exhibit 514, first page of the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 181

1       return itself, which is 22309, do you see it?

2              A.   Yes.

3              Q.   Okay.  It identifies compensation of

4       officers in Southern Coal Corporation at

5       ████████.  Did I read that correctly?

6              A.   What line item?

7              Q.   Seven.

8              A.   Yes.

9              Q.   And if you go ahead to Page 22322 of

10      the same exhibit, this is the compensation of

11      officers form?

12             A.   Yes.

13             Q.   Okay.  And this identifies

14      compensation for yourself, Jim Justice, III,

15      and James T. Miller, correct?

16             A.   Yes.

17             Q.   Was that your total compensation for

18      2013, or did you receive compensation from other

19      entities, as well?

20             A.   That would have been my total.

21             Q.   Was that James Justice, III's,

22      total compensation in 2013, or did he receive

23      compensation from others?

24             A.   Possibly.

25             Q.   Do you know if that was James

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 182

1      T. Miller's total compensation in 2013?

2          A.    That would not have been James

3      T. Miller's total compensation.

4          Q.    Do you know where else he received

5      compensation from in 2013?

6          A.    Greenbrier Hotel Corporation.

7          Q.    And is it possible that James C.

8      Justice, III, also received compensation from

9      another entity that year?

10          A.    Yes.

11          Q.    Who determined your wages or

12      compensation in 2013?

13          A.    James C. Justice, III, and, I guess,

14      technically, James C. Justice, II, but I think

15      that it would have predominantly been James C.

16      Justice, III.

17          Q.    Okay.  I want to look at the same line

18      on the 2014 return, which I believe is Exhibit

19      515.

20              And starting on the first page the

21      compensation of officers, Line 7, that line's

22      ████ on the 2014 return, and that means ████.

23      The officers weren't compensated at all in 2014,

24      is that accurate?

25          A.    Line 7 says ████ yes.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 183

1       Q.  And do you believe that to be true the

2   officers were compensated ████ by Southern Coal

3   Corporation and its subsidiaries in 2014?

4       A.  Yes.  I have no reason to think that

5   this isn't accurate.

6       Q.  You were still an officer in 2014 for

7   Southern Coal Sales Corporation, right?

8       A.  Yes.

9       Q.  Where did you receive your

10  compensation that year in 2014?

11      A.  I believe Justice Management Services.

12      Q.  Have we talked about them yet today?

13      A.  It no longer exists.

14      Q.  Okay.  It sounded like a new one.

15      A.  Yeah.  No.  It no longer exists.

16      Q.  Who owned Justice Management Services?

17      A.  I don't recall its ownership.

18      Q.  Was its ultimate ownership the Justice

19  Family?

20      A.  Yes.

21      Q.  Were you paid by that entity in any

22  other years?

23      A.  In 2015, as well.

24      Q.  Okay.  Do you know who paid the

25  compensation of the other officers of Southern

Page 184

1      Coal Corporation and its subsidiaries in 2014?

2           A.   I think it would have been Justice

3      Management Services, as well.

4           Q.   That's your expectation or -- I don't

5      want you to guess.

6           A.   I mean, typically, they would be paid

7      by the same people I would be paid by.

8           Q.   But in 20 --

9           A.   But that is a guess.

10           Q.   And, I mean, in 2013, they were paid

11      at least a part of their compensation by the

12      same entity, Southern Coal Corporation, right?

13           A.   Right.

14           Q.   But it's quite possible, if not

15      probable, they received the bulk of their

16      compensation from other Justice entities in

17      2013?

18                MR. ROBECK:   Objection; form

19                THE WITNESS:   I know that Terry Miller

20      did.  I don't know on Jay Justice.

21      BY MR. BOLLIN:

22           Q.   Okay.  Do you know if Jay Justice

23      received distributions or dividends in 2015?

24           A.   No dividends.

25           Q.   Is a distribution different than a

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 185

1      dividend, in your mind?

2              A.    Not in my mind.

3              Q.    Okay.

4              A.    Well, it typically de -- to me it

5      denotes noncash.

6              Q.    Mm-hmm.

7              A.    But they're, effectively, the same

8      thing to me.

9              Q.    Do you know if Jay Justice has

10     received dividends or distributions

11     in 2013, 2014, 2015 or 2016?

12             A.    He would not have.

13             Q.    Okay.  Do you know if he did in 2017?

14             A.    He wouldn't have then either.

15             Q.    How about Jim Justice for the same

16     years?

17             A.    No dividends or distributions.

18             Q.    You said that you were paid -- what's

19     the management entity?

20             A.    Justice Management Services.

21             Q.    And they paid you in 2014 and 2015?

22             A.    The first three months of 2015.

23             Q.    Okay.

24             A.    That -- when I moved to Greenbrier

25     Hotel Corporation after the death of the chief

CONFIDENTIAL - ATTORNEYS EYES ONLY

1       operating officer, --

2              Q.   Sure.

3              A.   -- I went on their payroll.

4              Q.   Okay.  That's when you went to work

5       for Greenbrier, was in 2015?

6              A.   Yeah.  April of 2015.

7              Q.   Did Southern Coal Corporation and its

8       subsidiaries report any compensation of its

9       officers in 2015?

10             A.   No.

11             Q.   Did Southern Coal Corporation and its

12      subsidiaries report compensation of any officers

13      in 2017 -- I'm sorry, 2016?

14             A.   No.

15             Q.   Did Southern Coal Corporation and its

16      subsidiaries report any officer compensation in

17      2017?

18             A.   No.

19             Q.   Aside from yourself, do you know how

20      any of the officers of Southern Coal Corporation

21      and its subsidiaries were compensated in the

22      years 2014 through 2017?

23             A.    I know that Terry Miller received the

24      majority of his salary from Greenbrier Hotel

25      Corporation, and he received a smaller amount

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 187

1      from Southern Coal and then Justice Management

2      Services.

3              Q.   Okay.

4              A.   I do not know how Jay Justice and Jim

5      Justice were compensated.

6              Q.   Turning back to Exhibit 514, which

7      is the 2013 return -- I believe it's an amended

8      return, correct?

9              A.   It's checked as an amended return.

10             Q.   Okay.  And you've got the subsidiary

11     -- qualified subsidiary elections at the

12     beginning of this document?

13             A.   Yes.

14             Q.   Okay.  Now, I was looking at

15     those, and they're prepared for Southern Coal

16     Corporation, and then they have the name of the

17     various subsidiaries.  First of all, you

18     prepared these, didn't you?

19             A.   I did not, no.

20             Q.   Oh, okay.

21                  You were identified as the officer or

22     legal representative from the IRS may call for

23     more information.  Did they tell you that?

24             A.   I don't recall from five years ago,

25     so I --

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 188

1          Q.    Sure.

2          A.    -- I'm sure Brian would have alerted

3     me to that, but I don't recall a specific

4     conversation.

5          Q.    On these forms there's a provision

6     for name of common parent, and it would be

7     common between Southern Coal Corporation and the

8     subsidiary on each form, and on each form it's

9     identified as James C. Justice Companies, Inc.

10    Do you see that?

11         A.    Yes.

12         Q.    So I think earlier we identified them

13    as -- I'm sorry, I'm looking at my chart, and

14    I'm just having a hard time putting it together.

15              James C. Justice companies Inc., is

16    that the parent of Bluestone Resources?

17         A.    No.

18              MR. ROBECK:  We're also talking about

19    a different time period now.

20              MR. BOLLIN:  Okay.

21              MR. ROBECK:  You're looking at a

22    2013 tax return, two years prior to the date we

23    agreed upon and all the other questions about

24    the corporate structure was focused on 2016, and

25    I think maybe a few questions about 2015 and

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 189

1      2017.

