# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ESSAR STEEL ALGOMA, INC., et al.** **Plaintiff,** v. **SOUTHERN COAL SALES CORPORATION, et al.** **Defendants.** | Case No. 1:17-mc-00360-AT AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM OF DEFENDANT SOUTHERN COAL SALES CORPORATION TO PLAINTIFF ESSAR STEEL ALGOMA INC.'S SECOND AMENDED COMPLAINT FOR BREACH OF CONTRACT |

Defendant, Southern Coal Sales Corporation ("SCSC"), by counsel and for its Answer, Affirmative Defenses and Counterclaim to the Second Amended Complaint for Breach of Contract (the "SAC") filed by Plaintiff, Essar Steel Algoma Inc. ("Algoma Canada"), respectfully states as follows:

## ANSWER AND AFFIRMATIVE DEFENSES

1. SCSC incorporates here by reference numerical paragraphs 1 through 172 and the First through Thirteenth Affirmative Defenses of its Answer and Affirmative Defenses filed and served in this action on or about January 22, 2019.

## COUNTERCLAIM

I. **ALGOMA CANADA'S BREACHES OF THE PARTIES' AGREEMENTS**

    A. <u>The 2015 Agreement And Deliveries</u>

1. The parties' Original Agreement entered on November 1, 2015 required Algoma Canada to purchase 540,000 tons of coal (+/- 10%) during the balance of the 2015 shipping season.

2. At more than a half million tons in just two months – or more if the lakes didn't close for shipments – the amount of coal Algoma Canada sought was extraordinary. Algoma Canada was aware that SCSC would provide coal to meet Algoma Canada needs not only from SCSC affiliated companies but by purchasing coal from third-parties. *See **Exhibit 1***, attached hereto.

3. At the time it entered the Agreement with SCSC, Algoma Canada was delinquent in payments to its normal suppliers and had initiated bankruptcy proceedings in Canada. According to the deposition testimony of Navnett Shanker, the Director of Raw Material Procurement for Algoma Canada, its normal suppliers declined to provide coal to the company because of its failure to pay for earlier purchases. *See **Exhibit 2***, attached hereto.

4. Algoma Canada induced SCSC to enter the Agreement on consignment terms by offering a premium on the price of coal and by agreeing to purchase a very large amount of coal, thereby ensuring meaningful profits for SCSC and enabling the financially stumbling Algoma Canada to avoid paying the full cost of coal up front. It initially appeared to be a mutually beneficial agreement.

5. However, once Algoma Canada had secured a sizeable amount of coal from SCSC and was on somewhat better footing financially, it sought out and began making purchases of coal from SCSC's third-party suppliers directly, circumventing SCSC and securing coal at a lower price. To avoid receiving coal from SCSC, Algoma Canada in bad faith declined to send vessels to meet trains which SCSC stood ready to load with coal and send for pick-up. *See **Exhibit 3***, attached hereto.

6. The process for transporting coal from a coal company or broker to Algoma Canada required it to first arrange for a vessel to be at one of its ports. A railroad company would

only issue the necessary permit for railcars to arrive at the mine or mine load-out location to pick up coal after it received confirmation that a vessel would be at the port to receive the coal upon delivery.

7.  One of three sources of coal from SCSC was the A&G mine, the loadout for which was at Paragon. Because of the refusal of Algoma Canada to arrange vessels, Paragon and A&G became completely backed up with coal that had been mined specifically for Algoma Canada. With overflowing coal – and without Algoma Canada to receive it – Paragon and A&G were forced to close. *See **Exhibit 4***, attached hereto. This presented another blow to SCSC at the hands of Algoma Canada, which had already failed to pay for the $6 million in coal provided through the original Coal Purchase Agreement.

8.  Algoma Canada avoided purchasing 133,014 tons of coal from SCSC for the 2015 shipping season, resulting in more than $13 million in lost sales. This may be determined by deducting the amount of coal Algoma Canada received from SCSC for 2015 from the amount designated in the Agreement in 2015. Algoma Canada, on the other hand, saved nearly one million dollars by rejecting SCSC coal in favor of making purchases from other companies. Additional information is available at Pages 48 through 52 of the Expert Report prepared and submitted by the Berkley Research Group (the "BRG Report") as of this date.

