**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ESSAR STEEL ALGOMA, INC.**<br>                    **Plaintiff,**<br>**v.**<br><br>**SOUTHERN COAL SALES**<br>**CORPORATION, et al.**<br>                    **Defendants.** | **Case No. 1:17-mc-00360-AT**<br><br>**MEMORANDUM IN SUPPORT OF**<br>**DEFENDANTS' MOTION TO**<br>**DISMISS SECOND AMENDED**<br>**COMPLAINT AS TO THE NEW**<br>**DEFENDANTS** |

June 24, 2019

Respectfully submitted,

 /s/ Richard A. Getty
RICHARD A. GETTY (*admitted pro hac vice*)
DANIELLE HARLAN (*admitted pro hac vice*)
MARCEL RADOMILE (*admitted pro hac vice*)

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky  40507
Telephone:  (859) 259-1900
Facsimile:  (859) 259-1909
E-Mail:  rgetty@gettylawgroup.com
E-Mail:  dharlan@gettylawgroup.com
E-Mail:  mradomile@gettylawgroup.com

and

PHILIP D. ROBBEN
MELISSA E. BYROADE

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Telephone:  (212) 808-7800
Facsimile:  (212) 808-7807
E-Mail:  probben@kelleydrye.com
E-Mail:  mbyroade@kelleydrye.com

COUNSEL FOR DEFENDANTS

## TABLE OF CONTENTS

The Complaint And Second Amended Complaint .........................................................1

Argument ..............................................................................................................3

I.     Plaintiff Has Not Met The Test For Treating Defendants As Alter Egos.........................3

     A.     Defendants Did Not Operate As A Single Economic Unit...................................3

          1.     Algoma Shows No Monetary Exchanges Involving Six Of The New Defendants ...........................................................................................9

          2.     Transfers Between The Remaining Defendants Are Easily Explained .....11

               a.     James Justice Companies, LLC ...................................................11

               b.     Bluestone Energy Sales Corporation .............................................11

               c.     Encore Leasing, LLC .................................................................12

               d.     Bluestone Resources, Inc. ............................................................12

               e.     Southern Coal Corporation ..........................................................13

     B.     There Is No Element Of Injustice Or Unfairness.................................................13

     C.     Defendants' Expert Report Solidly Demonstrates That The New Defendants Were Not Alter Egos Of SCSC .....................................................................15

          1.     Overview.................................................................................16

          2.     The Organization Of Southern Coal Corporation And Its Subsidiaries Is Consistent With Industry Standards And Practices ...................................18

          3.     The SCSC/Algoma Transactions Were Consistent With Industry Practices...........................................................................19

          4.     The Transactions Between SCSC And The New Defendants Were Appropriate And Consistent With Industry Practice ...............................19

          5.     The Stark Report Includes Inaccuracies And Unsupported Allegations ...20

II.     The Court Cannot Exercise Personal Jurisdiction Over The New Defendants .................22

III.     Conclusion ............................................................................................23

## <u>TABLE OF AUTHORITIES</u>

### <u>Authorities/Cases</u>

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe*, LLC, 241 F. Supp. 3d 461 (S.D.N.Y. 2017) .........3

*Abu-Nassar v. Elders Futures,* 1991 U.S. Dist. LEXIS 3794 (S.D.N.Y. March 28, 1991).............8

*Akzona, Inc. v. Du Pont*, 607 F. Supp. 227 (D. Del. 1984)...........................................................14

*Cohen v. Schroeder*, 248 F. Supp. 3d 511, 520 (S.D. N.Y. 2017),
*aff'd*, 2028 U.S. App. LEXIS 4947 (2d Cir. N.Y. Feb. 28, 2018) ..............................................7, 14

*DirecTV Latin Am., LLC v. Park610, LLC*, 691 F. Supp. 2d 405 (S.D.N.Y. 2010) .....................22

*Fletcher v. Atex, Inc.,* 68 F.3d 1451 (2d Cir. 1995) .....................................................................14

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d. Cir. 2003)....................................23

*Kirschner v. CIHLP LLC*, 2017 U.S. Dist. LEXIS 162719 (S.D.N.Y. Sept. 30, 2017) ...... 3, 3-4, 6

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
975 F. Supp. 2d 392 (S.D.N.Y. 2013)......................................................................................3, 13

*Nelson v. International Paint Co.,* 734 F.2d 1084 (5th Cir. 1984) ...............................................14

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168 (2d Cir. 2008) ...........................3, 4

*Oriental Commercial & Shipping Co. v. Rosseel, N.V.,* 702 F. Supp. 1005 (S.D.N.Y. 1988) ........8

*Siegel v. HSBC Holdings, PLC*, 2018 U.S. Dist. LEXIS 8986 (S.D.N.Y. Jan. 19, 2018)............23

*VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372 (S.D.N.Y. 2014) .....................................3

*Wallace ex rel. Cencom Cable Income Partners II v. Wood,* 752 A.2d 1175 (Del. Ch. 1999) .....13

### <u>Rules/Statutes</u>

Fed. R. Civ. P. 12(b)(2)....................................................................................................1, 22, 23

Fed. R. Civ. P. 12(b)(6)....................................................................................................................1

N.Y. C.P.L.R. § 301.......................................................................................................................23

N.Y. C.P.L.R. § 302.......................................................................................................................23

