# EXHIBIT E

| | | |
|---|---|---|
| **ESSAR STEEL ALGOMA, INC.** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **CASE NO. 1:17-mc-00360-AT** |
| **v.** | ) | |
| | ) | **JUDGE TORRES** |
| **NEVADA HOLDINGS, INC., f/k/a** | ) | |
| **SOUTHERN COAL SALES CORPORATION** | ) | |
| | ) | |
| **Defendant** | ) | |

## EXPERT REPORT OF JOHN M. STARK, CPA/ABV, CFF

I have been asked by counsel for Essar Steel Algoma, Inc. ("Algoma") to analyze Nevada Holdings, Inc. f/k/a Southern Coal Sales Corporation ("SCSC") and Bluestone Energy Sales Corporation ("BESC") in connection with the alleged breach of contract by SCSC related to production of coal that was purchased by Essar Steel Algoma, Inc. ("Algoma"). Such services are being performed in connection with the matter of <u>Essar Steel Algoma, Inc. v. Nevada Holdings, Inc., f/k/a Southern Coal Sales Corporation</u>, in the United States District Court for the Southern District of New York, Case No. 1:17-mc-00360-AT (the "Matter").

## NATURE OF ASSIGNMENT

According to the original Complaint, Algoma is an integrated primary steel producer with its principal place of business in Sault Ste. Marie, Ontario, Canada.[1]  Algoma buys coal from coal producers that is delivered by vessel between April and December each year via annual contracts.[2] The coal is used in coke ovens to make metallurgical coke, which is fed into a blast furnace with iron ore and small quantities of fluxes (minerals, such as limestone, which are used to collect impurities) to make steel.[3]

On or about November 1, 2015, Algoma entered into the Coal Supply Agreement with SCSC (the "Original Agreement") to buy coal from SCSC on a consignment basis.[4]  On or about April 25, 2016, Algoma and SCSC entered in the Amending Agreement, which modified certain provisions

---

[1] Complaint for Post-Petition Breach of Contract and Recovery of Property filed in the United States District Court, Southern District of New York, in connection with this matter.

[2] Complaint for Post-Petition Breach of Contract and Recovery of Property filed in the United States District Court, Southern District of New York, in connection with this matter.

[3] Complaint for Post-Petition Breach of Contract and Recovery of Property filed in the United States District Court, Southern District of New York, in connection with this matter.

[4] Complaint for Post-Petition Breach of Contract and Recovery of Property filed in the United States District Court, Southern District of New York, in connection with this matter.

of the Original Agreement (the "Amending Agreement").[5]  On or about October 4, 2016, Algoma and SCSC executed the Term Sheet, which was effective September 22, 2016 and modified certain provisions of the Original Agreement and the Amending Agreement and left other provisions intact.[6]  The Original Agreement, Amending Agreement and Term Sheet are collectively referred to as the "Agreements".

It is alleged that SCSC repeatedly breached the Agreements by failing to deliver the quantity of coal to Algoma as specified in the Agreements, by delivering coal that was not sampled and analyzed as required by the Agreements, and by delivering coal that did not meet the quality specifications set forth in the Agreements.[7]

SCSC is a wholly-owned subsidiary of Southern Coal Corporation which, during the years 2015 to 2017, also owned other entities including, but not limited to, Kentucky Coal Transport, LLC, Premium Coal Company Incorporated, Sequoia Energy, LLC, Black River Coal, LLC and Meg-Lynn Land Company, Inc.[8]  During the years 2015 to 2017, the owners of Southern Coal Corporation were James C. Justice, II ("Jim Justice"), James C. Justice, III ("Jay Justice") and Jillean Justice.[9]  Based upon the organizational chart provided for Southern Coal Corporation, the management of SCSC has represented that, during the years 2015 to 2017, there are numerous, other entities related to SCSC (see Exhibit I).

BESC, an S Corporation, was incorporated on November 4, 2015.  During the years 2015 to 2017, Jim Justice was the sole owner of BESC.[10]  I have been provided with an organizational chart for Bluestone Resources, Inc. ("BRI") and its other related entities (see Exhibit II).

It is alleged that certain entities including, but not limited to, Southern Coal Corporation, Bluestone Resources, Inc., BESC, Bluestone Industries, Inc., Bluestone Coal Corporation, Bluestone Mineral, Inc. f/k/a Mechel Bluestone, A&G Coal Corporation, Tams Management, Inc., Encore Leasing LLC, James C. Justice Companies, Inc., James C. Justice Companies, LLC, and Justice Family Farms (collectively, the "Justice Parties"), "operate SCSC as its instrumentalities and alter egos".[11]

---

[5] Complaint for Post-Petition Breach of Contract and Recovery of Property filed in the United States District Court, Southern District of New York, in connection with this matter.

[6] Complaint for Post-Petition Breach of Contract and Recovery of Property filed in the United States District Court, Southern District of New York, in connection with this matter.

[7] Complaint for Post-Petition Breach of Contract and Recovery of Property filed in the United States District Court, Southern District of New York, in connection with this matter.

[8] Federal income tax returns, Form 1120S, of Southern Coal Corporation for the years 2015 to 2017.

[9] Federal income tax returns, Form 1120S, of Southern Coal Corporation for the years 2015 to 2017.

[10] Federal income tax returns, Form 1120S, of Bluestone Energy Sales Corporation for the years 2015 to 2017.

[11] Second Amended Complaint for Breach of Contract filed in the United States District Court, Southern District of New York, in connection with this matter.

I expect to offer testimony at trial regarding the opinions expressed in this report. I may also be asked to testify at trial in rebuttal to testimony offered by or on behalf of SCSC, BESC, the Justice Parties or their expert(s). I[12] have not yet prepared exhibits for use at trial as a summary or in support for the opinions expressed in this report, but may do so in accordance with the pre-trial orders of the Court. Such exhibits might include, but may not be limited to, portions of the exhibits attached to this report.

The information in this report is based upon information supplied to me to date. Upon receipt of additional information, I may be asked to supplement this report and revise my opinions, as appropriate.

## DATA AND OTHER INFORMATION USED

The data and other information used in forming my opinions are listed on Exhibit A.

I did not audit, review, or compile the financial information utilized in this engagement. Had I performed an audit, review, or compilation of the underlying financial information, matters might have come to my attention that would alter the amounts used in the preparation of this report. Accordingly, I take no responsibility for the underlying data provided to me and presented in this report.

## OPINIONS[13]

In my opinion, based upon my analysis of the documents and information provided to me and available to me as of the date of this report, SCSC, BESC, the Justice Parties, and the other Justice related entities operated as if they were one economic unit, totally under the control, supervision and authority of their common management for the benefit of their common ownership, the Justice family.

In my opinion, management common among SCSC, BESC, the Justice Parties, and the other Justice related entities, operated as if they had complete authority and control (1) to authorize the transfer of significant economic and financial risks and rewards of the Agreements from SCSC to BESC, even though BESC was not party to any of the Agreements, and (2) to remove all of the funds out of SCSC and transfer them to or for the benefit of BESC, the Justice Parties or the other Justice Related Entities .

In my opinion, management common among of SCSC, BESC, the other Justice Parties, and the other Justice related entities operated as if they had complete authority and control (1) to authorize the recording of zero revenue from the Agreements with Algoma on the books and federal income tax returns of SCSC, and (2) to authorize the recording amount and timing of certain of the revenue from the Agreements with Algoma on the books and federal income tax returns of BESC.

---

[12] "I," "my" and such similar references include the work of employees of Applied Business Strategy LLC working under my direct supervision and control.

[13] The opinions expressed in this report are to a reasonable degree of certainty.

In my opinion, management common among of BESC, the Justice Parties, and other Justice related entities operated as if they had complete authority and control (1) to authorize the reporting of revenue from the Agreements with Algoma to partially pass through BESC and (2) to transfer certain revenue from the Agreements with Algoma to certain of the Justice Parties and other Justice related entities.

In my opinion, management common among of SCSC, BESC, the Justice Parties, and the other Justice related entities, would make a decision each day on transferring cash and recording it with intercompany transactions based upon whichever entity had the cash to be able to cover the amount that was due that day.

In my opinion, management common among of SCSC, BESC, the Justice Parties, and the other Justice related entities operated as if they had complete authority and control (1) to authorize the transfer of significant financial obligations between and among SCSC, BESC, and the other Justice related entities, and (2) to remove material intercompany receivable balances off the books and records of SCSC.