2      BY MR. BOLLIN:

3          Q.   So how was James C. Justice Companies

4      Inc., related to Bluestone Resources, Inc.?

5          A.   It has common ownership in that the

6      Justice family owns James C. Justice Companies

7      Inc.  And for these entities that you see these

8      forms, prior to 2013 they were owned by James

9      C. Justice Companies, Inc.  In 2013, in a

10     similar spinoff to what we were discussing

11     earlier, James C. Justice Companies, Inc., spun

12     those off to Southern Coal Corporation.  And

13     that was to eliminate any coal mining within the

14     James C. Justice Companies Inc., structure.

15              Certain banks that are willing to

16     finance agriculture do not want to finance any

17     coal exposure whatsoever, so we removed all

18     of the coal companies from James C. Justice

19     Companies, Inc.

20         Q.   When we were going through the bank

21     statements earlier, you saw a number of deposits

22     from Justice Family Farms to Southern Coal

23     Corporation -- Southern Coal Sales Corporation's

24     accounts.  Why did those transfers occur?

25         A.   It would just be another example of

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 190

 1          what we talked about, intercompany loans between
 2          companies, or repayment of intercompany loans.
 3               Q.   If you could take a look at the
 4          2014 return in Exhibit 515 back at the combined
 5          trader business income and deduction statement,
 6          which is on Page 22598, --
 7               A.   Okay.
 8               Q.   -- I noticed on this page there's a
 9          advertising expense reported of ██████, and
10          -- I'm sorry, ██████ of those dollars are for
11          Southern Coal Sales Corporation.  Do you know
12          what that advertising was for?
13               A.   I can't tell from this what that's
14          for.
15               Q.   Do you know what kind of expenses go
16          into this line item, advertising?
17               A.   I mean, I -- I think exactly
18          what would you expect to go into it, I mean,
19          especially given that it's on a tax return that,
20          you know, has very specific rules as far as what
21          can be deducted for marketing and advertising.
22               Q.   What kind of marketing and advertising
23          does Southern Coal Corporation do?
24               A.   It will sponsor various events.  Back
25          then it would -- I mean, it could be anything,

Page 191

1      but it would sponsor little league signs at

2      local little leagues, it sponsored youth golf

3      events.  I don't think any of those rise to the

4      number that's on there.  I don't know what makes

5      up that number, but that's, typically, the type

6      of advertising they did.

7                  MR. BOLLIN:  Let's take a five-minute

8      break.

9                  MR. ROBECK:  Okay.

10                 (Recess taken.)

11     BY MR. BOLLIN:

12          Q.   I'm going ask you to take a look at

13     the 2015 tax return, Exhibit 516.

14          A.   Okay.

15          Q.   Turn to Page 22767, please.

16          A.   Okay.

17          Q.   In 2015, what were the combined

18     costs of goods sold for Southern Coal and its

19     subsidiaries?

20                 MR. ROBECK:  What page are we looking

21     at?  I'm sorry.

22                 MR. BOLLIN:  22767.

23                 THE WITNESS:  ███████████

24     BY MR. BOLLIN:

25          Q.   And how much of that came from

CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Southern Coal Sales Corporation?

2           A.      ████████████

3           Q.   Okay.  If you could turn to Page

4      22771, there's a breakdown of those other costs

5      -- I'm sorry.  I've got the wrong page.  It's

6      22767, so it's the same page -- nope.  I'm

7      sorry.  I had it right the first time.  I'm

8      looking at other expenses.  If you go to Page

9      22771, it's the breakdown of other expenses as

10     set forth on Page 22767, and it shows --

11          MR. ROBECK:  Under costs.  That's

12     technically not under expenses.  It's under

13     costs.

14          MR. BOLLIN:  Okay.

15     BY MR. BOLLIN:

16          Q.   Costs of goods sold.  All right.

17               Well, in any case, on Page 22771,

18     there's a schedule of other costs, and under

19     Southern Coal Sales Corporation it's got an

20     other expenses category.  And it allocates

21     ████████████  to Southern Coal Sales Corporation

22     as an other expense.

23               Do you know or do you know where we

24     could find the basis for those other expenses?

25          A.   I can't tell from this what that is.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 193

1      I mean, that, generally, is a catchall for

2      something that doesn't specifically fit in

3      one of those other categories.

4           Q.   Yeah.  Do you know what's included in

5      other expense?

6           A.   Like I said, my understanding is

7      it's a catchall for something that doesn't

8      specifically meet one of these other categories

9      on this page, and I can't tell from looking at

10     this.

11          Yeah, I can't tell looking at the

12     income statement.  I know the general expense on

13     the income statement is ████.  Right above

14     it is freight expense export, and so it could

15     possibly be a combination of freight expense in

16     that.  But I just can't tell by looking at it.

17          Q.   Okay.  Do you know what documents I'd

18     have to review in order to determine what the

19     other expense was as identified for Southern

20     Coal Sales Corporation on Page 22771?

21          A.   I guess you would just have to see

22     what -- what the tax preparer combined off of

23     the year-end books to get into other expenses.

24     I can't tell from the face of it.

25          Q.   Okay.  Turning to the 2016 tax return,

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 194

1      Exhibit 517, I want to look at the costs of
2      goods sold which is set forth on Page 22995.
3                Are you there?
4           A.   Yeah.
5           Q.   Okay.  First of all, this is the
6      -- this is 2016, this is the year that Southern
7      Coal Corporation and subsidiaries reported ▉
8      gross receipts or sales from Southern Coal
9      Corporation or Nevada Holdings, Inc., right?
10          A.   Correct.
11          Q.   Similarly, there is ▉▉▉▉▉▉
12     allocated to cost of goods sold for Nevada
13     Holdings, Inc., or Southern Coal Corporation?
14          A.   Correct.
15          Q.   And this is the year that Southern
16     Coal entered into and supplied coal -- entered
17     into agreements and supplied coal to Algoma,
18     correct?
19          A.   Correct.
20          Q.   And I think we established earlier you
21     don't know why the gross receipts or sales or
22     the costs of goods sold aren't identified in the
23     tax return in 2016?
24          A.   I believe they're on the Bluestone
25     Energy Sales tax return, but without having that

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 195

1    in front of me I can't say that definitively.

2           Q.   Okay.  Thank you.

3                If you could turn two pages to Page

4    22998, this is other deductions.  Are you on

5    that page?

6           A.   Yes.

7           Q.   Okay.  There's an entry for freight

8    coal under Nevada Holdings, Inc.  It says,

9    expenses of ███████.  Do you see that?

10          A.   Yes.

11          Q.   Do you know how Nevada Holdings, Inc.,

12   would have expenses for freight coal in a year

13   when it reported ███ gross receipts or sales or

14   costs of goods sold?

15          A.   No.

16          Q.   I have the same question with regard

17   to loading costs of ███████.  Do you know

18   why that's recorded for Nevada Holdings, Inc.?

19          A.   No.

20          Q.   Is it possible that this cost is

21   related to one of the other Southern Coal

22   Corporation entities?

23          A.   It's possible.  I -- again, I think

24   the revenue is -- is, more than likely, on the

25   Bluestone Energy Sales tax return, and I think

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 196

1          this, probably, is an error and it should have

2          -- if the revenue went over to Bluestone Energy

3          Sales, the -- the cost of goods should have, as

4          well.  But I can't say that for sure, but none

5          of these other entities were operating, so I

6          don't think it would have been any of them.

7                Q.   Okay.  Understood.

8                     Next I want to look at the inventory

9          that was reported on this same tax return.  If

10         you could go to Page 22971, there's a Schedule L

11         there called Balance Sheets Per Books.

12               A.   Okay.

13               Q.   Do you see that?  Okay.  There's a

14         Line 3 called inventories.

15                    MR. ROBECK:  Did you say Schedule L?

16                    MR. BOLLIN:  Yeah.

17                    MR. ROBECK:  On Page --

18                    MR. BOLLIN:  22971.

19                    MR. ROBECK:  -- 22971 of Exhibit 517?

20                    MR. BOLLIN:  That's all right.

21                    MR. ROBECK:  Oh, I see.  I was looking

22         at Schedule K at the top.