  **B.**   **The 2016 Amending Agreement, Term Sheet, And Deliveries**

9.  Already compromised by Algoma Canada conduct, relations between the parties took a turn for the worse in 2016 when ESAI rejected early attempts by SCSC to work together to pin down 2016 pricing on SCSC coal, despite the contractual obligation to come to an agreement by March 1, 2016. *See* Original Agreement, attached as ***Exhibit 5***. It was not until April 25, 2016 that Algoma Canada agreed to a price. Algoma Canada also declined to send

vessels to the port to meet trains from SCSC in early 2016 even though the lake waters had thawed and SCSC was prepared to send coal. The delays were detrimental to SCSC and further complicated production, planning, and delivery of coal.

10. During this time, Algoma Canada was experiencing a surplus of coal on the ground. *See* attached **Exhibit 6**.

11. Following that, Algoma Canada unreasonably and unilaterally demanded that SCSC cease deliveries from Coal Mountain, another of the three SCSC family of mines designated to serve the contract (*see* attached **Exhibit 7**), further impeding SCSC's ability to perform on the Agreement.

12. In defense of its position, Algoma Canada claimed that the coal performed poorly in the coke-making process for which it was intended. However, with a dearth of evidence to back up this claim, long-time Algoma Canada employee (and now retained by Algoma Canada as its expert) Shawn Galey cites levels of "inerts" and "vitrinites" of the coal as contributors to the alleged problem. An analysis of this position is included in the BRG Report at Pages 58-72 and shows that HVB from Coal Mountain was more consistent with coal from Paragon than was Paragon itself from one shipment to another.

13. Notwithstanding the complaints about Coal Mountain HVB coal, the analysis of SCSC's expert revealed that Coal Mountain HVB coal suffered the lowest rejection level of any HVB coal delivered to Algoma Canada. *See* BRG Report, p. 72.

14. The goal of Algoma Canada's operations group responsible for the actual acquisition of coal was to have a minimum of 200,000 tons of coal on the ground to insure that operations could continue.

15. For every month of 2016, Algoma Canada exceeded that amount of inventory – including 515,000 tons on the ground in February and 311,000 tons of coal on the ground in March after a winter of frozen locks and no deliveries.

16. Despite Mr. Coutu's reluctance to admit that the amount was extraordinary, his email shows him remarking that the amounts are "huge".

17. Concern and awareness were voiced within Algoma Canada that if SCSC did deliver on the contract, then Algoma Canada would not only have too much coal in inventory, but could face cash flow problems from having to pay for the coal.

18. These facts reveal an incentive for Algoma Canada to limit deliveries from SCSC, to delay coming to an agreement on April pricing, to decline to send vessels as requested in March, to reject coal, to claim the coal was non-conforming, and to block deliveries from Coal Mountain, all in breach of Algoma Canada's contractual and good faith obligations to SCSC.

19. Not only did Algoma Canada wrongfully disallow shipments from Coal Mountain, it wrongfully assessed penalties on SCSC coal, acting unilaterally and upon test results from its own internal laboratory on samples improperly collected in violation of the sampling requirements in the applicable Purchase Agreement. Algoma Canada's method for imposing penalties was not supported by the provisions of the Agreement. *See* BRG Report, pp. 36-47.

20. Because the supposed internal testing results served the basis of the cut-off of Coal Mountain coal, SCSC was unable to provide coal it could have transported in accordance with the Agreement, and Algoma Canada wrongfully purchased coal from other sources depriving SCSC of the means and the opportunity to supply coal and of the profits such sales would have generated.

## COUNT I

### (Breach Of Contract)

21. SCSC incorporates by reference the preceding paragraphs of this Counterclaim as if fully set forth herein.

22. When Algoma Canada breached its obligation to purchase metallurgical coal from SCSC during the 2015 and 2016 delivery periods and instead purchased coal from third-party producers at lower prices than the contract prices for coal under the contractual arrangement with SCSC, or simply did not purchase coal at all, SCSC suffered damages in in excess of the jurisdiction limits of this Court, representing the savings received by Algoma Canada. This amount has only recently been determined by an analysis done by SCSC's experts in this litigation based on a review of contract documents and related materials.

23. SCSC suffered damages as a direct and proximate result of Algoma Canada's foregoing misconduct and other breaches of the parties' agreements.

24. SCSC is therefore entitled to recovery compensatory damages from Algoma Canada in an amount to be determined at trial.