Defendants, James C. Justice Companies, Inc., James C. Justice Companies, LLC, Bluestone Industries, Inc., Bluestone Coal Corporation, Bluestone Mineral, Inc., Bluestone Energy Sales Corporation, A&G Coal Corporation, Tams Management Inc., Encore Leasing LLC, Bluestone Resources Inc., Justice Family Farms, LLC, 15 Corporation (collectively, the "New Defendants"), and Nevada Holdings (formerly Southern Coal Sales Corp.) ("SCSC" or "Southern Coal"), by and through counsel, respectfully move for an Order dismissing with prejudice the allegations in the Second Amended Complaint (the "SAC") (Dkt. No. 106) asserted against the New Defendants.  The New Defendants were added based on an allegation that they are alter egos of SCSC.  Dismissal of the New Defendants is appropriate pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6), in that the SAC fails to state a claim against the New Defendants upon which relief can be granted and the Court lacks personal jurisdiction over the New Defendants.[1]

## THE COMPLAINT AND SECOND AMENDED COMPLAINT

In an action transferred to the Southern District of New York from the United States Bankruptcy Court for the District of Delaware, Plaintiff, Essar Steel Algoma Inc. ("Algoma"), alleged that Southern Coal breached a coal supply contract (the "Agreement") by failing to deliver the specified quantity of coal, failing to provide coal of acceptable quality, and failing to use appropriate testing methods to determine the quality of coal it provided. *See* Complaint, ¶¶ 9-14 (Dkt. No. 1); SAC, ¶¶ 5-9 (Dkt. No. 106).

In formulating the SAC, and without the benefit of a broad understanding of the manner in which privately-owned energy/commodity companies are frequently organized, Algoma

---

[1]      Dismissal under Rule 12(b)(6) is appropriate because, as demonstrated *infra*, even taking the allegations of the SAC as true, Algoma cannot prove any set of facts in support of its claims against the New Defendants which would entitle it to relief.  *See Naso v. Park*, 850 F.Supp. 264, 268-69 (S.D.N.Y. 1994) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1956); *Anderson v. Coughlin*, 700 F.2d 34, 40 (2d Cir. 1983)).

1

formed an opinion that a group of twelve entities, the New Defendants, were so connected to SCSC as to actually be its alter egos – a theory no doubt driven by Algoma's realization that any recovery from the sales company it contracted with, SCSC, may be limited.  Plaintiff's SAC adds the twelve Defendants and alleges they are liable as alter egos of SCSC.  All the Defendant companies are owned by members of the Justice family.

In the SAC, Algoma specifically alleges that SCSC, "is an undercapitalized sister entity to and/or subsidiary of the [New Defendants], which exert complete dominion and control over and therefore operate over Southern Coal as its instrumentalities and alter egos."  SAC, ¶ 82 (Dkt. No. 106).  The SAC alleges the undercapitalization was orchestrated "so that Southern Coal could not meet its obligations under the Agreements and be judgment-proof."  *Id.*, ¶ 94.  It states that the undercapitalization "emboldened" SCSC to breach its agreements with Algoma.  *See id.*, ¶ 95.  Of course, the SAC does not acknowledge that SCSC continued to deliver coal for months without getting paid, incurring a receivable owed by Algoma of over $6.0 million before it stopped delivery.  *See* Deposition of James C. Justice, III ("Justice Depo."), cited pages of which are attached collectively as ***Exhibit A***, at pp. 60-61.

In support of its position that SCSC was undercapitalized, Algoma claims that "[m]oney received by Southern Coal was treated as money of the [New Defendants] generally, and vice versa."  SAC, ¶ 94 (Dkt. No. 106).  It itemizes transfers either to or from SCSC occurring between November 2, 2015 and October 26, 2016.  *See id.*, ¶¶ 100-147, 265-166, 177-179, 198-207, 213-234, 237.  Altogether there were 57 transfers from SCSC to New Defendants and 24 transfers from New Defendants to SCSC.  *See id.*  Of the twelve New Defendants, six of them received no transfers, and only two of them transferred funds to SCSC.  *See id.*  As addressed below, Algoma's claims, when scrutinized carefully, are baseless and are the result of a gross

misunderstanding of how affiliated entities operate in the coal industry (or, for that matter, many other industries where a product is produced by one entity and sold by another).

## ARGUMENT

### I.  PLAINTIFF HAS NOT MET THE TEST FOR TREATING DEFENDANTS AS ALTER EGOS.

Delaware law allows Courts to disregard the corporate structure *only* in "exceptional" circumstances. *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 401-02, 404 (S.D.N.Y. 2013).  This stringent Delaware standard applies because SCSC was incorporated there, and New York's choice of law rules provide that the laws of the state in which a defendant is incorporated, here Delaware, control in determining whether the corporate form can be disregarded.  *See A.V.E.L.A., Inc. v. Estate of Marilyn Monroe*, LLC, 241 F. Supp. 3d 461, 474 (S.D.N.Y. 2017) (citing *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 381 (S.D.N.Y. 2014)).

The facts of this case do not provide the exceptional circumstances contemplated when Delaware law is applied.  With no allegation specifying fraud on the part of SCSC, a two-prong test applies: (1) whether the alleged alter egos and SCSC "operated as a single economic entity" and (2) "an overall element of injustice or unfairness." *Kirschner v. CIHLP LLC*, 2017 U.S. Dist. LEXIS 162719, at *10-11 (S.D.N.Y. Sept. 30, 2017) (citing *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008)) (other citation omitted).  Algoma has not met either of these prongs in the SAC.

### A.  Defendants Did Not Operate As A Single Economic Unit.

To determine "whether entities operated as a single economic unit, a court must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation." *Kirschner, supra*, 2017 U.S. Dist. Lexis 162719, at

3

*11 (citing *NetJets*, *supra*, 537 F.3d at 176-177) (other citation omitted).   Algoma's SAC

provides little concrete information about how SCSC operates.   In fact, it disregards a salient, if

obvious, fact: that SCSC is a *coal sales* company, and, as such, it must pay for coal it sells as

well as for services it uses in obtaining, marketing and transporting that coal.   SCSC never hid

from Algoma the fact that it has shared ownership with the New Defendants.   Where possible, it

purchased coal and used services provided by the New Defendants, dutifully noting the

transactions in its ledgers.   Such detailed record-keeping is inconsistent with the notion that the

Defendants operated as a single economic entity.