In my opinion, management common among of BESC and the other Justice related entities operated as if they had complete authority and control to authorize the recharacterization of transactions between and among BESC and the other Justice related entities.

In my opinion, management common among of SCSC, BESC, the Justice Parties, and the other Justice related entities had the complete authority and control to authorize and accept the providing of operating expenses and services by and among all of the entities.

In my opinion, SCSC has not provided documents and information sufficient to show the customers, invoices and dates for the SCSC accounts receivables written off as bad debt expense by SCSC as of December 31, 2016.

In my opinion, based upon my analysis of the documents and information provided to me and available to me as of the date of this report, SCSC's bad debt expense of $52,301,590 reported on its federal income tax return for the year ended December 31, 2016 and recorded in its detailed general ledger report is unsupported and inappropriate as I have not been provided with any information or documents typically maintained by companies, including but not limited to copies of invoices, detailed reports of historical sales by customers, copies of late notices for unpaid balances, or any correspondence from SCSC or its legal counsel regarding collections efforts for any outstanding accounts receivable balances.

In my opinion, either BESC's 2016 federal income tax return or BESC's 2017 federal income tax return is materially misstated.

In my opinion, based upon my analysis of the documents and information provided to me and available to me as of the date of this report, SCSC (1) reported net losses for each of the years ended December 31, 2015 through December 31, 2017, and (2) reported a retained deficit as of December 31, 2015 through December 31, 2017, and (3) received all the payments from Algoma and, either on the same day or shortly thereafter, SCSC withdrew the same amount or comparable

amounts and transferred all of such funds primarily to accounts of entities related to SCSC, including BESC, the Justice Parties, and the other Justice Related Entities.

## BASES AND REASONS FOR OPINIONS

### *SCSC and BESC Invoices and Revenue, Algoma Payments, and Related Transfer of Algoma Payments*

Algoma entered into the Agreements with SCSC to purchase coal on consignment. As identified on the signature pages of the Agreements, Jim Justice signed the Original Agreement as President on behalf of SCSC and Jay Justice signed both the Amending Agreement and Term Sheet as Executive Vice President on behalf of SCSC.

During the period November 2, 2015 through October 26, 2016, Algoma received invoices related to the Agreements from both SCSC and BESC (see Exhibit III). I have analyzed copies of at least 104 invoices sent by SCSC and BESC to Algoma during the period November 2, 2015 through November 2, 2016 and have determined that there were at least 31 invoices, totaling $4,072,745.00, were sent by SCSC to Algoma and at least 73 invoices, totaling $59,970,962.25, were sent by BESC to Algoma (see Exhibit III).

At the deposition of SCSC, its 30(b) corporate representative, Stephen Ball, vice president and general counsel for Southern Coal Corporation and all of its affiliates, testified as follows:[14]

> Q. Who prepared the invoices that were sent to Algoma?
>
> A. Typically, either Summer Harrison or Janet Ransom would do that.
>
> Q. Do you know whose decision it would have been to change the invoices from Southern Coal Corporation – Sales Corporation to Bluestone Energy Sales Corporation?
>
> A. I think Jay Justice would have instructed Summer to have that done.

The invoices sent by SCSC to Algoma contained payment instructions to wire funds to SCSC at an account at Wells Fargo, N.A. Certain of the invoices sent by BESC to Algoma contained payment instructions to wire funds to BESC at an account at "BBT" and certain invoices contained payment instructions to wire funds to SCSC at an account at JP Morgan Chase Bank (see Exhibit III).

Management of Algoma has provided a listing of payments made by Algoma to SCSC during the period November 5, 2015 through October 27, 2016 that reports Algoma made total payments of $62,997,193.92 for the Agreements (see Exhibit IV(a)). I have analyzed the monthly bank account statements of SCSC's account at Wells Fargo, N.A. (account #8228) for the period November 2015 to June 2016 and for SCSC's account at JP Morgan Chase Bank (account #0828) for the period June 2016 to May 2017 and determined the following:

---

[14] Stephen Ball deposition transcript, taken October 30, 2018, pages 170 – 171.

1. SCSC received $45,868,312.64 of payments from Algoma into its Wells Fargo, N.A. account (account #8228) and $17,127,661.28 of payments from Algoma into its JP Morgan Chase Banks account (account #0828), or a total of $62,995,973.92 of payments from Algoma for the Agreements (see Exhibit IV(b) and Exhibit V(a)).

2. During the period November 2015 through October 2016, after each payment from Algoma was received and deposited into these SCSC accounts, either on the same day or shortly thereafter, SCSC withdrew the same amount or comparable amounts and transferred all of such funds primarily to accounts of entities related to SCSC, including BESC, the Justice Parties, and the other Justice Related Entities (see Exhibit V(a), Exhibit V(b) and Exhibit V(c)).

At the deposition of SCSC, Stephen Ball testified as follows:[15]

Q. The wire instructions actually sought payment to a Bluestone Energy account, correct?

A. On some of them, and on some of them it's Southern Coal Sales.

Q. Okay. In any case, the payments were always made to a Southern Coal Sales Corporation account number, right?

A. Yes.

Q. Did Bluestone Energy Sales Corporation assume the contract within – within the company? Did it take over the contract?

A. That was our intention, but I don't think that ever happened.

I think it was a little different than the utility contracts where they were willing to start paying into the Bluestone Energy Sales bank account. In this instance, Algoma only paid the Southern Coal Sales bank account. So I don't think there was no – I don't think we ever completed an internal assignment of the contract.

Q. Okay. But after the money would be received from Algoma, it would, nevertheless, be transferred out almost immediately to Bluestone Energy Sales Corporation and other Justice-related entities, correct?

A. Yeah. As we discussed earlier, to pay back loans that had been previously made.

Q. And it was accomplished in such a way as to leave the account balance at zero or next to zero every month?

A. As money came in, it – it – almost all it have always went back out.

---

[15] Stephen Ball deposition transcript, taken October 30, 2018, pages 169 - 170.

At her deposition, Summer Harrison, vice president of Treasury for Bluestone Resources, Inc. and all of its affiliates, testified as follows (emphasis added):[16]

Q. **Did any payment from Algoma to Southern get deposited or transferred into accounts that were not Southern Coal accounts?**

A. **Yes.**

Q. Did Southern Coal pay any money to railroads, for example, or any third parties, related to the agreement with Algoma from accounts other than Southern Coal accounts?

A. Yes.

Q. In 2016, your title was Vice-President of Treasury for Bluestone Industries, Inc., is that correct?

A. For all companies.

Q. **About how many companies are there?**

A. **Fifty to 60 companies, I believe, that is under the Justice umbrella.** I'm sorry. I should say nothing to do with the hospitality. So The Greenbriar and Glade Springs, I was not involved in that at all. **So just the Justice family group, I guess, or coal, farms, that kind of thing; not hospitality at all**.

Q. In 2016, what were your job responsibilities?

A. Mostly tracking – I mean just managing cash, working with the banks to get financing. Depending upon the time, I would actually do some Accounts Receivable if Janet Ransom wasn't available; but I pretty much – she may do the nuts and bolts, but I was reviewing almost I mean everything to make sure it is right because at the end of the day, it is on me if she makes a mistake. So I say she does it; but she is making an invoice and I'm making sure it is right, so – but mostly Account – most of the Accounts Receivable, cash – anything to do with cash, if there is a deposit made, I would make sure that it was made to the correct account or, you know, money was directed to where it was supposed to be directed.

Q. So you were in charge of both the money that came in the door and the money going out the door?

A. Correct. There – sorry.
Q. Go ahead.

A. That is not to say that I have – I make decisions on where the money was going, because that – I don't have that – a typical company, VP of Treasury, CFO type person would probably be able to determine who you are paying and when. I don't do that. I report to

[16] Summer Harrison deposition transcript, taken March 14, 2018, pages 20 -23.

Jay. I tell him where we are cash wise, what position we're in, and he tells me to do this, do that, and then I make those – I tell everyone else to do what they are supposed to do and then I just track it to make sure nothing is – that it is ticking in time and nothing is happening that is not supposed to.