23                    MR. BOLLIN:  Oh, sure.  Okay.

24         BY MR. BOLLIN:

25               Q.   So the third line, it's called

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 197

1           inventories, it says, end of tax year,

2           Southern Coal Corporation and subsidiaries had

3           inventories of ████████████.

4                    Do you see that?

5           A.   Yes.

6           Q.   What are those inventories?

7           A.   Typically, inventories are things like

8           fuel and, like, the blasting supplies, powders

9           and things like that and coal inventory.

10          There's not enough detail from the tax return

11          for me to tell you exactly what those are.

12          Q.   Okay.  If you could turn to Page

13          23016, same document, do you see it?

14          A.   Yes.

15          Q.   Okay.  Now, this is called Combined

16          Ending Balance Sheet, and, again, Line 3 is

17          entitled, Inventories.  Do you see that?

18          A.   Yes.

19          Q.   Actually, it might be Line 4, my

20          apologies.  The combined amounts is ████████████,

21          just as it was on the prior page, right?

22          A.   Yes.

23          Q.   And ████████████ worth of that is

24          attributed to Nevada Holdings, Inc.  Do you see

25          that?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 198

1          A.   Yes.

2          Q.   I'm having a hard time understanding

3     what Nevada Holdings, Inc.'s, inventories would

4     have been.  It didn't own coal, right?

5          A.   Not -- I mean, not in the sense

6     of coal reserves, and it doesn't mine coal.

7     It owns coal that it buys and resells.

8          Q.   So do you know what this inventory of

9     ██████████ for Nevada Holding Company -- I'm

10    sorry, Nevada Holdings, Inc., was in 2016?

11         A.   I can't tell from this what that is.

12         Q.   Okay.  Do you know where we could look

13    to figure that out?

14         A.   General ledger on the -- I don't

15    recall what the balance sheet said for that same

16    year.

17              Yeah, see, I don't know, because

18    there's no inventory on the balance sheet.

19         Q.   That was going to be my next question.

20         A.   So I -- I don't know -- I don't know

21    what the -- I'm sorry.  I'm looking at 20 -- the

22    inventory question was 2015 or 2016?

23         Q.   2016.

24         A.   2016.  All right.  And I've laid that

25    out, so we're good.  So I'm looking at the 2016

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 199

1    balance sheet and it shows no inventory.  So I'm

2    not sure what that discrepancy would be, but

3    that's probably one that we would have to look

4    at whatever information the tax preparer was

5    relying on.

6         Q.   In the 2017 tax return, the

7    ███████████ inventory appears again on the

8    balance sheet, which is that Page 22927.

9              MR. ROBECK:  Can you repeat the

10   question, please?

11             (Referred-to testimony read back.)

12   BY MR. BOLLIN:

13        Q.   I'm having a hard time reading this

14   page.  Is yours better than mine?

15             MR. ROBECK:  Yeah.  I'm having a hard

16   time reading it, too.  Do you know what line

17   you're talking about?

18             MR. BOLLIN:  It's the fourth line

19   down, same as all the others.  You can kind of

20   make it out.  It says inventories.

21             MR. ROBECK:  Oh, it's Number 3?

22             MR. BOLLIN:  Yeah.  It is.

23             MR. ROBECK:  Okay.

24   BY MR. BOLLIN:

25        Q.   And then under Nevada Holdings Inc.,

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 200

1      it says ████████.

2              I can make it out on mine.  Can you

3      make it out on yours?

4          A.   I think that's right.

5          Q.   That's the same number we just saw on

6      the 2016 return.

7          A.   I can't see the middle three numbers,

8      but I --

9          Q.   Yeah.  I'll tell you what, I'll give

10     you this one to look at next to it.  It will

11     help you.

12             MS. SCHULTZ:  It's the same thing

13     printed but in portrait versus landscape.  It's

14     easier to read than that one.

15             MR. ROBECK:  Okay.

16     BY MR. BOLLIN:

17         Q.   All right.  So the inventory carried

18     over to the 2017 initial balance is consistent

19     with the 2016 balance statement, right?

20         A.   Correct, yes.

21             MS. SCHULTZ:  Should we attach these

22     two together for the record maybe?

23             MR. BOLLIN:  Sure.  Is that one that

24     can be attached?

25             MR. ROBECK:  Well, why don't you just

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 201

1          read the Bates Number.  We can look it up.

2                    MR. BOLLIN:  Yeah.  Well, same Bates

3          Number, just a different copy.

4                    MR. ROBECK:  Okay.  So it's Bates

5          Number -- 022903 is the beginning Bates Number.

6                    MS. SCHULTZ:  Right.  Through 22949.

7                    MR. BOLLIN:  Yeah.  It's just a

8          legible copy.  That's all.

9                    Tell you what, let's go ahead and mark

10         it whatever that is, A, so that we have a

11         legible copy on the record.

12                   What's that one?

13                   THE WITNESS:  519.

14                   MR. BOLLIN:  Okay.  So this will be

15         519A.

16                   (Ball Exhibit No. 519A, the 2017

17         return for Southern Coal Corporation printed in

18         portrait format, was marked.)

19         BY MR. BOLLIN:

20              Q.   Okay.  So the number here is -- the

21         amount of inventory is ████████ is that

22         right?

23              A.   Can you give me the page number again?

24              Q.   Yeah.

25              A.   I was flipping through this.

CONFIDENTIAL - ATTORNEYS EYES ONLY

                                            Page 202

1           Q.   No worries.  It's 22927, --

2           A.   Okay.

3           Q.   -- or is it six?  Lost track.  No.

4    It's seven.  Third line down.

5           A.   Yes.  For Nevada Holdings,

6    specifically, it's ███████████.

7           Q.   Okay.  And the combined total is?

8           A.   ██████████████.

9           Q.   All right.  If you could turn to

10   Page 22909, again, this is in the 2017 return --

11          A.   Okay.

12          Q.   -- and, again, we see that number,

13   ██████████████ as the inventory at the beginning

14   of the year, correct?

15          A.   Yes.

16          Q.   Okay.  And, finally, if you could go

17   to 22933, this is probably one of those you need

18   to read the clearer copy on -- do you have a

19   copy you can read?

20          A.   Yes.

21          Q.   Okay.  You're doing better than me.

22               What are the other costs that Nevada

23   Holdings reports for 2017?

24          A.   ██████████████.

25          Q.   What are those other costs, do you

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 203

1    know?

2            A.   I can't tell from this.

3            Q.   Where would you look in order to try

4    to determine what the ██████████ of other costs

5    were?

6            A.   The year-end income statement.  And if

7    I couldn't tell from there, then the general

8    ledger.

9            Q.   Pardon me a moment.  I failed to put

10   the document number on it.

11           If you'll turn in the same document,

12   the 2017 return, if could you turn to Page 22941

13   to page called Statement 11, do you see that?

14           A.   Yes.

15           Q.   All right.  There there's a -- about

16   five, six lines down, there's an inventory

17   adjustment for ████████, do you see that?

18           A.   Yes.

19           Q.   Do you know what that represents?

20           A.   Again, that would be removing

21   inventory from the books.

22           Q.   But it's an adjustment.  Do you know

23   why it's being adjusted?

24           A.   Typically, when you have an

25   adjustment like that, it's for lack of

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 204

1     substantiation.  Typically, these weren't

2     -- these weren't audited in 2017, the books

3     weren't audited in 2017, but, I mean, that's --

4     normally when you end up with an adjustment

5     is if you can't meet the satisfaction of the

6     auditor.  In this instance, where there was no

7     auditor, I don't know why it was treated as an

8     adjustment.

9          Q.   Again, Southern Coal Sales

10    Corporation, or Nevada Holdings, I mean, they're

11    the same thing, right, --

12         A.   Right.

13         Q.   -- they weren't doing business in

14    2017, were they?

15         A.   No.

16         Q.   If you could turn in the 2017 tax

17    return to Page 22921, first of all, Nevada

18    Holdings, Inc., reports ██████████ for costs of

19    goods sold, right?

20         A.   Yes.

21         Q.   Do you have any idea what that could

22    be?