## COUNT II

### (Breach Of Implied Covenant Of Good Faith And Fair Dealing)

25. SCSC incorporates by reference the preceding paragraphs of this Counterclaim as if fully set forth herein.

26. The parties' agreements contained implied terms that the parties would take no actions that would controvert the intent and stated purposes of the parties' express agreements, nor would they fail to take any reasonable actions necessary to effectuate the provisions of their express agreements.

27. Through the actions and inactions described above, Algoma Canada breached the implied covenants of good faith and fair dealing in the parties' agreements, directly and proximately causing SCSC to suffer damages in an amount in excess of the jurisdictional limits of this Court.

28. SCSC is therefore entitled to recovery compensatory damages from Algoma Canada in an amount to be determined at trial.

## COUNT III

## (DECLARATORY JUDGMENT)

29. SCSC incorporates by reference the preceding paragraphs of this Counterclaim as if fully set forth herein.

30. SCSC is entitled to declaratory relief in the form of a determination by the Court that Algoma Canada violated the terms of the Coal Supply Agreement dated November 1, 2015, as amended by the Amending Agreement to Coal Supply Agreement dated April 25, 2016 and the Term Sheet effective as of September 22, 2016 (the "Coal Supply Agreement") in assessing such penalties pursuant to testing results performed by Algoma Canada itself in violation of the express terms of the Coal Supply Agreement which contains specific limitations on the method of sampling and testing to be used as well as by whom such sampling and testing is to be done.

31. A real and justiciable controversy exists between the parties regarding whether Algoma Canada violated the parties' agreements, and SCSC is therefore entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201.

# COUNT IV

## (DECLARATORY JUDGMENT)

32. SCSC incorporates by reference the preceding paragraphs of this Counterclaim as if fully set forth herein.

33. SCSC is entitled to declaratory relief in the form of a determination by the Court that further performance by SCSC under the contract is limited to the terms set forth in the Term Sheet effective September 22, 2016 entered into by SCSC and Algoma Canada.

34. A real and justiciable controversy exists between the parties regarding SCSC's remaining duties under the parties' agreements, and SCSC is therefore entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201.

WHEREFORE, Defendant SCSC respectfully requests Judgment in its favor on Algoma Canada's SAC herein as follows:

A. The dismissal of the SAC on all claims against SCSC, with prejudice;

B. A trial by jury on all claims so triable;

C. SCSC's reasonable costs and attorneys' fees incurred in defending Plaintiff's claims in this action; and

D. Such other and further relief to which it is entitled.

May 20, 2019                              Respectfully submitted,

 /s/ Richard A. Getty
RICHARD A. GETTY (*admitted pro hac vice*)
DANIELLE HARLAN (*admitted pro hac vice*)
    and
MARCEL RADOMILE (*admitted pro hac vice*)

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky  40507
Telephone:  (859) 259-1900
Facsimile:   (859) 259-1909
E-Mail:  rgetty@gettylawgroup.com
E-Mail:  dharlan@gettylawgroup.com
E-Mail:  mradomile@gettylawgroup.com

And

PHILIP D. ROBBEN
    and
MELISSA E. BYROADE

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Telephone:  (212) 808-7800
Facsimile:   (212) 808-7807
E-Mail:  probben@kelleydrye.com
E-Mail:  mbyroade@kelleydrye.com

COUNSEL FOR DEFENDANTS,
SOUTHERN COAL SALES CORPORATION,
JAMES C. JUSTICE COMPANIES, INC., JAMES C. JUSTICE COMPANIES, LLC, BLUESTONE INDUSTRIES, INC., BLUESTONE COAL CORPORATION, BLUESTONE MINEAL, INC., BLUESTONE ENERGY SALES CORPORATION, A&G COAL CORPORATION, TAMS MANAGEMENT INC., ENCORE LEASING LLC, BLUESTONE RESOURCES INC., JUSTICE FAMILY FARMS, LLC AND SOUTHERN COAL CORPORATION

## **CERTIFICATE OF SERVICE**

      I hereby certify that on May 20, 2019, I electronically filed the foregoing Amended Answer, Affirmative Defenses And Counterclaim of Defendant Southern Coal Sales Corporation to Plaintiff Essar Steel Algoma Inc.'s Second Amended Complaint for Breach of Contract with the Clerk of Court using the CM/ECF System, which will automatically send e-mail notification of such filing to all counsel of record.

                                        /s/ Richard A. Getty
                                        COUNSEL FOR DEFENDANTS

ctepld0572