To support its alter ego claim, Algoma highlights the overlap of corporate officers

between all the companies – a fact which should be no surprise where, as here, the companies

share the same owners. This is not evidence that the Defendants operated as a single economic

entity.   Many related companies share officers, particularly where family owned entities are

involved.   Algoma cites the use of employees to work in service of multiple companies owned

by the Justices and of domain names for employee email addresses suggesting overlapping

affiliations.   The Justices are not Warren Buffet, but it stands to reason that even Buffet has some

point men (or women) who oversee various aspects of multiple companies, just as Summer

Harrison, the Vice President of Treasury for Bluestone, who also handles financial transactions

and performs other tasks on behalf of multiple coal-related companies.   *See* SAC, ¶92 (Dkt. No.

106).   The fact that she takes her marching orders from Jay Justice in service of multiple

companies, for all of which he serves as the Chief Executive Officer, does not make the

companies alter egos.

The fact that certain professional or other services are shared by various operating entities

is not evidence of an alter ego situation.   For example, three different mining companies owned

by the Justices may need mining engineering services but none of them individually is large enough to keep a full-time engineering staff.  It only makes sense to share such services between the companies.  It also makes economic sense to have Bluestone or another entity with ready cash initially pay for payroll, mineral leases, royalties and the like for a mining operation.  Once the coal is mined and sold, the proceeds of sale are available to the mining entity to pay back the intercompany advance/loan made by Bluestone.  Such transactions in this case were properly documented for each entity.  These intercompany transactions are reflected on the books of the Justice entities and the manner in which the transactions are documented is fully consistent with industry and professional accounting practices.  It is the manner in which such related companies generally operate, and it is not evidence of fraud or overreach – proven facts which Algoma refuses to acknowledge.

Algoma also notes the statement of SCSC's agent, Mr. Sears, in the Algoma transaction that he used "Justice" and "Southern" interchangeably,[2] and that other SCSC employees also received their pay from "Bluestone."[3]  As discussed below, New Defendant Bluestone Energy Sales Corporation was created specifically to assume the contract with Algoma and to facilitate obtaining a $60 million line of credit from the primary Justice financial institution, which was needed to fulfill the Algoma contract.  *See* Justice Depo., p. 80.  The SCSC entity was left in place only because the transaction began with it.  These allegations do not constitute evidence that "Bluestone" or other New Defendants operated as a single economic entity with SCSC in any respect.

---

[2]      *See SAC*, ¶ 86 (Dkt. No. 106).

[3]      *See* SAC, ¶¶ 158-159 (Dkt. No. 106).

If the SAC is to be taken at face value, then a determination of whether SCSC and any of the New Defendants operate as a single economic entity should consider the factors listed in *Kirschner, supra*.  They include:

- whether the corporation was adequately capitalized for the corporate undertaking;

- whether the corporation was solvent;

- whether dividends were paid;

- whether corporate records were kept;

- whether officers and directors functioned properly;

- whether corporate formalities were observed;

- whether the dominant shareholder siphoned corporate funds; and

- whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*See Kirschner, supra*, 2017 U.S. Dist. LEXIS 162719, at *11 (citation omitted).

Although this list does not purport to be exhaustive, it is noteworthy that Algoma's argument that the New Defendants are alter egos of SCSC centers almost entirely on one particular allegation: that SCSC was undercapitalized.  The circumstances surrounding SCSC's financial position at the time were well known to Algoma and were mostly the product of Algoma's failure to pay $6.0 million owed for coal provided by SCSC it had received earlier in 2015.[4]  Even so, "inadequate capitalization has correctly assumed *a limited role in veil-piercing*

---

[4]   Algoma breached the contract and thereby caused damage to SCSC in these ways: (1) it failed to pay for $6.0 million worth of coal supplied by SCSC earlier in 2015; (2) it purchased coal at lower prices and on 60 day terms once its own financial position allowed it to do so rather than taking the consignment coal from SCSC it had contracted to take, breaking its contract and costing SCSC another $6.0 million in sales; (3) it delayed burning SCSC's coal, causing delays in its payments because it did not have to

6

*cases*." *Cohen v. Schroeder*, 248 F. Supp. 3d 511, 520 (S.D.N.Y. 2017), *aff'd*, 2028 U.S. App. LEXIS 4947 (2d Cir. N.Y. Feb. 28, 2018) (citation omitted) (emphasis added).  As noted by this very Court in *Cohen*, *supra*, if undercapitalization was sufficient to pierce the corporate veil, then "'the veil of every insolvent subsidiary or failed start-up corporation could be pierced.'" *Id.* (citation omitted).

In truth, Algoma's concern seems to be not that the company could not "fund its corporate undertaking" but that it will not get a windfall from this litigation. Indeed, it alleges that funds were siphoned out of the company "*in order to* make it judgment-proof" so that SCSC could perform poorly on the Agreement with no fear of losing out in litigation.  *See* SAC, ¶ 94 (emphasis added) (Dkt. No. 106).  This is an absurd proposition for which Algoma offers no proof, but which is made solely in a (desperate) attempt to satisfy the second prong of the alter ego test: the "overall element of injustice or unfairness."  It also ignores the continued performance of SCSC in delivering coal even after it was "stiffed" to the tune of $6.0 million by Algoma.