Q. So you don't make the decisions on who gets paid.

A. No.

Q. – or when?

A. No, I do not.

Q. Jay makes those decisions?

A. That is correct.

---

***CONCLUSION***

**Management common among SCSC, BESC, the Justice Parties, and the other Justice related entities, operated as if they had complete authority and control (1) to authorize the transfer of significant economic and financial risks and rewards of the Agreements from SCSC to BESC, even though BESC was not party to any of the Agreements, and (2) to remove all of the funds out of SCSC and transfer them to or for the benefit of BESC, the Justice Parties or the other Justice Related Entities .**

**This confirms the assertion that SCSC, BESC, the Justice Parties, and other Justice related entities operated as if they were one economic unit, totally under the control, supervision and authority of their common management for the benefit of their common ownership, the Justice family.**

---

I have analyzed the 2015 through 2017 federal income tax returns of Southern Coal Corporation which report the revenue and expenses for the years ended December 31, 2015 through December 31, 2017 (see Exhibit VIII(a) through Exhibit VIII(c)) and assets and liabilities as of December 31, 2015, 2016 and 2017 (see Exhibit IX(a) through Exhibit IX(c)). Such tax returns include Southern Coal Corporation and its wholly-owned subsidiaries, including SCSC. In addition, I have analyzed the detailed general ledger report of SCSC for the period January 1, 2015 through December 31, 2017.

Based upon my analysis, I have determined that for the period November 2015 through December 2017, SCSC reported zero revenue from the Agreements with Algoma on its detailed general ledger and on its federal income tax returns even though SCSC issued invoices to Algoma for transactions in connection with the Agreements and even though SCSC received all of the payments from Algoma in connection with the Agreements (see Exhibit VI).

I have analyzed the detailed general ledger report of BESC for the period ended December 31, 2015 and for the years ended December 31, 2016 and December 31, 2017. Based upon my analysis, I have determined the following:

1. BESC was inconsistent with its internal accounting and did not always include a customer name in the comments field when recording revenue transactions, especially for the period November 2015 and December 2015.[17]

2. BESC almost never included a customer name in the comments when recording accounts receivable transactions.[18]

3. The BESC general ledger report for the period ended December 31, 2015 and for the years ended December 31, 2016 and December 31, 2017 identifies certain of the revenue transactions, totaling $28,947,080.15, as "Essar Steel Algoma" as follows:

| Account | Reference | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|
| Foreign Sales | (see Exhibit X(a)) | $ 0.00 | $ 17,244,991.56 | $ 10,860,890.08 | $ 28,105,881.64 |
| General Revenue | (see Exhibit X(b)) | 0.00 | 420,440.03 | (5,289,571.60) | (4,869,131.57) |
| Shipping & Freight | (see Exhibit X(c)) | 0.00 | 5,710,330.11 | 0.00 | 5,710,330.11 |
| | | | | | |
| | | $ 0.00 | $ 23,375,761.70 | $ 5,571,318.48 | $ 28,947,080.18 |

4. As described previously, Algoma had no transactions with either SCSC or BESC after October 27, 2016 even though the BESC detailed general ledger report reflects $5,571,318, net, of revenue from transactions with Algoma during 2017.

At the deposition of SCSC, Stephen Ball testified that he didn't know why BESC recorded revenue from Algoma in 2017 other than it could be a mistake or correcting a prior mistake but was not aware of any documents to help determine why it was recorded in 2017.[19]

---

**_CONCLUSION_**

**Management common among of SCSC, BESC, the other Justice Parties, and the other Justice related entities operated as if they had complete authority and control (1) to authorize the recording of zero revenue from the Agreements with Algoma on the books and federal income tax returns of SCSC, and (2) to authorize the recording amount and timing of certain of the revenue from the Agreements with Algoma on the books and federal income tax returns of BESC.**

**This confirms the assertion that SCSC, BESC, the Justice Parties, and other Justice related entities operated as if they were one economic unit, totally under the control, supervision and authority of their common management for the benefit of their common ownership, the Justice family.**

---

[17] See SC-ESAL 024927 - 025038.
[18] See SC-ESAL 024545 - 024584.
[19] Stephen Ball deposition transcript, taken February 12, 2019, pages 56 - 59.

***Transfer of Sales Revenues from BESC to Justice Parties and Other Justice Related Entities***

The BESC general ledger reports numerous debits (reductions to revenue) with comments such as "Record Sales to KFC", Record Sales to DEI", and "Record Sales to TAMS" as well as other related entities of BESC. Many of these debit entries are for amounts exactly equal to revenue transactions BESC recorded as "Essar Steel Algoma".

At the deposition of SCSC, Stephen Ball testified as follows (emphasis added):[20]

> Q. There's a journal entry here that says, "Record sales to KFC." Do you see that?

> A. Yes.

> Q. In A-1? What does that mean?

> A. That is an intercompany allocation between the sales company and the operating company, so we can generate a mine-level profit and loss statement. So the revenue that comes into the sales company for operating statement purposes gets allocated to the operation that produced or provided the coal. That way we can general a profit and loss statement to see how that particular mine is doing.

> Q. Okay. Well, in here, it's not just profit and loss statement. I mean, **it's actually being transferred over. It's being debited out of the Bluestone Energy Sales Corporation account and recorded over to KFC, right**.

> A. **Yeah, correct**.

At the deposition of SCSC, Stephen Ball testified as follows (emphasis added):[21]

> Q. So we're looking at the Bluestone Energy Sales Corporation general ledger, and it's showing these entries of recording sales to other Justice entities, and I'm wondering whether those entities then reported that income for tax purposes?

> A. Yes. Yeah, for royalty purposes, tax purposes. They would they recognized the revenue.

---

[20] Stephen Ball deposition transcript, taken February 12, 2019, page 63.
[21] Stephen Ball deposition transcript, taken February 12, 2019, page 65.

I have determined that, consistent with Mr. Ball's description, the effect of these transactions is to transfer the customer sales revenues from BESC to the Justice Parties and other Justice related entities. For the period ended December 31, 2015 and for the year ended December 31, 2016, the total transfer of revenues is $25,211,654.42[22] as follows:

|  | Foreign Sales (Exhibit X(a)) | General Revenue (Exhibit X(b)) | Shipping & Freight (Exhibit X(c)) | Total |
|---|---|---|---|---|
| To KFC | $ 1,347,289.90 | $ 115,537.07 | $ 295,651.85 | $ 1,758,478.82 |
| To TAMS | 4,652,633.91 | 614,439.48 | 1,046,824.71 | 6,313,898.10 |
| To DEI | 7,615,017.49 | 224,766.18 | 2,613,983.50 | 10,453,767.17 |
| To JEC | 0.00 | 6,567.67 | 0.00 | 6,567.67 |
| To A&G | 2,429,168.76 | 81,713.74 | 634,805.37 | 3,145,687.87 |
| To VFC | 1,991,161.02 | 51,816.21 | 689,294.08 | 2,732,271.31 |
| To NMM | 615,356.23 | 1,412.12 | 179,916.19 | 796,684.54 |
| To JSLM | 0.00 | 4,298.94 | 0.00 | 4,298.94 |
|  |  |  |  |  |
|  | $ 18,650,627.31 | $ 1,110,551.41 | $ 5,460,475.70 | $ 25,211,654.42 |

---

### CONCLUSION

**Management common among of BESC, the Justice Parties, and other Justice related entities operated as if they had complete authority and control (1) to authorize the reporting of revenue from the Agreements with Algoma to partially pass through BESC and (2) to transfer certain revenue from the Agreements with Algoma to certain of the Justice Parties and other Justice related entities.**

**This confirms the assertion that BESC, the Justice Parties, and the other Justice related entities operated as if they were one economic unit, totally under the control, supervision, and authority of their common management for the benefit of their common ownership, the Justice family.**

---

### BESC Transfer of Funds to Alleghany Motors (a Justice related entity)

The detailed general ledger report of BESC reports various transactions in an intercompany receivable account, over the period June 28, 2016 through September 6, 2017, involving a related entity, Allegheny Motors, LLC.[23]

1. On June 28, 2016, BESC advanced cash of $20,000.00 to Allegheny Motors, LLC.

2. On July 1, 2016, BESC advanced an additional $15,000.00 to Allegheny Motors, LLC.

---

[22] No transfer transactions were identified for the year ended December 31, 2017.
[23] See SC-ESAL 024608 – 024609.

3. On December 31, 2016, BESC zeroed out (via credit) the outstanding intercompany receivable balance of $35,000 due from Allegheny Motors, LLC with a journal entry stating "True up I/C Account." The offsetting entry (via debit) was to increase the Purchase Coal expense account for $35,000.