23         A.   I don't.  I thought I saw an

24    explanation for that earlier, but I may be

25    combining documents at this point.  But I -- I

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 205

1    don't know what the ███ is.

2        Q.   Okay.  On that same page, 22921 of

3    the 2017 return, there's a line there that

4    says other deductions, and there is an entry for

5    Nevada Holdings, Inc., of ██████.  Do you see

6    that?

7        A.   Yes.

8        Q.   Do you have any idea what those other

9    deductions would be for?

10       A.   I can't tell from this.

11       Q.   Now, again, Nevada Holdings wasn't

12   operating in 2017, right?

13       A.   No.

14       Q.   And it had no revenue in 2017?

15       A.   Not that I'm aware of.

16       Q.   And it reported no revenue in 2016?

17       A.   Correct.

18       Q.   Do you know if these deductions belong

19   to a different entity?

20       A.   I mean, just because it was idle,

21   I mean, doesn't mean it doesn't still have

22   obligations, and so, I mean, you have things

23   like this litigation and things like that.  I

24   just can't tell from this, but I -- I'm -- I

25   can't say that this belongs to someone else.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 206

1          Q.   Fair enough.

2               Not with regard to this document

3     anymore, do you know what bank account, if any,

4     Southern Coal Sales Corporation used to pay its

5     operating expenses that were reported to the

6     government in its 2016 and 2017 returns?

7          A.   2016, the first half of the year

8     the obligations would have been paid out of

9     the Wells Fargo account.  The second half of the

10    year they would have been paid out of the Chase

11    account.

12              First half of 2017, they would have

13    been paid out of the Chase account.  Second half

14    of 2017, I'm not sure.

15         Q.   Okay.  So if we're looking to identify

16    the operating expenses for Southern Coal Sales

17    Corporation in 2016 and 2017, we can look at the

18    bank statements that we've already reviewed here

19    today from Chase and from -- what was the other

20    one?

21         A.   Wells Fargo.

22         Q.   Wells Fargo.

23         A.   For payment of those expenses.  I

24    think they would have been paid out of those

25    accounts.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 207

1      Q.   Did anyone make any payments on behalf

2   of Southern Coal Sales Corporation?

3      A.   That wouldn't be typical.  I mean, it

4   is possible.  As we sit here, and without going

5   through those statements line by line, I would

6   expect someone to loan Southern Coal Sales the

7   money and then let them make the payment, but it

8   has happened before.

9      Q.   Okay.  And now that I asked the

10  question, I hadn't thought of this when I

11  asked the first one, but now that I've asked the

12  question I do recall an instance where Bluestone

13  Energy made payments to the railroad in order to

14  deliver railcars.  Are you familiar with that

15  instance?

16     A.   I'm aware that happened, yes.

17     Q.   Okay.  But it wasn't regular, but it

18  did happen on occasion?

19     A.   Yes.

20          MR. BOLLIN:  Okay.  If you folks don't

21  mind, I'm going to hand it over to Laura to ask

22  some questions while I try to make things more

23  efficient.

24          MS. BYROADE:  Sure.

25  ///

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 208

1                    EXAMINATION

2        BY MS. SCHULTZ:

3            Q.   Hi, Mr. Ball, for the record, we've

4        met earlier today, but I'm Laura Schultz.  I'm

5        one of the other attorneys representing Algoma

6        in this case.

7                    I wanted to speak to you for a few

8        minutes about sampling.

9            A.   Okay.

10           Q.   I believe you testified earlier

11       this morning that you spoke to Mr. Sarver and

12       Mr. Lambert regarding sampling; is that right?

13           A.   I spoke to Mr. Sarver.  I read

14       Mr. Lambert's deposition.

15           Q.   Okay.  Fair enough.

16                   Were there any other documents that

17       you reviewed in preparation today with respect

18       to sampling?

19           A.   I also read some of Tim Fugit's

20       deposition.  I read some of Steve Sarver's

21       deposition.  I think that's it as it relates to

22       sampling.

23           Q.   Okay.  Does Southern Coal Sales have

24       any policies and procedures relating to sampling

25       the coal it sells?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 209

1           A.   No formal policies.  It's, typically,

2      dictated by each contract that we enter into,

3      and we follow whatever that particular agreement

4      requires.

5           Q.   And so would it be the operator of

6      the particular mine that the coal is coming from

7      that would be in charge of sampling, then?

8                MR. ROBECK:  Objection; form.

9                THE WITNESS:  Usually the sampling is

10     either done by an automatic sampler or it's done

11     by car-top sampling.  We have none in play here,

12     but, for example, we have a few load-outs where

13     the coal is loaded with end-loaders, and so that

14     gets to be a little bit of a different process.

15     But, yeah, it would be on a mine-by-mine basis,

16     and it would be whoever's in charge of the

17     load-out at the mine.

18     BY MS. SCHULTZ:

19          Q.   And how do the people that are working

20     the load-out for a particular shipment know what

21     sampling procedures need to be followed in order

22     to meet the contractual obligations of Southern

23     Coal Sales Corporation?

24          A.   So, usually, it involves an automatic

25     sampler, and so they just know that the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 210

1    automatic sampler needs to be activated or

2    operational.  And they coordinate with the lab,

3    whoever the particular lab is, to make sure the

4    lab's there to pick up the bags that are grabbed

5    by the automatic sampler.

6          Q.    Okay.  I want to move for a second

7    away from sampling of the load-out.  Before the

8    coal arrives -- and I'm talking about, just for

9    the purpose of these questions, coal that was

10   shipped from Southern Coal Sales Corporation

11   to Algoma in 2016, let's start with Coal

12   Mountain, --

13         A.    Okay.

14         Q.    -- so for those shipments, before the

15   coal reached the load-out point and was shipped

16   to Algoma, was there testing that was done on

17   that coal prior to load-out?

18         A.    It's possible.  We don't always test

19   coal in the -- what we call the mine pit, which

20   is where it's uncovered, but sometimes when

21   we are encountering a first cut, it's, like,

22   the first cut that you make on the side of the

23   mountain, that coal will be sampled in the pit

24   to see if it's oxidized.  And once we determine

25   the limits of the oxidation, we don't,

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 211

1      typically, test beyond that.  But there is some

2      in-pit testing.

3           Q.   Okay.  And Coal Mountain, am I correct

4      that it produced both metallurgical coal and

5      steam coal?

6           A.   Yes.

7           Q.   And within a particular seam, do both

8      types of coal come out of the same seam, or are

9      they separate seams?

10          A.   Typically, it's a seam-by-seam basis,

11     so we know that, like, the Number 2 gas seam is

12     always metallurgical coal.  There's, like, 10

13     seams on that mountain.  Normally, the further

14     down you go, the better quality the coal is

15     going to be, so the upper seams, typically, tend

16     to be steam coal.  But within a seam, it's rare

17     that you would have met and steam.  But you do

18     run into some oxidation, that I talked about

19     earlier, and so that could render some met coal

20     -- that oxidation could render some met coal not

21     suitable for a met coal order.

22          Q.   At Coal Mountain, how did Southern

23     -- I guess I'm not sure whether it's Southern

24     Coal Sales Corporation, I'll start there, ensure

25     that, to the extent it was mining both steam

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          coal and met coal, that that coal didn't get

2          intermingled?

3                    A.    So, typically, that would be more

4          Dynamic Energy as the operator.

5                    Q.    So the operator is doing that work?

6                    A.    Yeah.  But the operator would keep

7          those coals segregated.  Either -- there's a

8          couple ways to do it -- you can leave the steam

9          coal and/or the met coal, but if you know your

10         next three or four loadings are all steam coal,

11         you wouldn't take the met coal to the load-out

12         yet, you would leave it in the pit, and

13         vice-versa, so you could try to keep those coals

14         segregated.

15                   Q.    For testing that was done prior to

16         load-out, is that something Southern Coal does

17         internally or sends out to a lab?