It is the case that funds were transferred from SCSC to other of the New Defendants, and that two of the New Defendants transferred funds to SCSC.  What Algoma fails to take into account, however, is that conglomerates or affiliated entities frequently use intercompany transfers to shore up one entity that needs financial support, and are repaid when circumstances allow it.  The other options are to let the company suffer financially or even fail, or to borrow

---

pay the 90 percent balance due until the consignment coal was burned, favoring instead the consumption first of coal it purchased on terms elsewhere at lower prices.  These breaches are particularly egregious when one realizes that SCSC in effect rescued Algoma when no one else would sell it coal because of financial problems and a pending Canadian bankruptcy proceeding and consigned the coal so it could be paid for when used – an unusual arrangement which SCSC had rarely, if ever, agreed to in the past.

from a bank at a higher cost.  Algoma has presented no evidence that the New Defendants expected to derive any personal financial benefit from the transactions.

Indisputably, it is an owner's prerogative to infuse capital into his own company or companies to "keep them afloat," and the coal industry, in particular, experiences ups and downs that require such support.  In the case of SCSC, meticulous records were kept of each transaction, and these records were provided to Algoma.   Algoma promotes a narrative that SCSC and the New Defendants acted to promote an unjust or unfair result because its ploy to include the New Defendants in this action cannot survive without it.

That being said, the focus on SCSC's inability to satisfy the judgment Algoma anticipates is misplaced. "[T]he mere fact that an entity may or may not have the capital to respond to a potential large award against it does not justify piercing the corporate veil."  *Abu-Nassar v. Elders Futures,* 1991 U.S. Dist. LEXIS 3794, at *44 (S.D.N.Y. March 28, 1991) (quoting *Oriental Commercial & Shipping Co. v. Rosseel, N.V.,* 702 F. Supp. 1005, 1021 (S.D.N.Y. 1988)) (other citations omitted).  SCSC was a sales company and Algoma knew it was a sales entity based upon prior dealings.  If it had a concern about recovering from SCSC, it could have asked for a guarantee from another Justice entity.  It chose not to do so, obviously more concerned about inducing SCSC to go out on a limb by agreeing to ship coal to it on a consignment basis – an arrangement rarely, if ever, agreed to by any of the Justice entities.  *See* Justice Depo., p. 57.

The transfers between SCSC and the New Defendants between November 5, 2015 and October 27, 2016 are enumerated over five pages of the SAC and are as follows:

| Name of Defendant | Transfers from | Transfers to |
|---|---|---|
| James C. Justice Companies, Inc. | 0 | 0 |

8

| | | |
|---|---|---|
| James C. Justice Companies, LLC | 1 | 0 |
| Bluestone Industries, Inc. | 0 | 0 |
| Bluestone Coal Corporation | 0 | 0 |
| Bluestone Mineral, Inc. | 0 | 0 |
| Bluestone Energy Sales Corporation | 9 | 0 |
| A&G Coal Corporation | 0 | 0 |
| Tams Management, Inc. | 0 | 0 |
| Encore Leasing, LLC | 7 | 0 |
| Bluestone Resources, Inc. | 18 | 3 |
| Justice Family Farms, LLC | 1 | 21 |
| Southern Coal Corporation | 20 | 0 |

*See* SAC, ¶¶ 100-147.

The SAC also lists three transfers by SCSC into its own savings account.   Altogether, 84 transfers occurred over the (nearly) one-year period.  As will be seen below, most of the outgoing transfers were primarily to pay for purchased coal to fulfill contracts or other services rendered.  *See* February 12, 2019 Deposition of Stephen Wayne Ball, General Counsel for the various Justice entities, ("2019 Ball Depo."), cited pages of which are attached collectively as *Exhibit B*, pp. 96-97. The ongoing transfers were to keep SCSC afloat, which allowed it to continue to ship coal to Algoma – a benefit conveniently ignored by Algoma.

### 1.    Algoma Shows No Monetary Exchanges Involving Six Of The New Defendants.

In an analysis of transfers purporting to evidence co-mingling of funds indicative of the operation as a single economic entity, it is notable that *no monetary dealings* were alleged between SCSC and *five* of the New Defendant companies. Starting our analysis with those, the

9

allegations made in the SAC specific to them and purporting to show they are alter egos of SCSC are as follows:

- Bluestone Industries, Inc.
  - Overlap of officers and business address
  - SCSC employees had associated domain names, e.g. @bluestoneindustries.com
  - General references to "Bluestone" by SCSC employees
  - No monetary dealings

- Bluestone Coal Corporation
  - Overlap of officers, employees, and business address
  - General references to "Bluestone" by SCSC employees
  - No monetary dealings

- Bluestone Mineral, Inc.
  - Overlap of officers and business address
  - General references to Bluestone by SCSC employees
  - No monetary dealings

- A&G Coal Corporation
  - Overlap of officers and business address
  - One SCSC employee "thinks that she used to work for A&G coal Corporation"
  - No monetary dealings

- Tams Management, Inc.
  - Overlap of officers and business address
  - No monetary dealings

10

The Defendants submit that, even if all the claims of the SAC are taken as true, these allegations are wholly inadequate to support a claim that these entities operated as a single economic unit with SCSC, the first prong of the two-prong test.  Accordingly, they should be dismissed from the SAC without further analysis.

   2. **Transfers Between The Remaining Defendants Are Easily Explained**.

The remaining Defendants are discussed in order of their appearance in the SAC.

   a. **James Justice Companies, LLC**.

The specific allegations pertaining to this entity are that there were overlapping officers and employees and that SCSC employees had email addresses in which "justice" was part of the domain name: @justicecorporation.com, however, there is no New Defendant named "Justice Corporation."

The SAC alleges only one transfer from SCSC to James. C. Justice Companies, Inc.  *See* SAC, ¶ 117 (Dkt. No. 106).  This single transfer simply does not justify treatment of this particular New Defendant as an alter ego of SCSC.

   b. **Bluestone Energy Sales Corporation**.