4. For the period June 12, 2017 through September 6, 2017, BESC made additional advances totaling $687,551 to Allegheny Motors, LLC.

5. As of December 31, 2017, the detailed general ledger report of BESC reported an outstanding intercompany receivable balance due from Allegheny Motors, LLC of $687,551.

At the deposition of SCSC, Stephen Ball testified as follows (emphasis added):[24]

Q. Going through the intercompany related party accounts in the general ledger, I came across a few familiar names and a few names I hadn't run into before. The first one is Alleghany Motors, LLC. Are you familiar with that entity?

A. Yes.

Q. What is that entity?

A. It's a car dealership owned by Jay Justice. He no longer owns it, but he owned it from 2012 through 2018. Middle of 2018.

Q. Is there any other – is there a relationship between Allegheny Motors and Bluestone Energy Sales Corporation?

A. Just the commonality of Mr. Justice.

Q. Okay. He owns both entities?

A. Has an ownership interest.

Q. Why would Bluestone Energy Sales Corporation transfer money to Jay Justice's car dealership?

A. Allegheny Motors was a Chevrolet GMC dealership, and it also was a Jeep Dodge Ram dealership, and it would provide predominantly Silverado pickup trucks to the mining companies for superintendents. And it also provides Jeeps for some executive-level people, and those transactions would be handled via intercompany.

Q. So Bluestone Energy Sales Corporation didn't have any employees, right?

A. Correct.

[24] Stephen Ball deposition transcript, taken February 12, 2019, pages 94 - 97.

12

Q. So who were the folks who were driving these cars that were leased or purchased from the car dealership, Allegheny Motors?

A. The operating companies that we discussed earlier. I think this falls into one of those categories that I mentioned to you on the general ledger. You would see sometimes when cash would come in. **It would go directly to either an affiliate or third party versus – versus going through, like, Southern Coal Sales to Bluestone Energy Sales and then to a third party.**

**But it would – it would be for superintendents at various operating companies and then executives at either Justice Management Services during 2015 or Bluestone Industries during 2016 and 2017.**

**Q. Okay. So how do you decide that Bluestone Energy Sales Corporation is going to cover these costs?**

**A. That's a function of cash management between Summer Harrison and Jay Justice. And – and they would make a decision each day on – on transferring cash and recording it with intercompany transactions.**

**Q. Okay. So which – whichever entity had the cash to be able to cover the amount that was due that day?**

**A. I think it's that simple sometimes, yes.**

No additional information or explanation, other than the testimony of Stephen Ball, has been provided as to the business purpose of these cash advances made by BESC to Allegheny Motors, LLC, which is in the business of an automobile dealership, or why BESC zeroed out the intercompany receivable balance due to BESC and recorded an expense for Purchase Coal.

### *BESC Transfer of Funds to Encore Leasing (a Justice related entity)*

During the period June 28, 2016 through October 31, 2017, the detailed general ledger report of BESC reports various transactions with Encore Leasing, LLC.[25] As a result of my analysis, I noted the following:

1. On June 27, 2017, BESC advanced cash of $98,810.94 to Encore Leasing.

2. On July 21, 2017, BESC made a cash payment of $501,310.00 to Insured Aircraft Title Services. According to their website, Insured Aircraft Title Service is "The world's leading aircraft title and escrow company – facilitating the buying and selling of aircraft around the globe."[26]

---

[25] See SC-ESAL 024727 – 024728.

[26] https://insuredaircraft.com

3. During the period July 28, 2017 through September 8, 2017, BESC made five (5) payments to Synovus Bank totaling $194,990.79.

4. As of December 31, 2017, the detailed general ledger report of BESC reported an outstanding intercompany receivable balance due from Encore Leasing of $810,006.50.

At the deposition of SCSC, Stephen Ball testified as follows:[27]

> Q. Another entity I saw referenced a lot in the Bluestone Energy Sales Corporation general ledger was Encore Leasing. Are you familiar with Encore Leasing?
>
> A. Yes.
>
> Q. Who are the owners of Encore Leasing?
>
> A. I'd like to – if I need to clean this one up after the fact, I'd like the opportunity to do that.
>
> Q. Well, just tell me what you know. I'm not trying to play gotcha.
>
> A. Yeah, no. I think it is the same three Justice family members, but for some reason I think it also has the potential of being one only owned by Jay Justice,
>
> Q. Do you know who manages Encore Leasing?
>
> A. Jay Justice.
>
> Q. And that was true in 2015, '16, '17, and today?
>
> A. Correct.
> Q. And I looked them up and on the Internet, and it says that they are an airplane leasing company; is that correct?
>
> A. Don't call us that for IRS purposes. They do own aircraft. We're very careful not to be a leasing company, because that would bring charter rules into play and very enhanced types of inspections and things like that. But the entity does own the aircraft that are utilized by the Justice organization.
>
> Q. And Jay manages and decides who gets to use the aircraft?
>
> A. Yes.

---

[27] Stephen Ball deposition transcript, taken February 12, 2019, pages 102 - 104.

At the deposition of SCSC, Stephen Ball testified as follows:[28]

Q. So Encore owns aircraft that are used by folks employed by the Justice organization?

A. Correct.

Q. It does not lease aircraft to anybody?

A. No.

Q. Does it make money, does it sell its goods or services to anyone other than the members of the Justice organization?

A. No.

Q. So that raised questions about why Bluestone Energy Sales Corporation is transferring money to Encore. What can you tell me?

A. It would be very similar to the Allegheny Motors situation we described. Just a different subject matter. Instead of cars, you're dealing with aircraft.

But to the extent Encore Leasing needed cash for operation purposes, there would be situations that Bluestone Energy Sales would – would provide the cash for those payments. It would be recorded on an intercompany basis.

Encore – Encore also would receive payments from, you know, other operating entities, as well, because it has no – has no other way of generating income, so it would be strictly from the related parties.

Q. Okay. The – I see some payments – some debits out of Bluestone Energy Sales Corporation's account from 2017 to – or in favor of Synovus Bank. Are you familiar with those?

A. Yes.

Q. Do you know what that's about?

A. Synovus finances one the airplanes.

Q. How many airplanes are there?

A. There are two. There's a King Air and a Cessna Citation.

---

[28] Stephen Ball deposition transcript, taken February 12, 2019, pages 104 - 106.

Q. So if you see a payment by Bluestone Energy Sales Corporation directly to Synovus Bank, you're thinking that's a finance payment on behalf of Encore Leasing?

A. Correct.

Based upon the deposition testimony of Stephen Ball, the payments to and on behalf of Encore Leasing would be for the initial purchase, and loan payments related to, the aircraft owned by Encore Leasing, LLC but used by the employees and management of the Justice Parties and other related individuals of the Justice family.

No additional information or explanation has been provided as to the business purpose of these cash advances made by BESC to or on behalf of Encore Leasing, LLC.


### ***SCSC Transfer of Funds to Encore Leasing (a Justice related entity)***

During the period November 2015 to December 2017, the detailed general ledger report of SCSC reports various transactions with Encore Leasing, LLC. Based upon my analysis of the monthly bank statements for the SCSC checking account #8228 at Wells Fargo, N.A during the period January 25, 2016 through June 13, 2016, SCSC made twelve (12) wire transfers totaling $13,309,368.90 out of its Wells Fargo, N.A. checking account (account #8228) to an account #3272 (see Exhibit XVII(a)). At his deposition, Stephen Ball testified that account #3272 is a bank account of Encore Leasing.[29] These twelve (12) payments that were wired to an account of Encore Leasing, LLC, however, were not recorded in the intercompany account of Encore Leasing in the general ledger of SCSC. Instead, all twelve (12) payment were recorded in the intercompany receivable account of Bluestone Resources, Inc. (see Exhibit XVII(a)).

Based upon my analysis, I have determined that certain payments from Algoma under the Agreements were deposited in the same SCSC Wells Fargo, N.A. checking account #8228 on the same day or previous days as eight (8) of these wire transfers to the Encore Leasing account #3272 (see Exhibit XVII(a) and Exhibit XVII(b)). The total of the eight (8) transactions was $11,951,269.87 (see Exhibit XVII(b)).

Based upon the deposition testimony of Stephen Ball, payments to and on behalf of Encore Leasing would be related to the aircraft owned by Encore Leasing, LLC but used by the employees and management of the Justice Parties and other related individuals of the Justice family.