18                   A.    We have the ability to do it

19         internally at some of the operations.  At Coal

20         Mountain we could test for minimal things, like

21         ash.  But to test oxidation and things like

22         that, you would send that out to a third party.

23                   Q.    What about Paragon?

24                   A.    Paragon would be similar.  We could do

25         some limited testing at Paragon.  Again, that

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 213

1    would be more for ash.  But if you were wanting

2    to see if the coal was oxidized or not, which

3    was not an issue at Paragon, as much as it could

4    be at Coal Mountain, but normally that coal

5    -- or that sample would be sent out to a third

6    party.

7         Q.   Do you know which third party was

8    performing that service for Coal Mountain in

9    2016?

10             MR. ROBECK:  If it was.

11             MS. SCHULTZ:  If it was ... I

12   thought he testified that they couldn't test for

13   oxidation and they needed to, from time to time,

14   test for oxidation?

15             MR. ROBECK:  He said they would test

16   before load-out, occasionally.  He didn't say

17   whether it was or was not.

18   BY MS. SCHULTZ:

19        Q.   Okay.  To your knowledge, did you test

20   for oxidation at Coal Mountain in 2016?

21        A.   I don't know.  It is possible, though.

22        Q.   Okay.  Do you know what company would

23   have provided that testing services in 2016?

24        A.   Not specifically in that timeframe,

25   because I don't know if we did or didn't.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 214

1          Q.   Okay.  Would Southern Coal

2     maintain records of that sort of testing, or

3     the Justice-owned company that owned the mine at

4     that time?

5          A.   Possibly, but that analysis

6     wouldn't be used for any other purpose, other

7     than determining whether it was oxidized or not.

8     So I don't know that we would.  I think once the

9     job got the report back that either it was or

10    wasn't, I think that there's really not much

11    more need for it at that point.

12         Q.   Okay.  So as you sit here today you're

13    just not sure whether --

14         A.   Not in that time period.

15         Q.   Okay.  Now, you testified previously

16    there was an automatic sampler that was in use

17    at Coal Mountain; is that correct?

18         A.   That is correct, yes.

19         Q.   Okay.  Do you know, was that sampler

20    certified as complying with ASTM standards?

21    And I'm going to start and say, has it ever been

22    certified, and then ask you particularly with

23    respect to in 2016?

24         A.   Yes, I do believe it has been

25    certified before.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 215

1        Q.   And when was it certified?

2        A.   We don't know the specific date.  It's

3    prior to 2016.  It may be significantly prior to

4    2016.  In talking to Mr. Sarver, it wasn't clear

5    to him when the certification took place.

6             Since that time, he's relied upon the

7    various labs that have sampled the coal at Coal

8    Mountain whether it was ineffective or not, and

9    that's been Mineral Labs and SGS, and he said

10   they've never had a problem with it.  So no

11   formal certification since that time, but

12   Mr. Sarver believes it was certified at one

13   time.

14       Q.   And certified by a third party?

15       A.   Yes.

16       Q.   Okay.  Any idea who that third party

17   was?

18       A.   I'll be honest with you, he took a

19   guess and thought it might be a company called

20   Kanawha Scales, but he could not tell me

21   definitively.

22       Q.   What was that company name?  I'm

23   sorry.

24       A.   Kanawha.

25       Q.   There are no records, though, in the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 216

1          possession of either Southern Coal Sales

2          Corporation or the entity owning and operating

3          the mine that showed such a certification?

4                A.   Correct.

5                Q.   You searched for those records but you

6          couldn't find them?

7                A.   We couldn't find them.

8                Q.   Okay.  So as we sit here today,

9          there's no records reflecting at least that the

10          automatic sampler at Coal Mountain was certified

11          and complied with ASTM standards; is that

12          correct?

13                A.   No records, correct.

14                Q.   Okay.  But it's Mr. Sarver's belief

15          that it did?

16                A.   That it was once certified, and he

17          does believe it complies with ASTM.  And for

18          that understanding he has relied on the various

19          labs that have sampled at Coal Mountain over the

20          years.

21                Q.   And which particular ASTM standard did

22          it comply with?

23                A.   That part -- I don't know that anyone

24          on our side knows the specifics of when you look

25          at the ASTM standards what it complies with.  I

1      think that they rely on the labs to tell them

2      whether they believe the sampler is sufficient

3      for purposes of allowing the sample to qualify

4      as an ASTM sample.

5             Q.   Now, Paragon also used an automatic

6      sampler, correct?

7             A.   Yes.

8             Q.   Was that sampler certified at any

9      point in time?

10            A.   We have not been able to locate any

11     records as to certification.

12            Q.   And does Mr. Sarver have any

13     recollection or understanding as to whether

14     it had been certified?

15            A.   It's very similar.  On that one he has

16     relied on the labs that do the sampling there.

17     He said they've never complained about it as

18     not being sufficient to allow the samples to

19     qualify.  But he did not have an understanding

20     as to whether or not a -- he has always

21     understood it to be certified, but when I asked

22     him about a formal certification he was unaware

23     of one.

24            Q.   Okay.  Now, did anyone at Southern

25     Coal Sales Corporation specifically instruct, in

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 218

1       this case -- let me step back for a second.

2                Would you agree with me that Mineral

3       Labs was the third party that performed testing

4       and analysis for the coal that Southern Coal

5       Sales Corporation shipped to Algoma in 2016?

6            A.   Yes.

7            Q.   Okay.  Did anyone at Southern Coal

8       Sales Corporation provide instruction to Mineral

9       Labs in 2016 to confirm that ASTM standards were

10      being followed with respect to the sampling that

11      was done at the Coal Mountain Mine?

12           A.   Yes.  I believe Mr. Sarver did that.

13           Q.   Okay.  And do you know when he did

14      that?

15           A.   I just think it was -- one, when

16      I talked to Mr. Sarver, I think it's generally

17      understood between him and the labs that the

18      parties expect the sample to be qualified under

19      ASTM standards.  Whether that's a car-top

20      sample, whether it's an automatic sampler or

21      whatever method, if the ASTM can be met, that's

22      what the goal is.

23           Q.   Any idea who, particularly, at Mineral

24      Labs he had that general understanding with?

25           A.   He dealt with three or four different

Page 219

1      people there.  I think most of his high-level

2      conversations were with Rodney Campbell.

3          Q.   Okay.

4          A.   I can't remember the other -- I know

5      of two others, but I can't remember their names

6      offhand.

7          Q.   Same is true of Paragon, Southern Coal

8      had a general understanding with Mineral Labs

9      that sampling was supposed to comply with ASTM

10      Standards, is that a fair?

11          A.   I think that's fair, yes.

12          Q.   Okay.  This was previously marked in

13      Mr. Campbell's deposition as Exhibit 8.  For the

14      record it's ALGOMA00014113 through 14127.  Take

15      a second to look through this and tell me when

16      you're ready.

17          A.   Okay.

18          Q.   Okay.  So if you look at the page that

19      is 14114 through the end of the document, would

20      you agree that this appears to be a certificate

21      of analysis for Permit Number M359G for Coal

22      Mountain Mine?

23          A.   Yes.

24          Q.   Okay.  Have you looked at these

25      sorts of certificates of analysis before you

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 220

1    understand what the document is, generally?

2        A.   Yes.

3        Q.   Okay.  If you look a third of the way

4    down the page you see where it says, sampled by

5    customer?

6        A.   Yes.

7        Q.   Okay.  I'll tell you that Mr. Campbell

8    at Mineral Labs previously testified that that

9    means that Southern Coal took the sample, not

10   Mineral Labs.  Would you agree that that's

11   accurate?

12            MR. ROBECK:  Well, I mean, there's

13       more details to it than that.

14            THE WITNESS:  I can't agree with that

15       as a blanket statement.

16   BY MS. SCHULTZ:

17       Q.   What do you mean by a blanket

18   statement?