Next on the list of New Defendants which do have financial transactions with SCSC is Bluestone Energy Sales Corporation ("BESC").  The SAC alleges – and records produced by SCSC show – that nine payments were made from SCSC to BESC.  *See* SAC, ¶¶ 131-147 (Dkt. No. 106).  BESC also sent some of the invoices Algoma received in association with the Agreement, and Algoma was directed to pay BESC directly for its purchase of some of the coal received in association with the Agreement – consistent with the understanding that the Bluestone sales entity, which was formed within days of the November 1, 2015 Agreement with Algoma, would replace the SCSC sales entity.   Algoma conveniently fails to disclose to the

Court that BESC was formed as a coal sales company in November 2015, just as the Agreement between Algoma and SCSC was getting started with the idea that it would take over the SCSC duties under the Agreement.  *See* October 30, 2018 Deposition of Stephen Wayne Ball ("2018 Ball Depo."), cited pages of which are attached as ***Exhibit C***, pp. 51-53.  SCSC was the original party to the Agreement because it had previous dealings with Algoma and was known to the players there.  *Id.*  As explained by testimony from Mr. Ball, SCSC planned to assign its Agreement with Algoma to BESC, which is also a coal brokerage, but because of the Algoma bankruptcy the assignment could not be effectuated.  *See* 2018 Ball Depo., p. 59.  Without more information, this is insufficient to justify a claim that the two are alter egos.

### c.      Encore Leasing, LLC.

Encore Leasing LLC received seven transfers from SCSC.  *See* SAC, ¶¶ 119-128 (Dkt. No. 106).  Encore Leasing owns aircraft that are utilized by employees of the various Justice entities.  *See* "2019 Ball Depo.", pp. 104-105.  The transfers, as with others, were fully documented intercompany loans to assist with the financial difficulties Southern Coal Sales experienced. *See, e.g.*, 2019 Ball Depo., p. 104, 109-110, 114.   Nothing nefarious is suggested here, and the facts do not justify including Encore Leasing in the Complaint.

### d.      Bluestone Resources, Inc.

Bluestone Resources, Inc. then owned the mining operation at Coal Mountain, the primary supplier of coal under the Agreement between SCSC and Algoma.  *See* SAC, ¶ 160.  As such, it stands to reason that the 18 transfers from SCSC were in payment for Bluestone coal. The transfers were above-board, were fully documented, and are not sufficient to support Algoma's claim that Bluestone Resources, Inc. and SCSC operated as a single economic entity.

### e.     <u>Southern Coal Corporation</u>.

SCSC transferred funds to Southern Coal Corporation on 20 occasions.  Southern Coal Corporation loaned funds to SCSC on 21 occasions as loans to keep it afloat.  Records of the transfers were maintained and the advances were clearly reflected on the relevant books and records.  Such intercompany transfers are normal, are legitimate, and were made in the ordinary course of intercompany business.  This does not constitute evidence that the two companies operated as a single economic unit.

### B.     <u>There Is No Element Of Injustice Or Unfairness</u>.

Algoma also fails to plausibly allege the second prong of the alter ego test: an overall element of unfairness or injustice.  "To satisfy this element of a veil-piercing attack, a plaintiff must allege injustice or unfairness that is a result of an abuse of the corporate form.  In other words, the corporation effectively must exist as a sham or shell through which the parent company perpetrates injustice." *Nat'l Gear & Piston, supra,* 975 F. Supp. 2d at 406 (citation omitted).  "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Id.* (quoting *Wallace ex rel. Cencom Cable Income Partners II v. Wood,* 752 A.2d 1175, 1184 (Del. Ch. 1999)).   Such a position is completely inconsistent with repeated references in the SAC that SCSC actually delivered coal pursuant to the purchasing agreements. *See* SAC, ¶¶ 42, 49, 53, 61, 80 (Dkt. No. 106).

Plaintiff's attempts to cast a sinister shadow over renegotiations of the original agreement with Plaintiff's Canadian and US bankruptcy proceedings pending and SCSC's impediments to full performance do not change the fact that SCSC's attempts to "make it work" serve as a testament to SCSC's good faith – not to an attempt to perpetuate a fraud.  Under the circumstances, Plaintiff's attempt to allege an overall element of unfairness or injustice are

implausible.  SCSC delivered coal under the contract and only stopped delivering when Algoma refused to pay for the coal – to the tune of $6.0 million.  *See* Justice Depo., pp. 60-61.

In the course of this case Algoma was asked to recall that SCSC borrowed $60 million in order to fund its participation under the Consignment Agreement.  The SAC reveals that it paid $54 million for the coal it purchased.  Under the circumstances, it cannot be said that SCSC has come out ahead on this deal – the numbers show that it, not Algoma, came out on the short end of this deal.

Plaintiff's alter ego claims against the New Defendants must be dismissed because, even if taken as true, they fail to meet the either prong of the test required by Delaware law.  There is no denial that many or all of the New Defendants are sister companies, but so are Facebook and Instagram. In small corporations it is not unusual to share officers and directors, and "courts in this district are 'especially hesitant to find a disregard of the corporate form when closely-held corporations are involved.'"  *Cohen, supra*, 248 F. Supp. 3d at 522 (citation omitted).

Although the question of whether to pierce the corporate veil is generally a factual question, and the standard for dismissing a Complaint is stringent, in a case such as this, when the SAC is so lacking in support for the alter ego claims, dismissal is appropriate.  "[C]ourts have granted motions to dismiss as well as motions for summary judgment in favor of defendant parent companies where there has been a lack of sufficient evidence to place the alter ego issue in dispute." *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1458-59 (2d Cir. 1995) (citing *Akzona, Inc. v. Du Pont*, 607 F. Supp. 227, 237 (D. Del. 1984) (rejecting plaintiffs' alter ego theory of liability on a motion to dismiss); *Nelson v. International Paint Co.,* 734 F.2d 1084, 1092 (5th Cir. 1984) ("In the lack of sufficient evidence to place the alter ego issue in dispute, a corporate defendant may be entitled to summary judgment.")) (other citation omitted).  Algoma has failed

14

to show sufficient evidence warranting the imposition of "alter ego" liability on the New Defendants. The evidence shows nothing more than usual intercompany support between affiliated entities and warrants the dismissal of the SAC with prejudice.