No additional information or explanation has been provided as to the business purpose of these cash advances made by SCSC to or on behalf of Encore Leasing, LLC.

---

[29] Stephen Ball deposition transcript, taken October 30, 2018, page 129.

**_BESC Payments Made to or on Behalf of Jay Justice_**

During the period July 12, 2016 through October 31, 2017, the detailed general ledger report of BESC reports various transactions in the account "Loan Payable to JCJ, III" which is for Jay Justice (see Exhibit XVIII). During the period July 12, 2016 through December 31, 2016, BESC makes twenty (20) cash advances, totaling $632,450.91, to on behalf of Jay Justice as follows:

1. On August 26, 2016, a payment to James C. Justice, III for $75,000.00.

2. On December 12, 2016, a payment to James C. Justice, III for $12,000.00.

3. Three (3) payments to Rhonda Burton, totaling $34,500.00, consisting of payments of $5,000.00 on July 28, 2016, $15,000.00 on July 28, 2016 and $14,500.00 on September 23, 2016.

At the deposition of SCSC, Stephen Ball testified that Rhonda Burton is an employee of the Justice Companies and that the Justice Companies will make a check out to her and she would then go to the bank to get a cashier's check.[30]

4. One (1) payment to Mervin Broce of $10,000.00 on August 26, 2016.

At the deposition of SCSC, Stephen Ball testified that Mervin "Whit" Broce is an employee of the Justice Companies and that, similar to Rhonda Burton, the Justice Companies will make a check out to him and he would then go to the bank to get a cashier's check.[31]

5. Four (4) payments to Carter Bank & Trust, totaling $133,368.04, consisting of equal payments of $33,342.01 on August 10, 2016, October 1, 2016, November 23, 2016 and December 27, 2016. Comments in the BESC detailed general ledger indicate these are for loan payments at Carter Bank & Trust.

6. One (1) payment to Gillespie's Flower and Products of $25,000.00 on August 22, 2016. Jay Justice was married on August 27, 2016 and used Gillespie's Flowers & Productions for floral and event design and favors.[32]

At the deposition of SCSC, Stephen Ball testified that he did not specifically know what the payment of $25,000 on August 22, 2016 to Gillespie's Flowers was for.[33]

7. Two (2) payments to The Prop Shop, totaling $5,584.60, consisting of $4,184.60 on August 22, 2016 and $1,400.00 on August 25, 2016.

At the deposition of SCSC, Stephen Ball testified that he did not know who The Prop Shop was.[34]

---

[30] Stephen Ball deposition transcript, taken February 12, 2019, pages 134 - 135.
[31] Stephen Ball deposition transcript, taken February 12, 2019, pages 139 - 140.
[32] Information per https://www.insideweddings.com.
[33] Stephen Ball deposition transcript, taken February 12, 2019, pages 137 - 138.
[34] Stephen Ball deposition transcript, taken February 12, 2019, page 138.

8. One (1) payment to Commonwealth Event Company of $10,194.08 on August 23, 2016.

9. One (1) payment to Apple Seven Hospitality of $91,421.34 on August 25, 2016.

10. One payment to Merrill Lynch of $100,000.00 on September 26, 2016.

11. Four (4) payments to James C. Justice Companies, Inc., totaling $135,382.85, consisting of payments of $35,000.00 on July 12, 2016, $15,000.00 on July 29, 2016, $35,382.85 on August 18, 2016 and $50,000.00 on August 18, 2016.

No additional information or explanation has been provided as to the purpose of these cash advances and payments made by BESC to or on behalf of Jay Justice during 2016.

The detailed general ledger report of BESC reports two (2) repayments, totaling $314,000.00, during the period July 12, 2016 through December 31, 2016 such that the outstanding receivable balance due from Jay Justice as of December 31, 2016 was $318,450.91 (see Exhibit XVIII). The detailed general ledger of BESC contained a comment of "James C. Justice, I" for these two (2) repayments and no additional information or explanation has been provided as to the source of these repayments.

After December 31, 2016, the detailed general ledger report of BESC reports that BESC continue to advance amounts to or on behalf of Jay Justice including the following:

1. One (1) payment to James C. Justice, III of $2,059,000.00 on January 31, 2017.

2. Seven (7) payments to Carter Bank & Trust, totaling $233,394.07, consisting of equal payment of $33,342.01 on January 30, 2017, February 15, 2017, March 20, 2017, April 28, 2017, May 24, 2017, June 22, 2017 and August 24, 2017. Comments in the BESC detailed general ledger indicate these are for loan payments at Carter Bank & Trust.

3. One (1) payment to Carter Bank & Trust of $357,056.03 on August 1, 2017. The comment in the BESC detailed general ledger indicates "Carter Bank & Trust : Jay FLP Interest".

No additional information or explanation has been provided as to the purpose of these cash advances and payments made by BESC to or on behalf of Jay Justice during 2016.

***SCSC Payments Made to or on Behalf of James C. Justice Companies, Inc. (one of the Justice Parties)***

During the period January 2, 2015 through December 30, 2016, the detailed general ledger report of BESC reports various transactions in the account "James C. Justice Companies, Inc."[35] As a result of my analysis, I noted that as of November 5, 2015, date of first payment by Algoma under of the Agreements (see Exhibit IV(a)), the outstanding receivable balance due from James C. Justice Companies, Inc. was $23,667,135.24 and as of December 31, 2016, outstanding balance was $25,261,208.96; therefore, during the period November 5, 2016 through December 31, 2016, SCSC made payments to or on behalf of James C. Justice Companies, Inc. of $1,564,073.72 ($25,261,208.96 minus $23,667,135.24).

No additional information or explanation has been provided as to the business purpose of these payments by BESC to or on behalf of James C. Justice Companies, Inc.

During the period November 5, 2016 to December 31, 2016, the detailed general ledger report of SCSC reported at least payments six (6) payments totaling $80,000 for credit cards consisting of the following: [36]

- A payment of $12,000.00 on November 23, 2015 for "11/202015 payment fort JCJ card".

- A payment of $20,000.00 on February 24, 2016 for "Epay JCJC Visa".

- A payment of $10,000.00 on March 10, 2016 for "Epay JCJC Visa".

- A payment of $15,000.00 on June 6, 2016 for "CC pmt JCJ".

- A payment of $13,000.00 on June 13, 2016 for "JCJC card pmt".

- A payment of $10,000.00 on June 16, 2016 for "credit card pmt for JCJ".

No additional information or explanation has been provided as to the business purpose of these credit card payments by SCSC to or on behalf of James C. Justice Companies, Inc.

---

[35] See SC-ESAL 023547 – 023573.
[36] See SC-ESAL 023571 – 023572.

## _BESC Payments Made on Behalf of Bluestone Resources, Inc. (one of the Justice Parties)_

During the period November 13, 2015 through December 31, 2017, the detailed general ledger report of BESC reports various transaction in the receivable account "I/C – Bluestone Resources, Inc." As a result of my analysis, I noted that on November 30, 2015, BESC recorded draws from its line of credit with Carter Bank & Trust totaling $13,349,000.00 (see Exhibit XIX(a)) as a result of twelve (12) payments totaling $13,349,000.00 made on behalf of Bluestone Resources, Inc. (see Exhibit XIX(b) and Exhibit XIX(c)). All twelve (12) entries contained the comment "Record CB&T LOC Advance to BRI Payroll" (see Exhibit XIX(b)).

At the deposition of SCSC, Stephen Ball testified as follows (emphasis added):[37]

Q. I've got a transaction highlighted, November 30, 2015. Do you see that?

A. Yes.

Q. Okay. What is that?

A. Carter Bank & Trust, Bluestone Energy Sales Corporation line of credit.

Q. Okay. So this is the line of credit that we've been discussing that was set up through Bluestone Energy Sales Corporation so that it could go forward with the Algoma transaction?

A. Correct.

Q. On November 30, 2015, there's an indication that there was a LOC, line of credit, advance to BRI payroll. Do you see that?

A. Yes.

**Q. Why – why is Bluestone Energy Sales Corporation making advances from its line of credit to BRI payroll?**

A. And, again, I think this is consistent with what we've been saying. **I mean, as money would come in to Bluestone Energy Sales, it would then be advanced to the operating companies on an intercompany basis, and also on as as-needed basis by the operating companies, to fund their operations.**

And in this particular instance, more than likely – and I don't recall that date specifically offhand, but either that day or the next day would have been a payroll day, and that where the money was advanced to.