19       A.   Well, I think there are instances

20   where they have marked, by customer, before and

21   they clearly were there, and so I'm not sure why

22   they did that.  I think it is just something

23   that has happened before, so I can't say a

24   blanket statement, sample by customer, means

25   that.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 221

1            And the other thing is anytime it's

2       sampled by an automatic sampler, I mean,

3       the mechanical sampler is the one sampling.  So

4       there's -- there's not a -- there's not a person

5       sampling, per se.  So I just -- I can't agree

6       with that as a blanket statement.

7            Q.   Okay.  Let me step back for a second.

8            A.   Okay.

9            Q.   So the automatic sampler, tell me

10      if I'm characterizing this correctly, but it,

11      literally, is automatic.  And every so often

12      it takes part of the shipment and puts it in a

13      bucket, should we say, for lack of a better

14      word?

15           A.   Sure.

16           Q.   Okay.  And that's something that

17      there's not a person that's physically running

18      the sampler, it occurs once they turn it on and

19      happens during the entire time the load-out is

20      proceeding.  Is that fair?

21           A.   Typically, yes.

22           Q.   Okay.  Is there -- Southern Coal

23      -- during this time period, 2016 at Coal

24      Mountain, was there a Southern Coal employee or

25      a employee of the entity that owned or operated

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 222

1          the mine that watched the sampler work for each

2          of the shipments?

3               A.   Not a single person.

4               Q.   Okay.

5               A.   At each one of the load-outs, I mean,

6          it depends on time of day who's there, who's

7          operating the load-out, things like that.  I

8          mean, there would be a person at the mine,

9          it would be a person that works at the load-out,

10         that would make sure the sampler's on.  If there

11         was a problem with it they would be able to,

12         hopefully, identify it, if it was a simple

13         problem, fix it, but not -- it's not a single

14         person.

15              Q.   So not the same individual each

16         and every time, but there is a person for each

17         shipment that's assigned with that task, is that

18         fair?

19              A.   Yeah.  I mean, typically, whoever is

20         operating the load-out whenever a train is being

21         loaded, one of their responsibilities would be

22         to make sure that the automatic sampler is

23         operating and that samples are being collected.

24              Q.   And was it Southern Coal's direction

25         to Mineral Labs, then, in 2016, that a Mineral

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 223

1    Labs employee should have also been in the room

2    watching the automatic sampler work during

3    the entirety of the load-out for a particular

4    shipment at Coal Mountain?

5        A.   I mean, I think, you know, it's what

6    Mineral Labs does day in and day out.  I don't

7    think we would tell them how to do their job,

8    per se, but I think we would call them and tell

9    them a train is loading at a certain time and

10   that they needed to be there for the sampling of

11   the coal to say that someone was specifically,

12   you know, instructing them, that probably -- it

13   probably wasn't that formal, because, like I

14   said, that's what these guys at Mineral do day

15   in and day out.  They know what they're supposed

16   to do.

17       Q.   But that was Southern Coal's

18   expectation, then, that that's what Mineral

19   Labs would do, be there for the whole process?

20       A.   In the ordinary course, that

21   -- absolutely.

22       Q.   Okay.

23       A.   They would expect Mineral Labs to be

24   there.

25       Q.   Now, I'm going to represent to you

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 224

1    that Mr. Campbell at Mineral Labs testified that

2    there were times that they weren't there for

3    shipments to Algoma in 2016, that they weren't

4    there at all when the train was being loaded;

5    they came later and just picked up a sample that

6    was provided to them.  Do you have any reason to

7    believe that's inaccurate?

8         A.   That happens from time to time.  A

9    train is supposed to show up on a certain day.

10   It doesn't show up when expected.  It shows up

11   in the middle of the night.  Mineral Labs, or

12   whoever the lab is, can't always get there right

13   away.  Sometimes you have to make a decision, if

14   you can't load a train right away, the railroad

15   may pull it and you may decide to load it so the

16   railroad doesn't pull it.

17             And so, I mean, if Mr. Campbell said

18   that happened, it does happen from time to time,

19   so I don't doubt him on that.

20        Q.   So how do we know for a particular

21   shipment, then, whether Mineral Labs was

22   involved in any way with the sampling or whether

23   they showed up after the fact and just took a

24   bag, if you will, of the sample that was pulled

25   for a particular shipment?  How do we tell that?

Page 225

1          A.   Well, first of all, we think that the

2     situation you and I just described is not the

3     norm.  I think that's in situations when Mineral

4     Labs could not get there on a timely basis and a

5     decision had to be made.  Because I don't think

6     their records are always consistent, I don't

7     think you can solely rely on it saying sampled

8     by customer to determine whether Mineral Labs

9     was there or not.

10         Q.   Okay.  What records do we rely on,

11    instead, then, of Southern Coal or the entity

12    that owns or operates the mine to show us

13    Mineral Labs' records are inaccurate as to who

14    took the sample?

15         A.   I'm not aware of any other records.

16         Q.   Okay.

17         A.   So it would be the people that were

18    there or the people that were in charge of

19    scheduling Mineral Labs.  But I'm not aware of

20    any other written records.

21         Q.   And how do we know who those people

22    were for a particular shipment, the person that

23    was onsite at the mine that was supervising the

24    sampling of the coal?