### C. Defendants' Expert Report Further Demonstrates That The New Defendants Were Not Alter Egos Of SCSC.

On May 16, 2019, Aaron J. Heighton, CPA/ABV, CVA, of Hayflich CPAs PLLC, submitted his expert report on behalf of SCSC and the New Defendants. A copy of this report (the "Heighton Report") is attached as ***Exhibit D***. Mr. Heighton was retained to opine "as to the validity of the manner in which SCSC, its parent company Southern Coal Corporation and subsidiary entities operate, in connection with the alleged breach of contract and 'alter ego' claims of Essar Steel Algoma ('Algoma'))." *See* Exhibit D, p. 1. Based on the reasons detailed in the Heighton Report and summarized herein, Mr. Heighton concluded that the entities at issue are not alter egos:

1. After a review of all the information provided to me to date, it is my opinion that SCSC, Southern Coal Corporation, related subsidiaries and the other related entities of the James C. Justice Group, *operate in a manner that is consistent with commonly accepted practices in their industry*.

2. It is my opinion that the transactions between SCSC and Algoma *were dealt with in a manner that is consistent with commonly accepted practices in their industry*.

3. It is my opinion that the intercompany transactions of and between SCSC, Bluestone Energy Sales Corporation (BESC) and the other related entities of the Justice Group *were handled in a manner that is consistent with commonly accepted practices in their industry*.

4. It is my opinion that certain points raised by [Plaintiff's expert] Mr. Stark in his report dated February 7, 2019 *are not accurate or adequately supported by the requisite evidence*.

Exhibit D, p. 3 (emphasis added).

15

The bases for each of these opinions are briefly summarized in turn below.

        1.     **Overview.**

Mr. Heighton first provides an "Overview of Structure and Operations of SCSC and

Parent Company" and an "Understanding of the SCSC and Algoma Contracts/Relationship."

*See* Heighton Report, pp. 3-5 and 5-6, respectively.  As stated by Mr. Heighton, in the coal

industry:

> Ultimately, it is the goal to have a parent company which owns the related
> subsidiary/affiliate (operating) companies setup in a manner that operational
> efficiencies can be achieved and utilized.  It is generally accepted that there would
> be a common management group in place, however, this common management
> group would be responsible for the operations of each individual
> subsidiary/affiliate and the parent company and is expected to operate each as a
> separate standalone entity.  It would be unrealistic to expect that each individual
> subsidiary or even parent company would have multiple CEO's, CFO's, in house
> counsel, managers, clerks etc.  To expect so, would in effect negate any potential
> for the effective application of the operational efficiencies and cost savings.

> *Id.*, p. 3.

Mr. Heighton then goes on to describe the industry norm for the setup, structure and

operations, including the existence of a general parent company and subsidiaries or affiliates,

including sales companies and operating entities, followed by an explanation of how these

industry norms have been applied by the Defendants.  *See* Exhibit D, pp. 4-5.  The sales

company markets the coal and secures the contracts, receives the funds for the coal, and provides

for the transfer of funds to the operating entities that actually mine and produce the coal being

sold.  *See id.*

> … It is not uncommon that the sales company subsidiary would have limited or
> no physical assets, as again, this is typically the entity simply responsible for
> securing the contracts for the sale of product.

> In some regards, the sales company operates as a gatekeeper for the other entities
> and provides for the *efficiencies* of having one entity that is responsible for the
> collection of revenues and ultimate distribution of the funds to compensate the

operating entities for their actual costs of production.  These transactions for the distribution of sales revenues are accounted for in a manner such as the intercompany receivable/payable setup.

In relation to SCSC and BESC, each of these entities is considered to be a "sales" company/subsidiary.  The sales company generally does not hold money, but rather it is usually passed through one entity transferring the funs to another, but is properly reflected through the accounting of the inter-company accounts.

*Id.*, p. 4 (emphasis in original).

In contrast to the sales entities, the operating entities are responsible for such things as "holding the mining permits, equipment, mining operations, and the transportation of the coal itself to the purchaser."  *See* Exhibit D, p. 4.  *See also*, Exhibit I to Exhibit D (Southern Coal Corporation Organizational Chart).  It is the operating entities that "will naturally be the entities that have physical assets and the actual operations of mining and production.  … one or more of these operating subsidiaries may also be responsible for fulfilling the transportation component of the coal to some degree."  *See* Exhibit D, pp. 4-5.

In this case, the terms of the Agreement between SCSC and Algoma were unusual for SCSC and were intended to accommodate Algoma:

It was known by SCSC that Algoma was in need of a substantial amount of coal prior to the winter months in 2015/2016 when the original contract was executed on November 1, 2015.  It was also known to SCSC that Algoma was not in a position to pay for the coal at the time of shipment and taking ownership of the coal, but rather had to setup an arrangement where the coal would be sold on consignment and Algoma would not pay for the coal until such time that it was actually consumed in their physical coke production process.

*See* Exhibit D, p. 5.

This was an atypical arrangement for SCSC, and was an accommodation for Algoma's financial position.  It also resulted in additional holding and financing costs incurred by SCSC.  *See id.*, pp. 5-6.

### 2.     The Organization Of Southern Coal Corporation And Its Subsidiaries Is Consistent With Industry Standards And Practices.

Southern Coal Corporation and its subsidiaries, including SCSC, were independently operated and were subject to acceptable controls and procedures.