Q. Okay.

---

[37] Stephen Ball deposition transcript, taken February 12, 2019, pages 117 - 119.

**A. That's too much money for a single payroll, so it would have then been moved somewhere else.**

No additional information or explanation has been provided as to the business purpose of these payments by BESC to or on behalf of James C. Justice Companies, Inc.

After November 30, 2015, BESC continued to advance funds to or on behalf of BRI as the outstanding balance in the receivable account due from BRI increased to $30,856,139.79[38] as of December 31, 2015 and further increased to $109,371,470.83[39] as of November 30, 2016.

On November 30, 2016, management common among BESC and all of the Justice related entities caused to be recorded in the detailed general ledger of BESC a journal entry whereby BESC reduces (via credit) the balance of the intercompany receivable account due from BRI by $98,022,256.14 with a journal entry stating "Roll I/C's Up to Parent Company". This journal entry also reduces (via debit) certain balances of eight (8) intercompany receivable balances for A&G, Justice Low Seam, Kentucky Fuel, Premium, TAMS, Virginia Fuel, Dynamic Energy, and Justice Energy (see Exhibit XX).

On November 30, 2016, management common among BESC and all of the Justice related entities caused to be recorded in the detailed general ledger of BESC a journal entry whereby BESC reverses a portion of this journal entry and increases (via debit) the balance of the intercompany receivable account due from BIR by $22,658,504.66 and increases (via credit) certain balance of two (2) intercompany receivable balances for A&G and Dynamic Energy (see Exhibit XX). The net effect of these two (2) journal entries on November 30, 2016 is a reduction of the intercompany receivable balance due from BRI of $75,363,751.48, such that the outstanding balance still due to BESC from BRI is $34,007,719.35.

After November 30, 2016, BESC continues to advance funds to or on behalf of BRI. The outstanding balance in the intercompany receivable account due from BRI as of December 31, 2016 is $51,217,613.29[40]. Therefore, during the month of December 2016, BESC advanced an additional $17,209,893.94 ($51,217,613.29 minus $34,007,719.35).

No additional information or explanation has been provided as to the business purpose of these payments by BESC to or on behalf of James C. Justice Companies, Inc.

---

[38] See SC-ESAL 024731.
[39] See SC-ESAL 024756.
[40] See SC-ESAL 024759.

*CONCLUSION*

**Management common among of SCSC, BESC, the Justice Parties, and the other Justice related entities, would make a decision each day on transferring cash and recording it with intercompany transactions based upon whichever entity had the cash to be able to cover the amount that was due that day.**

**This confirms the assertion that SCSC, BESC, the Justice Parties, and the other Justice related entities operated as if they were one economic unit, totally under the control, supervision and authority of their common management for the benefit of their common ownership, the Justice family.**

## *Transfer of Intercompany Balances among SCSC, BESC, and Other Justice Related Entities*

During the period November 2015 through December 2017, the detailed general ledger reports of SCSC (see Exhibit VII(a)) and BESC (see Exhibit XII(b)) report various transactions and outstanding balances in numerous intercompany receivable and intercompany payable accounts.

As of December 31, 2016, the detailed general ledger of SCSC reports an outstanding intercompany receivable balance due from James C. Justice Companies, Inc. of $25,261,208.96. On December 31, 2016, management common among SCSC, BESC and the other Justice related entities caused to be recorded a journal entry, identified as "Roll Up I/C's To The Parent Company – SCC" in the general ledger of SCSC, to zero out SCSC's outstanding intercompany receivable balance of $25,261,208.96 due from James C. Justice Companies, Inc. and transfer such balance to Southern Coal Corporation, the parent company of SCSC (see Exhibit XXII). Included in this journal entry are the intercompany receivable and payable balances for thirty (30) other Justice related entities (see Exhibit XXII).

No additional information or explanation has been provided as to the business purpose for the transfer of these balances by and among SCSC, BESC, and the other Justice related entities.

*CONCLUSION*

**Management common among of SCSC, BESC, the Justice Parties, and the other Justice related entities operated as if they had complete authority and control (1) to authorize the transfer of significant financial obligations between and among SCSC, BESC, and the other Justice related entities, and (2) to remove material intercompany receivable balances off the books and records of SCSC.**

**This confirms the assertion that SCSC, BESC, the Justice Parties and the other Justice related entities operated as if they were one economic unit, totally under the control, supervision and authority of their common management for the benefit of their common ownership, the Justice family.**

### *Recharacterization of Transactions between BESC and Other Justice Related Entities*

On December 31, 2016, management common among BESC and the other Justice related entities caused to be recorded in the detailed general ledger of BESC a journal entry to the zero out ten (10) intercompany payable accounts totaling $10,809,198.92, allegedly as a result of an adjustment to decrease BESC's cost of "Purchased Coal" (see Exhibit XXI). Included in this journal entry are adjustments to BESC's intercompany accounts with Greenbriar Golf & Tennis, Inc., Justice Farms of NC, Kirby Land, and Blue Ridge Farm Center (see Exhibit XXI).

There has been no explanation provided and there does not appear to be any reasonable explanation for management common among BESC and all of the Justice Parties recharacterizing transactions between BESC and such other Justice Parties in the hospitality and land/agriculture businesses as affecting BESC's cost of purchased coal.

---

### *CONCLUSION*

**Management common among of BESC and the other Justice related entities operated as if they had complete authority and control to authorize the recharacterization of transactions between and among BESC and the other Justice related entities.**

**This confirms the assertion that BESC and the other Justice related entities operated as if they were one economic unit, totally under the control, supervision and authority of their common management for the benefit of their common ownership, the Justice family.**

---

### *Operating Expenses of SCSC and BESC*

I have analyzed the federal income tax returns of Southern Coal Corporation for the years ended December 31, 2015 through December 31, 2017, which includes the revenue and expenses of SCSC (see Exhibit VI and Exhibit VII), and the federal income tax returns of BESC for the period ended December 31, 2015 and the years ended December 31, 2016 and December 31, 2017 (see Exhibit XI and Exhibit XII).

Based upon my analysis, for the time period November 2015 through October 2016, which correlates to the time period that Algoma received invoices from SCSC and BESC under the Agreements, I noted that neither SCSC nor BESC reported certain operating expenses, including but not limited to wages and payroll expense, payroll taxes, employee benefits, health insurance, liability insurance, rent expense, utilities, telephone, advertising, travel, and meals and entertainment.

At the deposition of SCSC, Stephen Ball testified as follows (emphasis added):[41]

Q.  Okay.  And I also, going through the general ledgers provided, saw no entries for rent, utilities, telephone, repairs and maintenance of the building, advertising, travels, meals and entertainment, insurance, other insurance.  Did I miss it, or do those companies not pay those expenses?

A.  These entities would not have any expenses like that.

Q. Okay.

A. **The coal sales companies typically do not own any assets, do not have employees.  Probably would be named insured on a general liability policy, as part of the affiliated group**, but you – I'm not surprised that you did not see any of those expenses.

Q. Okay.  Who pays for those types of expenses on behalf of Bluestone Energy Sales Corporation?

A. Bluestone Energy Sales Corporation doesn't actually incur those expenses.  It doesn't own a building, doesn't have any copiers or printers or anything like that.  To the extent anything is – is done on behalf of Bluestone Energy Sales, it would be through the employees that we discussed earlier.  So I – in 2015, **those expenses would have been borne by Justice Management Services.  In '16 and '17, and today, it's Bluestone Industries, Inc.**

At the deposition of SCSC, Stephen Ball, when questioned about the health insurance of the employees of the various Justice-related entities, testified as follows (emphasis added):[42]

Q. Did you provide health insurance to your employees?

A. **Generally speaking, we have a single health insurance plan for the non-hospitality businesses of the Justice organization.  As you can imagine, there is cost benefits to having a larger group for health insurance purposes.**

I think, during 2015, the – the primary insured under that plan was Southern Coal Corporation, with all of the operating entities as named insured.  So anyone that worked for one of the – like A&G Coal or Tams Management or Dynamic Energy, they would be eligible for health benefits under the plan.

Beginning in 2016 and 2017, that plan is implements through Bluestone Industries, Inc., and Bluestone Resources, Inc.  But the same thing, all of the operating companies are named – named entities, so anyone that employed by any of those entities will be eligible for health care.

---

[41] Stephen Ball deposition transcript, taken February 12, 2019, pages 33 - 34.
[42] Stephen Ball deposition transcript, taken February 12, 2019, pages 32 - 33.