25              MR. ROBECK:  You mean whether it was

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 226

```
 1        a person from Mineral Labs or a person from
 2        Southern Coal?
 3        BY MS. SCHULTZ:
 4             Q.   No.   I think what Mr. Ball testified,
 5        and please correct me if I'm wrong, is that the
 6        only person that would be able to disagree with
 7        what is in Mineral Labs' certificate of analysis
 8        as to who took the sample is the person from the
 9        mine that was onsite for the load-out
10        supervising the load-out, right?
11             A.   Well, I don't know if it would be the
12        only person.
13             Q.   Okay.
14             A.   But, I mean, that would be a person,
15        that if they had a specific recollection, which
16        I'm sure they wouldn't, at this point, given how
17        many trains load-in at a load-out, and this is
18        from, you know, three years ago, but that would
19        be a person that could dispute that.
20                  MR. ROBECK:   And Mr. Campbell also
21        testified that you could ask the sampler that
22        was actually there, too.
23                  MS. SCHULTZ:   You mean the individual
24        from Mineral Labs?
25                  MR. ROBECK:   Yeah.   Right.
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 227

1                 MS. SCHULTZ:   Okay.   But he also

2         testified that what -- the individual at Mineral

3         Labs would have filled out the certificate of

4         analysis in a particular way such that it would

5         indicate whether they observed the sample being

6         taken.

7                 MR. ROBECK:   He said that that's what

8         he believed the records indicate, but that if

9         there was a discrepancy in that, you'd have to

10        go to the person or the backup documents that

11        they didn't produce.

12        BY MS. SCHULTZ:

13            Q.   Let me ask the question a different

14        way here.

15                 So is there a particular shipment

16        that Southern Coal Sales Corporation made to

17        Algoma in 2016 that you can identify as you

18        sit here today where Mineral Labs said that

19        the sample was taken by the customer, meaning

20        Southern Coal Sales Corporation, but you believe

21        it was not?

22                 MR. ROBECK:   So you're talking about

23        every single train shipment?

24                 MS. SCHULTZ:   What I'm trying to

25        understand is, you know, he said that Mineral

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 228

1      Labs' records are not always accurate; he

2      believes that to be true; that when they say

3      they're sampled by a customer there's times when

4      that's not accurate.  I'm asking if there's

5      anyone that he can identify where that's true.

6                MR. ROBECK:  If you can do that right

7      now, go ahead.

8      BY MS. SCHULTZ:

9           Q.   I mean, to be clear, one of the topics

10     for the deposition today was the sampling that

11     was done for each and every shipment to Algoma.

12     So if you're saying that Mineral Labs' records,

13     which is the only record that we have of who did

14     the sampling, written record, is incorrect, I'm

15     wondering which ones are incorrect, and how you

16     know that they are?

17          A.   Well, --

18                MR. ROBECK:  Go ahead.

19                THE WITNESS:  -- I can't recall

20     a specific shipment off the top of my head,

21     but my understanding is there are a couple -- at

22     least a couple of shipments that were identified

23     by Mineral Labs as being sampled by the

24     customer, and they were there.

25                I think there are also instances where

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 229

1        Mineral Labs has a certificate that says,

2        sampled by customer, but I think we were

3        invoiced for travel time and things like that.

4        So I think in those instances they were clearly

5        there.

6   BY MS. SCHULTZ:

7        Q.   Well, they had to get there at

8   some point to pick up the sample, right?

9        A.   They --

10       Q.   They tested it, right?  They provided

11  testing of something.

12       A.   Yeah.  They were there.

13       Q.   So why wouldn't they bill you for

14  travel time for the time it took them to come

15  pick up whatever sample was provided to them?

16       A.   I'm just saying, I think that's

17  another document that could contradict the

18  -- you're asking what evidence would we have to

19  say to the contrary, a document that says they

20  billed us for travel time would be a document

21  that would contradict the fact they weren't

22  there.

23       Q.   Well, I mean, it wouldn't show that

24  they were there during the load-out, would it?

25       A.   It would show that they billed us for

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 230

1          traveling there on that day.

2                Q.   Right.

3                A.   That's all I'm saying.

4                Q.   Okay.  Fair enough.

5                A.   I mean, I don't think it says,

6          definitively, one way or the other, but it

7          proves that they were there.

8                Q.   To your knowledge, were there any

9          instances in the 2016 shipments from Southern

10         Coal to Algoma where Southern Coal delivered a

11         sample directly to the lab?

12               A.   Not that I'm aware of.

13               Q.   Okay.  The records that you were just

14         testifying regarding that showed a travel time

15         for existence from the lab, are those documents

16         -- do you know whether those were produced in

17         this litigation?

18                    MR. ROBECK:  Could you read the

19         question back, please?

20                    THE REPORTER:  Sure.

21                    (Referred-to testimony read back.)

22         BY MS. SCHULTZ:

23               Q.   Let me re-ask the question.

24                    You just testified that you thought

25         there were documents out there that showed that

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 231

1      Mineral Labs billed Southern Coal for travel

2      time from the lab to the load-out, right?

3           A.   Right.

4           Q.   Are you aware whether those documents

5      were produced in this litigation?

6           A.   I don't know.

7           Q.   Okay.  And where are those documents

8      kept within Southern Coal?

9           A.   You have to stop me here, if you think

10     I should stop, but I have this understanding

11     from the prior counsel in this case, Mr. Hunter

12     from Frost Brown Todd.

13          MR. ROBECK:  I think invoices were

14     produced.  My understanding is invoices were

15     produced.

16          MS. SCHULTZ:  Okay.  Okay.

17     BY MS. SCHULTZ:

18          Q.   And the testimony that you've given,

19     we started talking about Coal Mountain, but I

20     want to know, is the same true with respect to

21     load-outs at Paragon, that you're not sure or

22     you -- you're not sure that Mineral Labs'

23     certificate of analysis are accurate as to who

24     took the sample?

25          A.   Well, I think in all instances the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 232

1    sample was physically taken by the automatic

2    sampler.  Whether they were physically there to

3    pick up the bag or not, I think that my earlier

4    statements apply to Coal Mountain and Paragon.

5         Q.   Okay.  And let me make sure that we're

6    not speaking past one another.  With respect to

7    shipments in 2016 from Southern Coal to Algoma

8    from Coal Mountain, is it your testimony that

9    you believe Mineral Labs was present onsite

10   during the load-outs to observe the automatic

11   sampler working; is that right?

12        A.   Yes.

13        Q.   And is the same true of Paragon?

14        A.   Yes.

15        Q.   Okay.  And was it a Southern Coal

16   employee or a Mineral Labs employee that would

17   have physically taken the sample out of the

18   sampling room and left the facility with it, if

19   you will, for Coal Mountain, let's start with?

20        A.   Typically, it would be a Mineral Labs

21   employee.  Do I think there are instances where

22   a Dynamic Energy or an A&G Coal employee would

23   do it if Mineral Labs couldn't get there quick

24   enough or something like that, and we had to

25   load a train in one of those instances that I'm

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 233

1      talking about, I think there are probably

2      instances of both examples of what you described

3      happening.  But in the ordinary course, it

4      should be Mineral Labs taking it.

5          Q.   Okay.  And I apologize if I already

6      asked this question, but Mineral -- Mr. Campbell

7      at Mineral Labs testified that, to the extent

8      they observed the automatic sampler working,

9      they would indicate as much in the certificate

10     of analysis.

11          Do you have any reason to -- to

12     disagree with their records as to that point?

13          A.   No.

14          MS. SCHULTZ:  Okay.  Do you want to

15     take a quick break, a couple minutes?

16          (Recess taken.)

17     BY MS. SCHULTZ:

18          Q.   For Coal Mountain in 2016, do you know

19     who the employees were that worked the load-out?

20          A.   I think Tiger Lambert was responsible

21     for the entire job, and I think the person that

22     worked with Tiger that would help with coal

23     shipments was Todd Bradford.  As far as, like,

24     hourly workers and things like that, I don't

25     know who those would have been.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 234

1          Q.    What about Paragon?

2          A.    Paragon was the person that would

3     have been in charge.  I know Scott Mead was the

4     primary person in charge for a while, but Scott

5     left at some point.  I'd have to check.  I don't

6     remember when Scott left, but he definitely

7     would have been the person in charge while he

8     was there.

9          Q.    Okay.  And maybe I'm making this

10    more formal than it is, but for Coal Mountain,

11    for example, if a third party comes onsite, do

12    they have to sign in or anything like that?

13         A.    Technically speaking, from MSHA you're

14    supposed to, but if it's someone like a lab who

15    is there regularly, that tends to get a little

16    more relaxed versus like if someone that just

17    showed up to go onsite.  So it really depends on

18    who the third party is.

19         Q.    Okay.  So there's not necessarily a

20    written record if the lab shows up for either

21    Coal Mountain or Paragon what particular time

22    they came on that day?

23         A.    No.

24               MS. SCHULTZ:  Okay.  That's all I

25    have.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 235

1          MR. BOLLIN:  Just a few more

2     questions.

3          THE WITNESS:  Okay.

4               FURTHER EXAMINATION

5     BY MR. BOLLIN:

6          Q.   Do you know the coal production

7     capacity of the mines from which Southern Coal

8     Sales Corporation obtained coal to sell to

9     Algoma in 2015, '16 and '17?

10          MR. ROBECK:  Are you talking about the

11     ones that are owned by Justice Company, --

12          MR. BOLLIN:  Sure.

13          MR. ROBECK:  -- because there was

14     other coal that was purchased?

15          MR. BOLLIN:  Sure.  Understood.  Only

16     those owned by Justice Companies.

17          THE WITNESS:  So capacity at the mines

18     is, typically, dictated by what the market will

19     allow.  Some of these mines, you know, for

20     example, Tams in 2015 ███ running at a ██████ to

21     ████████ ton run rate.  Tams is capable of running

22     at ███████████████ times that, if the market

23     justified it.  And what I mean by the market

24     justifying it is there is tougher mining

25     conditions on certain parts of the permit that

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 236

1    have higher ratios and things like that, but if

2    the market is high enough that you can mine $85

3    coal, then the capacity can go up.

4            As we were mining it, Coal Mountain's

5    capacity was -- it varied, but it was in the

6    range of ███████ to ███████ per month.

7    BY MR. BOLLIN:

8        Q.   What time is this?

9        A.   The first half of 2015, we had just

10   reacquired Coal Mountain.  We acquired it in

11   February of 2015, and it took us three or four

12   months to get things up and running because it

13   had been completely idled by the prior owners.

14   So that run rate would have started taking

15   effect late 2015, and that would have been for

16   all of 2016 up until we sold it in January of

17   2017.

18       Q.   And how did you determine the run

19   rate?

20       A.   That's just based on the amount of

21   equipment we had available, the mining ratio.

22   You know, it's just a -- it's a calculation

23   based on the machines can move a certain amount

24   of material per hour.  And then, you know, we

25   determined that number based on the amount of

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 237

1      sales that we have, though, ultimately.

2          Q.   So it's a backwards-looking number?

3          A.   For the most part, yes.

4          Q.   Do you make projections of what your

5      capacity is?

6          A.   No.

7          Q.   What was the -- what was the

8      production capacity for Paragon in 2015 and

9      2016?

10         A.   The mine that supplied Paragon is

11     called A&G.  We refer to it as A&G 21.  And it's

12     another example that it has coal reserves that,

13     if the market is generous enough, you can -- you

14     can mine at much higher run rates than what we

15     were, but its capacity was anywhere from ████

16     to ████ tons per month.

17         Q.   And, again, is that a

18     backwards-looking number?

19         A.   Pretty much, yes.

20         Q.   Does that include, for example, time

21     in 2016 during the summer when the main shovel

22     was down at A&G?

23         A.   Obviously, that would impact

24     production.  You know, we had a situation where

25     we got a bad load of fuel at A&G that shut down,

Page 238

1      roughly, a half-dozen machines.  You know, that

2      impacts production.  The numbers I'm giving you

3      is, at its normal run rate, that's what its

4      capacity would be.  But, obviously, when the

5      main shovel is down, that's going to severely

6      impact production.

7              Q.   Mr. Jay Justice testified previously

8      that the overburden at A&G was much bigger, much

9      more extensive than it was at Coal Mountain.

10     Did you know that?

11             A.   Yes.

12             Q.   Okay.  Where does the price point have

13     to be in order for it to be profitable to mine

14     from A&G?

15             A.   What I just described to you is very

16     small scale mining at A&G, and that's probably

17     -- you know, that's the most you can mine when

18     the market is less than a hundred dollars.  If

19     the market goes above a hundred dollars,

20     A&G's capacity could be increased to ███ or

21     ███ tons a month, but the ratio goes up

22     significantly after that small amount of

23     tonnage.  But at the run rates we did in 2015

24     and 2016, that's all that we could stand under

25     those market conditions.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 239