- Each subsidiary had its own approval processes and procedures over day-to-day operations.

- There was not one approval process issued by the common management group and applied across the board to the subsidiaries.

*See* Exhibit D, p. 7.

The practice whereby SCSC negotiated the sale of coal and collected the sales proceeds, then distributed the proceeds to the parent or appropriate subsidiary that incurred the production and other costs is common in modern business practices.  *See id.*  As succinctly stated by Mr. Heighton, "[t]his type of arrangement is neither extraordinary nor uncommon."  *See id.*  Further,

> Based upon my review and reconciliation of the inter-company accounts as well as the financial statements, general ledgers, tax returns and other financial documents, it is my opinion that *these transactions are not contemplated to be or carried out in a way that is illicit or misleading in any way.*   The individual transactions between the related companies are handled in a manner that allows for the management to track and reconcile so as to insure the books and records are in balance and to allow the entities to settle up balances when funds are available between them.

Exhibit D, p. 7 (emphasis added).

Stated another way by Mr. Heighton, "I reviewed the accounting systems in place during the relevant period of time including the processes over the intercompany accounting and accounts *and have found it to be consistent with generally accepted accounting practices*."  *See id.*, p. 5 (emphasis added).[5]

---

[5]     *See also* Exhibit D, p. 7 ("I have concluded that the operations and transactions of SCSC, BESC, the Parent Company Southern Coal Corporation and the related subsidiary entities

18

### 3. The SCSC/Algoma Transactions Were Consistent With Industry Practices.

Mr. Heighton's detailed review of the transactions between the parties led him to the conclusion that all payments to SCSC were in accordance with the terms of the Agreement and were for the product received and consumed. *See* Exhibit D, p. 8. SCSC appropriately accounted for all monies received. *See id.* In summary, "the transactions between SCSC and Algoma were handled and recorded in an ordinary and acceptable manner." *Id.*

### 4. The Transactions Between SCSC And The New Defendants Were Appropriate And Consistent With Industry Practice.

Over the course of four pages, Mr. Heighton walks through the intercompany reconciliations prepared by or at the direction of the various entities for calendar years 2015, 2016, and 2017. Mr. Heighton concludes that "the *intercompany transactions* between SCSC, BESC and the other related Justice Group entities have been handled in a manner that is acceptable and commonly seen in situations where you have common ownership across a group of entities." *See* Exhibit D, p. 9 (emphasis in original). The typical practice of collection of revenues by the sales company and distribution of those revenues to the parent and/or related subsidiaries who incurred the costs for the mining and delivery of the coal was followed by SCSC in this case. *See generally*, Exhibit D, pp. 9-12.

All of the subject transactions, as described and explained in detail above, were recorded in the appropriate intercompany general ledgers of the entities receiving and distributing funds. The receipt of funds by SCSC and the distribution of those funds by SCSC were "consistently handled in this manner and [were] periodically … reconciled to insure that the balances [were] appropriately stated on the respective balance sheets for the companies involved." *See id.*, p. 9.

and other related entities occurred in a manner that is consistent with commonly accepted practices in business today.").

Importantly, the owners and management of the New Defendants expected that any and all "balances owed between the respective entities *will be repaid through the ordinary course of business.  While it may not be immediate, the repayment of the intercompany debt is expected.*" *Id.* (emphasis added).

Mr. Heighton prepared reconciliations of the intercompany accounts of SCSC and the New Defendants for the years 2015, 2016, and 2017.  *See* Exhibit D, p. 9 and Exhibit III thereto.  In preparing these reconciliations, Mr. Heighton reviewed the subsidiary ledger of SCSC and the subsidiary ledgers of each individual entity that owed balances to SCSC or was owed money from SCSC.  *See id.*, p. 9.  The findings for calendar years 2015, 2016, and 2017 are detailed by Mr. Heighton on pages 10, 11-12, and 12, respectively.  Mr. Heighton concluded, "the applicable procedures for recording the intercompany transactions and the corresponding reconcilements had been followed for 2015, 2016 and 2017."  *See* Exhibit D, pp. 9-10.

**5.      The Stark Report Includes Inaccuracies And Unsupported Allegations.**

Finally, Mr. Heighton provides a detailed review and critique of the expert report of Plaintiff's expert John M. Stark (the "Stark Report"), attached as ***Exhibit E***.  Specifically, Mr. Heighton details nine areas where the Stark Report is lacking.  Mr. Heighton's responses to these allegations will not be restated in detail herein, but certain of the refutations by Mr. Heighton bear particular notice.[6]

The fact that Algoma received invoices from SCSC and from BESC is of no relevance when the underlying facts are considered.  In order to obtain a line of credit to finance the

_____

[6]      Mr. Heighton's detailed comments with respect to the Stark Report allegations are found in Exhibit D, pp. 13-18.

consignment arrangement required by Algoma, Carter Bank and Trust required that a new entity

be created.  BESC was that entity.

> BESC's only purpose was the same as SCSC.  Its only function was to act as a
> sales company for the Algoma relationship. … [I]t was the intention for SCSC to
> assign the original agreements to BESC, however, that never actually occurred.
> The fact that Algoma received invoices from another entity other than SCSC, did
> not have an impact on the relationship or the method in which coal was sold and
> paid for.

Exhibit D, p. 13.

The line of credit was required to meet the financial needs of Algoma, *i.e.*, to sell it coal on a

consignment basis.  The creation of BESC and its issuance of invoices was all part of that

accommodation, not a nefarious effort to circumscribe Algoma and the requirement that SCSC

and BESC observe appropriate corporate procedures.