┌─────────────────────────────────────────────────────────────────────┐
│ ***CONCLUSION*** │
│ │
│ **Management common among of SCSC, BESC, the Justice Parties, and the other Justice** │
│ **related entities had the complete authority and control to authorize and accept the providing** │
│ **of operating expenses and services by and among all of the entities.** │
│ │
│ **This confirms the assertion that SCSC, BESC, the Justice Parties, and other Justice related** │
│ **entities operated as if they were one economic unit, totally under the control, supervision and** │
│ **authority of their common management for the benefit of their common ownership, the** │
│ **Justice family.** │
└─────────────────────────────────────────────────────────────────────┘

### *Accounts Receivable Write Off and Bad Debt Expense of SCSC*

For the year ended December 31, 2016, SCSC reported bad debt expense of $52,301,590 on its federal income tax return (see Exhibit VI).  The detailed general ledger report of SCSC reports, as of December 31, 2016, (1) outstanding customer balances, totaling $52,084,655.82, being written off as bad debt, (2) a journal entry to "Record bad debt" of $5,937.28, and (3) a journal entry to "Reverse CR00505" (for the reversal of an actual cash receipt) of $210,997.01.[43]  Combined these entries total $52,301,590.11, equal to the bad debt expense being reported by SCSC on its 2016 federal income tax return.

### *Court Order, dated November 20, 2018*

United States Magistrate Judge Robert W. Lehrburger issued an Order on Discovery, dated November 20, 2018, (the "Order on Discovery") that SCSC shall produce "Documents sufficient to show the customers, invoices and dates for the SCSC receivable balances written off for the year-end 2015, 2016 and 2017."[44]  I have not been provided with any invoices of SCSC related to the outstanding customer balances that were written off by SCSC as bad debt.  I have been advised that counsel for Algoma requested from SCSC, as a follow up to the Order on Discovery,  that SCSC produce information related to these accounts receivable reported bad debts, including copies of invoices, reports and other documents showing the dates and details of each of these customer amounts included in the bad debt expense of SCSC.

I have been provided with SCSC's detailed general ledger report for the period January 1, 2015 through December 31, 2017 and a Journal Drill Down as of December 31, 2016.  It is common practice for companies to maintain information and reports related to its customers and their sales, including but not limited to, customer files, credit applications, sales proposals, copies of invoices, and detailed reports on historical sales by customer.  Similarly, it is common practice for companies to maintain certain documents in its customer files who are slow paying or at risk for not paying an outstanding account receivable balance.  Such documents include, but are not limited to late notices from the company for unpaid balances, documentation of any phone discussions with the customer in attempt to collect any amounts, and email and/or letter correspondence from

---

[43] See SC-ESAL 023892 – 023897.

[44] Order on Discovery, dated November 20, 2018, issued by United States Magistrate Judge Robert W. Lehrburger in connection with this matter.

the company or its legal counsel regarding the collection efforts of such outstanding balance(s). In correspondence from counsel for SCSC, they indicated that "SCSC is not aware of and has not been able to locate any additional documents responsive" to this request.[45]

I have not received copies of any invoices, reports and other "documents sufficient to show the customers, invoices and dates for the SCSC receivables written off" and the Journal Drill Down report and the detailed general ledger reports did not disclose such information.

---

**_CONCLUSION_**

**SCSC has not provided documents and information sufficient to show the customers, invoices and dates for the SCSC accounts receivables written off as bad debt expense by SCSC as of December 31, 2016.**

---

I have analyzed the detailed general ledger report and the and Journal Drill Down report and have determined that there are at least fifteen (15) customers that make up the reported 2016 bad debt expense (see Exhibit XIII), of which seven (7) customers make up $48,609,951.72, or 92.9%, as follows:

| | |
|---|---|
| X Coal Energy & Resources | $ 20,416,149.31 |
| Ohio Power Company | 13,006,554.10 |
| Integrity Coal Sales | 8,097,282.31 |
| United States Steel | 5,804,846.36 |
| Duke Energy | 489,900.20 |
| VEPCO | 452,597.02 |
| CFC Resources | 342,622.42 |
| Total | $ 48,609,951.72 |

I have determined that (1) SCSC reported an accounts receivable balance as of December 31, 2015 of $53,659,299 (see Exhibit VII) and that (2) SCSC reported zero revenue on its federal income tax return for the year ended December 31, 2016 (see Exhibit VI); therefore, the accounts receivable being written off as bad debt as of December 31, 2016 would have been generated from sales on or before December 31, 2015.

---

[45] Email correspondence, dated December 21, 21018, from Melissa E. Byroade, special counsel of Kelley Dryer & Warren LLP, to Kip Bollin of Thompson Hine.

*Payments Received From Customers After December 31, 2015*

Based upon my analysis of the detailed general ledger report and certain bank statements of SCSC and BESC, I have determined the following:

1. On September 19, 2016, SCSC received from Integrity Coal Sales $5,000,000.00 as a wire transfer into its JP Morgan Chase Bank (account #0828) (see Exhibit XIV).

2. During the period February 10, 2016 through July 31, 2017, BESC received from Duke Energy at least thirty-four (34) payments, net of three (3) credits, totaling $11,057,441.38 (see Exhibit XVI).

3. During the period July 6, 2016 through October 24, 2017, BESC received from Integrity Coal Sales at least forty-eight (48) payments, net of three (3) credits, totaling $15,166,150.16 (see Exhibit XVI).

4. During the period November 15, 2017 through December 19, 2017, BESC received from X Coal & Resources at least four (4) payments, totaling $2,136,583.91 (see Exhibit XVI).

*Customer Payment Transferred to Related Parties of SCSC on September 19, 2016*

After the receipt of $5,000,000 from Integrity Coal Sales on September 19, 2016, on the same day, SCSC wires $2,500,000.00 out to Integrity Coal sales (see Exhibit XIV). The detailed general ledger report of SCSC only reports a net receipt of $2,500,000.00 into its checking account on September 19, 2016 along with a reduction (via credit) of accounts receivable of $60,996.48, a reduction (via credit) to an intercompany receivable account from Dynamic Energy of $647,899.44, and a reduction (via credit) to an intercompany receivable account from Bluestone Energy Sale of $1,791,104.08 (see Exhibit XV). No additional information has been provided as to why SCSC only reported a net receipt of $2,500,000 from Integrity Coal Sales or any explanation as to why the cash receipt was allocated between SCSC's accounts receivable balance and other intercompany receivable accounts.

After a series of transfers of this cash balance between accounts on September 19, 2016, SCSC ultimately transfers $2,500,000.00 out of its JP Morgan Chase savings account (account #5376) with $2,371,150.00 being transferred to the JP Morgan Chase operating account (account #8596) of BESC and $127,850.00 being transferred to a JP Morgan Chase account (account #7630) for or on behalf of A&G (see Exhibit XIV). BESC reported this cash receipt on September 19, 2016 along with a reduction (via credit) to its accounts receivable balance. No additional information or explanation has been provided as to why, even though the cash was deposited into the account of SCSC, did BESC report it as a payment against an outstanding accounts receivable balance rather than SCSC.

*Sales From Customers After December 31, 2015*

Based upon my analysis of the detailed general ledger report of BESC, I have determined the following:

1. During 2017, BESC recorded sales to X Coal Energy & Resources of at least $13,195,452.00 (see Exhibit X(b))

2. During 2016 and 2017, BESC recorded sales to Integrity Coal of at least $18,273,651.65 ($9,750,353.66 plus $8,470,129.59 plus $63,151.43 minus $9,983.00) (see Exhibit X(a), Exhibit X(b) and Exhibit X(c)).

3. During 2016 and 2017, BESC recorded sales to Duke Energy of at least $55,873.20 ($35,802.80 plus $20,070.40) (see Exhibit X(b)).

4. During 2016 and 2017, BESC recorded sales to American Electric Power of at least $166,480.50 ($167,269.00 plus $11,211.50 minus $12,000.00) (see Exhibit X(a), Exhibit X(b) and Exhibit X(c)).