```
1          Q.   And when you say ████████, you're
2     talking about ████ a ton?
3          A.   Yes.
4          Q.   How did Southern Coal Sales
5     Corporation know what coal was available to
6     sell?
7          A.   Well, from our exercise earlier today,
8     you know that the management on the operations
9     side and the sales side is similar, so I think
10    it's more of a function of Jay Justice knowing
11    how many tons could be sold and then having the
12    production to meet the requirements.
13         Q.   I've got a few mop-up questions from
14    earlier, so I'm going to bounce around a little
15    bit.  If I lose you when I'm bouncing, let me
16    know and I'll clarify.
17         A.   Okay.
18         Q.   Did Southern Coal Sales Corporation
19    have insurance in 2016?
20         A.   Just so I'm sure, like general
21    liability insurance?
22         Q.   Sure.
23         A.   Yes.
24         Q.   Okay.  What kind of insurance did it
25    have?
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 240

1          A.   It's a structured program where the

2     first -- I'm wanting to say the ███████████

3     dollars is self-insured, and then above that you

4     have different layers of, like, a primary up to

5     ██████████, then an excess policy up to ███ and

6     then another excess policy up to, I think, ████

7     ██████████

8               You know, obviously, auto insurance

9     and things like that would be a little

10    different, but, yes, it is insured.

11         Q.   But that's for Southern Coal Sales

12    Corporation?

13              MR. ROBECK:   Are these mop-up

14    questions all outside the scope of the topics

15    for the 30(b)(6), or is it just that one and

16    then you're going to go back inside the topics?

17              MR. BOLLIN:   I'll take that as an

18    objection.

19              THE WITNESS:   Southern Coal Sales

20    would be listed as a named insured on Southern

21    Coal Corporations policy.

22              MR. BOLLIN:   Thank you.

23    BY MR. BOLLIN:

24         Q.   In April of 2016, reviewing the

25    Southern Coal Sales Corporation's bank

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 241

1      statements, it had a balance of ███ at the

2      beginning and end of its -- of the month of

3      April 2016, does that sound about right?

4                  MR. ROBECK:  From memory, from what we

5      looked at earlier?

6                  MR. BOLLIN:  Well, every single month

7      we looked at it was there, so, yeah, that's what

8      I was doing.

9                  MS. BYROADE:  I mean, it says what it

10     says.  Do you have a question?

11     BY MR. BOLLIN:

12          Q.   What was -- how could Southern Coal

13     finance its obligations under the amending

14     agreement with Algoma?  Was it required to

15     borrow, was it required to spend money from

16     other Justice entities, or was it able to

17     perform the agreement on its own?

18          A.   I'm struggling with what obligations

19     it would have, like monetary obligations to

20     Algoma?  I mean, its commitment was to deliver

21     coal.

22          Q.   Right.  To fulfill its obligations to

23     Algoma, it requires some outlay of cash, right?

24          A.   I mean, for, like, scheduling trains

25     or ...

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 242

1    Q.   That would be one.

2    A.   Yeah.

3    Q.   And Southern Coal did not have

4    -- Southern Coal Sales Corporation did not have

5    cash of its own to pay for the trains that it

6    needed, correct?

7         MR. ROBECK:  Objection; form.

8         This is all predicated on a beginning

9    and ending monthly balance.  That's --

10        MR. BOLLIN:  You tell me.

11        THE WITNESS:  Okay.  I think I

12   testified to this earlier.  I think it depends

13   on the timing of incoming receipts from coal

14   sales.  If they had adequate cash available at

15   that time to pay for a train, they would do so.

16   If they didn't, they would borrow it from either

17   their parent company or an affiliate.

18   BY MR. BOLLIN:

19        Q.   Aside from the agreements in

20   lieu before, were there any other minutes of

21   any other board meetings of Southern Coal Sales

22   Corporation?

23        A.   No.

24        MR. BOLLIN:  Mark, what are we going

25   to do about the ledger request?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 243

1              MS. BYROADE:  On the record or going

2       off the record?

3              MR. ROBECK:  I don't care.  We'll, you

4       know, huddle and talk about it.

5              MR. BOLLIN:  Okay.  Well,

6       unfortunately, I can't conclude the deposition

7       without an opportunity to review those, the

8       answer to --

9              MR. ROBECK:  Well, I don't have it

10      to hand to you right now, so that does matter.

11             MR. BOLLIN:  I understand.  That's why

12      I'm trying to talk to you about it.  That's all.

13             MR. ROBECK:  Okay.

14             MR. BOLLIN:  As you know, a lot of the

15      questions that we asked today, the answer can be

16      found there.  So the question is, do we go to

17      the Court together, or do I go to the Court

18      alone?

19             MR. ROBECK:  Well, I said that we

20      would talk about it amongst ourselves.  I'm not

21      going to talk about it and then ignore you.

22             MR. BOLLIN:  I appreciate that.  I do.

23             MR. ROBECK:  I'll let you know what

24      we're going to do, and I'll let you know when

25      we're going to do it.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 244

1                MR. BOLLIN:  Okay.  So subject to

2        that, I don't have any further questions today.

3                Thank you.

4                MR. ROBECK:  Okay.

5                (Deposition concluded -- 5:35 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 245

1          Stephen Wayne Ball

2

3                    C E R T I F I C A T E

4

5               I do hereby certify that the aforesaid

6          testimony was taken before me, pursuant to

7          notice, at the time and place indicated; that

8          said deponent was by me duly sworn to tell the

9          truth, the whole truth, and nothing but the

10         truth; that the testimony of said deponent was

11         correctly recorded in machine shorthand by me

12         and thereafter transcribed under my supervision

13         with computer-aided transcription; that the

14         deposition is a true and correct record of the

15         testimony given by the witness; and that I am

16         neither of counsel nor kin to any party in said

17         action, nor interested in the outcome thereof.

18

19              WITNESS my hand and official seal this

20         8th day of November 2018.

21

22                              *Ryan K. Black*

23                              Ryan K. Black

24

25