The reporting of the Algoma revenues was appropriately made through the parent

company's tax returns.  SCSC, as a sales entity, "would not record the revenue on its books, but

rather will push all income down to the individual operating entities that are responsible for

producing the coal and providing any other support services in the process."  *See id.*, p. 14.  As is

standard industry custom, "[i]n the end all of the income and expenses is reported at the parent

level for federal income tax purposes once the entities are reported on a consolidated basis."  *Id.*

Again, it is not a failure to observe corporate structures, but a common, industry-accepted

practice that does not in any way support alter-ego allegations against the New Defendants.

Intercompany loans and credit card payments, including loans made by Jay Justice, are

typically (and appropriately) repaid from company revenues and have all been legitimately

recorded in the relevant companies' general ledgers.  *See, e.g.*, Exhibit D, pp. 14, 15.  Likewise,

SCSC and BESC did not report operating expenses *because as sales companies they did not have*

21

*operating expenses.  See id.*, p. 15 ("SCSC and BESC are both 'Sales Companies' and as such,

they do not typically incur any expenses of any kind.").

Much like far too many coal-industry entities during the past few years, SCSC has

suffered defaults by customers that proved uncollectible.  Several such accounts were ultimately

written off by SCSC, and each is detailed in Mr. Heighton's report.  *See* Exhibit D, pp. 16-17.

Again, nothing about these write-offs was nefarious or inappropriate:

> The method in which SCSC and the related entities account for sales and
> subsequent payments lends itself to a FIFO method.  That is, payments are
> applied to the oldest outstanding invoice and there can be a resulting partial
> payment on an invoice or a full payment.  What they end up with in the end is a
> balance remaining outstanding, which is then analyzed when certain events occur,
> terms renegotiated, relationships reviewed, etc. and then the determination of
> whether a balance is then deemed uncollectible and ultimately written off.  This is
> simply a function of the nature of customer disagreements and disputes and how
> they are handled.

Exhibit D, p. 17.

The Heighton Report clearly and succinctly demonstrates that the intercompany

procedures observed by SCSC, its parent and affiliated entities, are entirely appropriate and are

consistent with industry standard.  None of Algoma's alleged "evidence" of alter-ego status

between SCSC and the New Defendants holds weight when compared against the facts, and

dismissal of the SAC on these grounds is warranted.

## II.   THE COURT CANNOT EXERCISE PERSONAL JURISDICTION OVER THE NEW DEFENDANTS.

The SAC does not contain any factual basis for the Court's exercise of personal

jurisdiction over the New Defendants, and despite having been called to task on this issue

multiple times, Algoma is unable to come forward with evidence showing a basis for this Court

exercising personal jurisdiction over the New Defendants. *See* Fed. R. Civ. P. 12(b)(2); *DirecTV*

*Latin Am., LLC v. Park610, LLC*, 691 F. Supp. 2d 405, 416 (S.D.N.Y. 2010) ("On a Rule

22

12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff 'bears the burden of showing that the court has jurisdiction over the defendant'") (quoting *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d. Cir. 2003) (per curium)) (other citations omitted).

Plaintiff fails to allege jurisdiction pursuant to either N.Y. C.P.L.R. § 301 or § 302, and the exercise of jurisdiction does not comport with due process under the Constitution. None of the New Defendants are New York entities, and none utilize New York as a principal place of business. Plaintiff makes no allegations of contacts with New York, let alone allegations that the New Defendants have purposefully directed their activities at the forum and that the litigation arises out of or relates to those activities such that the New Defendants have sufficient "minimum contacts" with the forum. *See Siegel v. HSBC Holdings, PLC*, 2018 U.S. Dist. LEXIS 8986, at * 8 (S.D.N.Y. Jan. 19, 2018) (citation omitted).

Rather than providing a legitimate basis for personal jurisdiction, Plaintiff instead attempts to establish it by piggybacking on its implausible allegation that the New Defendants are alter egos of SCSC and, as such, may be deemed served. *See* SAC, ¶ 3 (Dkt. No. 106). Because Plaintiff's alter ego claims are specious, the action against the New Defendants alleging they are alter egos must be dismissed with prejudice. As such, there is no basis to find jurisdiction over the New Defendants.

<u>**CONCLUSION**</u>

For the reasons set forth above and in SCSC's prior submissions regarding Plaintiff's alter ego allegations, the New Defendants seek to dismiss all claims asserted against them in the Second Amended Complaint with prejudice.

23

Respectfully submitted,

Dated:  June 24, 2019

/s/ Richard A. Getty
RICHARD A. GETTY (*admitted pro hac vice*)
DANIELLE HARLAN (*admitted pro hac vice*)
        and
MARCEL RADOMILE (*admitted pro hac vice*)

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky  40507
Telephone:  (859) 259-1900
Facsimile:   (859) 259-1909
E-Mail:  rgetty@gettylawgroup.com
E-Mail:  dharlan@gettylawgroup.com
E-Mail:  mradomile@gettylawgroup.com

and

PHILIP D. ROBBEN
        and
MELISSA E. BYROADE

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Telephone:  (212) 808-7800
Facsimile:   (212) 808-7807
E-Mail:  probben@kelleydrye.com
E-Mail:  mbyroade@kelleydrye.com

COUNSEL FOR DEFENDANTS,
SOUTHERN COAL SALES CORPORATION,
JAMES C. JUSTICE COMPANIES, INC., JAMES
C. JUSTICE COMPANIES, LLC, BLUESTONE
INDUSTRIES, INC., BLUESTONE COAL
CORPORATION, BLUESTONE MINERAL, INC.,
BLUESTONE ENERGY SALES
CORPORATION, A&G COAL CORPORATION,
TAMS MANAGEMENT INC., ENCORE
LEASING LLC, BLUESTONE RESOURCES
INC., JUSTICE FAMILY FARMS, LLC AND
SOUTHERN COAL CORPORATION

dhbpld2208