*Financial Condition of Customers After December 31, 2015*

Based upon my research of the financial condition of the customers included in the SCSC's accounts receivable write off as bad debt as of December 31, 2016, I have determined the following:

1. Ohio Power Company is a currently operating subsidiary of American Electric Power Company, Inc. American Electric Power Company, Inc. is a publicly traded company with a current market capitalization value of its equity in excess of $40billion.[46]

2. United States Steel Corp is a publicly traded company with a current market capitalization value of its equity in excess of $4billion.[47]

3. X Coal Energy and Resources is a privately owned company that specializes in marketing metallurgical, thermal and anthracite coals from around with world and operates from 19 global offices.[48]

4. Integrity Coal Sales currently has offices in Pennsylvania, West Virginia and Kentucky and ships on average over 5 million tons of coal per year, serving 25 countries on five continents.[49]

---

[46] https://schwab.com
[47] https://schwab.com
[48] http://xcoal.com
[49] http://integritycoal.com

5. Duke Energy Corp is a publicly traded company with a current market capitalization value of its equity in excess of $64billion.[50]

6. VEPCO (Virginia Electric and Power Company) is a currently operating subsidiary of Dominion Resources. Dominion Resources is a publicly traded company with a current market capitalization value of its equity in excess of $59billion.[51]

No documentation or information has been provided (1) in support of any collection efforts made prior to December 31, 2016 nor (2) with respect to the basis to support that these amounts were, in fact, not collectible as of December 31, 2016.

---

**_CONCLUSION_**

**Based upon my analysis of the documents and information provided to me and available to me as of the date of this report, SCSC's bad debt expense of $52,301,590 reported on its federal income tax return for the year ended December 31, 2016 and recorded in its detailed general ledger report is unsupported and inappropriate as I have not been provided with any information or documents typically maintained by companies, including but not limited to copies of invoices, detailed reports of historical sales by customers, copies of late notices for unpaid balances, or any correspondence from SCSC or its legal counsel regarding collections efforts for any outstanding accounts receivable balances.**

---

**_Material Misstatement of BESC 2016 or 2017 Federal Income Tax Returns of BESC_**

The generally accepted formula for calculating retained earnings (deficit) is as follows:

       Retained earnings (deficit) - beginning of the period
           plus
       Net income for the period
           or minus
       Net loss for the period
           equals
       Retained earnings (deficit) – end of period.

In addition, retained earnings (deficit) beginning of the period should be exactly the same as retained earnings (deficit) – end of prior period.

---

[50] https://schwab.com
[51] https//finance.yahoo.com

As reported on BESC's 2017 federal income tax return, retained earnings (deficit) - beginning of year (January 1, 2017) would be calculated as follows (see Exbibit XII(a)):

| | |
|---|---|
| Retained earnings – December 31, 2017 | $3,388,174 |
| Plus: 2016 Net Loss | 4,033,815 |
| Retained Earnings – January 1, 2017 | $7,421,989 |

As reported on BESC's 2016 federal income tax return, retained earnings (deficit) – end of year (December 31, 2016) was a deficit of ($14,942,761) (see Exbibit XII(a)).  Accordingly, either BESC's 2016 federal income tax return or its 2017 federal income tax return are materially misstated by $22,364,750 ($7,421,989 v. ($14,942,761)).

Based upon my analysis of BESC's 2016 detailed general ledger, internal financial statements, and federal income tax return, I have identified a discrepancy whereby the federal tax return of BESC for 2016 reports the cost of coal purchases of $122,784,474 yet the detailed general ledger for the year ended December 31, 2016 reports $100,419,625[52], a difference of $22,364,849.

### Option #1

The preparer of BESC's 2017 federal income tax return erroneously misstated BESC's balance sheet as of December 31, 2017, overstating retained earnings (deficit) and understating intercompany accounts payable by $22,364,849.  Based upon this option, there would be no effect on the reported net income or loss for either 2016 or 2017. However, after correction, as of December 31, 2017, BESC's liabilities would have exceed its assets, an indicia that, as of December 31, 2017, BESC was insolvent

### Option #2

The net loss reported on BESC's 2016 federal income tax return was materially overstated, that BESC's 2016 tax return should have reflected net income of $60,423 (($22,304,426) plus $22,364,849) not a net loss of ($22,304,426), and that amended 2016 tax returns for BESC and for it sole shareholder, Jim Justice, need to be filed.

At the deposition of SCSC, Stephen Ball could not explain why there was a difference in excess of $22 million for cost of purchased coal on BESC's internal financial statements and BESC's federal income tax return for 2016.[53]

No information or explanation has been provided as to the reconciliation of the difference in the cost of coal purchases, and resulting net income/(net loss), reported by BESC for the year ended December 31, 2016 or the difference in retained earnings reported by BESC as of December 31, 2016 and December 31, 2017.

---

[52] See SC-ESAL 025064 - 025067.
[53] Stephen Ball deposition transcript, taken February 12, 2019, pages 46 - 48.

<div style="border:1px solid black; padding:10px">

***CONCLUSION***

**Based upon my analysis of the documents and information provided to me and available to me as of the date of this report, either BESC's 2016 federal income tax return or BESC's 2017 federal income tax return is materially misstated.**

</div>

### *Retained Deficit and Reported Losses of SCSC*

I have analyzed the federal income tax returns of SCSC for the years ended December 31, 2015, December 31, 2016 and December 31, 2017 (see Exhibit VI and Exhibit VII), which are included in the tax returns of its parent company, Southern Coal Sales.

Based upon my analysis, I have determined the following:

1. SCSC reported a net loss of ($12,787,273) for the year ended December 31, 2015 based upon total revenue of $37,504,152 and total expenses of $50,291,425 (see Exhibit VI).

2. SCSC reported a retained deficit of ($85,778,212) as of December 31, 2015 such that its liabilities exceeded its assets by such amount (see Exhibit VII); therefore, SCSC would have also had a retained deficit as of December 31, 2014 (year-end prior to the commencement of the Agreements with Algoma) of ($72,990,939) (($85,778,212) minus ($12,787,273)).

3. SCSC reported a net loss of ($53,581,713) for the year ended December 31, 2016 based upon zero revenue and $53,581,713 of expenses, including $1,280,123 of claimed operating expenses and $52,301,590 of bad debt expense (see Exhibit VI).

4. SCSC reported a retained earnings deficit of ($159,949,906) as of December 31, 2016 such that is liabilities exceeded its assets by such amount (see Exhibit VII).

5. SCSC reported a net loss of ($915,158) for the year ended December 31, 2017 based upon zero revenue and $915,158 of claimed operating expenses (see Exhibit VI).

6. SCSC reported a retained earnings deficit of ($160,561,993) as of December 31, 2017 such that is liabilities exceeded its assets by such amount (see Exhibit VII).

As discussed previously, SCSC reported zero revenue from the Agreements with Algoma on its federal income tax returns and detailed general ledger even though SCSC issued certain invoices to Algoma for transactions in connection with the Agreements and even though SCSC received all of the payments from Algoma in connection with the Agreements. Also, as discussed previously, after SCSC received these payments from Algoma, SCSC accounts, either on the same day or shortly thereafter, SCSC withdrew the same amount or comparable amounts and transferred all of such funds primarily to accounts of entities related to SCSC, including BESC, the Justice Parties, and the other Justice Related Entities.

<div style="border: 1px solid black; padding: 10px;">

***CONCLUSION***

**Based upon my analysis of the documents and information provided to me and available to me as of the date of this report, SCSC (1) reported net losses for each of the years ended December 31, 2015 through December 31, 2017, (2) reported a retained deficit as of December 31, 2015 through December 31, 2017, and (3) received all the payments from Algoma and, either on the same day or shortly thereafter, SCSC withdrew the same amount or comparable amounts and transferred all of such funds primarily to accounts of entities related to SCSC, including BESC, the Justice Parties, and the other Justice Related Entities.**

</div>

## COMPENSATION TO BE PAID FOR STUDY AND TESTIMONY

The firm of Applied Business Strategy LLC, including Mr. John M. Stark, is being compensated at its standard hourly rates, plus out-of-pocket expenses. Mr. Stark's rate is $350 per hour and professional staff rates range from $125 to $395 per hour.

## QUALIFICATIONS OF MR. STARK

I.  Curriculum Vitae, including publications authored, of Mr. Stark (see Exhibit B).

II. Listing of other cases in which Mr. Stark has testified as an expert at trial or by deposition during the preceding four years (see Exhibit C).

I assume no responsibility to update this report for events and circumstances occurring, or for receipt of additional information, after the date of this report, but reserve the right to do so.

Applied Business Strategy LLC

John M. Stark CPA/ABV, CFF
February 27, 2019